

FILED & ENTERED

JUL 03 2018

CLERK U.S. BANKRUPTCY COURT
Central District of California
BY wesley    DEPUTY CLERK

# UNITED STATES BANKRUPTCY COURT

## CENTRAL DISTRICT OF CALIFORNIA

## LOS ANGELES DIVISION

| | |
|---|---|
| In re:<br><br>Altadena Lincoln Crossing LLC<br><br><br><br><br><br><br>Debtor(s). | Case No.: 2:17-bk-14276-BB<br><br>CHAPTER 11<br><br>**FINDINGS OF FACT AND CONCLUSIONS OF LAW RESOLVING (IN PART) DEBTOR'S OBJECTIONS TO CLAIMS 9 AND 11 FILED BY EAST WEST BANK**<br><br>Date:      June 20, 2018<br>Time:      11:00 AM<br>Courtroom: 1539 |

The Court conducted evidentiary hearings on the objections of debtor and debtor in possession Altadena Lincoln Crossing LLC ("Debtor") to proofs of claim nos. 9 and 11 filed by secured creditor East West Bank ("EWB") on May 23, 2018, May 24, 2018 and June 20, 2018.  This memorandum sets forth the Court's findings of fact and conclusions of law in response to those objections.  For the reasons set forth below, this Court holds that the default interest that EWB seeks to collect from the Debtor constitutes an unenforceable penalty that may not be collected pursuant to California Civil Code section 1671(b).  Accordingly, claims nos. 9 and 11 (jointly, the "EWB

Claims") will be disallowed to the extent that these claims include default interest.  More specifically, with regard to claim no. 11, the total amount of the claim asserted by EWB (without deduction for any payments received that EWB received from Peter Mastan (the "BGM Trustee") in his capacity as chapter 11 trustee for BGM Pasadena, LLC in case no. 2:15-bk-27833-BB (the "BGM Case")) shall be recalculated without default interest (the "Recalculated Amount"), and EWB shall hold an allowed secured claim in this bankruptcy case for the amount, if any, by which the Recalculated Amount exceeds the payments that EWB received from Peter Mastan.

As this result means that the Debtor is the prevailing party with regard to its objections to the EWB Claims (jointly, the "Objections"), EWB shall not include in its calculations of the attorneys' fees that it seeks to recover as part of the EWB Claims any attorneys' fees or costs incurred in defending against the Objections, and the Debtor shall be entitled to a credit against any amounts that it will otherwise be due EWB on account of the EWB Claims for such amount as the Court may later determine constitutes its reasonable attorneys' fees and expenses for prosecuting the Objections.

## I

## FINDINGS OF FACT

1.      Commencing in or about mid-2004, the Debtor sought financing from EWB for the construction of a mixed use project in Altadena, California.  The process of negotiating the terms of the loan took a period of months.  The loan agreements went through a number of drafts.  The Debtor was represented by an attorney (Knapp) in connection with these negotiations.

2.      None of the witnesses who testified concerning the loan negotiation process can remember any discussions or negotiations concerning what the default interest would be in connection with the loan.   (EWB's witness, Robert Lo, testifies that he does not remember whether he and the Debtor discussed this issue [Lo Declaration [Doc. No. 446], p. 5, lines 10-11]; the Debtor's witness, Greg Galletly, testified that no

such discussions ever occurred [Supplemental Declaration of Greg Galletly [Doc. No. 444], p. 5 at lines 13-26].)  Accordingly, the Court finds that no such discussions or negotiations ever occurred. EWB placed this default interest rate in the draft loan documents that it gave to the Debtor, and this loan term was never changed.

3.      This is not suprising:  the Debtor's expert witness, Thomas Tarter, testified at trial that parties do not generally shop for loans based on what the default interest rate will be.  He explained that, at the inception of a loan, parties focus on what the nondefault rate of interest will be and rarely if ever discuss what the default rate of interest will be.  No other witness contradicted this testimony.

4.      The only recollection that any of the witnesses for either party had of discussions concerning default interest occurred in connection with the negotiation of the "Forbearance Agreements," as defined below.

5.      The Debtor did not put on evidence concerning an inequality of bargaining power at the inception of the loans.  Therefore, the Court does not find that there was an inequality of bargaining power at the inception of the loans.

6.      The Debtor obtained two loans from EWB:

a.      Claim No 9 (the "Larger Loan"):  a loan to finance the construction of a mixed use development located at and commonly known as 2180 through 2220 Lincoln Avenue and 377 Woodbury Road, located at the northeast corner of Lincoln Avenue and Woodbury Road in Altadena, California, (the "Property") in an original principal amount not to exceed $18,000,000, evidenced by a promissory note dated April 28, 2005 with a scheduled maturity date of August 1, 2006, and secured by a deed of trust against the Property recorded June 8, 2005; and

b.      Claim No. 11 (the "Smaller Loan"):  a loan to provide additional construction financing for the Property in an original principal amount not to exceed $2,500,000, evidenced by a promissory note dated May 15, 2007, with a scheduled maturity date of March 15, 2008, and secured by a deed of trust against the Property recorded May 25, 2007.

7.      The nondefault interest rate on the Larger Loan was 1 percent over a reference rate.  The default interest rate on that loan was 6 percent over the reference rate.  The nondefault interest rate on the Smaller Loan was 5 percent over a reference rate.  The default interest rate on that loan was 10 percent over the reference rate.  Thus, with regard to both loans, in the event of a default, the interest rate increased by 5 percent.

8.      Neither side presented any documents, testimony or other evidence of any kind to suggest that the choice of a 5 percent default rate resulted from any effort on the part of EWB or anyone else to quantify, estimate, approximate or compensate for any damages that might be expected to flow from a default with regard to either loan.  Neither side presented any testimony as to who at EWB selected this rate, when it was selected or why that rate was selected.  Accordingly, the Court finds that the choice of this default rate was not the result of anyone's endeavor to quantify, estimate, approximate or compensate for any damages that might be expected to flow from the Debtor's default and that it was EWB's practice during the relevant time period to utilize a 5 percent default rate whenever it made a construction loan, regardless of the size or type of the loan.

9.      The Debtor's principal, Greg Galletly, testified that a 5 percent default interest rate (or higher) was common for these kinds of loan at the time the loans were made.  Both the Debtor's expert witness, Thomas Tarter, and EWB's expert, Tom Hallock, agreed that a default interest rate of 5 percent was within the range of default interest rates commonly charged in the relevant industry during the time period in question.

10.     Mr. Galletly and two other insiders or affiliates of the Debtor executed guaranties in connection with the loans.  During the course of its cross-examination of Mr. Galletly, EWB introduced at trial evidence to support the contention, and this Court finds, that (a) the personal financial statements that Mr. Galletly provided to EWB in connection with this financing omitted material financial information, including the existence of a large judgment against him and other obligations that he had guaranteed at the time; and (b) adverse rulings have been made concerning financial improprieties by some of the guarantors in unrelated transactions or business ventures.  EWB acknowledged at trial that it did not know of these omissions and findings at the time it was negating the terms of the loans; EWB only learned this information after the Objections were filed and litigation commenced.  Therefore, EWB's decision to utilize a 5 percent default interest rate at the time the parties entered into the loans had nothing to do with and was not made in reliance upon any concerns that EWB may now have as to Mr. Galletly's character or that of any of the guarantors.

11.     The Debtor failed to repay the Larger Loan at its original maturity date. Thereafter, the Debtor and EWB entered into a number of written modification agreements and related documents that, among other things, increased the principal amount of the loan to $26,000,000 and extended the maturity date to February 2, 2009.

12.     Beginning in or about August of 2008, the Debtor and EWB entered into a series of short term forbearance agreements with regard to the Larger Loan (collectively, the "Forbearance Agreements"). The last of these agreements, the Thirteenth and Final Forbearance Agreement, was entered into as of February 10, 2016 and extended the maturity of the Larger Loan to June 23, 2016.  (That date was later extended by letter to November 15, 2016.)

13.     Although the Debtor complained about the accrued default interest, arguing that the amount was excessive [see Lo Declaration, p. 9, at lines 21-25], in each of the Forbearance Agreements, EWB agreed to extend the maturity date of the loan and the Debtor acknowledged the amounts then due, including the amount of the

then accrued default interest, and agreed to release any claims known or unknown

against EWB related to the loan.  The Forbearance Agreements also specified that the

loan would continue to accrue interest at the default interest rate, but that the Debtor

would make payments to EWB calculated at the nondefault rate during the term of the

forbearance, and, with the exception of the third forbearance agreement (which

contained no such provision),  that EWB would forgive all accrued default interest if the

Debtor paid the outstanding balance of the loan in full by the (new) maturity date (the

"Default Interest Forgiveness Provision").

14.    Robert Lo testified, and the Debtor did not dispute, that, each time the

parties negotiated a new Forbearance Agreement, EWB tried to delete the Default

Interest Forgiveness Provision, but the Debtor insisted that this provision be retained.

See Lo Declaration, p. 10, at lines 24-26.

15.    In Claim No. 9, EWB seeks an "Exit Fee" of $1,715,000.  EWB

acknowledged on the record at and before the time of trial that this figure is an error.

The correct amount of the exit fee should be $600,000.  Mr. Lo testified [Lo Declaration,

p. 12 at lines 26-28 & p. 13 at line 1], and the Debtor does not dispute that this amount

was really an "extension fee" that EWB normally collects at the time it enters into a

forbearance agreement.  In this case, the Debtor requested, and EWB agreed, to collect

this fee at maturity, rather than "up front."  The Court finds that this fee was intended to

compensate EWB for the administrative costs associated with entering into the

Forbearance Agreements and that it is enforceable.

16.    In or about January of 2015, the Debtor sold a portion of the Property and

paid EWB $10,000,000 toward the balance due on the First Loan.

17.    Pursuant to a compromise between EWB and the BGM Trustee in the

BGM Case, on or about June 29, 2017, the BGM Trustee paid EWB $2,402,731.25 on

account of amounts due under the Smaller Loan.

18.    The loan agreements include provisions that require the Debtor to pay

EWB's out-of-pocket costs for servicing or attempting to collect on the loan in the event

1  of default, including without limitation, reimbursing the lender for any out-of-pocket costs

2  that it incurs to discharge any taxes, liens, security interests, encumbrances and other

3  claims against the Property, any costs of insuring, maintaining and preserving the

4  Property; attorneys' fees and expenses; late charges; post-judgment collection services,

5  the cost of searching records, obtaining title reports (including foreclosure reports),

6  surveyor reports, appraisal fees, title insurance; fees due a foreclosure trustee; and

7  other court costs.  Accordingly, the default interest rate was not intended to compensate

8  EWB for any of these types of expenses.

9       19.    The loan agreements also provided for a late fee on any late or missed

10 payment.  The Court finds that this fee was intended to serve as compensation for any

11 additional administrative costs that EWB might have incurred in performing tasks related

12 to the servicing and processing of late payments (assuming that such tasks have not

13 been entirely automated). Accordingly, the Court finds that the default interest rate was

14 not intended to compensate EWB for these types of expenses.

15      20.    Mark Garmaise, one of EWB's experts, offered his expert opinion [in

16 Docket No. 442] that (a) one of the central purposes of default interest is to compensate

17 the lender for the heightened risk that defaulted loans carry of non-payment of the

18 loan's principal and interest; (b) in order to offset the increased risk of nonpayment in

19 the event of default at the inception of the loan (when construction was largely

20 incomplete), the default interest rate would have had to have been at least prime plus

21 11.45 percent; and (c) in order to offset the increased risk of nonpayment in the event of

22 default during the latter part of the forbearance period (when construction of several

23 structures was complete), the default interest rate would have had to have been at least

24 prime plus 8.56 percent.  Garmaise Declaration, p. 3, lines 6-25.  No party offered any

25 evidence to suggest that EWB engaged in an analysis of this type in connection with its

26 selection of a 5 percent default interest rate at any time, and the Court finds that EWB

27 did not engage in such an analysis in connection with its selection of the default interest

28 rate that would apply to the Debtor's loans.

21.     Dr. Garmaise made the foregoing calculations utilizing data for the two different time periods (the inception of the loans and during the forbearance period) by comparing (a) projections of a lender's anticipated percentage of recovery on loans that have not fallen into default discounted to present value with (b) projections of a lender's anticipated percentage of recovery on loans that have fallen into default discounted to present value.  He then opines that the lower projected recoveries on the defaulted loans result in a loss in the value of the loan equal to the amount of this difference and that a higher interest rate can be utilized to offset this loss in value.   In other words, Dr. Garmaise is opining about what the value of the loan would be once it has gone into default as compared with the value of the loan before it went into default.   The loss that a lender suffers from a default in Dr. Garmaise's analysis is the diminution in the value of the loan.  EWB did not offer any evidence or testimony as to how this diminution in value translates into any actual loss to or damage for EWB.  Were EWB to sell the loan, presumably, this diminution in value would translate into a reduction in the price at which EWB would be able to sell the loan, but EWB did not sell the loan, and counsel for EWB vehemently argued at trial that Dr. Garmaise's opinion should not be understood as testimony concerning the price at which EWB would be able to sell the loan after it fell into default.  However, the ease with which Dr. Garmaise was able to perform the calculations contained in his expert opinion demonstrates that a loss of this kind, if it can be characterized as a loss, would not be costly or difficult to estimate at the inception of a loan.

22.     Another of EWB's experts Tom Hallock [in Docket No. 440, on p. 4, at lines 20-22] testified that "Default interest compensates the lender for the increased risk of non-payment associated with an event of default" and that "It also compensates the lender for the increased cost associated with managing a defaulted loan."  He lists on pages 6 through 7 of his report several types of administrative costs that are incurred by a lender when a loan falls into default, including several types of fees and expenses that, under the terms of the parties' loan documents, are to be passed along to and paid

by the borrower (such as fees charged by engineers, appraisers and consultants, legal

fees, and insurance costs).  Among the types of administrative costs that Mr. Hallock

lists that are *not* separately recoverable from the Debtor under the loan documents are

increased loan loss reserves,[1] staff and senior management time devoted to managing,

overseeing and reporting on the loan and the loan relationship, increased regulatory

and audit oversight and potential reputational risk.

23.     No party offered any evidence to suggest that EWB considered any of the

possible administrative costs that Mr. Hallock identified in his report in connection with

its selection of a 5 percent default interest rate at any time, and the Court finds that

EWB did not consider any of these costs in connection with the selection of the default

interest rate that would apply to the Debtor's loans.

24.     Mr. Tarter testified at trial that some of the administrative costs that a

lender will incur when a loan goes into default rise with the size of the loan; others do

not.  For example, it does not cost more to generate a notice advising that a payment is

late or processing a late payment based on size of the missed payment.  Inspections or

appraisals might cost a bit more because the underlying properties will be larger, but it

will not cost 20 times more to inspect or appraise a property worth 20 times more.  And

staff or senior employee time will not cost more per hour because a loan is larger.

Although and management may be willing to devote more time to services and

oversight related to a larger loan due to the prospect of the lender's incurring a larger

loss if the loan is not repaid, but, again, the magnitude of the time increase is unlikely to

rise in strict correlation with the size of the loan.  Therefore, Mr. Tarter testified, and the

Court finds, that, if a lender is trying to select a default interest rate that will bear a

reasonable relationship to the range of actual damages that the parties could have

anticipated would flow from a breach at the time the loan is made, "one size does not fit

---

[1] The Court sustained the Debtor's evidentiary objections and its request to strike a declaration that EWB proffered from Miriam Galvan [Docket No. 447] on the subject of the impact of a loan's default on the reserves that the bank would be required to maintain on the ground that EWB had failed to disclose the identity of the declarant in response to a request from the Debtor for the names of witnesses with information on this issue.

all;" as the loan grows larger, the compensation afforded by any given default interest rate will grow to a point where it cannot be said to bear a reasonable relationship to this range of actual anticipated damage.

25.    The Court finds further, based on the testimony of Mr. Tarter, that it would not be costly or inconvenient for EWB to have calculated its actual administrative costs in overseeing and servicing a defaulted loan.  It would be difficult to predict with any degree of certainty at the inception of a loan how much these costs would prove to be later, but EWB could readily have kept track of such information by, for example, requiring its employees to keep timesheets to reflect how much time they spent overseeing or servicing which loans, and could have included provisions in the loan agreement passing these costs along to the Debtor as they accrued.

## II

## CONCLUSIONS OF LAW

1.    The Court's written tentative rulings did not include rulings on two sets of EWB's evidentiary objections to declarations from Greg Galletly and Gregory Salvato, Docket Nos. 308 and 309, respectively.  At the continued hearing held June 20, 2018, the Court made the following rulings on these evidentiary objections:

      a.    <u>Docket No. 308</u>:  (1) Sustain (best evidence rule); (2) Overrule (court will treat testimony as being to the best of declarant's knowledge);

(3) Overrule; (4) Overrule; (5) Sustain to the extent that declarant is offering testimony concerning any conversation to which he was not a party; (6) Overrule; (7) Overrule; (8) Objection withdrawn on the record at the time of trial; (9) Sustain (best evidence rule); (10) Sustain (best evidence rule); (11) Sustain (best evidence rule); (12) Overrule (court will treat testimony as being to the best of declarant's knowledge);

(13) Sustain (legal opinion); (14) Overrule (court will treat testimony as

1    being to the best of declarant's knowledge); (15) Overrule; (16) Overrule;

2    and (17) Objection withdrawn on the record at the time of trial.

3

4        b.  <u>Docket No. 309</u>:  (1) Sustain; (2) Sustain; (3) Sustain; (4) Sustain;

5        (5) Overrule; (6) Overrule; (7) Sustain; (8) Overrule; (9) Overrule;

6        (10) Overrule; (11) Overrule; and (12) Overrule.

7    2.    Bankruptcy Code section 506(b) permits a secured creditor to include in

8 the amount of its secured claim "interest on such claim, and any reasonable fees, costs

9 or charges provided for under the agreement."

10    3.    With regard to default interest, the Ninth Circuit has held that a default

11 interest rate should be enforced, unless the default interest provision is not enforceable

12 under applicable nonbankruptcy law.  <u>See</u> <u>General Electric Capital Corp. v. Future</u>

13 <u>Media Productions, Inc.</u>, 547 F.3d 956, 961 (9th Cir. 2008).

14    4.    California case law analyzes the enforceability of default interest

15 provisions in a commercial, nonconsumer contract under California Civil Code Section

16 1671(b), which provides that: "a provision in a contract liquidating the damages for the

17 breach of the contract is valid unless the party seeking to invalidate the provision

18 establishes that the provision was unreasonable under the circumstances existing at the

19 time the contract was made." See Cal. Civ. Code § 1671(b).

20    5.    As the Debtor is challenging the enforceability of EWB's default interest

21 provisions, the Debtor bears the burden of proving that the default interest provisions

22 were not reasonable based on circumstances existing at the time.

23    6.    "A liquidated damages clause will generally be considered unreasonable,

24 and hence unenforceable under section 1671(b), if it bears no reasonable relationship

25 to the range of actual damages that the parties could have anticipated would flow from a

26 breach" at the time the contract was made. <u>Cal. Bank & Trust v. Shilo Inn, Seaside</u>

27 <u>East, LLC</u>, 2012 U.S.Dist.LEXIS 163134 at *12, 2012 WL 5605589 (D. Or. Nov. 15,

28 2012) (quoting <u>Ridgley v. Topa Thrift & Loan Ass'n</u>, 17 Cal.4th 970, 977 (1988)).  <u>See</u>

also <u>Morris v. Redwood Empire Bancorp</u>, 128 Cal.App.4th 1305, 1314 (2005) ("Absent a relationship between the liquidated damages and the damages the parties anticipated would result from a breach, a liquidated damages clause will be construed as an unenforceable penalty").

7.    The liquidated damages amount "must represent the result of a reasonable endeavor by the parties to estimate a fair average compensation for any loss that may be sustained." <u>Garrett v. Coast & Southern Fed. Sav. & Loan Assn.</u>, 9 Cal. 3d 731, 739 (Cal. 1973) ( superseded by statute on other grounds).

8.    "An amount disproportionate to the anticipated damages is termed a 'penalty.' A contractual provision imposing a 'penalty' is ineffective, and the wronged party can collect only the actual damages sustained." <u>Perdue v. Crocker Nat'l Bank</u>, 38 Cal.3d 913, 931 (Cal. 1985); <u>see</u> <u>also</u> <u>Ridgley</u>, <u>supra</u>, 17 Cal. 4th at 977-78 ("[A]ny provision by which money or property would be forfeited without regard to the actual damage suffered would be an unenforceable penalty" [citation omitted]).

9.    In describing what it meant by the "actual damages" resulting from a borrower's default, the California Supreme Court in <u>Garrett</u> provided the following explanation:  "The lender's charges could be fairly measured by the period of time the money was wrongfully withheld plus the administrative costs reasonably related to collecting and accounting for a late payment." <u>Garrett</u>, <u>supra</u>, at p. 741 (citing <u>Farthing v. San Mateo Clinic</u>, 143 Cal. App. 2d 385, 299 P.2d 977 (1956)).

10.    As the reasonableness of a default interest provision must be determined based on the facts and circumstances that existed at the time the parties entered into the contract that contained the default interest provision, the amount of the actual damages that EWB may have sustained later based on the Debtor's breaches is irrelevant.  <u>California Bank & Trust</u>, <u>supra</u>; <u>El Central Mall, LLC v. Payless ShoeSource, Inc.</u>, 174 Cal. App. 4th 58, 63 (2009) (quoting the Law Review Commission comments to section 1671(b) ("The validity of the liquidated damages provision depends on its reasonableness at the time the contract was made and not as it appears in retrospect.

1   Accordingly, the amount of damages actually suffered has no bearing on the validity of

2   the liquidated damages provision")).

3       11.    Accordingly, the Court has disregarded as irrelevant the portions of the Lo

4   Declaration that discuss the actual events that occurred after the signing of the parties'

5   loan agreements.  The Court has also disregarded as irrelevant the total amount of

6   default interest that eventually accrued over a period of years based on the language of

7   the parties' agreements.  The standard is whether the default interest provisions were

8   the result of a reasonable endeavor at the time the parties entered into the agreement

9   to estimate a fair average compensation for any loss that might later be suffered and not

10  whether the default interest figure eventually produced appears after the fact to be

11  reasonable in relation to the principal amount of the loan.

12      12.    The Court finds that the relevant period of time for assessing the

13  reasonableness of the default interest provisions is at the inception of the loans, not at

14  the multiple later points in time at which the parties entered into the Forbearance

15  Agreements.  The Forbearance Agreements merely carried forward the Debtor's original

16  liability for the payment of default interest and did not create any new obligations.

17      13.    The Court rejects EWB's argument that the acknowledgments and waivers

18  contained in the Forbearance Agreements bar the Debtor from challenging the default

19  interest provisions at this point.  EWB has cited no authority for the proposition that an

20  unenforceable penalty will be rendered enforceable if the borrower signs an

21  acknowledgment that it is obligated to pay the penalty or if the borrower agrees to waive

22  any defenses it may have to the obligation to pay this amount.  Moreover, in each

23  Forbearance Agreement (with the exception of the third), EWB agreed to forgive default

24  interest provided the obligation was repaid at maturity, effectively creating a new

25  liquidated damages provision that would need to be examined to ascertain whether it

26  was an unenforceable penalty.  As the amount of accrued default interest was larger

27  each time EWB and the Debtor executed a new forbearance agreement, it would

28  become harder and harder for the Court to find a reasonable relationship between the

liquidated damages amount and any damages that the parties anticipated would flow from breach of the Forbearance Agreement.  The Court finds no reason to conclude that the drafters of section 1671(b), who intended for the analysis to be performed at the inception of a loan, would have meant for the court to re-examine the result produced by a liquidated damage provision each time the parties extended the maturity date of a loan or any other due date for performance.

14.    Notwithstanding the foregoing, as the analysis that the Court is called upon to perform is to determine whether the default interest provisions were intended as compensation for anticipated loss or as a penalty to incentivize the Debtor to perform in a timely manner, EWB's willingness to defer and forgive default interest if the obligation was paid in a timely manner in entering into the Forbearance Agreements is relevant, as it bears upon and reflects EWB's understanding of and intentions with regard to the purpose of the default interest provisions.

15.    The Court finds that, while it might be relevant to the issue of reasonableness to know that other lenders typically charge 5 percent or more as default interest on construction loans, it is not dispositive.  Industry standard or custom in the industry is different from reasonableness in this context.  (The Court is not in a position to determine, and the parties have not litigated whether, lenders make a practice of imposing a default interest rate that is intended to function as a penalty to incentivize borrowers to pay in a timely fashion or whether they select default interest rates in an effort to provide compensation for anticipated losses.)  The Law Revision Commission comments concerning the adoption of section 1671(b) identify a number of factors for the court to consider on a case-by-case basis in connection with its reasonableness analysis (none of which factors is whether the rate charged was consistent with the rates charged by other lenders in the relevant industry).  Those factors are:

a. The relationship that the contract damages bears to the range of harm that reasonably can be anticipated;

b. The relative equality of the bargaining power of the parties;

c. Whether the parties were represented by lawyers or brokers when the contract was made;

d. The anticipation that proof of actual damages would be costly or inconvenient; and

e. The difficulty of proving causation and foreseeability.

16. The Debtor has established that the selection of the 5 percent default interest rate was not the result of a reasonable endeavor by the parties to estimate a fair average compensation for any loss that might be suffered by EWB in the event of a default, in that the Debtor has established that there was no endeavor at all by either of the parties at the time they entered into the loans, let alone a reasonable endeavor, to estimate any losses that might be suffered by EWB in the event of a default. The default interest provision was selected arbitrarily pursuant to EWB's standard practice of utilizing a default interest rate in this amount.

17. In the alternative, if it is appropriate for the Court to consider facts and circumstances that the parties could have, but did not, contemplate at the time they entered into the loan for the purpose of assessing whether the default interest rate that they selected arbitrarily can be characterized as reasonable, the Court finds that the Debtor has carried its burden of proving that the default interest rate contained in the loan agreements was not reasonable for the reasons discussed below.

18. In light of the principal amount of the obligation (initially $18,000,000; later $26,000,000), the amount of default interest that would result from a 5 percent default interest rate is grossly disproportionate to any administrative costs or other actual damages not already being passed along to the Debtor under separate provisions of the loan agreement that EWB could reasonably have anticipated at the time the loan was made. The magnitude of the default interest to be charged as liquidated damages in the event of default could only be characterized as reasonable in comparison to EWB's anticipated losses or damages if the Court were to accept EWB's argument that the type of diminution in value described by Dr. Garmaise (the "Loss in Value") should be

1    included in the calculation.  But for this component of alleged loss, there could not be a

2    reasonable relationship between the range of harm that might reasonably be anticipated

3    (and not already charged to the Debtor under the loan agreements) and the default

4    interest charges to be imposed under the loan agreements.

5        19.    None of the cases that interpret Cal. Civ. Code section 1671(b) cited by

6    the parties or that the Court was able to locate provides any support for the conclusion

7    that default interest can be justified by consideration of the kind of Loss in Value

8    identified by Dr. Garmaise.  It is true that cases applying section 1671(b) talk about

9    compensating the lender for the risk that it will incur certain kinds of losses, but the

10   types of losses that these cases discuss, if and when they occur, are actual damages,

11   expenses or out-of-pocket costs, not diminutions in value that result solely from a higher

12   degree of risk.

13       20.    The Court requested post-trial briefs from the parties on this issue, and

14   EWB cited the following cases as support for the proposition that a Loss in Value should

15   be taken into consideration in applying section 1671(b):[2]  Edwards v. Symbolic Intern.,

16   Inc., Case No. 07-CV-1826-JMA, 2009 WL 1178662 (S.D. Cal. April 30, 2009);

17   Radisson Hotels Intern., Inc. v. Majestic Towers, Inc., 488 F. Supp. 2d 952 (C.D. Cal.

18   2007); Premier Golf Properties, LP, 564 B.R. 660 (Bankr. S.D. Cal. 2016); UPS Store,

19   Inc. v. Hagan, Case No. 14-cv-1210, 2016 WL 1659188 (S.D.N.Y. Mar. 15, 2106); and

20   Wells Fargo Bank Northwest v. Ryan Intern. Airlines, Inc., Case No. CV 09-03489-AHM

21   (JWJx), 2011 WL 13177285 (C.D. Cal. Apr. 27, 2011).  None of these cases actually

22   addresses the issue raised by the Court, and none of these cases supports the

23   conclusion that Loss in Value of the kind identified by Dr. Garmaise should be taken into

24   consideration in an analysis under section 1671(b).

25       21.    In the Edwards case, the liquidated damage clause in question was the

26   seller's right to retain the buyer's 10 percent deposit in the event that the buyer failed to

27

28   _____

[2] EWB also cited two cases from other states that EWB claims support the proposition that it is permissible to charge default interest as compensation for increased risk of non-payment after default.  The Court has not considered these cases as they are not decided under section 1671(b).

-16-

perform under an agreement to purchase a 1959 Ferrari for $3.1 million.  In reaching

the decision that the liquidated damage provision was enforceable under section

1671(b), the court identified various possible types of damages that the seller would

suffer if the buyer failed to perform.  The seller had already put down its own

nonrefundable $200,000 deposit in order to acquire the vehicle; if the buyer failed to

perform, the seller would be required to pay $2,785,000 to purchase the vehicle (which

was more than the seller believed the vehicle was worth); and seller would lose its

anticipated profit of $300,000 if the buyer failed to perform.  The Edwards case has

nothing to do with whether an increased risk of nonpayment after default is an

appropriate element of loss to consider in an analysis under section 1671(b).

22.    In Radisson, the liquidated damage clause in question required a hotel

operator who had defaulted under the terms of its licensing agreement with Radisson

Hotels to pay two years of lost royalties in the event there was an early termination of

the agreement.  Radisson argued that this amount was designed to estimate the

revenue/future royalties that would be lost by Radisson while it searches for a

replacement franchisee (which, on the average would take two years to accomplish).

Again, this case has nothing to do with the issue at hand.  The anticipated losses here

relate to the actual out-of-pocket damages that reasonably could be expected to flow

from the breach.

23.    Premier Golf cannot be characterized as support for EWB's position

either.  In that case, the borrower owed a lender approximately $15.3 million, consisting

of approximately $10.8 million in principal, $3 million in (nondefault) interest and $1.4

million in legal fees.  The borrower filed bankruptcy, but never confirmed a plan.

Instead, its first bankruptcy case was dismissed pursuant to a settlement

agreement/structured dismissal approved by the bankruptcy court.  Under that

settlement agreement, the debtor would be entitled to pay off the amounts due the

lender with a discount of approximately $6.8M if it, among other things, (1) made a lump

sum payment of $8.5M by a date certain and (2) remained current on the payment of its

real property taxes.  The debtor failed to pay $1.7 million of its real property taxes on time and failed to make the lump sum payment when due.  Instead, it filed a second bankruptcy case and tried to cure and reinstate its obligations under the settlement agreement and retain the ability to discharge the debt in exchange for a payment in the reduced amount.  The bankruptcy court rejected this strategy and held that the loss of the conditional discount was not a penalty; the debtor owed the entirety of the larger amount (as to which there was no issue of enforceability).  It was not a penalty to impose conditions under which the lender was willing to discount the amount that would otherwise be due.

24.    In the portion of the <u>Premier Golf</u> opinion that applies section 1671(b) to decide whether the debtor's obligation to pay an additional $6.8 million can be characterized as an unenforceable penalty for failing to pay a $1.7 million tax bill, the Court found the required reasonable relationship between the charge and the lender's anticipated loss in that the failure to pay real property taxes could have resulted in the property being sold at a tax sale and the lender's losing the entirety of its collateral.  Once again, this is a very different type of fact pattern than the instant case.

25.    <u>UPS v. Hagen</u> differs little from the <u>Radisson</u> case discussed above and relies heavily on its holding.  As in <u>Radisson</u>, the liquidated damages provision in <u>UPS v. Hagen</u> provided for up to two years of royalties in the event of an early termination of the parties' agreements.  Hagen argued that these damages were excessive because there were other franchisees nearby whose stores might well have gotten more business when his store closed, making up any lost royalties.  The court rejected Hagen's attempt to look at what actually happened after the breach, and noted that his mere speculation that UPS might have recouped its lost royalties through other franchisees did not establish that the liquidated damage clause was unreasonable at the time it was made.  Again, any lost royalties that UPS might have suffered in the event of an early termination of its contract are actual cognizable damages--a reduced amount of cash flow coming into the company.  How does the holding of this case

support the conclusion that the Court should consider increased risk in its 1671(b) analysis?

26.    <u>Wells Fargo Bank v. Ryan Intern. Airlines</u> is similarly useless as support for EWB's position.  In that case, the liquidated damage provision was enforceable because it bore a reasonable relationship to the range of harm that might be anticipated, and the harm in question was "loss of new and additional rental income, significant transactional costs and loss of goodwill," among other things.  This case does not stand for the proposition that a lender's anticipated harms for the purpose of a section 1671(b) analysis include a higher risk of nonpayment after a borrower defaults.

27.    The Debtor's post-trial brief, on the other hand, cited to a case that does appear to bear on the issue raised by the Court:  <u>In re Aero Drive Holdings, LLP</u>, Case No. 16-03135-MM, 2017 WL 2712961 (Bankr. S.D. Cal. 2017).  In that case, the debtor proposed a plan in which it sought to pay its secured lender in full.  "The most hotly contested issue" in the plan proceeding was whether, in order to pay the lender in full, the debtor should be required to pay accrued default interest.  (When the debtor defaulted on its obligations under the loan agreement, the lender had increased the debtor's interest rate by 5 percent from 5.977 percent to 10.977 percent.)

28.    The Court in <u>Aero Drive</u> analyzed the issue under Cal. Civ. Code section 1671(b).  The lender argued that the default interest rate was reasonable within the meaning of section 1671(b) because it was necessary to compensate the lender for the additional risk and expenses upon default that are necessarily triggered or incurred when a loan changes from one that is performing into one that is in default.  In rejecting this argument, the bankruptcy court in <u>Aero Drive</u> noted that the risky aspects of the loan (that it was secured by a ground lease and that debtor's income relied on a franchise agreement) "were not generated by the default.  Rather, these risks were present throughout the Loan, even when the 5.77 [nondefault] interest rate applied."  Further, the Court noted that the parties' agreement already had numerous provisions that protected the lender from additional perils and overhead costs in the case of

breach, including funding reserve and escrow accounts, late charges, a defeasance fee and a broad indemnity clause that covered all costs incurred in connection with securing the debtor's ongoing performance.

29.     The Court in <u>Aero Drive</u> also rejected the lender's argument under <u>Thompson v. Gorner</u>, 104 Cal. 168, 169 (1894), that the enforceability of a default interest provision should not be analyzed under section 1671(b), because it is, in substance, an alternate form of performance and not a liquidated damages clause.  The evidence admitted at trial did not show that the parties negotiated the default interest provision in exchange for an agreement to give the Debtor a lower rate of interest at the inception of the loan or that the default interest provision was intended to provide the debtor with a "free rational choice" as to how to perform its obligations when the loan was made.  Applying the California Supreme Court's much later ruling in <u>Garrett</u>, 9 Cal. 3d at 738, the court in <u>Aero Drive</u> held that, when the contract provides for an additional charge contingent on breach of the contract, the provision is a liquidated damages clause, not an alternative form of performance, and should be analyzed as such.   The same is true in the instant case.

30.     In <u>Aero Drive</u>, because the risks had not increased since the inception of the loan and most, if not all, of the reasonably foreseeable consequences or damages attributable to default were already to be passed along to the borrower in other provisions of the agreement, the court in <u>Aero Drive</u> found that the default interest had nothing to do with covering expenses or compensating for additional risk, but was intended instead to increase revenue.  The Court agrees with the Debtor that the facts of this case closely resemble those of <u>Aero Drive</u> and that the same result should pertain.

31.     Moreover, there is no reason to believe, in this case or in any case, that a borrower's default *increases* the risk that a lender will not receive payment of its principal.  Such a reading of Dr. Garmaise's report is an invitation to the court to fall into the trap of confusing correlation with causation.  The only conclusion that this court can

1   legitimately draw from Dr. Garmaise's report is that, as a statistical matter, lenders

2   recover less on loans that fall into default, but his report does not have any tendency

3   whatsoever to establish that defaults *cause* a loss of principal or even a greater risk of

4   loss of principal.  In fact, as a logical matter, it is equally if not more likely that the causal

5   relationship is the other way around, namely, that a borrower who lacks the ability to

6   repay a loan in full or who owns collateral that will not produce enough to pay off the

7   debt in full through sale, foreclosure or refinancing is more likely to default than a

8   borrower who has sufficient resources to pay off the loan either from other sources of

9   cash or by monetizing the value of the collateral.  The factors that lead a borrower to fall

10  into the former camp (borrowers who can pay) rather than the latter camp (borrowers

11  who cannot pay) are likely to be present at the inception of the loan and are not

12  themselves *caused* by the borrower's default.  Only when the loan agreement itself

13  imposes adverse financial consequences after a borrower defaults, as, for example, by

14  increasing the interest rate by 5 percent, does the default itself make the borrower's

15  financial condition more bleak than it already was.[3]

16          32.     Therefore, the Court rejects the argument that it is appropriate to consider

17  in a section 1671(b) analysis an increased risk of loss resulting from a borrower's

18  default or any perceived diminution in the value of the loan attributable to such default.

19  This is not the kind of damage, harm or loss that it is permissible to use a liquidated

20  damage provision to protect against.  As the loan agreements between the parties pass

21  along most of the remaining types of costs that might result from a borrower's default,

22  the Court finds that the default interest provisions in the loan agreements do not have a

23  reasonable relationship to the range of actual damages that the parties could have

24  anticipated would flow from a breach at the time the contracts were made.  To the

25

26  [3] In fairness to Dr. Garmaise, he does not purport to testify that a default *causes* or creates a higher risk of loss to the
    lender.  He opines merely that "a payment default is associated with a dramatically heightened risk of foreclosure."
27  See Docket No. 442, Exhibit 54, page 12 (internal page 2 of the Garmaise expert opinion).  His expert report
    explains why someone calculating the value of a debt could place a lower value on it if the debt had fallen into
28  default as of the time of valuation and what interest rate would have to be added to the debt to offset the amount of
    this decline.  The Court has no quarrel with Dr. Garmaise's calculations, but, based on its review of the applicable
    case law, the Court does not believe that it has any relevance to an analysis under section 1671(b).

contrary, the Court finds that they were intended to serve as a penalty to give the Debtor a hefty incentive not to default under the agreements.  Therefore, the default interest provisions contained in the parties' agreements are not enforceable.

## IV

## FURTHER PROCEEDINGS

1.    Based on the foregoing, the Court sustains the Objections to the extent that EWB seeks to include default interest or an "exit fee" of more than $600,000 in the amount of its secured claims.  The Court overrules the Objections to the extent that they seek to have disallowed EWB's exit fee of $600,000 or its late charges.  With regard to claim no. 11, EWB will need to recalculate the total amount of its claim without default interest and without deducting any payment received from the BGM Trustee.  If the amount paid by the BGM Trustee is less than the Recalculated Amount, EWB shall be entitled to assert a secured claim in this chapter 11 case for the difference.

2.    Not later than July 31, 2018:

a. EWB shall file and serve one or more declarations setting forth its calculation of the attorneys' fees and costs that it is entitled to recover as part of its secured claims, which declarations shall include as attachments copies of time records reflecting the relevant services. As the Debtor is the prevailing party with regard to the Objections, these calculations should not include fees or costs incurred in connection with litigation of the Objections;

b. the Debtor should file and serve a motion for attorneys' fees and costs as the prevailing party with regard to the Objections (the "Debtor's Fee Motion"), which motion should be accompanied by one or more declarations authenticating and attaching time records for the relevant services; and

c. Unless EWB advises the Debtor by July 9, 2018 that it does not intend to assert a claim for actual damages, each of the parties

shall file a memorandum of points and authorities on the issue of
whether a lender whose default interest provisions have been
stricken as an unenforceable penalty under section 1671(b) is
nevertheless entitled to recover as actual (rather than liquidated)
damages any damages proximately caused by its borrower's
default in excess of the amounts that the Debtor is already
required to pay under the parties' loan agreements.

3.      Not later than August 15, 2018:  (a) the Debtor may file and serve an
opposition to EWB's request for payment of attorneys' fees; and (b) EWB may file and
serve an opposition to the Debtor's Fee Motion.

4.      Not later than August 22, 2018:  (a) EWB may file and serve a reply to the
Debtor's opposition to its attorneys' fee request; and (b) the Debtor may file and serve a
reply to EWB's opposition to the Debtor's Fee Motion.

5.      The Court will conduct a hearing on August 29, 2018 at 2:00 p.m. on:
(a) EWB's request to include attorneys' fees in the amount of its secured claims;
(b) the Debtor's Fee Motion; and (c) the issue identified in paragraph 2(c) above.

6.      Once the Court has determined the amount of attorneys' fees and costs to
which the Debtor is entitled as the prevailing party with regard to the Objections, the
allowed amount of the EWB Claims shall be reduced by this amount.

# # #

Date: July 3, 2018

Sheri Bluebond
United States Bankruptcy Judge