1  TIMOTHY J. YOO (SBN 155531)
   tjy@lnbyb.com
2  EVE H. KARASIK (SBN 155356)
   ehk@lnbyb.com
3  JEFFREY S. KWONG (SBN 288239)
   jsk@lnbyb.com
4  LEVENE, NEALE, BENDER, YOO & BRILL L.L.P.
   10250 Constellation Boulevard, Suite 1700
5  Los Angeles, California 90067
   Telephone: (310) 229-1234
6  Facsimile: (310) 229-1244

7  Attorneys for Jason Rund
   Chapter 7 Trustee
8

9

10              **UNITED STATES BANKRUPTCY COURT**

11              **CENTRAL DISTRICT OF CALIFORNIA**

12                   **LOS ANGELES DIVISION**

13

14  In re                              Case No. 2:17-bk-14276-BB

15  ALTADENA LINCOLN CROSSING LLC, a
    Delaware limited liability company,   Chapter 7
16

17          Debtor.                     **CHAPTER 7 TRUSTEE'S
                                        OPPOSITION TO MOTION FOR
18                                      RECONSIDERATION OF "ORDER
                                        DENYING APPLICATION BY THE
19                                      GEORGE GARIKIAN LIVING TRUST
                                        FOR ALLOWANCE AND PAYMENT
20                                      OF ADMINISTRATIVE EXPENSES . . .
                                        ." [DOC. NO. 1116]; DECLARATION
21                                      OF JASON RUND IN SUPPORT
                                        THEREOF**
22
                                        Date:  August 26, 2020
23                                      Time:  10:00 a.m.
                                        Place: Courtroom 1539
24                                             255 E. Temple Street
                                             Los Angeles, CA 90012
25

26

27

28

# TABLE OF CONTENTS

I.    INTRODUCTION ..................................................................................................2

II.    STATEMENT OF FACTS .....................................................................................2

III.    ARGUMENT ........................................................................................................6

A.    No Valid Substantive Reasons Exist For The Court To Vacate The Admin Order. .........8

1.    Garikian's Argument That The Court Erred In Failing To Consider Evidence Regarding Extension Of The Outside Termination Date Should Be Rejected. .....................9

2.    Garikian's Argument That The Settlement Agreement Was Effective To Bind The Estate Prior To The Court's Entry Of A Confirmation Order Should Be Rejected. .............9

3.    Garikian's Argument That The Court Erred In Failing To Consider The Steps Taken By The Parties Toward Implementation Of The Settlement Agreement Should Be Rejected. ...................................................................................................................12

4.    Garikian's Argument That The Court Erred In Finding That The Appointment Of A Trustee Was Not An Anticipatory Breach Of The Settlement Agreement Should Be Rejected. ...................................................................................................................13

5.    Garikian's Argument That The Court Erred In Finding That "No Benefit To The Estate" Resulted From The Settlement Agreement Should Be Rejected. ...........................15

6.    Garikian's Argument That The Court Erred In Finding That The "Law Of The Case" Doctrine Is Applicable Should Be Rejected. .......................................................17

IV.    CONCLUSION ....................................................................................................18

DECLARATION OF JASON RUND ..................................................................................19

# TABLE OF AUTHORITIES

**Page(s)**

**Federal Cases**

*In re Branam*,
226 B.R. 45 (9th Cir. BAP 1998) ................................................................................ 7

*Central Trust Co. v. Chicago Auditorium Ass'n*,
240 U.S. 581 (1916) ................................................................................................ 13

*In re Colortex Indust., Inc.*,
19 F.3d 1371 (11th Cir. 1994) ................................................................................ 15

*In re Dant & Russell, Inc.*,
853 F.2d 700 (9th Cir. 1988) .................................................................................. 15

*In re Dennis Ponte, Inc.*,
61 B.R. 296 (B.A.P. 9th Cir. 1986) ......................................................................... 16

*Frietsch v. Refco, Inc.*,
56 F.3d 825 (7th Cir. 1995) .................................................................................. 7, 8

*In re Grand Union Co.*,
266 B.R. 621 (Bankr. D.N.J. 2001) ......................................................................... 16

*Matter of H.L.S. Energy Co., Inc.*,
151 F.3d 434 (5th Cir. 1998) ................................................................................. 16

*Hayes v. Palm Seedlings Partners-A (In re Agricultural Research and Tech.
Group, Inc.)*,
916 F.2d 528 (9th Cir. 1990) ................................................................................... 6

*In re Kadjevich*,
220 F.3d 1016 (9th Cir. 2000) ............................................................................... 16

*In re Kellogg*,
197 F.3d 1116 (11th Cir. 1999) ............................................................................... 6

*Matter v. Jartran Inc.*,
732 F.2d 584 (7th Cir. 1984) ................................................................................. 16

*McDowell v. Calderon*,
197 F.3d 1253 & 1255 (9th Cir. 1999) ..................................................................... 6

*In re Merry-Go-Round Enterprises, Inc.*,
180 F.3d 149 (4th Cir. 1999) ........................................................................... 11, 16

*MGIC Indemnity Corp. v. Weisman*,
803 F.2d 500 (9th Cir. 1986) ............................................................................... 6, 8

*In re Patient Educ. Media, Inc.*,
  221 B.R. 97 (Bankr. S.D.N.Y. 1998) ...................................................................... 16

*In re Pilgrim's Pride Corp.*,
  442 B.R. 522 (Bankr. N.D. Tex. 2010) .................................................................. 17

*Reading Co. v. Brown*,
  391 U.S. 471, 88 S.Ct. 1759, 20 L.Ed.2d 751 (1968) ........................................ 16

*Matter of Reese*,
  91 F. 3d 37 (7th Cir. 1996) ............................................................................... 7, 8

*In re Romberger*,
  150 B.R. 125 (Bankr. M.D. Pa. 1992) .................................................................. 10

*In re Sundquist*,
  570 B.R. 92 (Bankr. E.D. Cal. 2017) ................................................................... 17

**California Cases**

*Crescenta Valley Moose Lodge No. 808 v. Bunt*,
  8 Cal.App.3d 682, 87 Cal.Rptr. 428 (2d Dist.1970) ........................................... 11

*De Burgh v. De Burgh*,
  39 Cal. 2d 858, 250 P.2d 598 (1952) .................................................................. 12

*Jeppi v. Brockman Holding Co.*,
  34 Cal. 2d 11 (1949) ........................................................................................... 14

**Federal Statutes**

Bankruptcy Code
  § 503(b)(1)(A) ................................................................................................ 15, 16
  § 1129(a) ............................................................................................................. 15

**Other Authorities**

Federal Rule of Bankruptcy Procedure 9023 ............................................................ 2

Federal Rule of Civil Procedure Rule 59 ................................................................... 2

Jason Rund, the Chapter 7 trustee (the "Trustee") for the bankruptcy estate (the "Estate") of Altadena Lincoln Crossing, LLC (the "Debtor"), hereby respectfully submits this opposition (the "Opposition") to the "*Motion For Reconsideration Of "Order Denying Application By The George Garikian Living Trust For Allowance And Payment Of Administrative Expenses . . . .*" [Doc. No. 1116] (the "Reconsideration Motion") filed by The Garikian Living Trust ("Garikian"), and respectfully represents as follows:

## I.    INTRODUCTION[1]

The Reconsideration Motion should be denied because Garikian has failed to meet its burden of showing any "highly unusual circumstances" for reconsideration required by Federal Rule of Civil Procedure Rule 59 ("Rule 59") as incorporated by Federal Rule of Bankruptcy Procedure 9023. The Reconsideration Motion repeats the same flawed arguments that were properly rejected by the Court previously, and presents no new facts or law that were unavailable at the time the Court originally considered the Admin Application (as defined below). Further, many of Garikian's arguments are improper attempts to supplement and complete the presentation of its case, through new and previously waived arguments. Finally, even though Rule 59 does not afford the Court the discretion to reconsider Garikian's substantive arguments in this case, Garikian's substantive arguments are wholly without merit for the reasons detailed below.

## II.    STATEMENT OF FACTS

1.    On April 7, 2017, the Debtor filed a chapter 11 voluntary petition in the United States Bankruptcy Court for the Central District of California.  The case was precipitated by, among other things, a dispute with its secured lender, East West Bank ("EWB").

2.    On September 27, 2019, the Court entered an order appointing a chapter 11 trustee for the Debtor's case, *see* [Doc. No. 956]; and, on October 7, 2019, Jason Rund was appointed the chapter 11 trustee (the "Chapter 11 Trustee"), *see* [Doc. No. 968].

---

[1] All capitalized but undefined terms in this section shall have the same meanings ascribed to them in the other parts of the Opposition.

3.      On March 13, 2020, the Debtor's chapter 11 case was converted to a chapter 7 case.  The Trustee was appointed to serve as the chapter 7 trustee.

4.      Prior to the Trustee's appointment as chapter 11 trustee, the Debtor and Garikian entered into the "*Settlement Agreement*" [Doc. No. 369-1] dated January 20, 2018 (the "Settlement Agreement") to settle their disputes related to certain alleged issues associated with Garikian's purchase from the Debtor of the "Market Quadrant" portion of the Lincoln Crossing shopping center project, which has a common street address of 2230-2268 Lincoln Avenue, Altadena, California.

5.      The Debtor subsequently filed a motion for Court approval of the Settlement Agreement [Doc. No. 369] (the "Settlement Motion") on January 25, 2018, which was approved by an order entered by the Court [Doc No. 560] on June 22, 2018.  A true and correct copy of the Settlement Motion, attaching the Settlement Agreement as Exhibit 1 thereto, is attached as **Exhibit "1"** to the Declaration of Jason Rund annexed hereto (the "Rund Declaration").

6.      The closing of the settlement provided for under the Settlement Agreement ("Closing") was expressly conditioned on, among other conditions, the entry of an "***order confirming [the Debtor's] Plan*** which provides for the assumption of the 16 Space Parking Lease and the Amended 14-Space Parking Lease," and the settlement would be "deemed terminated, and without further force or effect" if the Closing failed to occur on or before June 30, 2018 or any extensions thereof (the "Outside Termination Date").  (Settlement Agreement §§ 13-14).  However, a Court order confirming the Debtor's chapter 11 plan was never entered in this case (the "Case").

7.      After numerous discussions with East West Bank ("EWB"), the Trustee successfully negotiated an agreement by which all of the issues and claims between the Estate and EWB will be resolved.  That agreement – memorialized in that certain "*Settlement Agreement and General Releases*" dated December 17, 2019 (the "EWB Agreement") – provided for EWB to pay  $1,500,000 to the Estate in exchange for (1) dismissal of the Estate's state court action against EWB; (2) dismissal of the Ninth Circuit appeal; and (3) relief from

3

stay so that EWB could foreclose on the property located at the corner of Lincoln Avenue and Woodbury Road in Altadena, California (the "Property").

8.      On December 20, 2019, the Trustee filed a motion seeking, among other things, an order approving the EWB Agreement (the "EWB Settlement Motion").

9.      Garikian filed an opposition to the EWB Settlement Motion [Doc. 1024] (the "EWB Settlement Opposition") on January 15, 2020.  In the EWB Settlement Opposition, Garikian specifically argued that the Settlement Agreement was effective, and that it "b[ound] the Estate, and its representatives, including the Trustee." (Oppos. Ex. 2, 12).  A true and correct copy of the EWB Settlement Opposition is attached as **Exhibit "2"** to the Rund Declaration.

10.      On January 22, 2020, the Trustee filed his reply to, among other opposition pleadings, the EWB Settlement Opposition [Doc. No. 1026] (the "EWB Settlement Reply").  Specifically, in response to Garikian's argument that the "Garikian Settlement Agreement [bound] the Estate, and its representative, including the Trustee," the Trustee argued that "The Garikian Settlement Agreement was expressly conditioned on confirmation of a plan of reorganization, and that agreement terminated unless it closed by June 30, 2018, or such later date as the parties agreed to in writing . . . . Because [no confirmation order was entered,] the Garikian Settlement Agreement has expired by its terms, it is a nullity." (Oppos. Ex. 3, 3).   A true and correct copy of the EWB Settlement Reply is attached as **Exhibit "3"** to the Rund Declaration.

11.      Shortly before the hearing, on January 29, 2020, the Court entered its tentative ruling on the EWB Settlement Motion (the "EWB Tentative Ruling").  The Tentative Ruling rejected Garikian's objections to the EWB Settlement Motion, and stated that the "Court agrees with trustee that the Garikian Agreement has never 'closed' or become effective because a plan was never confirmed . . . . Approval of the proposed compromise would not give rise to a breach of the settlement agreement, and the compromise is not a disguised attempt to undo the court's prior order approving the Garikian settlement."  A true and correct copy of the Tentative Ruling is attached as **Exhibit "4"** to the Rund Declaration.

12.     A hearing was held on the EWB Settlement Motion on January 29, 2020; and, on February 5, 2020, the Court entered its order approving the EWB Settlement Motion [Doc. No. 1035] (the "EWB Settlement Order").  The EWB Settlement Order provided, among other things, that the EWB Settlement Motion was granted "for the findings and reasons stated on the record, including as set forth in the Court's Tentative Ruling (as amended)."  A true and correct copy of the EWB Settlement Order is attached as **Exhibit "4A"** to the Rund Declaration.

13.     On May 29, 2020, Garikian filed its application for the allowance and payment of its asserted $110,000 administrative expense claim arising out of the Estate's alleged breach of the Settlement Agreement (the "Admin Application").  Notably, despite arguing that the Settlement Agreement was effective and bound the estate (notwithstanding the fact that no confirmation order had been entered in the Debtor's case), no evidence was presented in the Application that the Outside Termination Date was extended from June 30, 2018.  A true and correct copy of the Admin Application is attached as **Exhibit "5"** to the Rund Declaration.

14.     On July 1, 2020, the Trustee filed his objection to the Application (the "Admin Objection") arguing, among other things, that the Settlement Agreement terminated on its own terms and never went effective, because no confirmation order was ever entered in the Debtor's bankruptcy case.  A true and correct copy of the Admin Objection is attached as **Exhibit "6"** to the Rund Declaration.

15.     On July 8, 2020, Garikian filed its reply to the Admin Objection (the "Admin Reply"): (1) arguing that the Settlement Agreement was effective; (2) arguing, for the first time and in violation of LBR 9013-1(g), that the Outside Termination Date had been extended to February 28, 2020; and (3) arguing, for the first time and in violation of LBR 9013-1(g), that the Estate was liable for the anticipatory breach of the Settlement Agreement.  A true and correct copy of the Admin Reply is attached as **Exhibit "7"** to the Rund Declaration.

16.     After considering the pleadings and evidence filed by Garikian and the Trustee related to the Admin Application, the Court entered its: (1) tentative ruling on the Admin Application on July 14, 2020 (the "Admin Tentative Ruling"); and (2) order denying the Admin Application on July 17, 2020 [Doc. No. 1111] (the "Admin Order").  True and correct copies of

the Admin Tentative Ruling and Admin Order are attached respectively as **Exhibits "8" and**

**"9"** to the Rund Declaration.

17.    Despite having a full opportunity to brief the issues in connection with the

Admin Application (including the issue of whether the Settlement Agreement became effective

before Closing), instead of taking an appeal of the Admin Order, Garikian filed the

Reconsideration Motion to re-argue the issues, and/or present new arguments to supplement its

previously-filed pleadings.    For the reasons described below, the Reconsideration Motion

should be denied.

### III.    ARGUMENT

**The Reconsideration Motion Should Be Denied Because It Does Not Consider the**

**Import of Newly Discovered Evidence.**

The Debtor brings the Reconsideration Motion under Federal Rule of Bankruptcy

Procedure ("FRBP") 9023, incorporating Federal Rule of Civil Procedure ("Rule") 59, which

authorizes courts, including bankruptcy courts, to reconsider orders and judgments.    However,

motions under Rule 59 serve to correct manifest errors of law or fact, or to consider the import

of newly discovered evidence; they are not to be used by a losing party who failed to raise

available arguments, or who simply disagrees with the court's decisions.    *In re Kellogg*, 197

F.3d 1116 (11th Cir. 1999).    A motion under Rule 59(e) should not be granted "absent highly

unusual circumstances," and reconsideration of a judgment or order after its entry by the court

"is an extraordinary remedy which should be used sparingly."    *McDowell v. Calderon*, 197 F.3d

1253, 1254 n.1 & 1255 (9th Cir. 1999) (citations omitted).

It is well settled that a motion for reconsideration may properly be denied where the

motion fails to state new law or facts.    *Hayes v. Palm Seedlings Partners-A (In re Agricultural*

*Research and Tech. Group, Inc.)*, 916 F.2d 528, 542 (9th Cir. 1990) (citing *MGIC Indemnity*

*Corp. v. Weisman*, 803 F.2d 500, 505 (9th Cir. 1986)); *MGIC,* 803 F.2d at 505 (finding that the

district court's did not err when it concluded that the reconsideration "motion was ***frivolous***

***because it introduced nothing new***" and "wasted the time of court and counsel") (emphasis

added).

1     Similarly, "[m]otions for reconsideration which merely revisit the same issues already

2    ruled upon by the bankruptcy court, or advance supporting facts that were otherwise available

3    when the issues were originally briefed, generally will not be granted." *In re Branam*, 226 B.R.

4    45, 54 (9th Cir. BAP 1998).  Simply put, a party may not use Rule 59 to complete presentation

5    of the party's case after the court has ruled against that party. *Matter of Reese*, 91 F. 3d 37 (7th

6    Cir. 1996); *Frietsch v. Refco, Inc.*, 56 F.3d 825, 828 (7th Cir. 1995).

7     Here, Garikian's argument that the Court should reconsider the Admin Order is improper

8    because the facts and arguments allegedly at issue either: (1) have already been presented to,

9    considered by, and/or rejected by the Court; or (2) are improper attempts to supplement and

10   complete presentation of its case, through new and previously waived arguments.  Specifically,

11   the following facts and arguments (consisting of the purported "enumerated errors" of the Court

12   as described by Garikian) in the Reconsideration Motion were previously presented to,

13   considered by, and/or rejected by the Court prior to its entry of the Admin Order: (1) the

14   extensions of the Outside Termination Date[2]; (2) the Settlement Agreement becoming effective,

15   despite no Closing ever occurring[3]; (3) the parties to the Settlement Agreement, and the Court

16   taking steps to implement that agreement;[4]  (4) there was an anticipatory breach of the

17   Settlement Agreement;[5]  (5) the Settlement Agreement conferred a benefit to the Estate;[6] and (6)

18   that the "law of the case" doctrine is inapplicable.[7]  For this reasons alone, the Reconsideration

19   Motion should be denied.  *Reese*, 91 F. 3d at 37 ("A motion under Rule 59(e) is not authorized

20

21   [2] *See* (Admin Reply, 8) (". . . . letter-agreements . . . with the last one extending the Closing to
and including February 29, 2020").

22   [3] *See* (Admin Reply, 9) (" . . . the Trustee's assertion that the Settlement Agreement never

23   became 'effective' is wrong as a matter of fact and law.").

24   [4] *See* (Admin Reply, 9) (" . . . the Former DIP not only amended its plan to reflect that
agreement . . . took steps towards implementing the Lot 5 Improvements . . . . Court's order

25   approving the Garikian Settlement Agreement, the Former DIP earmarked $50,000 out of
EWB's cash collateral.").

26   [5] *See* (Admin Reply, 7) (" . . . an actionable anticipatory breach of that agreement by the Estate
had nevertheless occurred.").

27   [6] *See* (Admin Reply, 5) (" . . . aimed at clearing a cloud on title . . . conferred a benefit upon the
Estate.").

28   [7] *See* (Admin Reply, 9) (" . . . "Law of the Case" Is Inapplicable . . . .").

1   'to enable a party to complete presenting his case after the court has ruled against him.'");

2   *Frietsch v. Refco, Inc.*, 56 F.3d 825, 828 (7th Cir. 1995) ("It is not the purpose of allowing

3   motions for reconsideration to enable a party to complete presenting his case after the court has

4   ruled against him. Were such a procedure to be countenanced, some lawsuits really might never

5   end, rather than just seeming endless."). The Reconsideration Motion does not present any new

6   law or facts that were not available at the time the Court considered the Admin Application, and

7   it should be denied.

8       Moreover, the "new" sub-arguments made by Garikian (that were waived because they

9   were available to Garikian when it filed the Admin Application) to complete presentation of its

10  case in the Reconsideration Motion – *e.g.*, the arguments that "Closing" does not equate to

11  "effectiveness," that a "bankruptcy event" can constitute an anticipatory breach," that an

12  administrative claim can arise even where there is no "discernable benefit" to the estate as a

13  "risk-of-doing business," and that the "law of the case" doctrine is inapplicable to rulings from a

14  non-appellate, non-Article I court – should not be considered by the Court. *See Reese*, 91 F. 3d

15  37.

16      At its core, Garikian has not met its burden of showing any "highly unusual

17  circumstances" for the Court to utilize the extraordinary remedy of reconsideration of the

18  Admin Order. Garikian has not raised any facts or issues that were not otherwise available to it,

19  on or before the hearing on the Admin Application. The Debtor is not entitled to yet another

20  bite of the apple to persuade this Court to grant the Admin Application. The Reconsideration

21  Motion should be denied.

22  **A.    No Valid Substantive Reasons Exist For The Court To Vacate The Admin Order.**

23      Although it is unnecessary to address the substantive merits of the Reconsideration

24  Motion, because it is frivolous and does not introduce any "new" facts and law, *see MGIC*, 803

25  F.2d at 505, Garikian's substantive arguments for why the Admin Order should be vacated are

26  meritless for a multitude of reasons as described below.

27  / / /

28

1.  <u>Garikian's Argument That The Court Erred In Failing To Consider Evidence Regarding Extension Of The Outside Termination Date Should Be Rejected.</u>

As an initial matter – even if (as Garikian wrongly[8] contends) the Court failed to consider evidence regarding the extensions of Outside Termination Date "to and including February 28 2020" – this was not in error.  Garikian has no one but itself to blame for the fact that it argued, and presented evidence about the extensions of the Outside Termination Date for the first time in the Admin Reply.  This contravenes Local Bankruptcy Rule ("<u>LBR</u>") 9013-1(g), which provides that "[n]ew arguments or matters raised for the first time in reply documents ***will not be considered***."  LBR 9013-1(g).    In fact, the Trustee first learned about the alleged extensions of the Outside Termination Date after the Admin Reply was filed, and did not have a chance to address these allegations in the Admin Opposition.

Moreover, the alleged extensions of the Outside Termination Date to February 20, 2020 do not help Garikian.  That date has passed, and no plan confirmation order was ever entered by the Court to confirm the Debtor's Chapter 11 plan.   Put simply, Closing did not occur before the Outside Termination Date of June 30, 2018 or any extensions thereof, and the Settlement Agreement "terminated", and is without further force or effect."  *See* (Oppos. Ex. 1, Ex. 1 § 14).

2.  <u>Garikian's Argument That The Settlement Agreement Was Effective To Bind The Estate Prior To The Court's Entry Of A Confirmation Order Should Be Rejected.</u>

Garikian's argument that the Settlement Agreement was effective prior to the Court's entry of a confirmation order runs contrary to the bargained-for terms of that agreement.  The Settlement Agreement not only provides for certain conditions to occur before Closing pursuant to Section 13 could occur, but also states in Section 14 that:

> "**Event of Non-Closing By Closing Deadline**
> 14.      In the event Closing does not occur on or before [the Outside Termination Date, or any extensions thereof] . . . this Agreement ***shall be deemed terminated, and without further force or effect***.   In such event, all items deposited into

---

[8] The letter agreements dated July 13, 2018 and February 18, 2019 (that allegedly extended the Outside Termination Date) were attached as Exhibits A and B to the Admin Reply, and there is no evidence to show that the Court failed to consider them.

1    Escrow by Garikian will be returned to Garikian, and all items deposited into Escrow by ALC will be returned to ALC."

2    (Settlement Agreement § 14) (emphasis added). Garikian cannot read Sections 1[9] and 13[10] of

3    the Settlement Agreement in isolation; this is especially true where Section 14 of the Settlement

4    Agreement provides that that agreement would essentially be void, and be "deemed terminated"

5    and "without further force or effect" if the conditions in Section 13 (including the Court's entry

6    of a plan confirmation order) were not met by the Outside Termination Date.  *See In re*

7    *Romberger*, 150 B.R. 125, 127 (Bankr. M.D. Pa. 1992) (finding that the option contract was

8    "terminated pre-petition and cannot be resurrected" because "[t]he agreement clearly stated that

9    it would be without force and effect if requisite payment was not made and notice of termination

10   was given to the debtor" and payment was not made within the specified time).  Put another

11   way, the Court's entry of a plan confirmation order was a ***condition*** (and was necessary) to

12   avoid the consequence of having the Settlement Agreement become void and of no "further

13   force or effect," if "Closing" did not occur by the Outside Termination Date.[11]  *See* (Settlement

14   Agreement § 14); *see Columbia Gas*, 50 F.3d 233, 241 (3d Cir. 1995) ("[n]on-occurrence of a

15   condition is not breach by a party unless he is under a duty that the condition occur.").  This is

16   what the parties to the Settlement Agreement unambiguously bargained for, and Garikian cannot

17   now unilaterally choose to write Section 14 out of the Settlement Agreement.  The Outside

18   Termination Date has passed, and no confirmation order was ever entered by the Court.

19   Garikian's further argument that "[t]here was no version of a Chapter 11 plan providing

20   that the Settlement Agreement was to be 'assumed'" is nonsensical. First, the Settlement

21   Agreement provided as a condition that there be an "order confirming [the Debtor's] Plan which

22   provides for the ***assumption of the 16 Space Parking Lease and the Amended 14-Space***

23   ***Parking Lease***."  *See* (Settlement Agreement §§ 13-14) (emphasis added).  The Settlement

24

25   [9] This Settlement Agreement section is titled "Agreement Subject to Court Approval."
     [10] This Settlement Agreement section is "The Closing."

26
27   [11] This is in response to the Garikian's characterization of a "condition" as needing to be in the "if . . . then . . ." format. (Motion 24-25).  No matter how Garikian attempts to re-characterize the conditions to Closing, the fact is that the Settlement Agreement would be terminated and

28   would have no further force or effect if Closing did not occur by the Outside Termination Date.

1  Agreement was not to be assumed; rather the Parking Leases were to be assumed. Further, it is

2  not clear how the postpetition Settlement Agreement could be "assumed" pursuant to a Chapter

3  11 plan or otherwise. *See In re Merry-Go-Round Enterprises, Inc.*, 180 F.3d 149, 160 (4th Cir.

4  1999) (" . . . limited § 365 to prepetition leases . . . . extending § 365 to apply to a Chapter 11

5  debtor-in-possession would be contrary to both common sense and general bankruptcy policy.").

6  Finally, the Settlement Agreement is not an assumable executory contract "under which the

7  obligation of both the [Debtor] and [Garikian] are so far unperformed that the failure of either to

8  complete performance would constitute a material ***breach*** excusing performance of the other."

9  *Columbia Gas System Inc.*, 50 F.3d at 239 (emphasis added).  This is because, among other

10  reasons, the Settlement Agreement never went effective and was, instead, terminated on the

11  Outside Closing Date. *See* (Oppos. Ex. 1, Ex.1); (Oppos. Ex. 4).

12       Further, the fact that the parties took actions to allow for "Closing" under the Settlement

13  Agreement to occur is a red herring; such actions: (1) cannot override the dictates of Section 14

14  of the Settlement Agreement; and (2) merely show that the Debtor was working cooperatively

15  with Garikian to effectuate a possible "Closing" under Section 13 of the Settlement Agreement,

16  such that no anticipatory breach of the Settlement Agreement occurred.

17       Lastly, Garikian has provided neither legal authority nor evidence for the proposition

18  that it could unilaterally waive the Settlement Agreement's plan confirmation condition to

19  "Closing" (the "Confirmation Condition") to prevent the Settlement Agreement from being

20  "terminated," and becoming of "no further force or effect." *See* (Settlement Agreement § 14).

21  Specifically, there is no evidence to show: (1) that Garikian ever attempted to waive the

22  Confirmation Condition; or (2) that the Confirmation Condition was added to the Settlement

23  Agreement for Garikian's sole benefit, to allow that condition to be unilaterally waived by it.

24  *See Wyler Summit P'ship v. Turner Broad. Sys.*, Inc., 135 F.3d 658, 662 (9th Cir.

25  1998); *Crescenta Valley Moose Lodge No. 808 v. Bunt*, 8 Cal.App.3d 682, 687, 87 Cal.Rptr.

26  428, 431 (2d Dist.1970) ("Whether a condition is solely for the benefit of [a

27  particular contracting party] is for the trial court to determine as a fact from all the evidence").

28

3.  <u>Garikian's Argument That The Court Erred In Failing To Consider The Steps Taken
By The Parties Toward Implementation Of The Settlement Agreement Should Be
Rejected.</u>

As discussed above, the fact that the parties took actions to allow for "Closing" to occur is immaterial, and cannot override the clear dictates of Section 14 of the Settlement Agreement. Further, the Court's entry of an order approving cash collateral is a separate matter from, and does not provide evidence that the Settlement Agreement went effective.

Importantly, Garikian's own conduct – in failing to withdraw and amend its proofs of claims pursuant to the terms of the Settlement Agreement – shows that it also did not believe that the Settlement Agreement was effective and obligated the parties to act prior to the Closing. Specifically, Section 9 of the Settlement Agreement provides:

> "**Amendment of Indemnity Proof of Claim / Withdrawal of Lease Rejection Claim**
> 9.     Upon full execution of this Agreement, and upon ALC's submittal of an amended Plan and disclosure statement as provided above, Garikian will (a) file an amended Proof of Claim (the "Amended Indemnity Claim"), amending the Indemnity Claim (Proof of Claim No. 10) to reduce the Garikian claim to the actual amount of its attorneys' fees and costs incurred in the Case, not to exceed $60,000, to remain secured by the Deed of Trust and to be paid under the Debtor's plan within six months of the Effective Date; and (b) file a Withdrawal of the Lease Rejection Proof of Claim (Proof of Claim No. 12), without prejudice to refiling. ALC will not object, nor cause any other party to object, to the Amended Indemnity Claim, as described herein.

(Settlement Agreement § 9).  The resolution of Garikian's claims was undeniably a cornerstone of the settlement memorialized in the Settlement Agreement. In this context, if Garikian's argument (*i.e.*, that the Settlement Agreement became effective before Closing occurred) is taken to its logical conclusion, Garikian's failure to amend Proof of Claim No. 10 and withdraw Proof of Claim No. 12 – after the parties' executed the Settlement Agreement on January 20, 2018, and after the amended plan and disclosure statement were filed on February 7, 2018 [Doc. Nos. 391 & 392] – constituted a material breach of the Settlement Agreement more than one year before the appointment of a Chapter 11 trustee in the bankruptcy case, which would excuse the performance of the Debtor's obligations, if any, under the Settlement Agreement. *See De*

1    *Burgh v. De Burgh*, 39 Cal. 2d 858, 863, 250 P.2d 598, 601 (1952) ("[I]n contract law a material

2    breach excuses further performance by the innocent party.").  Garikian's failure to perform its

3    obligations under the Settlement Agreement provide further support that the Settlement

4    Agreement was not effective to bind the parties before all of the conditions for Closing were

5    met.

6              4.    <u>Garikian's Argument That The Court Erred In Finding That The Appointment Of A</u>

7                    <u>Trustee Was Not An Anticipatory Breach Of The Settlement Agreement Should Be</u>

8                    <u>Rejected.</u>

9              As with the tardily-presented evidence regarding the alleged extensions of the Outside

10   Termination Date, Garikian's "anticipatory breach" argument was improperly raised for the first

11   time in the Admin Reply, in contravention of LBR 9013-1(g).  This fact alone gave the Court

12   discretion to decline to consider Garikian's tardy "anticipatory breach" argument.

13             However, as reasoned by the Court at the hearing on the Admin Application, Garikian's

14   anticipatory breach argument has no merit.  Garikian argues that the appointment of a Chapter

15   11 trustee in October 2019 was an anticipatory breach of the Settlement Agreement because "the

16   Former DIP simultaneously lost its ability to perform the Lot 5 Improvements, triggering

17   Garikian's rights to assert an anticipatory breach, and to seek remedies, including

18   administrative-claim status arising from such breach."  (Mot. 22:1-3).[12]  This argument can be

19   rejected for various reasons.  ***First***, as late as January 24, 2020, more than three months after the

20   Trustee was appointed, the Debtor filed an amended Chapter 11 disclosure statement and plan

21   which provided for the assumption of the Parking Leases required by the Settlement Agreement,

22   and demonstrates that there was no anticipatory breach upon appointment of the Trustee.

23   ***Second***,   as discussed above and acknowledged by Garikian, the Debtor's conduct in working

24

25   [12] Garikian's citation to *Central Trust Co. v. Chicago Auditorium Ass'n*, 240 U.S. 581 (1916) for
     the proposition that "bankruptcy events such as [the] appointment of a trustee might constitute

26   an anticipatory breach" is misguided. That case is more than a hundred years old, and decided
     under the Bankruptcy Act.  Further, Garikian's interpretation of that case is too broad, although

27   non-debtor counterparties to a breached agreement can participate in the bankruptcy process, it
     does not make sense to treat all of the debtor's contracts as breached when a Chapter 11 trustee

28   is appointed in a bankruptcy case.

cooperatively with Garikian towards Closing of the Settlement Agreement (*e.g.*, filing amended plans and disclosure statements, taking steps to allow for the Lot 5 Improvements to move forward, and allegedly agreeing to extend the Outside Termination Date two times) does not show that it repudiated that contract. *See* (Mot. 19-20).[13] *Third*, the Trustee did not affirmatively repudiate the Settlement Agreement; in fact, he did not even know that the Outside Termination Date was extended from June 30, 2018 (as set forth in the Settlement Agreement) until the Admin Reply was filed on July 8, 2020. *Fourth*, as described above, Garikian has not explained how its failure to amend/withdraw its proofs of claim was not a material breach of the Settlement Agreement (which would excuse the Debtor and Trustee from performance under such agreement). *Lastly*, it cannot be said that the appointment of a Chapter 11 trustee itself constituted a anticipatory or other breach of the Settlement Agreement, because the Settlement Agreement specifically accounted for this scenario (in addition to the fact that the Settlement Agreement did not characterize the appointment of a Chapter 11 trustee as a breach or default under such agreement). *See* (Settlement Agreement § 15) ("If, after Closing, the Case is converted[14] . . . to one under Chapter 7 . . . or a Chapter 11 Trustee is appointed in the Case, this Agreement shall remain in full force and effect and binding . . . upon any Chapter 11 trustee or any trustee appointed upon conversion of the Case.  In the event Closing has not occurred prior to any such Chapter 11-trustee appointment or conversion of the case, Garikian may elect to terminate this Agreement and cancel the Escrow.  Upon such event, and all items deposited into escrow by ALC will be returned to the Case Trustee.").  Relatedly, Garikian also fails to account for the fact that Chapter 11 trustees, and creditors (such as Garikian, upon termination of exclusivity) can propose Chapter 11 plans (such that the Trustee could have proposed his own chapter 11 Plan that provided for the consummation of the settlement contained in the Settlement Agreement).

---

[13] *Contra Jeppi v. Brockman Holding Co.*, 34 Cal. 2d 11 (1949) (finding that repudiation occurred where "corporation, by its telegram to the title company, repudiated the contract and notified Jeppi of the sale of the property to Young.").

[14] Presumably, the Settlement Agreement does not address the scenario where "Closing" does not happen, because under that scenario, the Settlement Agreement would be "terminated" and be "without further force or effect" pursuant to Section 14 of the Settlement Agreement.

It is also important to note that – unlike Sections 2 to 12 of the Settlement Agreement (which, arguably, are terms under the Settlement Agreement, if effective) – Section 13 of the Settlement Agreement (regarding the *conditions* for Closing) does not instruct parties to the Settlement Agreement to take any action.  For example, this is made clear by the fact that the Debtor cannot unilaterally obtain confirmation of its Chapter 11 plan.  Put another way, the Debtor can file a Chapter 11 plan, but only the bankruptcy court can enter an order confirming such plan after finding that all of the requirements of Section 1129(a) of the Bankruptcy Code have been met.

For all of the foregoing reasons, there is no merit to Garikian's assertion that an anticipatory breach of the Settlement Agreement occurred upon the Court's appointment of a Chapter 11 trustee in the Debtor's bankruptcy case.

> 5.   Garikian's Argument That The Court Erred In Finding That "No Benefit To The Estate" Resulted From The Settlement Agreement Should Be Rejected.

Section 503(b)(1)(A) of the Bankruptcy Code provides:

> "After notice and a hearing, there shall be allowed administrative expenses, other than claims allowed under section 502(f) of this title, including –
> (1)(A) the actual, necessary costs and expense of preserving the estate…."

11 U.S.C. § 503(b)(1)(A).   Section 503(b) priorities should be "narrowly" construed to maximize the value of the estate for all creditors.  *In re Dant & Russell, Inc.*, 853 F.2d 700, 707 (9th Cir. 1988).   *In re Colortex Indust., Inc*., 19 F.3d 1371, 1377 (11th Cir. 1994).   The modifiers "actual" and "necessary" must be observed with scrupulous care.  *See* Collier on Bankruptcy, Volume 4, 16th Ed. ¶503.06[1]; *Dant & Russell*, 853 F.2d at 706 ("The terms 'actual' and 'necessary' are *construed narrowly so as to keep fees and administrative costs at a minimum*.") (emphasis added).  Courts have "broad discretion in determining whether to award administrative expense priority," "limited by the clear intent of section 503(b)(1)(A): the actual and necessary costs of preserving the estate." *Dant & Russell*, 853 F.2d at 707.

As already argued in Section III.B. of the Admin Objection (which, by this reference, is incorporated herein for the sake of brevity), neither the Settlement Agreement nor its alleged

breach provided any benefit to the Estate, and is not a "necessary cost and expense of preserving the estate." Further, although the Settlement Agreement was executed, and approved by the Court post-petition – the "source of the obligation" for Garikian's claims (damages and attorneys' fees) arose pre-petition, and cannot be entitled to administrative priority. *In re Kadjevich,* 220 F.3d 1016, 1020 (9th Cir. 2000) ("Consistent with Abercrombie and Cohen, we hold that the attorney fees awarded by the state court to Nicholas, based on Robert's bad-faith failure to settle the pre-petition fraud case, may not be granted administrative-expense priority.").

Garikian's citations to certain cases where administrative expense claims were allowed are inapposite, including: (1) *In re Grand Union Co.*, 266 B.R. 621 (Bankr. D.N.J. 2001) (involving debtors' contract with warehousing business for post-petition storage of merchandise); (2) *In re Merry-Go-Round Enterprises Inc.*, 180 F.3d 149 (4th Cir. 1999) (involving post-petition lease agreement); *In re Patient Educ. Media, Inc.*, 221 B.R. 97 (Bankr. S.D.N.Y. 1998) (involving landlord's post-petition administrative claim to store debtor's assets for liquidation); and (4) *Matter v. Jartran Inc.*, 732 F.2d 584 (7th Cir. 1984) (yellow page ads for the Debtor). Unlike Garikian's asserted claim (which is based on the breach of an agreement to resolve certain pre-petition litigation claims), the administrative expense claims in those cases involved post-petition services or goods provided by vendors, landlords, or other creditors of debtors to preserve estate assets for liquidation or as a going concern. *See id*. Likewise, Garikian's claim does not consist of the Debtor's post-petition torts or legal violations, and cannot be awarded administrative priority on that basis. *Contra Reading Co. v. Brown*, 391 U.S. 471, 88 S.Ct. 1759, 20 L.Ed.2d 751 (1968); *In re Dennis Ponte, Inc.,* 61 B.R. 296, 298 (B.A.P. 9th Cir. 1986) ("[i]t is well established that damages for a post-petition tort become an administrative expense under 11 U.S.C. § 503(b)(1)(A)"); *Matter of H.L.S. Energy Co., Inc.,* 151 F.3d 434, 438-39 (5th Cir. 1998) (trustee's legal obligation to comply with law gave costs of plugging wells administrative claim status).

/ / /

6. <u>Garikian's Argument That The Court Erred In Finding That The "Law Of The Case"
Doctrine Is Applicable Should Be Rejected.</u>

It is important to note that the parties were afforded a full opportunity to brief, among other things, the issues of: (1) whether Garikian is entitled to an administrative claim; and (2) whether the Debtor could have and, in fact, breached the Settlement Agreement prior to Closing. Based on the parties' filed briefs, evidence, and arguments at the hearing concerning these and other issues, the Admin Application was denied.

The Court also properly applied the "law of the case" doctrine to the Admin Application, regarding the issue of whether the Settlement Agreement could have become effective to bind the parties before Closing. Prior to the filing of the Admin Application: (1) Garikian filed the EWB Settlement Opposition arguing that the Settlement Agreement bound "the Estate, and its representatives, including the Trustee" prior to Closing; (2) the Trustee argued in the Admin Reply that the "The Garikian Settlement Agreement was expressly conditioned on confirmation of a plan of reorganization, and that agreement terminated unless it closed by June 30, 2018, or such later date as the parties agreed to in writing . . . . Because [no confirmation order was entered,] the Garikian Settlement Agreement has expired by its terms, it is a nullity"; (3) the Court agreed with the Trustee in its tentative ruling that Settlement Agreement could not have become effective prior to its entry of a plan confirmation order, which served as a basis for overruling the EWB Settlement Opposition; and (4) after the hearing on the EWB Settlement Motion, the Court entered its order denying the EWB Settlement Motion for the reasons stated in its amended tentative ruling. *See* (Oppos. Exs. 2-4A).

Garikian's contention that the "law of the case" doctrine only applies to rulings by appellate courts or Article I courts is wrong, and should be rejected. *See e.g., In re Sundquist*, 570 B.R. 92, 98 (Bankr. E.D. Cal. 2017) ("For the time being, the law of the case is that the Interested Parties are parties to this adversary proceeding. This is an example of the ***trial-level version of the law of the case doctrine***, according to which the parties are bound by the trial court's rulings even though that trial court has discretion to revisit its prior rulings.") (emphasis added); *In re Pilgrim's Pride Corp.*, 442 B.R. 522, 530 (Bankr. N.D. Tex. 2010) ("In the

1  bankruptcy context, the law of the case doctrine should be applied to disputes arising in the

2  main bankruptcy case as well as all of its related adversary proceedings. The doctrine of *res*

3  *judicata,* on the other hand, is applied where the same dispute is posed to a court as was (or

4  should have been) adjudicated in a prior proceeding before that or another (not necessarily

5  coordinate) court.").

6      The Court also properly denied the Admin Application based on the "law of the case"

7  doctrine.

8                        **IV.    <u>CONCLUSION</u>**

9      **WHEREFORE**, the Trustee respectfully requests that the Court enter an order:

10      1.      Denying the Reconsideration Motion in its entirety; and

11      2.      Granting such other and further relief as may be necessary or appropriate under

12  the circumstances.

13  Date:  August 12, 2020

14                              Respectfully submitted,

15                              LEVENE, NEALE, BENDER, YOO & BRILL L.L.P.

16                              By: */s/ Timothy J. Yoo*
                                TIMOTHY J. YOO
17                              EVE. H. KARASIK
                                JEFFREY S. KWONG
18                              Attorneys for Jason Rund,
                                Chapter 7 Trustee
19

20

21

22

23

24

25

26

27

28

## **DECLARATION OF JASON RUND**

I, Jason Rund, declare as follows:

1.     I am the duly-appointed, qualified, and acting Chapter 7 Trustee for the bankruptcy estate (the "Estate") of Altadena Lincoln Crossing, LLC, the debtor herein.  Unless otherwise stated, I have personal knowledge of the facts set forth below and, if called to testify, would and could competently testify thereto. All capitalized terms not defined herein shall have the same meanings ascribed to them as in the Opposition to which this Declaration is annexed.

2.     On April 7, 2017, the Debtor filed a chapter 11 voluntary petition in the United States Bankruptcy Court for the Central District of California.  The case was precipitated by, among other things, a dispute with its secured lender, East West Bank ("EWB").

3.     On September 27, 2019, the Court entered an order appointing a chapter 11 trustee for the Debtor's case, *see* [Doc. No. 956]; and, on October 7, 2019, I was appointed the chapter 11 trustee, *see* [Doc. No. 968].

4.     On March 13, 2020, the Debtor's chapter 11 case was converted to a chapter 7 case.  I was appointed to serve as the chapter 7 trustee.

5.     Prior to my appointment as chapter 11 trustee, the Debtor and Garikian entered into the "*Settlement Agreement*" [Doc. No. 369-1] dated January 20, 2018 (the "Settlement Agreement") to settle their disputes related to certain alleged parking issues associated with Garikian's purchase from the Debtor of the "Market Quadrant" portion of the Lincoln Crossing shopping center project, which has a common street address of 2230-2268 Lincoln Avenue, Altadena, CA.

6.     The Debtor subsequently filed a motion for Court approval of the Settlement Agreement [Doc. No. 369] (the "Settlement Motion") on January 25, 2018, which was approved by an order entered by the Court [Doc No. 560] on June 22, 2018.  A true and correct copy of the Settlement Motion, attaching the Settlement Agreement as Exhibit 1 thereto, is attached as **Exhibit "1"** hereto.

7.     The closing of the settlement provided for under the Settlement Agreement ("Closing") was expressly conditioned on, among other conditions, the entry of an "***order***

Case 2:17-bk-14276-BB    Doc 1120    Filed 08/12/20    Entered 08/12/20 17:29:04    Desc
Main Document    Page 23 of 420

1   *confirming [the Debtor's] Plan* which provides for the assumption of the 16 Space Parking

2   Lease and the Amended 14-Space Parking Lease," and the settlement would be "deemed

3   terminated, and without further force or effect" if the Closing failed to occur on or before June

4   30, 2018 or any extensions thereof (the "Outside Termination Date"). *See* (Settlement

5   Agreement §§ 13-14). However, a Court order confirming the Debtor's chapter 11 plan was

6   never entered in this case (the "Case").

7         8.    After numerous discussions with East West Bank ("EWB"), I successfully

8   negotiated an agreement by which all of the issues and claims between the Estate and EWB will

9   be resolved. That agreement – memorialized in that certain "*Settlement Agreement and General*

10  *Releases*" dated December 17, 2019 (the "EWB Agreement") – provided for EWB to pay

11  $1,500,000 to the Estate in exchange for (1) dismissal of the Estate's state court action against

12  EWB; (2) dismissal of the Ninth Circuit appeal; and (3) relief from stay so that EWB could

13  foreclose on the property located at the corner of Lincoln Avenue and Woodbury Road in

14  Altadena, California (the "Property").

15        9.    On December 20, 2019, I filed a motion seeking, among other things, an order

16  approving the EWB Agreement (the "EWB Settlement Motion").

17        10.    Garikian filed an opposition to the EWB Settlement Motion [Doc. 1024] (the

18  "EWB Settlement Opposition") on January 15, 2020. A true and correct copy of the EWB

19  Settlement Opposition is attached as **Exhibit "2"** hereto.

20        11.    On January 22, 2020, I filed the reply to the EWB Settlement Opposition [Doc.

21  No. 1026] (the "EWB Settlement Reply"). A true and correct copy of the EWB Settlement

22  Reply is attached as **Exhibit "3"** hereto.

23        12.    Shortly before the hearing, on January 29, 2020, the Court entered its tentative

24  ruling on the EWB Settlement Motion (the "EWB Tentative Ruling"). A true and correct copy

25  of the Tentative Ruling is attached as **Exhibit "4"** hereto.

26        13.    A hearing was held on the EWB Settlement Motion on January 29, 2020; and, on

27  February 5, 2020, the Court entered its order approving the EWB Settlement Motion [Doc. No.

28  1035] (the "EWB Settlement Order"). A true and correct copy of the EWB Settlement Order is

20

attached as **Exhibit "4a"** hereto.

14.    On May 29, 2020, Garikian filed its application for the allowance and payment of its asserted $110,000 administrative expense claim arising out of the Estate's alleged breach of the Settlement Agreement (the "Admin Application").  A true and correct copy of the Admin Application is attached as **Exhibit "5"** hereto.

15.    On July 1, 2020, I filed my objection to the Application (the "Admin Objection") arguing, among other things, that the Settlement Agreement terminated on its own terms and never went effective, because no confirmation order was ever entered in the Debtor's bankruptcy case.  A true and correct copy of the Admin Objection is attached as **Exhibit "6"** hereto.

16.    On July 8, 2020, Garikian filed its reply to the Admin Objection (the "Admin Reply").  A true and correct copy of the Admin Reply is attached as **Exhibit "7"** hereto.

17.    I first learned about the alleged extensions of the Outside Termination Date after the Admin Reply was filed, and did not have a chance to address these allegations in the Admin Opposition.

18.    After considering the pleadings and evidence related to the Admin Application, the Court entered its: (1) tentative ruling on the Admin Application on July 14, 2020 (the "Admin Tentative Ruling"); and (2) order denying the Admin Application on July 17, 2020 [Doc. No. 1111] (the "Admin Order").  True and correct copies of the Admin Tentative Ruling and Admin Order are attached respectively as **Exhibits "8" and "9"** hereto.

19.    As of the date of this Declaration, Garikian's Proof of Claim Nos. 10 and 12 have neither been amended nor withdrawn.

I declare and verify under penalty of perjury under the law of the United States of America that the foregoing is true and correct to the best of my knowledge.

Executed on August //, 2020, at El Segundo, California.

JASON RUND

# EXHIBIT "1"

GREGORY M. SALVATO (SBN 126285)
    Gsalvato@salvatolawoffices.com
JOSEPH BOUFADEL (SBN 267312)
    Jboufadel@salvatolawoffices.com
SALVATO LAW OFFICES
Wells Fargo Center
355 South Grand Avenue, Suite 2450
Los Angeles, California 90071-9500
Telephone:    (213) 484-8400
Facsimile:    (213) 402-3778

Attorneys for Debtor-in-Possession
ALTADENA LINCOLN CROSSING LLC,
a Delaware limited liability company

# UNITED STATES BANKRUPTCY COURT

# CENTRAL DISTRICT OF CALIFORNIA

# LOS ANGELES

| | |
|---|---|
| In re:<br><br>ALTADENA LINCOLN CROSSING LLC, a Delaware limited liability company,<br><br>Debtor. | Case No. 2:17-bk-14276-BB<br><br>Chapter 11<br><br>**Motion for Order to:**<br>**(1) Approve Compromise between Debtor Altadena Lincoln Crossing, LLC and George Garikian as Trustee of the George Garikian Living Trust;**<br>**(2) Modify Cash Collateral Order to Approve $50,000 Expenditure Required by Compromise;**<br>**Memorandum of Points and Authorities; Declaration of Greg Galletly in Support**<br><br>Hearing Date:<br>Date:    February 28, 2018<br>Time:    10:00 a.m.<br>Place:    Courtroom 1539<br>          255 E. Temple Street<br>          Los Angeles, CA 90012 |

Salvato Law
Offices

Motion for Order to Approve Compromise and to
Modify Cash Collateral Order
                                        -i-                    In re Altadena Lincoln Crossing LLC, Debtor
                                                               Case No. 2:17-bk-14276-BB

# TABLE OF CONTENTS

1.   Introduction. ........................................................................................... 1

2.   Statement of Relevant Facts. .................................................................. 2

  2.1.   Garikian's Proofs of Claim Nos. 10 and 12. ...................... 2

  2.2.   The Purchase and Sale Agreement and related agreements
         between the parties. ............................................................. 3

  2.3.   The SK Market Lease. .......................................................... 4

  2.4.   The Indemnity Agreement and Memorandum of Lease
         regarding the Parking Structure Leases. .............................. 4

  2.5.   The Debtor's Settlement Agreement with Garikian to
         resolve all outstanding issues and claims. ........................... 5

  2.6.   The Order authorizing the Debtor's use of cash collateral
         through March 31, 2018. ...................................................... 6

3.   Legal Arguments. ................................................................................... 7

  3.1.   Rule 9019 standard for approving a compromise and
         settlement. ............................................................................ 7

  3.2.   The settlement agreement between the Debtor and
         Garikian is fair and reasonable and should be approved. ..... 8

  3.3.   Modification of the cash collateral order to authorize the
         improvements on Lot 5 is fair, reasonable, and increases
         the value of the Property. ..................................................... 9

4.   Conclusion. ............................................................................................ 10

DECLARATION OF GREG GALLETLY .................................................... 11

Motion for Order to Approve Compromise and to
Modify Cash Collateral Order                    -ii-                    *In re Altadena Lincoln Crossing LLC*, Debtor
Case No. 2:17-bk-14276-BB

## MEMORANDUM OF POINTS AND AUTHORITIES
## IN SUPPORT OF MOTION TO APPROVE COMPROMISE AND
## MODIFY CASH COLLATERAL ORDER

### 1. Introduction.

Debtor and Debtor-in-Possession Altadena Lincoln Crossing LLC (the "**Debtor**") hereby submits the attached Settlement Agreement (**Exhibit 1**) with creditor George Garikian, as Trustee of the George Garikian Living Trust ("**Garikian),** and moves the Court for an Order approving the compromise and settlement.

The Debtor and Garikian have settled their disputes with respect the various agreements executed between the parties and have resolved the disputed Proofs of Claim filed by Garikian in anticipation of the Debtor's proposed rejection of various executory contracts and leases to which Garikian is a party.  As a result of the proposed compromise, the Debtor intends to assume the Indemnity Agreement, the 16-Space Parking Space Lease, and the 14-Space Parking Lease, as modified, under its Plan of Reorganization. The assumption of these agreements will thereby eliminate any basis for the projected $5 million damage claims asserted by Garikian against the Debtor's estate as a consequence of the proposed rejection of those leases and agreement.

As part of the settlement with Garikian, the Debtor also seeks an order approving a proposed modification to the Cash Collateral Order (the "Order approving Stipulation for Order Authorizing Use of Cash Collateral Through March 31, 2018") entered on January 10, 2018 [Dkt. No. 351].[1] The modification seeks approval of the deposit of $50,000 into a segregated account, and authority to use such funds exclusively to make the improvements described in the Settlement Agreement for the: (a) grading of the

---

[1] The Debtor understands that East West Bank may in fact be amenable to the proposed modification of the Cash Collateral Order as requested here, but the Debtor was unable to obtain the Bank's consent to the expenditure (requiring authorization to use cash collateral) prior to the Court's approval of the compromise with Garikian.

Salvato Law
Offices

Motion for Order to Approve Compromise and to     -1-     *In re Altadena Lincoln Crossing LLC, Debtor*
Modify Cash Collateral Order                              Case No. 2:17-bk-14276-BB

1   unimproved Lot 5 (an undeveloped portion of the Debtor's real property) and permit

2   approvals, (b) paving and striping of Lot 5 in accordance with County requirements; and

3   (c) relocation of the sprinkler fixtures, so that no fewer than 14 vehicles can be parked on

4   Lot 5. (*See* **Exhibit 1** at ¶¶ 7-8).

5       The Settlement Agreement represents the resolution of the controversies between

6   the Debtor and Garikian on the terms and conditions set forth in the executed Settlement

7   Agreement (**Exhibit 1**), which terms are more fully described below.

8       The Debtor respectfully requests that the Court grant this Motion and approve the

9   Settlement Agreement between the parties, and approve the modification of the cash

10  collateral order to authorize the expenditure of $50,000 for parking lot improvements so

11  that the Debtor may implement the settlement and begin the necessary improvements on

12  Lot 5.

13

14  **2.   Statement of Relevant Facts.**

15      **2.1.   Garikian's Proofs of Claim Nos. 10 and 12.**

16      On April 7, 2017, the Debtor commenced this voluntary Chapter 11 bankruptcy

17  case, *In re Altadena Lincoln Crossing LLC,* Case No. 2:17-bk-14276-BB.

18      On July 18, 2017, Garikian filed a Motion to Compel Assumption or Rejection of

19  the two parking leases with the Debtor that required the Debtor to provide parking spaces

20  dedicated to the Market Quadrant. [Dkt. No. 157]. The Debtor, in response, sought

21  additional time to decide whether to assume or reject the parking space leases, as well as

22  opposing the motion on other grounds. [Dkt. No. 188].

23      On August 8, 2017, Garikian filed his Proof of Claim No. 10, seeking a claim for

24  an "unknown [amount] but not less than $5 million" secured by the Debtor's Property

25  located at 2180-2220 Lincoln Avenue, Altadena, CA 91001 based upon the anticipated

26  rejection of an indemnity agreement.

27      Also on August 8, 2017, Garikian filed his Proof of Claim No. 12, an unsecured

28  claim for an "unknown [amount] but not less than $5 million" for "damages arising from

Salvato Law
Offices

1    rejection of 99-year Parking Garage Lease."

2        Ultimately, the Debtor filed a proposed plan of reorganization proposing to reject

3    the Parking Spaces Leases and the Indemnity Agreement upon the Effective Date of the

4    Plan. Objections to the Garikian Proofs of Claim were being prepared when the parties

5    began discussions of settlement.

6        **2.2.    The Purchase and Sale Agreement and related agreements**

7             **between the parties.**

8        The dispute arises from a series of pre-bankruptcy agreements between the Debtor

9    and Garikian. On or as of August 26, 2014, Garikian and the Debtor entered into the

10    "Standard Offer, Agreement and Escrow Instructions for Purchase of Real Estate (Non-

11    Residential") (the "**PSA**"), and on January 8, 2015, Garikian and Debtor entered into the

12    following additional agreements; (1) an Indemnity Agreement ("**Indemnity**

13    **Agreement**"); (2) a Deed of Trust securing the Debtor's obligations under the Indemnity

14    Agreement ("**Deed of Trust**"); (3) a 99-year lease for 16 parking spaces (the "**16-Space**

15    **Parking Lease**"); and (4) a 99-year lease for 14 parking spaces (the "**14-Space Parking**

16    **Lease**").

17        Between October 8, 2014, and January 14, 2015, the parties executed a series of

18    amendments to the PSA, including a Fifth Amendment thereto (the "**Fifth Amendment to**

19    **PSA**"). Pursuant to the foregoing Agreements (collectively the "**Purchase and Sale**

20    **Agreements**"), the Debtor agreed to sell, and Garikian agreed to purchase, the real

21    property located at and commonly known as 2230-2260 Lincoln Ave., Altadena,

22    California (described in the Purchase and Sale Agreements as the "**Market Quadrant**").

23        Prior to the sale, the Debtor was the owner of both the Market Quadrant and

24    another quadrant called, in the Purchase and Sale Agreements, the "**Fitness Quadrant.**"

25    The Parking Structure is located on the Fitness Quadrant.  Following the sale, the Debtor

26    is the Landlord and Garikian is the Tenant under the 16-Space Parking Lease and the 14-

27    Space Parking Lease (collectively the "**Parking Structure Leases**").

28

Salvato Law
Offices

## 2.3.    The SK Market Lease.

Prior to Garikian's purchase of the Market Quadrant, ALC and B&V Enterprises, Inc., dba SK Market ("**SK Market**") entered into a lease with the Debtor dated April 1, 2008, as amended (the "**SK Market Lease**"). SK Market's premises consist of 37,500 square feet, which is a portion (approximately 86.5%) of the overall 43,304 square-feet Market Quadrant footprint. Paragraph 18.5 of the SK Market Lease requires that "[SK Market] and its invitees have the non-exclusive right to park in all of the parking spaces located in the Shopping Center (including the surface parking spaces located on the Market Quadrant; the surface parking spaces located on the Fitness Quadrant; and parking spaces located in the parking structure located on the Fitness Quadrant)."

Additionally, under the SK Market Lease, SK Market is granted the exclusive right to thirty (30) parking spaces located on the top level of the Parking Structure for use by its employees. The SK Market Lease further states that the Debtor shall not do anything which: (i) reduces the amount of parking for SK Market's invitees on the Fitness Quadrant; (ii) reduces the amount of exclusive parking spaces in the Fitness Quadrant Parking structure allocated to SK Market; or (iii) reduces the parking ratio for both Quadrants (collectively the "**Shopping Center**") below the amount required by law. A Memorandum of the SK Market Lease was recorded with the Office of the Los Angeles County Recorder on August 21, 2008. The Debtor contends that it remains obligated to provide the parking spaces under the SK Market Lease.

## 2.4.    The Indemnity Agreement and Memorandum of Lease regarding the Parking Structure Leases.

Paragraph 1(a) of the Indemnity Agreement between the Debtor and Garikian dated January 8, 2015, provides for the indemnification of Garikian by the Debtor against the following occurrences/events:

> "i) any assertion by [SK Market] that section 18.5 of the [SK Market Lease] (or any other provision of the [SK Market Lease] related to parking, in effect on the date of this Indemnity Agreement) has been violated due to the failure to provide exclusivity rights of SK in thirty

Salvato Law
Offices

---

Motion for Order to Approve Compromise and to
Modify Cash Collateral Order

-4-

*In re Altadena Lincoln Crossing LLC, Debtor*
Case No. 2:17-bk-14276-BB

(30) parking spaces in the [Parking Structure], (ii) any assertion that the property violates applicable laws, codes or ordinances, in effect as of the date of this Indemnity Agreement, regarding the provision of parking spaces based on Tenant Leases in effect on the date of this Indemnitee (sic) Agreement (so long as Tenant maintains the 162 onsite parking spaces at the Market Quadrant), (iii) any and all damages and claims that arise in the event that [Garikian], after pursuing diligently and in good faith, is unable to procure from Los Angeles County a parking permit for the Property pursuant to file no. RPKP 201300005 (R2013 -- 01662) (the "Parking Permit"), and/or (iv) [Debtor's] breach of or default with regard to any of its covenants under that certain Fifth Amendment to Standard Offer, Agreement and Escrow Instructions for Purchase of Real Estate, dated as of November 18, 2014 [copy attached, but omitted here]. This Agreement shall survive the closing under the PSA and the recording of the conveyance deed for the Property to [Garikian]."

A Memorandum of Lease covering the 14-Space Parking Lease and a Memorandum of Lease covering the 16-Space Parking Lease were recorded on January 15, 2015 in Los Angeles County. The Deed of Trust was executed in order to secure the Debtor's obligations under the Indemnity Agreement, and was also recorded on January 15, 2015 in Los Angeles County.

## 2.5.    The Debtor's Settlement Agreement with Garikian to resolve all outstanding issues and claims.

The parties have agreed to compromise Garikian's claims in order to resolve any dispute as to the Garikian Proofs of Claim, to treat the claims in this bankruptcy case, and to resolve all matters between the parties.

On or around January 20, 2018, the Debtor and Garikian entered into a final written Settlement Agreement formalizing their agreement for the allowance of the Garikian claims in the amount of $60,000, the assumption of the Indemnity Agreement and Parking Structure Leases as modified, and a plan to accomplish the improvement of Lot 5 (an undeveloped portion of the Debtor's real property) so as to satisfy the parking requirements of the County of Los Angeles, and allow Garikian to obtain the necessary parking authorization. Ultimately, the Settlement Agreement will lead to the removal of the Garikian Deed of Trust on the Property once the parking conditions have been

Salvato Law
Offices

1    satisfied and all amounts due to Garikian have been paid, and will permit the possible

2    development of Lot 5 for other, income producing uses.  (*See* Galletly Declaration) All

3    parties and all constituents of the bankruptcy estate will thereby benefit from this

4    Settlement Agreement, which will lead to an enhancement of the value of the Debtor's

5    Property.

6          Please see **Exhibit 1** for an executed copy of the Settlement Agreement that

7    includes the detailed terms of the settlement, which are incorporated herein by reference

8    as though set forth in full.

9          The Debtor's Third Amended Disclosure Statement describing the Debtor's Third

10    Amended Plan of Reorganization dated January 10, 2018 [Dkt. No. 353] contains the

11    general terms of the negotiated agreement between the Debtor and Garikian. Among other

12    things, the Third Amended Plan treats and classifies Garikian's claims as a single Class 5

13    claim in the amount of no more than $60,000, secured by the Property, and provides for

14    the assumption of the Indemnity Agreement (with modifications), the 16-Space Parking

15    Lease Agreement, and the 14-Space Parking Lease Agreement, as modified.

16          Resolution of the Garikian Claims in the manner described in the Debtor's Third

17    Amended Plan and as proposed in the Settlement Agreement, removes a significant

18    contingency of confirmation of the Plan.

19          **2.6.**    **The Order authorizing the Debtor's use of cash collateral**

20                   **through March 31, 2018.**

21          On January 10, 2018, the Court entered an Order approving the stipulation with

22    East West Bank [Dkt. No. 348] for the Debtor's use of cash collateral through March 31,

23    2018. [Dkt. No. 351].

24          In order for the Debtor to make the Lot 5 improvements to the Property—as part of

25    the settlement with Garikian that will remove the Garikian liens, clean title, and increase

26    the value of the Property—the cash collateral order needs to be modified to approve the

27    deposit of $50,000 into the specified segregated account and to authorize the Debtor to

28    make the improvements to Lot 5 for the purposes set forth in the Settlement Agreement.

Salvato Law
Offices

1    (**Exhibit 1** at ¶¶ 7-8).

2    As reported to East West Bank, the $50,000 is the Debtor's estimated budget

3    amount for (1) grading plans for the improved lot and submission of grading plans for

4    approval, (2) grading contractor, (3) asphalt paving, (4) striping, (5) lights, and (6) moving

5    the existing water standpipe.  (*See* Galletly Declaration).

6    The Debtor was unable to obtain East West Bank's approval of this expenditure

7    and authority to use cash collateral prior to the Court's approval of, or even conditional

8    upon, the approval of the compromise and settlement with Garikian.  Thus, the Debtor

9    requests that the modification to the cash collateral authorization be included in the Order

10   approving this motion.

11

12   **3.  Legal Arguments.**

13         **3.1.    Rule 9019 standard for approving a compromise and settlement.**

14   Rule 9019(a) of the Federal Rules of Bankruptcy Procedure authorizes the

15   Bankruptcy Court to approve a compromise or settlement on a motion by the trustee after

16   notice and a hearing.

17   The court will approve a settlement that is fair, equitable, and reasonable. *In re A &*

18   *C Properties*, 784 F.2d 1377, 1382 (9th Cir. 1986), citing *Protective Committee for Indep.*

19   *Stockholders of TMT Trailer Ferry v. Anderson*, 390 U.S. 414, 424-25 (U.S. 1968). In

20   evaluating the reasonableness of the proposed compromise or settlement, bankruptcy

21   courts consider the following factors:

22         "(a) The probability of success in the litigation; (b) the difficulties, if
         any, to be encountered in the matter of collection; (c) the complexity
23         of the litigation involved, and the expense, inconvenience and delay
         necessarily attending it; and (d) the paramount interest of the
24         creditors and a proper deference to their reasonable views in the
         premises."
25

26   *In re A & C Properties*, 784 F.2d at 1381.

27   The bankruptcy court is not required to hold a mini-trial or full evidentiary hearing

28   before approving the settlement; otherwise, compromise would serve no purpose. *In re*


Salvato Law
Offices

1    *Blair*, 538 F.2d 849, 851-52 (9th Cir. 1976). Instead, the court should evaluate whether the

2    settlement falls below the lowest point in the range of reasonableness. *In re Doctors Hosp.*

3    *of Hyde Park, Inc*., 474 F.3d 421, 429-30 (7th Cir. 2007); Collier on Bankruptcy ¶

4    9019.02 (16th ed., 2017).

### 3.2.    The settlement agreement between the Debtor and Garikian is fair and reasonable and should be approved.

7    In this case, the factors weigh strongly in favor of approval of the Settlement

8    Agreement and compromise.

9    Litigating the Garikian secured claims either before this Court or the Superior

10   Court would be expensive and time-consuming, involving complicated issues of fact and

11   law that would unlikely be resolved on summary judgment. In order to avoid costly

12   litigation and to finally resolve their complex dispute, the Debtor and Garikian have

13   entered into a written settlement agreement after substantive negotiations, agreeing to the

14   allowance of the Garikian claims in the amended Plan in the amount not to exceed

15   $60,000 (representing an amount intended to cover all actual legal fees incurred to date).

16   The Debtor will also assume the Indemnity Agreement and Parking Structure Leases (as

17   modified). The settlement will also resolve a condition precedent to confirmation of the

18   proposed Plan.

19   An allowed claim of $60,000 represents a substantial discount from the alleged

20   damage amount set forth in the Garikian's Proofs of Claim Nos. 8 and 10. This discount is

21   fair and reasonable to avoid the additional expenses of any additional claim objection or

22   litigation on a matter that arises from the Proofs of Claim, and the uncertainty that

23   litigation entails.

24   By settling the Garikian claims, the parties will remove an uncertain and

25   undetermined encumbrance on title while also clearing title on the Property. As a result,

26   (assuming the disputes with East West Bank can be resolved) there will likely be equity

27   for junior lienholders whose claims would otherwise be partially unsecured (as in with

28   Dorn Platz Class 6 claim) or completely unsecured (as with the Class 7 and Class 8 claims

Salvato Law
Offices

of RJJ/JFP/Barlow and Bromley/Opics, respectively).

Furthermore, settlement at this time would free up additional time and resources for the Debtor to evaluate the other claims, objections, and litigation in this case for the benefit of the estate and its creditors.

### 3.3. Modification of the cash collateral order to authorize the improvements on Lot 5 is fair, reasonable, and increases the value of the Property.

As part of the Settlement Agreement, the Debtor requires Court approval and authorization to use $50,000 of cash collateral to improve Lot 5, an undeveloped portion of the Debtor's Property.  To that end, Paragraphs 7 and 8 of the Settlement Agreement provide that:

> 7. As part of its motion seeking entry of the Approval Order, ALC shall also seek approval of the deposit of $50,000 into a segregated Debtor-in-Possession account (the "**Lot 5 Improvements Account**"), and authority to use such funds exclusively to make the improvements described in the Purchase and Sale Agreements (the "**Improvement Work**"), consisting of: (a) paving and striping of Lot 5 in accordance with County requirements to accommodate not fewer than 14 vehicles; and (b) relocation of the sprinkler fixtures so that no fewer than 14 vehicles can be parked on Lot 5.

> 8. Upon entry of the Approval Order, ALC will deposit $50,000 into the Lot 5 Improvements Account. Within 60 days of the later of (1) entry of the Approval Order or (2) Garikian's obtaining necessary permits from the County Department of Building and Safety, ALC will begin the **Improvement Work**, which shall be completed not later than 30 days of the date first scheduled for the County hearing on the Permit Parking Application.

The sum of $50,000 is the Debtor's best estimate to cover all of the anticipated costs for (1) grading plans for the improved lot and submission of grading plans for approval, (2) grading contractor, (3) asphalt paving, (4) striping, (5) lights, and (6) moving the existing water standpipe.  (*See* Galletly Declaration).

East West Bank has indicated to the Debtor that it would not authorize the use of the $50,000 for proposed improvements to Lot 5 absent a settlement with Garikian and

Court approval of that settlement. Unfortunately, the Debtor was unable to secure East West Bank's approval to use the required cash collateral in advance of, or conditional upon, receipt of that approval of this compromise, and so the Debtor makes this request for an Order for use of such cash collateral at this time.

Now, in order for the Debtor to make the Lot 5 improvements to the Property—as part of the settlement with Garikian that will remove the Garikian liens and clean title, and will increase the value of the Property with the improvements—the cash collateral order needs to be modified to approve the deposit of $50,000 into a segregated account and authorize the Debtor to make the improvements to Lot 5 on the specific bases set forth in the Garikian Settlement Agreement. (**Exhibit 1** at ¶¶ 7-8).

**4. Conclusion.**

For the foregoing reasons, the Debtor respectfully requests that the Court grant the Motion, approving the Settlement Agreement between the Debtor and Garikian and approving modification of the cash collateral order to authorize the use of $50,000 to make the Lot 5 improvements to the Property.

Dated:   January 25, 2018          SALVATO LAW OFFICES

                                          */s/ Gregory M. Salvato*
                                   By: _____
                                          Gregory M. Salvato
                                          Joseph Boufadel

                                   Attorneys for Debtor-in-Possession
                                   ALTADENA LINCOLN CROSSING
                                   LLC, a Delaware limited liability
                                   company

Salvato Law Offices

Motion for Order to Approve Compromise and to
Modify Cash Collateral Order                    -10-          *In re Altadena Lincoln Crossing LLC, Debtor*
                                                              Case No. 2:17-bk-14276-BB

# DECLARATION OF GREG GALLETLY

I, Greg Galletly, declare:

1.      I am the manager of the Debtor, Altadena Lincoln Property, LLC, a Delaware limited liability company, through my role as the manager of Altadena Dorn Platz, LLC, which is the manager of DPP Altadena, LLC, the manager of the Debtor and Debtor in Possession ("**Debtor**").

## Basis for Personal Knowledge

2.      I am actively involved in the management of the Debtor's Property, and in that connection, I have been actively engaged in the negotiations for the settlement and compromise that is the subject of this Motion.

3.       I submit this Declaration in support of the Debtor's Motion for an order to approve the proposed compromise and settlement with creditor George Garikian, as Trustee of the George Garikian Living Trust, and to approve a modification of the cash collateral order to provide for the cash expenditure required by that compromise (the "**Motion**"). The following facts are known to me of my own personal knowledge, and if called as a witness, I could and would competently testify to the truth thereof.

## Background in Debtor's Bankruptcy Case

4.      On April 7, 2017, the Debtor filed its voluntary Chapter 11 petition, commencing this bankruptcy case. [Dkt. No. 1].

5.      On July 18, 2017, Garikian filed a Motion to Compel Assumption or Rejection of the two parking leases with the Debtor that required the Debtor to provide parking spaces dedicated to the Market Quadrant. [Dkt. No. 157]. The Debtor, in response, sought additional time to decide whether to assume or reject the parking space leases, as well as opposing the motion on other grounds. [Dkt. No. 188].

6.       On August 8, 2017, Garikian filed his Proof of Claim No. 10, seeking a claim for an "unknown [amount] but not less than $5 million" secured by the Debtor's Property located at 2180-2220 Lincoln Avenue, Altadena, CA 91001 based upon the anticipated rejection of an indemnity agreement.

Salvato Law
Offices

7.    On August 8, 2017, Garikian filed his Proof of Claim No. 12, an unsecured claim for an "unknown [amount] but not less than $5 million" for "damages arising from rejection of 99-year Parking Garage Lease."

8.    Ultimately, the Debtor filed a proposed plan of reorganization proposing to reject the Parking Spaces Leases and the Indemnity Agreement upon the Effective Date of the Plan.  Objections to the Garikian Proofs of Claim were being prepared when the parties began discussions of settlement.

## Negotiations to Resolve Parking Impasse

9.    The Debtor has been actively and continuously engaged in negotiations with Mr. Garikian over the series of agreements and conditions pertaining to the parking requirements for the Market Quadrant, a portion of the Debtor's original property that had been sold to Mr. Garikian in 2015. To that end, the Debtor has worked to resolve the parking requirements for the Market Quadrant that involved two long-term leases for a total of 30 spaces in the Debtor's parking structure, which are also to be provided under a separate lease with Garikian's tenant, SK Markets.  An Indemnity Agreement protected Mr. Garikian's and SK Markets' access to those spaces, and the obligations under the Indemnity Agreement are secured by a Deed of Trust encumbering the Debtor's Property. While it was originally contemplated that he Deed of Trust was to be short-lived, for various reasons no parking permit had been secured by Mr. Garikian since 2015, and the Deed of Trust had not been removed at the time the bankruptcy case was commenced.

10.    While the Debtor believed that the Indemnity Agreement and the Deed of Trust were no longer necessary as the Debtor was already required to provide the parking under a pre-existing lease with a tenant on the Market Quadrant, ultimately, the negotiations resulted in agreement upon a mechanism for securing the necessary parking and obtaining the necessary approvals to enable the Deed of Trust to be removed in the near future.

11.    As a result of the discussions and agreement between the parties, the Debtor was able to propose a treatment of the Garikian claims in its most recent Plan of

Salvato Law
Offices

Reorganization to reflect a settlement that has now been finalized in a written Settlement Agreement, subject to Court approval.

**Debtor's Settlement Agreement with Garikian**

12.    The Debtor has engaged in substantive negotiations with Garikian through counsel, ultimately reaching an agreement that permits the parking approval process to go forward with the County of Los Angeles, resolves the outstanding dispute over rejection of the Garikian leases, and allowance of a single Garikian claim in a reduced amount of not more than $60,000, all of which is beneficial to the Debtor's estate.

13.    On or around January 20, 2018, the Debtor and Garikian entered into a final written Settlement Agreement formalizing their agreement for the allowance of the Garikian claims in the amount of $60,000, the Debtor's assumption of the Indemnity Agreement and Parking Structure Leases as modified, and a plan to accomplish the improvement of Lot 5 (an undeveloped portion of the Debtor's real property) so as to satisfy the parking requirements of the County of Los Angeles, and allow Garikian to obtain the necessary parking approvals. Ultimately, the Settlement Agreement will lead to the removal of the Garikian Deed of Trust on the Property once the parking conditions have been satisfied, and will permit the possible development of Lot 5 for other, income producing uses.  All parties and all constituents of the bankruptcy estate will thereby benefit from this Settlement Agreement, which will lead to an enhancement of the value of the Debtor's Property.

14.    The Debtor believes that the Debtor's bankruptcy estate and all constituents will benefit from the Settlement Agreement with Garikian, as it removes one of the conditions precedent to confirmation of the Debtor's plan of reorganization, and removes a major dispute between the parties and potential sizable claims that had been asserted in anticipation of the Debtor's rejection of those agreements.

**Requested Modification of Cash Collateral Order**

15.    The proposed settlement and compromise with Mr. Garikian – subject to Court approval – requires the Debtor to segregate funds in the amount of $50,000 and then

Salvato Law
Offices

1  to spend those funds for certain improvements on Lot 5, an undeveloped portion of the

2  Debtor's Property, to make it usable for an additional 14 parking spaces. The

3  improvements to Lot 5 are a necessary element of the settlement, and will assist in

4  securing the necessary approval permits from the County.

5      16.    As reported to East West Bank, the $50,000 is the Debtor's estimated

6  budget amount for (1) grading plans for the improved lot and submission of grading plans

7  to the County of Los Angeles for approval, (2) the grading contractor, (3) asphalt paving,

8  (4) striping, (5) lights, and (6) moving the existing water standpipe.

9      17.    Ultimately, the Settlement Agreement will permit the Debtor to develop Lot

10  5 with the planned construction of an apartment building with eight additional units,

11  which will lead to the enhancement of the value of the Property.

12      18.    Despite the evident benefit to all parties concerned and the clear

13  enhancement to the value of the Property, East West Bank has refused to approve the use

14  of cash collateral in advance of, or even conditional upon, the Debtor first obtaining

15  approval of the Garikian settlement. Accordingly, the Debtor seeks authorization from the

16  Court to use the Bank's cash collateral, in the sum of $50,000, to implement the terms of

17  the Settlement as described in this Motion.

18      19.    There are sufficient rents held in the Debtor's Debtor in Possession bank

19  account to support this additional expenditure, without an appreciable impact upon the

20  Bank's equity cushion and cash collateral reserve. Use of the funds for improvements to

21  the Debtor's Property as proposed will not impact upon the Debtor's ability to continue its

22  monthly payments to the Bank, as provided in the Cash Collateral Order.

23      I declare under penalty of perjury under the laws of the United States of America

24  that the foregoing is true and correct.

25      Executed on January 25, 2018, at Pasadena, California.

26

27

Salvato Law
Offices     28

_____
Greg Galletly

---

Motion for Order to Approve Compromise and to        -14-        *In re Altadena Lincoln Crossing LLC, Debtor*
Modify Cash Collateral Order                                              Case No. 2:17-bk-14276-BB

1    <u>Exhibit Authenticated by Declaration</u>:

2        1.  Settlement Agreement between the Debtor and Garikian

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Salvato Law
Offices

# EXHIBIT 1

# EXHIBIT 1

# SETTLEMENT AGREEMENT

THIS SETTLEMENT AGREEMENT (this **"Agreement"**) is made as of January 20, 2018 (the **"Effective Date"**) by and between ALTADENA LINCOLN CROSSING, LLC, a Delaware Limited Liability Company (**"ALC"** or **"Debtor"**), on the one hand, and George Garikian as Trustee of the George Garikian Living Trust (**"Garikian"**), on the other hand (collectively, the "**Parties**"), with reference to the following facts:

## I.    RECITALS

A.    ALC is the Debtor in Possession in Chapter 11 proceedings entitled *In re Altadena Lincoln Crossing LLC,* Case No.2:17-bk-14276 BB (the "**Case**"), now pending in the United States Bankruptcy Court for the Central District of California, Los Angeles Division (the "**Court**").  The Case was commenced on April 7, 2017 (the "**Petition Date**").

B.    ALC  is the owner of a three-story parking structure (the "**Parking Structure**"), which is adjacent to, and part of, the parcel of real property listed in Debtor's Schedule A/B filed in the Case.

C.    On or as of August 26, 2014, a date prior to the Petition Date, Garikian and ALC entered into the "Standard Offer, Agreement and Escrow Instructions for Purchase of Real Estate (Non-Residential)" for the sale of a portion of its real property  (the "**PSA**") and on January 8, 2015, Garikian and ALC entered into the following additional agreements; (1) Indemnity Agreement ("**Indemnity Agreement**") (2) Deed of Trust securing ALC's obligations under the Indemnity Agreement ("**Deed of Trust**"); (3) a 99-year lease for 16 parking spaces (the "**16-Space Parking Lease**") and (4) a 99-year lease for 14 parking spaces (the **14-Space Parking Lease**").  Between October 8, 2014, and January 14, 2015, the parties executed a series of amendments to the PSA, including a Fifth Amendment thereto ("**Fifth Amendment to PSA**").  Pursuant to the foregoing Agreements (collectively the "**Purchase and Sale Agreements**"), ALC agreed to sell, and Garikian agreed to purchase, the real property located at and commonly known as 2230-2260 Lincoln Ave., Altadena, California (described in the Purchase and Sale Agreements as the **"Market Quadrant"**).  ALC is the Landlord and Garikian is the Tenant under the 16-Space Parking Lease and the 14-Space Parking Lease (collectively the "**Parking Structure Leases**").  Prior to the sale, ALC was the owner of both the Market Quadrant and another quadrant called, in the Purchase and Sale Agreements, the **"Fitness Quadrant."** (The Parking Structure is located on the Fitness Quadrant.)

D.    Prior to Garikian's purchase of the Market Quadrant, ALC and B&V Enterprises, Inc., dba SK Market (**"SK Market"**) entered into a lease dated April 1, 2008, as amended (collectively, the **"SK Market Lease"**).   SK Market's premises consist of 37,500

1

square feet, which is a portion (approximately 86.5%) of the overall 43,304 square-feet Market Quadrant footprint. Paragraph 18.5 of the SK Market Lease requires that "[SK Market] and its invitees have the non-exclusive right to park in all of the parking spaces located in the Shopping Center (including the surface parking spaces located on the Market Quadrant; the surface parking spaces located on the Fitness Quadrant; and parking spaces located in the parking structure located on the Fitness Quadrant)." Additionally, under the SK Market Lease, SK is granted the exclusive right to thirty (30) parking spaces located on the top level of the Parking Structure for use by SK's employees. The Lease further states that ALC shall not do anything which: (ii) reduces the amount of parking for SK's invitees on the Fitness Quadrant, (iii) reduces the amount of exclusive parking spaces in the Fitness Quadrant Parking structure allocated to SK; or (iv) reduces the parking ratio for both Quadrants (collectively the "**Shopping Center**") below that required by law. A Memorandum of the SK Lease was recorded with the Office of the Los Angeles County Recorder on August 21, 2008 as Instrument No. 20081516511. Debtor contends that it remains obligated to provide the parking spaces under the SK Lease.

E.    The Indemnity Agreement, at paragraph 1(a) thereof, provides for the indemnification of Garikian by ALC against the following occurrences/events:

> "i) any assertion by [SK Market] that section 18.5 of the [SK Market Lease] (or any other provision of the [SK Market Lease] related to parking, in effect on the date of this Indemnity Agreement) has been violated due to the failure to provide exclusivity rights of SK in thirty (30) parking spaces in the [Parking Structure] (ii) any assertion that the property violates applicable laws, codes or ordinances, in effect as of the date of this Indemnity Agreement, regarding the provision of parking spaces based on Tenant Leases in effect on the date of this Indemnitee (*sic*) Agreement (so long as Tenant maintains the 162 onsite parking spaces at the Market Quadrant), (iii) any and all damages and claims that arise in the event that [Garikian], after pursuing diligently and in good faith, is unable to procure from Los Angeles County a parking permit for the Property pursuant to file no. RPKP 201300005 (R2013 -- 01662) (the "**Parking Permit**"), and/or (iv) [ALC's] breach of or default with regard to any of its covenants under that certain Fifth Amendment to Standard Offer, Agreement and Escrow Instructions for Purchase of Real Estate, dated as of November 18, 2014 [copy attached, but omitted here]. This Agreement shall survive the closing under the PSA and the recording of the conveyance deed for the Property to [Garikian]."

F.    A Memorandum of Lease covering the 14-Space Parking Lease to Garikian was recorded on or about January 15, 2015 as Instrument No.20150054311 with the Office of the County Recorder for the County of Los Angeles. A Memorandum of Lease covering the 16-Space Parking Lease to Garikian was recorded on or about January 15, 2015 as Instrument No.20150054312 with the Office of the County Recorder for the

County of Los Angeles.   The Deed of Trust was executed in order to secure ALC's obligations under the Indemnity Agreement, and was recorded on January 15, 2015, as Instrument No. 20150054316 with the Office of the County Recorder for the County of Los Angeles.

G.    Prior to Garikian's purchase of the Market Quadrant, by an agreement entitled "Covenant and Agreement to Hold Property as One Parcel"  (the "**County Covenant**") recorded with the Los Angeles County Recorder's Office as Instrument 06-2724403 on December 7, 2006,  ALC had covenanted with Los Angeles County to hold the Market Quadrant and the Fitness Quadrant as one Parcel, *i.e.*, as an undivided "Shopping Center."

H.    In order to effect the transactions contemplated by the Purchase and Sale Agreements and the Parking Structure Leases, ALC requested that the County of Los Angeles release it from its obligation under the County Covenant to hold the Market Quadrant and the Fitness Quadrant as one unified Shopping Center.  The County of Los Angeles informed the parties that it wanted the shortage of parking to be addressed, and agreed to release the County Covenant, if and only if ALC met the following requirements:

(1)    That it enter into a 99-year lease with Garikian to provide thirty (30) parking spaces in the Parking Structure Lease;

(2)    That the parking area of the Market Quadrant be re-striped by ALC to ensure that all parking spaces were of the correct dimension and code-compliant;

(3)    That ALC would withdraw its request for the Conditional Use Permit and Parking Permit for the vacant lot 5 (which ALC represents is a portion of and not a separate parcel adjacent to) the Fitness Quadrant ("**Lot 5**");

(4)    That ALC could no longer build on lot 5 and it would be converted into a parking lot to satisfy the lack of adequate parking; and

(5)    That it comply with the other requirements set forth in a letter of October 13, 2014 to Ms. Kristina Kuezycki, of the Los Angeles County Department of Regional Planning / Zoning Permits East.

I.    On January 10, 2018, ALC filed in the Case its (1) amended Disclosure Statement entitled "Altadena Lincoln Crossing LLC's Third Amended Disclosure Statement Describing Third Amended Plan of Reorganization" and (2) amended Plan of Reorganization entitled "Altadena Lincoln Crossing LLC's Third Amended Plan of Reorganization dated January 10, 2018." As used herein "**Plan**" shall refer to such Third Amended Plan, as it may be further amended from time to time.

J.    On August 8, 2017, Garikian filed Claim No. 10 (the "**Indemnity Proof of Claim**") and Claim No. 12 (the  "**Lease Rejection Proof of Claim**") in the Case (collectively the "**Garikian Claims**").  Each of the Garikian Claims states a claim amount as "unknown but not less than $5 million."

3

**NOW, THEREFORE, THE PARTIES AGREE AS FOLLOWS:**

## II.  <u>Terms</u>

The recitals contained in paragraphs A through J above are an integral part of this Agreement and are incorporated herein by this reference, and the parties hereto, intending to be legally bound, hereby further covenant and agree as follows:

### <u>Agreement Subject to Court Approval</u>

1.      This Agreement and each of its terms shall be subject to Court approval as evidenced by entry of a final order (the "**Approval Order")** in substantially the same form and of the same content as Exhibit "A" hereto.  Within 14 days of the complete execution of this Agreement, but not later than January 25, 2018, ALC shall file a motion with the Court seeking entry of the Approval Order, which among other things, provides that ALC is authorized to enter into this Agreement and to perform its obligations hereunder.

### <u>The Escrow</u>

2.      Upon complete execution of this Agreement, an escrow (the "**Escrow**") will be opened with First American Title Co. or such other escrow company as the parties may mutually agree in writing, and the documents listed below under the heading "Documents to be Deposited Into Escrow" shall be deposited into such Escrow as and when such documents become available.

### <u>Submittal of Parking Permit Application</u>

3.      ALC represents that it has submitted all documents within ALC's custody and control and which are required by the County to be submitted as part of the **Parking Permit Application**, as the County has acknowledged.   Garikian has submitted the Parking Permit Application to the County and requested a hearing thereon.  Garikian will transmit to ALC any information he receives from the County regarding the status of the Parking Permit Application.

### <u>Assumption of Parking Structure Leases</u>

4.      Pursuant to the terms of the compromise represented by this Agreement, ALC has filed an amended Plan of Reorganization to provide for:

> (a)  assumption of the 16-Space Parking Lease and seek an order approving the Plan and such assumption; and

(b) assumption of an amended 14-space Parking Lease, which amendment shall provide that its term will expire when the SK Market Lease terminates (the "**Amended 14 Space Parking Lease**").  The Amended 14-Space Parking Lease will be in substantially the same for and of the same content as Exhibit "D" hereto.

Provided that the terms of such assumption entail only the foregoing modification, Garikian will not object to such assumption of the Amended 14-Space Parking Lease or the 16-Space Parking Lease as proposed in the Debtor's amended Plan of Reorganization.

## Treatment of the SK Lease in the Plan

5.     ALC shall either:  (1) Amend its Schedule G to include the SK Lease as an unexpired lease, or (2) in its Schedule A/B identify the on-going rights of SK Market to 30 spaces in the Fitness Quadrant as provided in the SK Lease.  Thereafter, ALC shall either (a) seek Court approval for assumption of the SK Lease and include such assumption as part of its Plan, or (b) provide in its Disclosure Statement and Plan that SK's rights in such 30 spaces shall not be abrogated by any act initiated by ALC.

## Lot 5 Improvements/Segregated Account

6.     As part of its motion seeking entry of the Approval Order, ALC shall also seek approval of the deposit of $50,000 into a segregated Debtor-in-Possession account (the "**Lot 5 Improvements Account**"), and authority to use such funds exclusively to make the improvements described in the Purchase and Sale Agreements  (the "**Improvement Work**"), consisting of: (a) paving and striping of Lot 5 in accordance with County requirements to accommodate not fewer than 14 vehicles; and (b) relocation of the sprinkler fixtures so that no fewer than 14 vehicles can be parked on Lot 5.

7.     Upon entry of the Approval Order, ALC will deposit $50,000 into the Lot 5 Improvements Account. Within 60 days of the later of (1) entry of the Approval Order or (2) Garikian's obtaining necessary permits from the County Department of Building and Safety, ALC will begin the **Improvement Work**, which shall be completed not later than 30 days of the date first scheduled for the County hearing on the Permit Parking Application.

## Availability to the Market Quadrant of 16 Parking Spaces in the Parking Structure

8.     ALC acknowledges and reaffirms its obligation to Garikian regarding the availability of parking spaces under the 16-Space Parking Lease, which provides in pertinent part in Paragraph 1 thereof that:

"Landlord [ALC] shall ensure that  the parking requirements of all of the tenant leases

("Tenant Leases") affecting the Market Quadrant as of the date of this Lease (under the tenant leases as they exist as of the date of this Lease) [January 8, 2015] shall at all times be satisfied by Landlord with regard to the spaces demised under this Lease (along with the 162 onsite parking spaces at the Market Quadrant), it being understood that such assurance by Landlord shall not cover any code changes or voluntary modifications by Tenant to the Market Quadrant parking that reduces the available parking spaces thereon."

## Amendment of Indemnity Proof of Claim / Withdrawal of Lease Rejection Claim

9.    Upon full execution of this Agreement, and upon ALC's submittal of an amended Plan and disclosure statement as provided above,  Garikian will (a) file an amended Proof of Claim (the "**Amended Indemnity Claim**"), amending the Indemnity Claim (Proof of Claim No. 10)  to reduce the Garikian claim to the actual amount of  its attorneys' fees and costs incurred in the Case, not to exceed $60,000, to remain secured by the Deed of Trust and to be paid under the Debtor's plan within six months of the Effective Date; and (b)  file a Withdrawal of the Lease Rejection Proof of Claim (Proof of Claim No. 12), without prejudice to refiling.   ALC will not object, nor cause any other party to object, to the Amended Indemnity Claim, as described herein.

10.   Garikian and ALC will execute a modification of the Fifth Amendment to the PSA (the "**Modification Agreement")** in substantially the same form and of substantially the same content as Exhibit "B" hereto, providing for, among other things, that so long as Seller (ALC) continues to provide the requisite parking spaces under the SK Lease in the Parking Structure, Buyer (Garikian) shall not object to any application by ALC for the development of Lot 5 for other uses.

## Amendment of Debtor's Disclosure Statement and Plan

11.   As provided in Paragraph 4 above, upon full execution of this Agreement, Debtor shall file an amended Disclosure Statement and Plan which modify the treatment of Garikian and the Garikian claims to be consistent with the provisions hereof; including but not limited to:
    12.1   Assumption of the 16 Space Parking Space Lease
    12.2   Assumption of the 14 Space Parking Space Lease, as modified herein
    12.3   Allowance of the Amended Indemnity Claim as provided herein and payment of the Amended Indemnity Claim within six months of the Effective Date; and
    12.4   Release of the Deed of Trust upon full payment of the Amended Indemnity Claim.

## Documents To Be Deposited Into Escrow

12.   Following complete execution of this Agreement, but not later than June 30, 2018 unless extended by mutual agreement of the Parties, the following documents shall be deposited into Escrow:

6

(1)     Escrow instructions providing for the exchange/release of documents upon Close of  Escrow (the "**Escrow Instructions**"), in substantially the same form and of substantially the same content as Exhibit "C" hereto;

(2)     Duplicate originals of this Agreement;

(3)     The Modification Agreement, in substantially the same form and of substantially the same content as Exhibit "B" hereto;

(4)     The entered Approval Order in substantially the same form and of substantially the same content as Exhibit "A" hereto;

(5)     The entered Order of the Court confirming Debtor's Plan, which shall have been amended in accordance with this Agreement to provide for the assumption of the 16-Space Parking Lease and the Amended 14-Space Parking Lease;

(6)     Issued permit(s) by the County of Los Angeles granting without conditions the Parking Permit Application;

(7)     The Amended 14-Space Parking Lease, in the form of Exhibit "D" hereto.

(8)     Written confirmation and photographs establishing that the Lot 5 Improvements have been completed.

## The Closing

13.     (A)     "**Closing**" shall occur upon the occurrence of each and all of the following:

(1)     Entry of the Approval Order as a final order and deposit of the Approval Order into Escrow;

(2)     Entry of an order confirming ALC's Plan which provides for the assumption of the 16 Space Parking Lease and the Amended 14-Space Parking Lease under applicable authority, and deposit into Escrow of an order granting approval for the assumption of such leases;

(3)     Deposit into Escrow of documentary and photographic evidence that the Lot 5 Improvements have been completed in accordance with one or more issued permits and the Approval Order;

(4)     Issuance by the County of the Parking Permit in accordance with the Parking Permit Application and deposit into Escrow of such permit;

(5)     Deposit into Escrow of duplicate originals of the Modification Agreement, signed by each of the Parties;

(B)     Upon Closing, the following shall be delivered to each of the parties:

To Garikian:

(1)     A duplicate original of this Agreement, bearing an original signature hereon on behalf of ALC;

(2)     A duplicate original of the Modification Agreement, bearing an original signature hereon on behalf of ALC;

(3)     A duplicate original of the Amended 14-Space Parking Lease, bearing

7

an original signature thereon on behalf of ALC

To ALC
(1)      A duplicate original of this Agreement, bearing an original signature
         hereon on behalf of Garikian;
(2)      A duplicate original of the Modification Agreement, bearing an
         original signature thereon on behalf of Garikian;
(3)      A duplicate original of the Amended 14-Space Parking Lease, bearing
         an original signature thereon on behalf of ALC
(4)      A certified copy of the Parking Permit.


## Event of Non-Closing By Closing Deadline

14.    In the event Closing does not occur on or before June 30, 2018 (the "**Closing
       Deadline**"), or by any extension of the Closing Deadline agreed upon by the Parties in
       writing, this Agreement shall be deemed terminated, and without further force or effect.
       In such event, all items deposited into Escrow by Garikian will be returned to Garikian,
       and all items deposited into Escrow by ALC will be returned to ALC.


## Conversion or Appointment of Chapter 11 Trustee

15.    If, after Closing, the Case is converted to one under Chapter 7 of the Bankruptcy Code,
       or a Chapter 11 Trustee is appointed in the Case, this Agreement shall remain in full
       force and effect and binding upon any such Chapter 11 Trustee or any trustee appointed
       upon conversion of the Case.  In the event Closing has not occurred prior to any such
       Chapter 11-trustee appointment or conversion of the case,  Garikian may elect to
       terminate this Agreement and cancel the Escrow.  Upon such event, all items deposited
       into Escrow by Garikian will be returned to Garikian, and all items deposited into
       Escrow by ALC will be returned to the Case Trustee.


## Dismissal of ALC Bankruptcy Case

16.    In the event of a dismissal of the Case prior to Closing, the Closing requirements shall
       be modified by **Amended Closing Instructions** to remove any Closing requirements
       entailing the filing of documents in the Case or the requirements(s) of Court orders,
       provided such filings or Court orders have not previously been entered. In the
       event any such dismissal occurs after Closing, the provisions of Bankruptcy Code section
       349(b) regarding "Effects of Dismissal" shall not be applicable to the transfers and
       agreements made pursuant to this Agreement, as set forth more fully in the form of
       Approval Order attached as Exhibit "A" hereto.

8

## Representations and Warranties

17.    As an inducement to Garikian to enter in this Agreement, ALC represents and warrants:

(a)    Lot 5 is an integral part of the Fitness Quadrant and is not a separate parcel.

(b)    Upon entry of the Approval Order, this Agreement will be valid, binding and enforceable against ALC in accordance with its terms, and by his sole signature hereon, Greg Galletly is authorized to enter into this Agreement on behalf of ALC;

(c)    Except as provided herein, no consent, approval or authorization of, or filing, registration or qualification with, any person or entity is required to be obtained in connection with the execution and delivery of this Agreement, or any undertaking or performance of any liability or obligation hereunder other than any such consents, authorizations and/or approvals which have been obtained.

(d)    The execution and delivery of this Agreement and the performance by ALC of its obligations hereunder will not conflict with, or result in any breach of, any judgment, writ, injunction or decree of any court or governmental authority, or any agreement or instrument to which  is a party or by which ALC is or may be bound.

(e)    With the exception of the 15 exclusive parking rights already granted by ALC to the residential tenants (9 spaces) and to two retail tenants (1 space to Eileen Chang dba 20/20 Vision, and 5 spaces to Earth Tone), ALC has not granted to any other tenant of the Fitness Quadrant any further exclusive parking rights which would impinge upon the allocation of the 16 parking spaces to the Market Quadrant.

(f)    No representation or warranty by ALC contained in this Agreement, or any certificate or other instrument, agreement or document furnished to Garikian pursuant to this Agreement or in connection with the preparation and negotiation of this Agreement contains any untrue statement of material fact or omits to state a material fact necessary to make such representation or warranty not misleading in light of the circumstances under which it was made.

18.    As an inducement to ALC to enter in this Agreement, Garikian represents and warrants:

(a)    Upon entry of the Approval Order, this Agreement will be valid, binding and enforceable against Garikian in accordance with its terms, and that George Garikian has full and complete authority to bind the Trust by his signature hereon;

(b)    Except as provided herein, no consent, approval or authorization of, or filing,

9

registration or qualification with, any person or entity is required to be obtained in connection with the execution and delivery of this Agreement, or any undertaking or performance of any liability or obligation hereunder other than any such consents, authorizations and/or approvals which have been obtained.

(c)    The execution and delivery of this Agreement and the performance by Garikian of its obligations hereunder and thereunder will not conflict with, or result in any breach of, any judgment, writ, injunction or decree of any court or governmental authority, or any agreement or instrument to which  is a party or by which Garikian is or may be bound.

(d)    No representation or warranty by Garikian contained in this Agreement, or any certificate or other instrument, agreement or document furnished to ALC pursuant to this Agreement or in connection with the preparation and negotiation of this Agreement contains any untrue statement of material fact or omits to state a material fact necessary to make such representation or warranty not misleading in light of the circumstances under which it was made.

Each party expressly acknowledges that the foregoing representations and warranties it has made herein are made to induce the other party to enter into this Agreement, and each understands that its representations and warranties made herein are being specifically relied upon by the other as a material inducement  to enter into this Agreement and to forbear from exercising rights and remedies that might otherwise be available to it.

## Execution of Further Agreements and Documents

19.    The parties shall  execute and deliver such further agreements or additional documents as may be necessary to effectuate the intent and objectives of this Agreement.

## Execution in Counterparts

20.    This Agreement may be executed in several counterparts, and all  so executed shall constitute this Agreement, that shall be binding upon all Parties hereto, regardless of whether all of the Parties are signatories to the original or to the same counterpart. Facsimile or photocopy signatures shall be considered originals.

## Construction of Agreement

21.    This Agreement is the product of negotiations and preparation by and among each Party and his/her/its attorneys. Therefore, the Parties acknowledge and agree that this Agreement shall not be deemed prepared or drafted by one party or another, and should be construed accordingly. The headings in the Agreement are for convenience only, and shall not be deemed to aid in the interpretation of this Agreement or any part hereof.

## Governing Law

22.    This Agreement shall be governed by the laws of the State of California, without giving effect to principles of conflicts of laws, and shall be construed without the aid of any canon, custom or rule of law requiring construction against the draftsman.

## Retention of Jurisdiction

23.    The parties agree that the Court may retain jurisdiction for the purpose of determining any dispute arising from this Agreement.

**IN WITNESS WHEREOF**, the undersigned have executed this Agreement as of the date set forth above, and agree as indicated herein.

Altadena Lincoln Crossing, LLC, Debtor in
Possession

By: Greg Galletly, Managing Member

George Garikian, Trustee of
The George Garikian Living Trust

By: George Garikian, Trustee

Exhibit Attachments:

A) Form of Approval Order
B) Modification to Fifth Amendment (regarding Lot 5)
C) Escrow Instructions
D) Amended Indemnity Proof of Claim
E) Amended 14-Space Parking Space Lease

11

**Governing Law**

22.    This Agreement shall be governed by the laws of the State of California, without giving
effect to principles of conflicts of laws, and shall be construed without the aid of any
canon, custom or rule of law requiring construction against the draftsman.

**Retention of Jurisdiction**

23.    The parties agree that the Court may retain jurisdiction for the purpose of determining
any dispute arising from this Agreement.

**IN WITNESS WHEREOF**, the undersigned have executed this Agreement as of the date set
forth above, and agree as indicated herein.

Altadena Lincoln Crossing. LLC, Debtor in
Possession

By: Greg Galletly, Managing Member

George Garikian. Trustee of
The George Garikian Living Trust

By: George Garikian, Trustee

Exhibit Attachments:

A) Form of Approval Order
B) Modification to Fifth Amendment (regarding Lot 5)
C) Escrow Instructions
D) Amended Indemnity Proof of Claim
E) Amended 14-Space Parking Space Lease

11

Approved as to Form and Content:

Barness & Barness LLP

By: _____
       Daniel L. Barness, Esq.

Attorneys for George Garikian, Trustee
The George Garikian Living Trust


Salvato Law Offices

By: _____
       Gregory M. Salvato, Esq.

Attorneys for Debtor in Possession
Altadena Lincoln Crossing, LLC

Case 2:17-bk-14276-BB    Doc 363-1    Filed 01/23/18    Entered 01/23/18 17:09:16    Desc
Exhibit 1    Page 16 of 43

# EXHIBIT "A"

1  GREGORY M. SALVATO (SBN 126285)
       Gsalvato@salvatolawoffices.com
2  JOSEPH BOUFADEL (SBN 267312)
       Jboufadel@salvatolawoffices.com
3  SALVATO LAW OFFICES
4  Wells Fargo Center
   355 South Grand Avenue, Suite 2450
5  Los Angeles, California 90071-9500
6  Telephone:   (213) 484-8400
   Facsimile:    (213) 402-3778
7
   Attorneys for Debtor-in-Possession
8  ALTADENA LINCOLN CROSSING LLC,
   a Delaware limited liability company
9

10            **UNITED STATES BANKRUPTCY COURT**

11            **CENTRAL DISTRICT OF CALIFORNIA**

12                   **LOS ANGELES**

13

14  In re:                          | Case No. 2:17-bk-14276-BB

15  ALTADENA LINCOLN CROSSING       | Chapter 11
    LLC, a Delaware limited liability
16  company,                        | **Order Approving Debtor's Motion to
                                      Approve Settlement with George
17            Debtor.                 Garikian as Trustee of the George
                                      Garikian Living Trust**
18

19

20                                    Hearing:
                                    Date:   February ___, 2018
21                                  Time:   10:00 a.m.
22                                  Place:  Courtroom 1539
                                            255 E. Temple Street
23                                          Los Angeles, CA 90012

24

25

26

27

Salvato Law
Offices    28

1    The Bankruptcy Court, having considered the "Motion to Approve Settlement with

2    George Garikian as Trustee of the George Garikian Living Trust," between Debtor

3    Altadena Lincoln Crossing LLC (the "**Debtor**") and Creditor George Garikian as Trustee

4    of the George Garikian Living Trust ("**Garikian**"), through their respective counsel, filed

5    on January___, 2018 (the "**Motion**"), and for good cause appearing,

6

7    **IT IS HEREBY ORDERED THAT:**

8    1.    The Motion is granted.

9    2.    The settlement agreement between the Debtor and Garikian is approved, a

10    copy of which is attached to this Order as **Exhibit A** and is incorporated by reference as

11    though set forth in full.

12    3.    The Debtor is authorized to enter into the Settlement Agreement and take all

13    actions in performance thereof; *provided, however,* that any use of cash collateral must

14    require approval of East West Bank or a further Order of the Court.

15

16    ###

17

18

19

20

21

22

23

24

25

26

27

Salvato Law
Offices

28

Case 2:17-bk-14276-BB    Doc 369-1    Filed 01/25/18    Entered 01/25/18 17:09:16    Desc
Exhibit 1    Page 16 of 43

# EXHIBIT "B"

# MODIFICATION AGREEMENT

   This Agreement for the Modification of "Fifth Amendment to Standard Offer, Agreement and Escrow Instructions for Purchase of Real Estate" (the "**Fifth Amendment**") (a copy of which is attached as Exhibit "A") is made as of January 17, 2018 (the "**Effective Date**") by and between ALTADENA LINCOLN CROSSING, LLC, a Delaware Limited Liability Company ("**ALC**"), on the one hand, and George Garikian as Trustee of the George Garikian Living Trust ("**Garikian**" or the "**Trust**"), on the other hand (collectively, the "**Parties**"), pursuant to the Settlement Agreement of even date  between the Parties.

Whereas, and for the consideration set forth in the Settlement Agreement, the Parties agree that the Fifth Amendment may be, and hereby is, modified as follows:

1.     Paragraph 2(b) shall be modified to strike the words: "*(and Seller shall not further amend said application to remove or modify those parking spaces without Buyer's express written consent)*" and replace them with the words "*and, provided that Seller continues to provide the requisite parking spaces under the SK Lease, Buyer will not object to any application by Seller for the development of Lot 5 for other uses*".

2.     With the modifications set forth in Paragraph 1 above, Paragraph 2(b) of the Fifth Amendment shall hereafter read as follows:

    "b. Buyer and Seller shall have entered into a new parking lease or leases on terms and conditions approved by Buyer, providing for sixteen (16) parking spaces in the garage at 376 Acacia Street, Altadena (the"Garage"), and, subject to paragraph 3 below, fourteen (14) parking spaces on Lot 5 (which Lot 5 is shown in Exhibit "A" attached hereto), which is adjacent to the Property(the"Parking Leases"), or in the Garage. Said parking spaces on Lot 5 shall have been incorporated into the Revised Exhibit "A"application (R2004-00402 and RCUP 200700155 and parking permit case RPKP 200600011 ), and said Lot 5 shall be "tied" to the remainder of Seller's property that is adjacent to the Property by an an instrument approved by Los Angeles County in writing to ensure that the provided parking cannot be altered except with further Los Angeles County approval *(and, provided that Seller continues to provide the requisite parking spaces under the SK Lease, Buyer will not object to any application by Seller for the development of Lot 5 for other uses)*; this covenant shall survive the close of escrow)."

3.     Except as modified by the foregoing, the Fifth Amendment shall in all other respects remain unmodified, and in full force and effect.

1

So Agreed.

Altadena Lincoln Crossing, LLC, Debtor in
Possession

Approved as to Form and Content

Salvato Law Offices
Attorneys for Debtor in Possession

By:_____

Gregory Galletly, Managing Member

By:_____

Gregory M. Salvato, Esq.
Dated:_____

The George Garikian Living Trust

Approved as to Form and Content

Barness & Barness LLP
Attorneys for  The George Garikian Living
Trust

By: _____

George Garikian, Trustee

By:_____

Daniel I. Barness, Esq.

2

Case 2:17-bk-14276-BB   Doc 369-1   Filed 01/26/18   Entered 01/26/18 17:09:16   Desc
Exhibit 1   Page 21 of 43

# Exhibit "A"

**Fifth Amendment to PSA Lease**

<u>Fifth Amendment to Standard Offer, Agreement and Escrow Instructions
for Purchase of Real Estate (Non-Residential)</u>

This Fifth Amendment to Standard Offer, Agreement and Escrow Instructions for
Purchase of Real Estate is made as of this ___ th day of November, 2014 (this "**Fifth
Amendment**") by and between George Garikian, Trustee of the George Garikian Living Trust
("**Buyer**"), and Altadena Lincoln Crossing, LLC, a Delaware limited liability company
("**Seller**"), with reference to the following:

A. Buyer and Seller entered into that certain Standard Offer, Agreement and Escrow
Instructions for Purchase of Real Estate executed on or about August 26, 2014 for the purchase
of certain real property located at 2230-68 Lincoln Avenue, Altadena, California, as amended by
four (4) prior amendments to such agreement (collectively, as amended, the "**Agreement**").

B. Buyer and Seller desire to further amend the Agreement on the terms and conditions
set forth below. Capitalized terms used below but not otherwise defined herein shall have the
meaning given to such terms in the Agreement.

AGREEMENT:

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which
is hereby acknowledged, Buyer and Seller agree to amend the Agreement as follows:

1. Conditioned on all of the matters set forth in the Agreement and in this Fifth Amendment,
   Buyer hereby waives the Buyer's Contingencies.

2. In addition to the closing conditions in favor of Buyer under the Agreement, the
   following shall be conditions precedent to Buyer's obligations to complete the purchase
   of the Property (and shall be deemed included in paragraph 35 of the Agreement):

   a. The documentation requirements of Buyer's lender, which may include without
      limitation tenant estoppels and SNDAs, and approval of environmental studies,
      shall be fulfilled to the lender's satisfaction, and the lender shall have funded its
      purchase money loan, or terms and conditions approved by Buyer.

   b. Buyer and Seller shall have entered into a new parking lease or leases on terms
      and conditions approved by Buyer, providing for sixteen (16) parking spaces in
      the garage at 376 Acacia Street, Altadena (the "Garage"), and, subject to
      paragraph 3 below, fourteen (14) parking spaces on lot 5 (which lot 5 is shown in
      Exhibit "A" attached hereto), which is adjacent to the Property (the "Parking
      Leases"), or in the Garage. Said parking spaces on lot 5 shall have been
      incorporated into the Revised Exhibit "A" application (R2004-00402 and RCUP
      200700155 and parking permit case RPKP 200600011), and said lot 5 shall be
      "tied" to the remainder of Seller's property that is adjacent to the Property by an
      instrument approved by Los Angeles County in writing to ensure that the
      provided parking cannot be altered except with further Los Angeles County
      approval (and Seller shall not further amend said application to remove or modify

1

### Fifth Amendment to Standard Offer, Agreement and Escrow Instructions
### for Purchase of Real Estate (Non-Residential)

This Fifth Amendment to Standard Offer, Agreement and Escrow Instructions for Purchase of Real Estate is made as of this __ th day of November, 2014 (this "**Fifth Amendment**") by and between George Garikian, Trustee of the George Garikian Living Trust ("**Buyer**"), and Altadena Lincoln Crossing, LLC, a Delaware limited liability company ("**Seller**"), with reference to the following:

A. Buyer and Seller entered into that certain Standard Offer, Agreement and Escrow Instructions for Purchase of Real Estate executed on or about August 26, 2014 for the purchase of certain real property located at 2230-68 Lincoln Avenue, Altadena, California, as amended by four (4) prior amendments to such agreement (collectively, as amended, the "**Agreement**").

B. Buyer and Seller desire to further amend the Agreement on the terms and conditions set forth below. Capitalized terms used below but not otherwise defined herein shall have the meaning given to such terms in the Agreement.

### AGREEMENT:

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, Buyer and Seller agree to amend the Agreement as follows:

1. Conditioned on all of the matters set forth in the Agreement and in this Fifth Amendment, Buyer hereby waives the Buyer's Contingencies.

2. In addition to the closing conditions in favor of Buyer under the Agreement, the following shall be conditions precedent to Buyer's obligations to complete the purchase of the Property (and shall be deemed included in paragraph 35 of the Agreement):

   a. The documentation requirements of Buyer's lender, which may include without limitation tenant estoppels and SNDAs, and approval of environmental studies, shall be fulfilled to the lender's satisfaction, and the lender shall have funded its purchase money loan, or terms and conditions approved by Buyer.

   b. Buyer and Seller shall have entered into a new parking lease or leases on terms and conditions approved by Buyer, providing for sixteen (16) parking spaces in the garage at 376 Acacia Street, Altadena (the "Garage"), and, subject to paragraph 3 below, fourteen (14) parking spaces on lot 5 (which lot 5 is shown in Exhibit "A" attached hereto), which is adjacent to the Property (the "Parking Leases"), or in the Garage. Said parking spaces on lot 5 shall have been incorporated into the Revised Exhibit "A" application (R2004-00402 and RCUP 200700155 and parking permit case RPKP 200600011), and said lot 5 shall be "tied" to the remainder of Seller's property that is adjacent to the Property by an instrument approved by Los Angeles County in writing to ensure that the provided parking cannot be altered except with further Los Angeles County approval (and Seller shall not further amend said application to remove or modify

1

those parking spaces without Buyer's express written consent; this covenant shall survive the close of escrow).

c.  Schedule B exception 27 (set forth in the Title Company's preliminary report for the Property dated April 11, 2014 for order no. 00022664-x49) shall have been terminated as a matter of record and shall not be included in any title policy issued on the closing.

3.  Seller shall prior to the scheduled closing date procure (x) fully executed amendments to the leases between Seller and one or more tenants of the Property (to the extent necessary) such that the Garage has lawful and adequate parking for such tenants and their employees and/or invitees, as reasonably determined by Buyer, and (y) the written consent of Los Angeles County, on terms and conditions acceptable to Buyer, to the concept that such tenants' employee and other parking needs as set forth in such tenants' leases and/or the requirements of applicable codes or ordinances regarding the provision of parking spaces are satisfied by the Parking Leases (using lot 5 or the Garage). Seller shall also procure executed non-disturbance agreements from all of its secured lenders in favor of Buyer with regard to the Parking Leases, in form and content acceptable to Buyer, prior to the scheduled closing date. Seller shall prior to the issuance of the parking permit described in paragraph 5 below date make such improvements to lot 5 so that it can be used for the purposes described in the applicable Parking Lease in compliance with applicable law. Seller shall indemnify, defend and hold harmless Buyer (and its related successors and assigns) from and against any and all claims, losses, costs and expenses (including but not limited to attorneys' fees and costs) which arise out of or relate to (a) any assertion by B&V Enterprises, Inc. ("SK"), the tenant under a lease with Seller dated April 1, 2008 (the "SK Lease"), that section 18.5 of the SK Lease (or any other provision of the SK Lease related to parking has been violated due to the failure to provide exclusivity rights of SK in thirty (30) parking spaces in the Garage, and/or (b) any assertion that the Property violates applicable laws, codes or ordinances regarding the provision of parking spaces, and/or (c) the failure to complete the improvements described in the preceding sentence promptly following the close of escrow for the sale of the Property. Such indemnity shall, at Buyer's request, be further set forth in an instrument that is secured by a deed of trust on Seller's remaining properties comprising the shopping center and adjacent properties of which the Property is a part (which will record on the closing date), and in such event Seller shall cause its secured lender to provide a non-disturbance agreement regarding said deed of trust, in form and content reasonably acceptable to Buyer, as a closing condition in favor of Buyer (which will be deemed added to the closing conditions set forth in paragraph 35 of the Agreement). The foregoing provisions shall survive the close of escrow.

4.  Seller shall immediately comply with all of the covenants and conditions applicable to Seller that are contained in that certain letter from Buyer to Kristina Kulczycki, a copy of which is attached hereto as Exhibit "B" and by this reference incorporated herein.

5.  Upon the closing, Seller shall execute and deliver to Buyer an indemnity agreement in form and content designated by Buyer which will protect Buyer from damages and

2

claims that arise in the event that Buyer is unable to procure from Los Angeles County a parking permit for the Property pursuant to file no. RPKP 201300005 (R2013-01662). Such indemnity agreement shall be secured by a deed of trust on Seller's remaining property that is in the vicinity of and/or adjacent to the Property. Seller shall procure the written consent to said deed of trust from its lender on such other property, in form and content acceptable to Buyer. The said indemnity agreement and deed of trust will terminate if and when such parking permit is issued on terms and conditions acceptable to Buyer.

6. Seller shall use its best efforts to procure such documents and consents as may be needed in order to waive the condition set forth in paragraph 40(a) of the Agreement.

7. The scheduled closing date is hereby moved to December 19, 2014, provided, however, that if all of the conditions in favor of Buyer have not been fully satisfied by said date, Buyer shall have the right to extend said date to January 15, 2015.

8. The Purchase Price is hereby amended to be $15,225,000.00.

9. This Fifth Amendment shall be governed by and construed in accordance with the laws of the State of California.

10. All rights and obligations of the parties hereunder shall be binding upon and inure to the benefit of the parties and the successors and assigns of each such party.

11. This Fifth Amendment may be executed in any number of counterparts, each of which shall be effective only upon delivery and thereafter shall be deemed an original, and all of which shall be taken to be one and the same instrument, for the same effect as if all parties hereto had signed the same signature page. In the event of any conflict between the provisions of the Agreement and the provisions of this Fifth Amendment, the provisions of this Fifth Amendment shall control.

IN WITNESS WHEREOF, the parties hereto have executed this Fifth Amendment as of the day and year first above written.

George Garikian, Trustee of the George
Garikian Living Trust

ALTADENA LINCOLN CROSSING, LLC,
a Delaware limited liability company

By:
Name: Gus Calderusly
Its: Manager

3

EXHIBIT "A"
LOT 5

4

EXHIBIT "B"

October 30, 2014

Ms. Kristina Kulczycki
Regional Planning Assistant II
Zoning Permits East
Department of Regional Planning
320 West Temple Street, 13ᵗʰ floor
Los Angeles, CA 90012

Re: Lincoln Crossing Parking

Dear Ms. Kulczycki:

This letter sets forth the anticipated structure of the resolution of the potential parking issues in
relation to the referenced property, and the requested termination of the covenant and agreement
made by Altadena Lincoln Crossing, LLC ("ALC") for the benefit of the County of Los Angeles,
which is dated December 7, 2006 and was recorded in the Official Records of Los Angeles County as
Instrument No. 06-2724403 (the "Restrictive Instrument"), as follows:

1.    As you know, The George Garikian Living Trust ("Buyer") is under contract to purchase the
"Market Quadrant" portion of the Lincoln Crossing shopping center project, which portion has a
common street address of 2230-2268 Lincoln Ave., Altadena, CA (the "Subject Property"), from
ALC. ALC will continue to own the "Fitness Quadrant" portion of the Lincoln Crossing project.
ALC has agreed to allow Buyer to take over and continue with the existing parking permit case
RPKP 201300005 (R2013-01662), with the application being amended to have the Buyer's name.

2.    ALC will provide travel information kiosks and displays situated in common areas and
work with project site tenants to produce and distribute alternative travel mode and rideshare
opportunities information to employees. Said kiosks and displays shall contain no advertisements
or be located in such a way that it would take from the current landscaping and parking space.

3.    We anticipate that prior to the Restrictive Instrument being terminated and removed as a matter
of record affecting title to the Subject Property, the parking areas of the Market Quadrant will
be restriped by ALC to ensure that all spaces are of the correct dimensions and meet code. If ALC
fails to complete the restriping by the time that the sale escrow for the Subject Property closes, Buyer
will complete the restriping project.

4.    To ameliorate any shortage in onsite parking for the Subject Property, Buyer and ALC have
agreed to enter into a 99 year lease to provide up to thirty (30) parking spaces in the parking structure

5

located at 376 Acacia Street which is owned by ALC; a draft of that lease is attached hereto as Exhibit "A". Buyer and ALC have agreed that a short form memorandum of the parking lease will be recorded. ALC will cause its lender to provide a non-disturbance agreement with regard to the parking lease so that even a foreclosure of the deed of trust which encumbers the land on which the parking structure is built will not terminate the lease.

5.    ALC has agreed to withdraw its request for the Conditional Use Permit and Parking Permit for lot 5 of the Lincoln Crossing project (R2013-01660 (RPKP 201300006) and RCUP-201300082). ALC shall submit an official letter requesting the withdrawal with seven (7) business days following the execution of this agreement.

6.    ALC has agreed to file a Revised Exhibit "A" application (R2004-0402 and RCUP 2007-00115 and parking permit case RPKP 200600011) to update the current layout of the Fitness Quadrant site, to update the parking table, and to identify the bike parking for the reduction in necessary parking spaces. In addition the necessary bike parking will be installed in the Fitness and Market Quadrants per code. ALC has also agreed to not use the parking structure in relation to the development and/or operation of lot 5 of the Lincoln Crossing project, and that parking will be provided on said lot 5 for all future improvements on that lot. The revised exhibit "A" shall be submitted with in seven (7) business days following the execution of this agreement. Buyer needs written confirmation from the county that the foregoing matters are approved.

7.    ALC has agreed that the parking spaces for the Market Quadrant in the parking structure will be clearly identified and parking in these spaces will be restricted to Market Quadrant employees.

8.    Attached hereto as Exhibit "B" is an analysis of the available parking usage at the Lincoln Crossing project.

9.    We will not be able to obtain a loan and close the purchase of the Subject Property unless the Restrictive Instrument is terminated and removed. Accordingly, it is critical that the County agree to terminate and remove the Restrictive Instrument as a matter of record concurrently with the closing of Buyer's purchase of the Subject Property, the recordation of the memorandum of the 99 year lease, and upon inspecting the restriped parking to determine that it matches the approved site plan and that the new bike parking meets code.

10.    Time is of the essence in this transaction and we would like to close the transaction by the end of November. Prior to Buyer spending additional funds in connection with its loan commitment, Buyer would like the County to review and approve this term sheet and enter into an agreement incorporating the above matters.

Please call me with any questions regarding the foregoing. Thank you.

George Garikian, for The George
Garikian Living Trust

Agreed, acknowledged and confirmed.

6

Altadena Lincoln Crossing, LLC

By: _____
Its: _____

EXHIBIT "A"
PARKING LEASE

EXHIBIT "B"
PARKING AVAILABILITY ANALYSIS

As currently developed, the Fitness Quadrant site has 182 parking spaces required for the gym (based on an occupancy load determination of 545), the 9 existing 1-bedroom apartment units require 14 parking spaces, the retail spaces take up 8,422 square feet and require 34 parking spaces, and the Subway restaurant has an occupancy load determination of 30 which would require 10 parking spaces. The total number of required parking based on the current uses of the Fitness Quadrant site is 240 spaces. Following is the breakdown:

**Fitness Quadrant parking calculations**

Current uses on the site:

| | | |
|---|---|---|
| 24-Hour Fitness Gym | 545 OL / 3 = | 182 |
| 9 Existing 1-BR apartment units | (9 x 1.5 = 13.5) | 14 |
| Retail (Bldg 3) | 8,422 / 250= | 34 |
| Subway | 30 OL / 3 = | 10 |

| | |
|---|---|
| Total | 240 spaces required |
| | 244 spaces are provided |

Therefore, there are 4 available parking spaces that could be utilized by the Market Quadrant if authorized through a parking permit.

If section 22.52.1081 is applied (which allows for a 5% reduction in parking if bike parking is provided above the amount that is required by the code), then that would reduce the number of required parking spaces by 12. Therefore, **only 228 spaces would be required and the Fitness Quadrant would have 16 additional spaces that could be used by the Market Quadrant.**

If the Market Quadrant also applies the 5% bike parking reduction, then the required parking will be reduced by 9 spaces (from 187 to 178 required spaces...162 spaces are provided). **Therefore, the Market Quadrant would only be missing 16 spaces.**

9



# EXHIBIT "C"

# JOINT ESCROW INSTRUCTIONS

These Joint Escrow Instructions are made and entered into as of January 17, 2018 by and between, George Garikian as Trustee of the George Garikian Living Trust ("**Garikian**"), on the one hand, and ALTADENA LINCOLN CROSSING, LLC ("**ALC**"), on the other, pursuant to that certain Settlement Agreement of even date **(**the "**Settlement Agreement**"**)** by and between the foregoing parties (the "**Parties**"), and, if necessary, shall append, or be appended to, any Standard Escrow Instructions that may be required by First American Title Co. Of Los Angels [OR ALTERNATE SELECTED BY THE PARTIES] (the "**Escrow Agent**") in connection with the Settlement Agreement and Escrow Account #:_____ (the "**Escrow**").

The Escrow Agent is instructed as follows:

## I.    Documents To Be Deposited Into Escrow

Following complete execution of the Settlement Agreement, but not later than February 28, 2018, the following documents (all as defined in the Settlement Agreement) shall be deposited into Escrow:

(1)    These Instructions, fully executed by the Parties and/or their respective attorneys of record;

(2)    Execution version of the Settlement Agreement;

(3)    Execution version of the Modification Agreement;

(4)    The entered Approval Order ;

(5)    Entered Order(s) of the Court approving ALC's assumptions of the Parking Structure Leases;

(6)    The entered Order of the Court confirming ALC's Plan, which shall have been amended in accordance with the Settlement Agreement;

(7)    Issued permit(s) by the County of Los Angeles granting without conditions the Parking Permit Application;

(8)    Unfiled Amended Garikian Indemnity Proof of Claim;

(9)    Written confirmation and photographs establishing that the Lot 5 Improvements have been completed;

(9)    Request for Reconveyance of the Deed of Trust in recordable form.

## II.    The Closing

(A)    "**Closing**" shall occur upon the occurrence of each and all of the following:

(1)    Entry of the Approval Order as a final order of the Court and deposit of the Approval Order into Escrow;

(2)    Entry of an order of the Court granting a motion seeking approval for ALC to assume the 16-Space Parking Lease and the Amended 14-Space Parking Lease <u>or</u> of an order confirming ALC's Plan which provides for the assumption of such leases under applicable authority, and deposit into

Escrow of an order granting approval for the assumption of such leases;

(3)    Deposit into Escrow of documentary and photographic evidence that the Lot 5 Improvements have been completed in accordance with one or more issued permits and the Approval Order – with a "Receipt Acknowledged" sign-off by or on behalf of Garikian;

(4)    Issuance by the County of the Parking Permit in accordance with the Parking Permit Application and deposit into Escrow of duplicate certified copies of such permit;

(5)    Deposit into Escrow of the Amended Indemnity Proof of claim showing confirmation of filing:

(6)    Deposit into Escrow of duplicate originals of the Modification Agreement, signed by each of the Parties.

(B)    Upon Closing, the following shall be delivered to the respective Parties:

To Garikian:
(1)    A duplicate original of the Settlement Agreement, bearing an original signature on behalf of ALC;

(2)    A duplicate original of the Modification Agreement, bearing an original signature thereon on behalf of ALC;

(3)    A copy of the items described in Paragraph 1(A)(3) above as evidence of completion of the Lot 5 Improvements;

(4)    A duplicate certified copy of the (issued) Parking Permit

To ALC
(1)    A duplicate original of the Settlement Agreement, bearing an original signature on behalf of Garikian;

(2)    A duplicate original of the Modification Agreement, bearing an original signature thereon on behalf of Garikian;

(2)    The (recordable) Request for Reconveyance;

(3)    ECF confirmation or other Proof of the filing with the Court of the Withdrawal of the Lease Rejection Proof of Claim;

(4)    ECF confirmation or other proof of the filing with the Court of the Amended Indemnity Proof of Claim;

(5)    A duplicate certified copy of the (issued) Parking Permit

## III.    Event of Non-Closing

1.    In the event Closing does not occur on or before May 31, 2018 (the "**Closing Deadline**"), or by any further extension(s) of the Closing Deadline agreed upon by the Parties in writing, the Settlement Agreement shall be deemed terminated, and without further force or effect. In such event, upon written notice of such termination to the Escrow Agent, the Escrow Agent shall return  all items deposited into Escrow by Garikian to Garikian, and all items deposited into Escrow by ALC to ALC.

IV. **Notices**

2.   The following are the Parties' respective addresses/contact information for notice/delivery
     purposes under these Escrow Instructions:

     **To ALC:**

     c/o Gregory M. Salvato, Esq.
     Gsalvato@Salvatolawoffices.com

     SALVATO LAW OFFICES
     355 So. Grand Avenue, Suite 2450
     Los Angeles, CA 90071-9500
     Telephone: (213) 484-8400
     Facsimile: (213) 402-3778

     **To Garikian**:

     c/o Daniel I. Barness, Esq.
     Daniel@BarnessLaw.com

     BARNESS & BARNESS LLP
     11377 W. Olympic Blvd., 2nd Floor
     Los Angeles, CA 90064
     Telephone:  (310) 594-3011
     Facsimile:  (310) 473-8700


Altadena Lincoln Crossing, LLC, Debtor                The George Garikian Living Trust
 in Possession

                                                      _____
_____                       By: George Garikian, Trustee
By: Gregory Galetly, Managing
     Member


Approved as to Form and Content                       Approved as to Form and Content

                                                      Barness & Barness LLP
Salvato Law Offices                                   Attorneys for  The George Garikian
Attorneys for Debtor in Possession                     Living Trust


By:_____                     By:_____
Gregory M. Salvato, Esq.                              Daniel I. Barness, Esq.

# EXHIBIT "D"

**Fill in this information to identify the case:**

| | |
|---|---|
| Debtor 1 | ALTADENA LINCOLN CROSSING LLC |
| Debtor 2 (Spouse, if filing) | |
| United States Bankruptcy Court for the: | Central District Of California |
| Case number | 2:17-bk-14276 BB |

Official Form 410

# Proof of Claim

04 /16

Read the instructions before filling out this form. This form is for making a claim for payment in a bankruptcy case. Do not use this form to make a request for payment of an administrative expense. Make such a request according to 11 U.S.C. § 503.

Filers must leave out or redact information that is entitled to privacy on this form or on any attached documents. Attach redacted copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages, and security agreements. Do not send original documents; they may be destroyed after scanning. If the documents are not available, explain in an attachment.

A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.

Fill in all the information about the claim as of the date the case was filed. That date is on the notice of bankruptcy (Form 309) that you received.

## Part 1:    Identify the Claim

| | | |
|---|---|---|
| 1. | Who is the current creditor? | **The George Garikian Family Trust** <br> Name of the current creditor (the person or entity to be paid for this claim) <br><br> Other names the creditor used with the debtor _____ |
| 2. | Has this claim been acquired from someone else? | ☒ No <br> ☐ Yes.  From whom? _____ |

| | | | |
|---|---|---|---|
| 3. | Where should notices and payments to the creditor be sent? <br><br> Federal Rule of Bankruptcy Procedure (FRBP) 2002(g) | **Where should notices to the creditor be sent?** <br><br> The George Garikian Family Trust <br> Name <br> c/o Barness & Barness LLP, 11377 W. Olympic Blvd. <br> Number    Street <br> Los Angeles        CA        90064 <br> City        State        ZIP Code <br><br> Contact phone  (310) 594-3011 <br> Contact email _____ <br><br> Uniform claim identifier for electronic payments in chapter 13 (if you use one): <br><br> __ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __ | **Where should payments to the creditor be sent?** (if different) <br><br> The George Garikian Family Trust <br> Name <br> c/o Barness & Barness LLP, 11377 W. Olympic Blvd. <br> Number    Street <br> Los Angeles        CA        90064 <br> City        State        ZIP Code <br><br> Contact phone  (310) 594-3011 <br> Contact email _____ |

| | | |
|---|---|---|
| 4. | Does this claim amend one already filed? | ☐ No <br> X Yes.  Claim number on court claims registry (if known) ___10___        Filed on  **08/08/17** <br>          MM / DD / YYYY |
| 5. | Do you know if anyone else has filed a proof of claim for this claim? | X No <br> ☐ Yes.  Who made the earlier filing? _____ |

| **Part 2:** | **Give Information About the Claim as of the Date the Case Was Filed** |
|---|---|

| | | |
|---|---|---|
| 6. | **Do you have any number you use to identify the debtor?** | ☐ s   _ _____   _ _____ |

| | | | |
|---|---|---|---|
| 7. | **How much is the claim?** | Unknown, but not to exceed $60,000 | **Does this amount include interest or other charges?**<br>X No<br>☐ Yes. Attach statement itemizing interest, fees, expenses, or other charges required by Bankruptcy Rule 3001(c)(2)(A). |

| | | |
|---|---|---|
| 8. | **What is the basis of the claim?** | Examples: Goods sold, money loaned, lease, services performed, personal injury or wrongful death, or credit card.<br><br>Attach redacted copies of any documents supporting the claim required by Bankruptcy Rule 3001(c).<br><br>Limit disclosing information that is entitled to privacy, such as healthcare information.<br><br>Indemnity Agreement secured by 2230-2260 Lincoln Ave., Altadena, California |

| | | |
|---|---|---|
| 9. | **Is all or part of the claim secured?** | ☐ No<br>☒ Yes. The claim is secured by a lien on property.<br><br>**Nature of property:**<br>☒ Real estate. If the claim is secured by the debtor's principal residence, file a *Mortgage Proof of Claim Attachment* (Official Form 410-A) with this *Proof of Claim*.<br>☐ Motor vehicle<br>☐ Other. Describe: _____<br><br>**Basis for perfection:** Deed of Trust - Recorded against real property<br>_____<br>Attach redacted copies of documents, if any, that show evidence of perfection of a security interest (for example, a mortgage, lien, certificate of title, financing statement, or other document that shows the lien has been filed or recorded.)<br><br>**Value of property:**  $ 20,000,000<br>**Amount of the claim that is secured:**  $60,000 *<br><br>**Amount of the claim that is unsecured:**  $_0_____ (The sum of the secured and unsecured amounts should match the amount in line 7.)<br><br>* Unknown but not to exceed $60,000<br><br>**Amount necessary to cure any default as of the date of the petition:**  $_____<br><br>**Annual Interest Rate** (when case was filed)_____%<br>☐ Fixed<br>☐ Variable |

| | | |
|---|---|---|
| 10. | **Is this claim based on a lease?** | X No<br>☐ Yes. **Amount necessary to cure any default as of the date of the petition.**  $_____ |

| | | |
|---|---|---|
| 11. | **Is this claim subject to a right of setoff?** | X No<br>☐ Yes. Identify the property: _____ |

| | | |
|---|---|---|
| 12. | **Is all or part of the claim entitled to priority under 11 U.S.C. § 507(a)?** | ☐ No<br>☒ Yes. *Check all that apply:*          **Amount entitled to priority** |

| | | |
|---|---|---|
| A claim may be partly priority and partly nonpriority. For example, in some categories, the law limits the amount entitled to priority. | ☐ Domestic support obligations (including alimony and child support) under 11 U.S.C. § 507(a)(1)(A) or (a)(1)(B). | $_____ |
| | ☐ Up to $2,850* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use. 11 U.S.C. § 507(a)(7). | $_____ |
| | ☐ Wages, salaries, or commissions (up to $12,850*) earned within 180 days before the bankruptcy petition is filed or the debtor's business ends, whichever is earlier. 11 U.S.C. § 507(a)(4). | $_____ |
| | ☐ Taxes or penalties owed to governmental units. 11 U.S.C. § 507(a)(8). | $_____ |
| | ☐ Contributions to an employee benefit plan. 11 U.S.C. § 507(a)(5). | $_____ |
| | ☒ Other. Specify subsection of 11 U.S.C. § 507(a)(__2__) that applies. | $ 60,000   _____ |

\* Amounts are subject to adjustment on 4/1/16 and every 3 years after that for cases begun on or after the date of adjustment.

## Part 3:   Sign Below

| | |
|---|---|
| **The person completing this proof of claim must sign and date it. FRBP 9011(b).**<br><br>If you file this claim electronically, FRBP 5005(a)(2) authorizes courts to establish local rules specifying what a signature is.<br><br>**A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157 and 3571.** | *Check the appropriate box:*<br><br>☐ I am the creditor.<br>☒ I am the creditor's attorney or authorized agent.<br>☐ I am the trustee, or the debtor, or their authorized agent. Bankruptcy Rule 3004.<br>☐ I am a guarantor, surety, endorser, or other codebtor. Bankruptcy Rule 3005.<br><br>I understand that an authorized signature on this *Proof of Claim* serves as an acknowledgment that when calculating the amount of the claim, the creditor gave the debtor credit for any payments received toward the debt.<br><br>I have examined the information in this *Proof of Claim* and have a reasonable belief that the information is true and correct.<br><br>I declare under penalty of perjury that the foregoing is true and correct.<br><br>Executed on date  _____<br>            MM / DD / YYYY<br><br>            /s/ Daniel I. Barness _____<br>            Signature<br><br>**Print the name of the person who is completing and signing this claim:**<br><br>Name        Daniel I. Barness<br>            First name      Middle name      Last name<br><br>Title        Attorneys  for The George Garikian Family Trust<br><br>Company   Barness & Barness LLP<br>            Identify the corporate servicer as the company if the authorized agent is a servicer.<br><br>Address    c/o Barness & Barness LLP, 11377 W. Olympic Blvd.<br>            Number       Street<br>            Los Angeles          CA          90064<br>            City              State      ZIP Code<br><br>Contact phone   (310) 594-3011          Email  _____ |

# EXHIBIT "E"

## AMENDMENT TO PARKING SPACE LEASE
## DATED AS OF JANUARY 8, 2015

.
This Amendment is made as of January 7, 2018 by and between ALTAENA LINCOLN
CROSSING, LLC, a Delaware Limited Liability Company ("**ALC**"/"**Landlord**"), on the one
hand, and George Garikian as Trustee of the George Garikian Living Trust ("**Garikian**")
/"**Tenant**"), on the other hand (collectively, the "**Parties**"), and modifies the PARKING SPACE
LEASE dated as of January 8, 2015,  (the "14-Space Lease") as to which a Memorandum of
Lease, bearing Recording No.20150054311 is of record with the Los Angeles County Recorder's
Office.  This Amendment is made pursuant to the Settlement Agreement of even date between
the Parties and in accordance with paragraph 24(l)of the 14-Space Lease.

Paragraph 3 of the 14-Space Lease is hereby modified as follows:

"3. **Term**.  The term of this lease (the "Term") shall begin on January 8, 2015 (the "Effective
Date"), and shall expire up the earlier of: (1) termination of that certain Shopping Center Lease
by and between ALC and B&V Enterprises, Inc. dated April 1, 2008 and/or (2) Ninety-nine (99)
years from the Effective Date."

Except as modified by the foregoing, the 14-Space Lease shall in all other respects remain
unmodified, and in full force and effect. Further, and for the sake of clarification, this
Amendment shall modify and apply only to the 14-Space Lease, and not the separate lease
agreement between the Parties entitled: "Parking Space and Trash Enclosure Lease " dated as of
January 8, 2015.

So Agreed.

Altadena Lincoln Crossing, LLC, Landlord          Approved as to Form and Content

                                                   Salvato Law Offices
                                                   Attorneys for Landlord

By: _____                By:_____
Gregory Galletly, Managing Member,                Gregory M. Salvato, Esq.

The George Garikian Living Trust, Lessee

By:_____
        George Garikian, Trustee

Approved as to Form and Content

Barness & Barness LLP
Attorneys for The George Garikian Living
Trust

By:_____
Daniel I. Barness, Esq.

.

Proof of Service   Page 10 of 20

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding.  My business address is:

**Salvato Law Offices, 355 South Grand Avenue Suite 2450, Los Angeles, CA 90071-9500**

A true and correct copy of the foregoing document entitled (*specify*):

1. **Notice of Motion for Order to: Approve Compromise between Debtor Altadena Lincoln Crossing, LLC and George Garikian as Trustee of the George Garikian Living Trust; Modify Cash Collateral Order to Approve $50,000 Expenditure Required by Compromise; Memorandum of Points and Authorities; Declaration of Greg Galletly in Support; and**

2. **Motion for Order to: Approve Compromise between Debtor Altadena Lincoln Crossing, LLC and George Garikian as Trustee of the George Garikian Living Trust; Modify Cash Collateral Order to Approve $50,000 Expenditure Required by Compromise; Memorandum of Points and Authorities; Declaration of Greg Galletly in Support; and**

will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner stated below:

**1.  TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**:  Pursuant to controlling General Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document. On (*date*) **1/25/2018**, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:

- Daniel I Barness    daniel@barnesslaw.com
- Anastasia E Bessey    anastasia.bessey@kralikjacobs.com, rina.ross@kralikjacobs.com,aeblaw@gmail.com
- Mikel R Bistrow    mikel.bistrow@dinsmore.com, caron.burke@dinsmore.com
- J Scott Bovitz    bovitz@bovitz-spitzer.com
- Peter W Bowie    peter.bowie@dinsmore.com, caron.burke@dinsmore.com
- Christopher Celentino    chris.celentino@dinsmore.com, caron.burke@dinsmore.com
- Lois Jacobs    lois.jacobs@kralikjacobs.com
- Lisa Lenherr    ll@tiemlaw.com, sml@tiemlaw.com
- Ron Maroko    ron.maroko@usdoj.gov
- Gregory M Salvato    gsalvato@salvatolawoffices.com, calendar@salvatolawoffices.com;jboufadel@salvatolawoffices.com;gsalvato@ecf.inforuptcy.com
- James A Tiemstra    jat@tiemlaw.com, sml@tiemlaw.com
- United States Trustee (LA)    ustpregion16.la.ecf@usdoj.gov

☐ Service information continued on attached page

**2.  SERVED BY UNITED STATES MAIL**:
On (*date*) _____, I served the following persons and/or entities at the last known addresses in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail, first class, postage prepaid, and addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge will be completed no later than 24 hours after the document is filed.

☐ Service information continued on attached page

//
//
//
//
//
//

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*June 2012*                                                      **F 9013-3.1.PROOF.SERVICE**

**3. SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL** (state method for each person or entity served): Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on (date) *1/25/2018*, I served the following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows. Listing the judge here constitutes a declaration that personal delivery on, or overnight mail to, the judge will be completed no later than 24 hours after the document is filed.

Overnight
Honorable Sheri Bluebond
United States Bankruptcy Court
255 E. Temple Street, Suite 1534
Los Angeles, CA 90012

☐ Service information continued on attached page

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

| 1/25/2018 | Lynnette Garrett | /s/ Lynnette Garrett |
|-----------|------------------|----------------------|
| Date | Printed Name | Signature |

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

June 2012

**F 9013-3.1.PROOF.SERVICE**

# EXHIBIT "2"

1  Daniel I. Barness
     SBN 104203, Daniel@BarnessLaw.com
2  **BARNESS & BARNESS LLP**
     13636 Ventura Blvd.
3  Los Angeles, CA 91423
     Telephone:  (310) 594-3011
4  Facsimile:  (818) 906-2638

5  Attorneys for **The George Garikian Living Trust**, Creditor

6                    **UNITED  STATES BANKRUPTCY COURT**

7                    **CENTRAL  DISTRICT OF CALIFORNIA**

8                        **LOS ANGELES DIVISION**

                                        Case No. 2:17-bk-14276 BB
9
                                        Chapter 11
10   In re                           )
                                        )
11   ALTADENA LINCOLN CROSSING,       )  **OPPOSITION BY THE GEORGE**
     LLC,                            )  **GARIKIAN LIVING TRUST TO**
12                                     )  **"MOTION TO APPROVE**
                                        )  **AGREEMENT WITH EAST WEST**
13              Debtor.                )  **BANK FOR: (1) SETTLEMENT OF**
                                        )  **STATE COURT ACTION; (2)**
14                                     )  **RELIEF FROM STAY; AND**
                                        )  **(3) DISMISSAL OF NINTH CIRCUIT**
15                                     )  **APPEAL"; DECLARATION OF**
                                        )  **DANIEL I. BARNESS**
16                                     )
                                        )  **[REQUEST FOR JUDICIAL NOTICE**
17   _____  )  **FILED CONCURRENTLY]**

                                        DATE:      January 29, 2020
18                                     TIME:      10:00 A.M.
                                        CRTRM:     1539
19                                                 255 E. Temple Street
                                                   Los Angeles, CA 90012
20

21

22

23

24

25

26

27

28
                                                                            1

# TABLE OF CONTENTS

I.         INTRODUCTION

II.        STATEMENT OF FACTS

III.       DISCUSSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

           A. Applicable Authorities . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8
.

           B. Applicable Authorities Do Not Support the Trustee's Motion . . . . . . . . . . . . . . 10

           1.      The Garikian Settlement Agreement is binding upon the Trustee and the
                   Estate . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

           2.      The Motion Invites Harm to Garikian, the Estate and Successors  . . . . . . . . 10

                        a.      Harm to Garikian . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10
                        b.  Harm to Estate and/or Successor Owner   . . . . . . . . . . . . . . . . 11

           3.      The Motion is Ineffectual as a Request to Set Aside the Garikian Settlement
                   Order . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

IV.   CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

           DECLARATION OF DANIEL I. BARNESS   . . . . . . . . . . . . . . . . . . . . . . . 14

# **TABLE OF AUTHORITIES**

CASES

*Albert v. Chesapeake Bank & Trust Co. (In re Linton Props., LLC)*, 410 B.R. 1, 12 Bankr. D.D.C.2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*Creative Data Forms, Inc. v. Pennsylvania Minority Business Development Authority*, 72 Bankr. 619, 623 (E.D. Pa. 1985). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*Ford Motor Credit Co. v. Weaver*, 680 F.2d 451, 461 (6th Cir.1982) . . . . . . . . . . . . . . . . . . . . 8

*In re Johnson,* 518 F.2d 246, 251 (10th Cir.), cert. denied, 423 U.S. 893, 96 S. Ct. 191, 46 L. Ed. 2d 125 (1975) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*Leonard v. Vrooman,* 383 F.2d 556, 561 (9th Cir.1967) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*Mosser v. Darrow*, 341 U.S. 267, 273-74, 71 S. Ct. 680, 683, 95 L. Ed. 927 (1951) . . . . . . . . . . . . 8

*Sherr v. Winkler*, 552 F.2d 1367, 1374 (10th Cir.1977). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*In re Valley Engineering Company*, 41 Bankr. 509 (Bankr. N.D. Ill. 1984) . . . . . . . . . . . . . . . . . . 9

*Wolf v. Weinstein*, 372 U.S. 633, 650, 83 S. Ct. 969, 979, 10 L. Ed. 2d 33 (1963).. . . . . . . . . . . . .8

STATUTES/RULES

Federal Rules of Civil Procedure

Rule 59 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9, 10

Rule 60 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9, 10

Federal Rules of Bankruptcy Procedure

Rule 9023 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

ii

**OPPOSITION BY THE GEORGE GARIKIAN LIVING TRUST TO "MOTION TO APPROVE AGREEMENT WITH EAST WEST BANK FOR: (1) SETTLEMENT OF STATE COURT ACTION; (2) RELIEF FROM STAY; AND (3) DISMISSAL OF NINTH CIRCUIT APPEAL" DECLARATION OF DANIEL I. BARNESS**

ii

The George Garikian Living Trust (the "Garikian Trust" or "Garikian") submits this Opposition to the Motion by the Chapter 11 Trustee herein (the "Trustee") entitled:  "Motion to Approve Agreement with East West Bank For: (1) Settlement of State Court Action; (2) Relief from Stay; and (3) Dismissal of Ninth Circuit Appeal" (the "Motion") and to the underlying settlement agreement with EWB (the "EWB Settlement").

## I.    **INTRODUCTION**

For substantive and procedural reasons the Motion should be denied:  Harm to the Estate will be among other  adverse consequences of granting the Motion, in that it will result in the setting-aside of the Court's order approving the below-described Garikian Settlement.   In the absence of that settlement, Garikian will assert damages against the Estate arising from rejection of post-petition leases; Garikian's  $5 million secured claim will be reinstated (now as a sold-out junior with an elephantine administrative  claim).  It is also likely that as a consequence,  the Estate will incur the risks and expense of costly litigation to determine Garikian's damages resulting from  the post-petition rejection.

If implemented, the EWB Settlement will cause economic harm to  Garikian as well: By throwing the settled parking issues into disarray and uncertainty, a significant cloud on title, which the Garikian Settlement seeks to avoid, will remain on Garikian's Market Quadrant (defined below). This same disarray and uncertainty over Code-compliant parking  will also cloud the title of  the Estate's below-defined Fitness Quadrant.  That cloud impedes a sale of the Market Quadrant by EWB or its successor, if not preventing a sale altogether.  The Motion not only fails to address the potential harm arising from unwinding the Garikian Settlement, it fails even to mention that Settlement or the Court's order approving it.

The Motion is also procedurally improper, and for that reason alone should be denied:  It is a

OPPOSITION BY  THE GEORGE GARIKIAN LIVING TRUST TO "MOTION TO APPROVE AGREEMENT WITH EAST WEST BANK FOR: (1) SETTLEMENT OF STATE COURT ACTION; (2) RELIEF FROM STAY; AND (3) DISMISSAL OF NINTH CIRCUIT APPEAL" DECLARATION OF DANIEL I. BARNESS

2

disguised attempt to undo a previous Court Order approving a Settlement Agreement between this Chapter 11 Estate and Garikian (the "Garikian Settlement"), and is in dereliction of the Trustee's duties under the Code to act as fiduciary on behalf of all creditors and the Estate.

Accordingly, the Garikian Trust respectfully requests that the Court deny the Motion and decline to approve the EWB Settlement.

## II.    STATEMENT OF FACTS

The following facts are established by the record of these proceedings; the concurrently-filed Request for Judicial Notice ("RJN"); and by the annexed declaration of Daniel I. Barness ("Barness Declaration"):

1.  This case was commenced on April 7, 2017 (the "Petition Date") (Doc 1).  From the Petition Date until October 3, 2019, when a Chapter 11 trustee was appointed (Doc 968), Debtor had been acting as debtor in possession herein.  After close to two years of litigation concerning eight iterations of a plan of reorganization by the former debtor in possession (Doc 943), and after appeals by EWB regarding its default interest assessed against Debtor -- culminating in the Ninth Circuit appeal covered by the Motion -- on October 7, 2019, the Court entered an order appointing a Chapter 11 trustee, followed by the acceptance of such appointment by Jason Rund (the "Chapter 11 Trustee")  [(Doc  965); Barness Declaration, ¶ 1].

2.  Initially (prior to the Petition Date), Debtor's predecessor-entity Altadena Lincoln Crossing, LLC ("ALC")[1] owned an integrated singular shopping center (the "ALC Center") consisting of two quadrants -- the Fitness Quadrant, which had as its anchor tenant a 24-Hour Fitness facility (the "Fitness Quadrant"); and (across the street) the Market Quadrant, which had as

---

[1]    As used herein, "ALC" will mean  the pre-petition Debtor.

**OPPOSITION BY  THE GEORGE GARIKIAN LIVING TRUST TO "MOTION TO APPROVE AGREEMENT WITH EAST WEST BANK FOR: (1) SETTLEMENT OF STATE COURT ACTION; (2) RELIEF FROM STAY; AND (3) DISMISSAL OF NINTH CIRCUIT APPEAL" DECLARATION OF DANIEL I. BARNESS**

3

its anchor tenant Super King Market (the "Market Quadrant").   A covenant in favor of  Los

Angeles County entitled " " (the "County Covenant") that was  recorded on December 7,

2005[2] required that the ALC Center not be legally divided, *i.e.*,  that the Fitness Quadrant and

the Market Quadrant be maintained as a singular ALC Center, versus two legally divided

parcels with two separate centers. [Barness Declaration, ¶ 2]

3.     In order to effect a sale of  the Market Quadrant that would conform to Los Angeles County

requirements and lead to the release of the County's subdivision restriction, the parties (ALC

and Garikian), as part of the documentation of their purchase and sale agreement dated

January 15, 2015[3] (the "Purchase and Sale Agreement") also entered into the Leases and the

Indemnity Agreement, which were incorporated into and made part of the Purchase and Sale

Agreement and documentation. [(Doc 412); RJN, Exhibit "A"] Among other things, these

agreements were intended to achieve formal compliance with County requirements regarding

the Off-Site Parking Arrangements – a condition for the release of the County Covenant

which otherwise would have prevented  the division of the formerly integrated (undivided)

ALC Center [Barness Declaration, ¶ 3].  A Memorandum of Lease covering the 14-Space

Parking Lease [RJN, Exhibit "C"] and a Memorandum of Lease covering the 16-Space

Parking Lease [RJN, Exhibit "D"] were recorded on January15, 2015 in Los Angeles County.

The Indemnity [RJN, Exhibit "E"] The Deed of Trust  [RJN, Exhibit "F"] was executed in

order to secure the Debtor's obligations under the Indemnity Agreement, and was also

recorded on January 15, 2015 in Los Angeles County.   The template for these arrangements

is set forth in correspondence between the County and Garikian, which is part of the record

---

[2]     See RJN, Exhibit "B" and Garikian Declaration [(Doc 412, ¶¶ 1-7); RJN, Exhibit "A".]

[3]     [(Doc 412), ¶¶ 1-7; RJN, Exhibit "A"]

**OPPOSITION BY  THE GEORGE GARIKIAN LIVING TRUST TO "MOTION TO APPROVE
AGREEMENT WITH EAST WEST BANK FOR: (1) SETTLEMENT OF STATE COURT
ACTION; (2) RELIEF FROM STAY; AND (3) DISMISSAL OF NINTH CIRCUIT APPEAL"
DECLARATION OF DANIEL I. BARNESS**                                                                              4

of these proceedings   [RJN, Exhibit "A"].

4.    As a result of these transactions, ALC (the Estate's predecessor) retained the Fitness

Quadrant and conveyed the Market Quadrant to Garikian.  The sale transaction, without

more, however, would have been impermissible, because it would have left the (Garikian's)

Market Quadrant without sufficient parking according to County requirements and would

have been in abrogation of the parties' agreements with the County upon which withdrawal of

the County Covenant was conditioned. [Barness Declaration, ¶ 4] So, following  guidelines

approved by the County, the parties entered into a number of ancillary agreements, including:

(1) an Indemnity Agreement [ RJN, Exhibit "E" ]: (2) the 14-Space Parking Lease [RJN,

Exhibit "F" ]; and (3) the 16-Space Parking Lease [RJN, Exhibit "D" ][4].

5.    These agreements implemented the County-approved arrangements allocating on ALC's

Fitness Quadrant 30 parking spaces, to be granted to the (Garikian) Market Quadrant to

adjust for the loss of parking resulting from dividing the integrated Center into two

separately-owned parts. The obligations under the Indemnity Agreement were secured by a

deed of trust to the Fitness Quadrant in favor of Garikian [RJN, Exhibit "F"][5].  The Off-Site

---

[4]    Doc 91, pp.34-36 (RJN, Exhibit "E") will hereinafter be called the "Indemnity
Agreement" and the 14-Space Lease and the 16-Space Lease will hereinafter be
called collectively the "Parking Leases".

[5]    The Indemnity Agreement provides indemnification by ALC against the risks of "(i)
any assertion by [SK Market] that section 18.5 of the [SK Market Lease] (or any
other provision of the [SK Market Lease] related to parking, in effect on the date of
this Indemnity Agreement) has been violated due to the failure to provide exclusivity
rights of SK in thirty (30) parking spaces in the [Parking Structure], (ii) any assertion
that the property violates applicable laws, codes or ordinances, in effect as of the
date of this Indemnity Agreement, regarding the provision of parking
spaces based on Tenant Leases in effect on the date of this Indemnitee
(sic) Agreement (so long as Tenant maintains the 162 onsite parking
spaces at the Market Quadrant), (iii) any and all damages and claims that
arise in the event that [Garikian], after pursuing diligently and in good
faith, is unable to procure from Los Angeles County a parking permit for

---

**OPPOSITION BY  THE GEORGE GARIKIAN LIVING TRUST TO "MOTION TO APPROVE
AGREEMENT WITH EAST WEST BANK FOR: (1) SETTLEMENT OF STATE COURT
ACTION; (2) RELIEF FROM STAY; AND (3) DISMISSAL OF NINTH CIRCUIT APPEAL"
DECLARATION OF DANIEL I. BARNESS**

Parking Arrangements agreed by the parties (the "Off-Site Parking Arrangements") also

included certain specified improvements to ALC's  Lot 5 (a vacant lot) to accommodate 14

parking spaces. These improvements (the "Lot 5 Improvements") included the following: (a)

grading of the unimproved Lot 5 (an undeveloped portion of the Debtor's real property) and

permit approvals, (b) paving and striping of Lot 5 in accordance with County requirements;

and (c) relocation of the sprinkler fixtures, so that no fewer than 14 vehicles can be parked on

Lot 5. (RJN, Exhibit "A" at  pp. 7-8).  Without the Lot 5 Improvements, there would be an

undue parking burden on the Fitness Quadrant, which otherwise would have an inadequate

number of parking spaces to accommodate employees and visitors. *Id.*

6.     Following the Petition Date, a significant dispute arose between Garikian and the Estate

when the former debtor-in-possession proposed its First Amended (Doc 160) and Second

Amended (Doc 293) Plans.  The First Amended Plan was silent as to assumption/rejection;

and the Second Amended Plan would have effected a rejection of the Parking Leases and

purportedly of the Indemnity Agreement[6].  In response to this state of affairs, Garikian filed a

motion seeking an order compelling assumption or rejection of the parking leases. [Doc 145;

Barness Declaration, ¶  6]  That motion to was withdrawn when the parties subsequently

---

the Property pursuant to file no. RPKP 201300005 (R2013 -- 01662) (the
"Parking Permit"), and/or (iv) [Debtor's] breach of or default with regard
to any of its covenants under that certain Fifth Amendment to Standard
Offer, Agreement and Escrow Instructions for Purchase of Real Estate,
dated as of November 18, 2014 [copy attached, but omitted here]. This
Agreement shall survive the closing under the PSA [Purchase and Sale Agreement]
and the recording of the conveyance deed for the Property to [Garikian]." [RJN,
Exhibit "E"]

[6]     Garikian has disputed on the record that the Indemnity Agreement is "executory" in
nature. [Barness Declaration, ¶ 8]

---

**OPPOSITION BY  THE GEORGE GARIKIAN LIVING TRUST TO "MOTION TO APPROVE
AGREEMENT WITH EAST WEST BANK FOR: (1) SETTLEMENT OF STATE COURT
ACTION; (2) RELIEF FROM STAY; AND (3) DISMISSAL OF NINTH CIRCUIT APPEAL"
DECLARATION OF DANIEL I. BARNESS**                                                    6

reached a settlement [Barness Declaration, ¶ 6].

7.    On or about January 20, 2018, Garikian and the former debtor-in-possession reached a settlement agreement (the "Garikian Settlement"), which was viewed as a better alternative to the extensive and costly litigation which would have arisen from the Estate's targeted rejections.  Among other things, the settlement included Debtor's performance of the Lot 5 Improvements, which had previously been stalled since the 2015 purchase and sale transaction.  [Barness Declaration, ¶ 7]

8.    Among other arrangements embodied by the Garikian Settlement, the Debtor was to assume the two Parking Leases, and Garikian was to withdraw its Indemnity Proof of Claim for $5 million (Doc 361-9, RJN, Exhibit "H") [Barness Declaration, ¶ 8].

9.    On January 25, 2019, the Debtor filed a Motion (Doc 125) "Garikian Settlement Approval Motion") seeking Court-approval and authority to enter into the Garikian Settlement, which EWB opposed  [(Doc 406); [Barness Declaration].  On June 24, 2018, the Court issued its order granting the Garikian Settlement Motion. [Doc 561, RJN, Exhibit "I"].  It took from the initial filing of Debtor's Motion for approval of the Garikian Settlement on January 26, 2018 until June 24, 2018 -- a period of over five months-- just for the litigation process concerning the Settlement to run its course.  [Barness Declaration, ¶ 10]

10.    Finally, following the Court's  OSC (Doc 929), the Court ordered the appointment of Chapter 11 trustee. On or about October 23, 2019, Jason Rund (the "Trustee") accepted appointment as Chapter 11 Trustee, and at present is so serving.  [(Doc  965); Barness Declaration, ¶ 10]

11.    The Settlement Agreement resulted from extensive negotiations between Debtor and the Garikian Trust.  The considerable time, effort and expense spent to resolve the parking issues

**OPPOSITION BY  THE GEORGE GARIKIAN LIVING TRUST TO "MOTION TO APPROVE AGREEMENT WITH EAST WEST BANK FOR: (1) SETTLEMENT OF STATE COURT ACTION; (2) RELIEF FROM STAY; AND (3) DISMISSAL OF NINTH CIRCUIT APPEAL" DECLARATION OF DANIEL I. BARNESS**

which stem from Garikian's 2015 acquisition of the Market Quadrant from ALC ultimately led to the Garikian Settlement Agreement.  The aim of the Settlement Agreement was to avoid long, drawn-out, expensive litigation; to meet the County requirements (regarding the Off-site Parking Arrangements); to provide a means by which Debtor might increase the value of its property, and to mitigate a significant multimillion-dollar risk looming over Garikian's Market Quadrant, which is also the  risk facing any transferor (*e.g.,*  EWB) or subsequent owner of the Fitness Quadrant, unless the Lot 5 Improvements are made prior to any transfer.  At the time of the Trustee's appointment, Garikian and the former debtor-in-possession were well on  their way to consummating the terms of the Garikian Settlement, and accomplishing the Lot 5 Improvements.  [Barness Declaration, ¶ 11]

## III.   **DISCUSSION**

### A. **Applicable Authorities**

It is a long-settled principle that a Chapter 11 trustee is a fiduciary of each creditor of the estate. [See, *e.g., Wolf v. Weinstein*, 372 U.S. 633, 650, 83 S. Ct. 969, 979, 10 L. Ed. 2d 33 (1963).]  As such, he or she has a duty to treat all creditors fairly and to exercise that measure of care and diligence that an ordinarily prudent person under similar circumstances would exercise. *Ford Motor Credit Co. v. Weaver*, 680 F.2d 451, 461 (6th Cir.1982); *Sherr v. Winkler*, 552 F.2d 1367, 1374 (10th Cir.1977).

A  trustee may be personally liable not only for intentional but also negligent violations of duties imposed upon him by law.  [See , *Mosser v. Darrow*, 341 U.S. 267, 273-74, 71 S. Ct. 680, 683, 95 L. Ed. 927 (1951); *In re Johnson*, 518 F.2d 246, 251 (10th Cir.), cert. denied, 423 U.S. 893, 96 S. Ct. 191, 46 L. Ed. 2d 125 (1975; cf. *Leonard v. Vrooman,* 383 F.2d 556, 561 (9th Cir.1967) (trustee can be held personally liable for acts which either are not taken in good faith or are unreasonable).]

**OPPOSITION BY  THE GEORGE GARIKIAN LIVING TRUST TO "MOTION TO APPROVE AGREEMENT WITH EAST WEST BANK FOR: (1) SETTLEMENT OF STATE COURT ACTION; (2) RELIEF FROM STAY; AND (3) DISMISSAL OF NINTH CIRCUIT APPEAL" DECLARATION OF DANIEL I. BARNESS**                                                                 8

A Trustee is bound by orders of the court, including orders  (as here) arising out of settlements to which the  predecessor debtor-in-possession was a party.  In *Albert v. Chesapeake Bank & Trust Co. (In re Linton Props., LLC)*, 410 B.R. 1, 12 (Bankr.D.D.C.2009), for example, a trustee was determined to be bound by a debtor-in-possession's agreement with the particular creditor and the trustee's predecessor, the debtor-in-possession not to challenge a garnishment lien.  Accordingly, the successor Chapter 11 trustee was barred from challenging  the lien.

Motions to set aside previous orders or judgments of the court are governed by  Rules 59 and 60 of the Federal Rules of Civil Procedure.  With certain inapplicable exceptions, Bankruptcy Rules 9023 and 9024 incorporate Fed. R. Civ. Proc. 59 and 60 into all matters governed by the Bankruptcy Rules.  *Creative Data Forms, Inc. v. Pennsylvania Minority Business Development Authority*, 72 Bankr. 619, 623 (E.D. Pa. 1985).

Fed. R. Civ. Proc. 60(b)(1) provides that the court may relieve a party from an order entered against such party by reason of mistake, inadvertence, surprise or excusable neglect.   Fed. R. Civ. Proc. 60(b)(6) provides for such relief for "any other reason justifying relief from the operation of the judgment."

Relief from a judgment or order may also be granted under Fed. R. Civ. Proc. 59, as incorporated by Bankruptcy Rule 9023.  Rule 59 provides in part that the court may "open the judgment . . . , amend findings of fact and conclusions of law or make new findings and conclusions, and direct the entry of a new judgment." Fed. R. Civ. Proc.  59(a).  It has been stated that "one purpose of the Rule 59 motion is to allow the trial court to exercise its "power and duty to order a new trial whenever, in its judgment, this action is required in order to prevent injustice. [Citation omitted]".  *In re Valley Engineering Company*, 41 Bankr. 509 (Bankr. N.D. Ill. 1984).

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**B.  Applicable Authorities Do Not Support the Trustee's Motion**

**1.  The Garikian Settlement Agreement is binding upon the Trustee and the Estate.**

The Garikian Settlement Agreement binds the Estate, and its representatives, including the Trustee.  As such, the Trustee should not be permitted to effect its breach, which he has initiated by filing the Motion.  The Estate's obligation to perform the Lot 5 Improvements is a central component of that settlement agreement.

**2.  The Motion Invites Harm to Garikian, the Estate and Successors.**

To the extent implementation of the EWB Settlement results in a cloud on title, because the Lot 5 Improvements will not been performed, there looms the possibility that the entire transaction leading to the subdivision of the former unitary center, could unravel. At the very least, if the parking arrangements are not implemented, any successor in ownership would face similar clouds on title arising from the uncertainty.  It would therefore be in the interest of all parties involved to have the Lot 5 Improvements completed, so at least this major issue will have been settled and resolved prior to any transfer of title. A cloud on title will be harmful to all parties concerned, if their ability to obtain financing and/or sell their respective parcels is impaired.

**a.  Harm to Garikian**

If  implemented, the EWB Settlement would harm Garikian's interests by creating uncertainty about compliance with the off-site parking requirements imposed by the County as a condition to the parcel-split and Garikian's purchase of the Market Quadrant.  The threats of negative financial effects which were facing Garikian until approval of the Settlement  will arise again:  Garikian  has previously shown what those  negative financial effects would be  – impairment of marketability and financing opportunities with respect to the Market Quadrant – that it has faced, and continues to face –because of irresolution of the Off-Site Parking Arrangement issues. [See, *e.g.*, Declaration of George Garikian and attached October 30, 2014 letter to the Los Angeles County Department of Regional Planning / Zoning Permits East, citing problems in obtaining financing because of the

1    unresolved situation with the Off-Site Parking Arrangements. [RJN, Exhibit "A"].

2

3    After five months of litigation regarding *just* approval of the Garikian Settlement, the Court

4    finally entered the Garikian Settlement Order on June 24, 2018  [Doc 561]. If the Garikian

5    Settlement is set aside, as would be accomplished by a grant of the Trustee's Motion, there will be

6    consequential harm not only to Garikian and the Estate.

7        **b.  <u>Harm to Estate and/or Successor Owner</u>**

8        Potential cloud-on-title harm, akin to those faced by Garikian, is also faced by the Estate and

9     any successor-owner.  There, however, additional potential harms to the Estate:  Abrogation  of the

10    Garikian Settlement Agreement by way of the EWB Settlement will also result in Garikian's $5

11    million secured claims against the Estate springing back, accompanied by a large administrative

12    claim for the breach of the agreements that were to be assumed.  It is safe to say that costly claim

13    litigation will follow. Such litigation would be avoidable by full implementation of the Lot 5

14    Improvements. Without full resolution of the Off-Site Parking Arrangements, including the Lot 5

15    Improvements, however,  title to both parcels (the Fitness and Market Quadrants) will be clouded:

16    The  County Covenant could spring back into existence -- or other remedies pursued by the County -

17    - for the failure of the parties to implement the steps which were conditional to that covenant's

18    release.   Specifically, the County Covenant [RJN, Exhibit "B"] was released on condition that the

19    Off-Site Parking Arrangements would be implemented in order to make up for the Market

20    Quadrant's  parking-shortfall resulting from the split of the Market Quadrant from ALC's-retained

21    Fitness Quadrant [RJN, Exhibit "A"].

22        It follows then, that the actions which the Trustee is requesting by way of his Motion would also

23    make the title (and therefore lending) issues even more complex.  This could adversely affect not

24    only the Trust's Market Quadrant, but also the Estate's Fitness Quadrant, and for that matter, any

25    successor owner,  in that this cloud might  make it impossible to convey or encumber either of  the

26    properties.

27

28

**OPPOSITION BY  THE GEORGE GARIKIAN LIVING TRUST TO "MOTION TO APPROVE
AGREEMENT WITH EAST WEST BANK FOR: (1) SETTLEMENT OF STATE COURT
ACTION; (2) RELIEF FROM STAY; AND (3) DISMISSAL OF NINTH CIRCUIT APPEAL"
DECLARATION OF DANIEL I. BARNESS**                                                11

**3.  The Motion is Ineffectual as a Request to Set Aside the Garikian Settlement Order.**

The sole focus of the Motion is approval of the EWB settlement, with no mention of the Garikian Settlement Order, let alone a request that that Order be set aside.

If the EWB Settlement is approved, however, the Motion would have accomplished more than just approval of the EWB Settlement: It will have led to the set-aside of the Court's earlier Garikian Settlement Order, without having satisfied the FRCP Rule 59 or 60 criteria, much less meeting the requirements for reconsideration under the Local Rules.   The Motion is thus ineffectual to seek  a set-aside of the Court's Garikian Settlement Order.

As shown by the record, a great deal of time, effort and expense went into the steps leading to the Garikian Settlement, and the Court's order approving that settlement:  Just the process of obtaining Court approval of the Garikian Settlement  after it had been reached took more than five months [Barness Declaration ¶ 9].  That Settlement Agreement grew out of extensive negotiations between Debtor and the Garikian Trust. Its aim was to avoid drawn-out, expensive litigation; to meet the County requirements; to provide a means by which Debtor might increase the value of its property; and to mitigate a significant multi-million dollar risk looming over the Trust's Market Quadrant, with the same cloud-on-title risks attaching to the Estate's Fitness Quadrant. [Barness Declaration, ¶ 3; RJN, Exhibit "A"].

As a procedural matter, the expenditure of judicial resources to arrive at the Garikian Settlement should not be discarded (especially not inadvertently), as the Motion would have it, without consideration of the Court's previous Garikian Settlement Order.

Thus, without more, as an ineffectual motion for relief under FRCP  59 or 60, the Motion should be denied.

///

**OPPOSITION BY  THE GEORGE GARIKIAN LIVING TRUST TO "MOTION TO APPROVE AGREEMENT WITH EAST WEST BANK FOR: (1) SETTLEMENT OF STATE COURT ACTION; (2) RELIEF FROM STAY; AND (3) DISMISSAL OF NINTH CIRCUIT APPEAL" DECLARATION OF DANIEL I. BARNESS**

**IV.    CONCLUSION**

If granted, the Motion will cause tremendous harm to both the Estate and Garikian, in that, among other things, complex litigation and legal issues that were resolved by way of the Garikian Settlement and the Court's Order thereon will be revived. Further, unless the Lot 5 Improvements are implemented, and the Off-Site Parking Arrangements finally concluded, clouds on title will remain against the Estate's Fitness Quadrant and Garikian's Market Quadrant.

In addition to the significant harm that would result from the granting the Motion, the Motion should also be denied because it is a procedurally defective mechanism to set aside the Garikian Settlement Order.

For the foregoing substantive and procedural reasons, the Garikian Trust respectfully requests that the Court deny the Motion or, alternatively, that it condition relief upon completion of the Lot 5 Improvements.

Dated: January 15, 2020                    Respectfully submitted,


                                           BARNESS & BARNESS LLP

                                           By: */s/ Daniel I. Barness*

                                               Daniel I. Barness
                                               Attorneys for The George Garikian

                                               Living Trust, Creditor

**OPPOSITION BY THE GEORGE GARIKIAN LIVING TRUST TO "MOTION TO APPROVE AGREEMENT WITH EAST WEST BANK FOR: (1) SETTLEMENT OF STATE COURT ACTION; (2) RELIEF FROM STAY; AND (3) DISMISSAL OF NINTH CIRCUIT APPEAL" DECLARATION OF DANIEL I. BARNESS**

13

### DECLARATION OF DANIEL I. BARNESS

I am an attorney at law duly licensed to practice before the courts of the State of California and before this Court.   I am a partner in the law firm of Barness & Barness LLP, counsel for the George Garikian Living Trust (the "Garikian Trust" or "Garikian")[7].  I have been a practicing attorney, primarily in the area of bankruptcy, since 1982.  In connection with my representation of Garikian, I have familiarized myself with the matters described in the Docket, and know the facts below either from my own knowledge or from a review of the Docket regarding the described events or circumstances.  The facts stated herein are known to me personally to be true, and if called upon to testify as to the truth of such facts, I could and would so testify.   In forming the conclusions stated in Paragraph 13 below, (*i.e.,* that the EWB Settlement is substantively harmful and that the Motion is procedurally improper), I considered the following matters, all of which are matters of record and/or have been set forth in pleadings and other materials previously filed on behalf of Garikian.  References to "Doc" and "RJN" in this Declaration are to the corresponding docket item or Request for Judicial Notice exhibit, respectively, each of which I reviewed before making this Declaration:

1.     This case was commenced on April 7, 2017 (the "Petition Date") (Doc 1).  From the Petition Date until October 3, 2019, when a Chapter 11 trustee was appointed (Doc 968), Debtor had been acting as debtor in possession herein.  After close to two years of litigation concerning eight iterations of a plan of reorganization by the former debtor in possession (Doc 943), and after appeals by EWB regarding its default interest assessed against Debtor -- culminating in the Ninth Circuit appeal covered by the Motion -- on October 7, 2019, the Court entered an order appointing a Chapter 11 trustee, followed by the acceptance of such appointment by Jason Rund (the "Chapter 11 Trustee")  (Doc  965).

---

[7]       Unless otherwise defined, capitalized terms in this Declaration will have the same meanings as in the Response to which this Declaration is attached.

**OPPOSITION BY  THE GEORGE GARIKIAN LIVING TRUST TO "MOTION TO APPROVE AGREEMENT WITH EAST WEST BANK FOR: (1) SETTLEMENT OF STATE COURT ACTION; (2) RELIEF FROM STAY; AND (3) DISMISSAL OF NINTH CIRCUIT APPEAL" DECLARATION OF DANIEL I. BARNESS**

14

2.  Initially (prior to the Petition Date), Debtor's predecessor-entity Altadena Lincoln Crossing, LLC ("ALC") owned an integrated singular shopping center (the "ALC Center") consisting of two quadrants -- the Fitness Quadrant, which had as its anchor tenant a 24-Hour Fitness facility (the "Fitness Quadrant"); and (across the street) the Market Quadrant, which had as its anchor tenant Super King Market (the "Market Quadrant").   A covenant in favor of  Los Angeles County (the "County Covenant") that was  recorded on December 7, 2005[8] required that the ALC Center not be legally divided, in other words that the Fitness Quadrant and the Market Quadrant be maintained as a singular ALC Center, versus two legally divided parcels comprising two separate centers.

3.  In order to effect a sale of  the Market Quadrant that would conform to Los Angeles County requirements and lead to the release of the County's subdivision restriction, the parties (ALC and Garikian), as part of the documentation of their purchase and sale agreement dated January 15, 2015[9] (the "Purchase and Sale Agreement") also entered into the Leases and the Indemnity Agreement, which were incorporated into and made part of the Purchase and Sale Agreement and documentation. [(Doc 412); RJN, Exhibit "A"] Among other things, these agreements were intended to achieve formal compliance with County requirements regarding the Off-Site Parking Arrangements – a condition for the release of the County Covenant which otherwise would have prohibited the division of the formerly integrated (undivided) ALC Center.  The template for these arrangements is set forth in correspondence between the County and Garikian, which is part of the record of these proceedings. *Id.*

4.  As a result of these transactions, ALC (the Estate's predecessor) retained the Fitness Quadrant and conveyed the Market Quadrant to Garikian.  The sale transaction, without more, however, would have been impermissible, because it would have left Garikian's

---

[8]      [See Garikian Declaration, (Doc 412, ¶ 1); RJN, Exhibit "A".]

[9]      [(Doc 412), ¶¶ 1-7; RJN, Exhibit "A"]

Market Quadrant without sufficient parking according to County requirements, and would have been in abrogation of the parties' agreements with the County upon which withdrawal of the County Covenant was conditioned.  So, following  guidelines approved by the County, the parties entered into a number of ancillary agreements, including: (1) an Indemnity Agreement [RJN, Exhibit "E" ]: (2) the 14-Space Parking Space Lease [RJN, Exhibit "C"]; and (3) the 16-Space Parking Lease [RJN, Exhibit "D" ]. These agreements implemented the County-approved arrangements allocating on ALC's Fitness Quadrant 30 parking spaces dedicated and granted to the (Garikian) Market Quadrant to adjust for the loss of parking resulting from dividing the integrated Center into two separately-owned parts. The obligations under the Indemnity Agreement were secured by a deed of trust to the Fitness Quadrant in favor of Garikian.  The two Parking Leases were also recorded against the Fitness Quadrant.

5. Integrated as part of the Purchase and Sale Agreement were arrangements for a total of 30 off-site parking spaces allocated for the Market Quadrant to be provided on ALC's Fitness Quadrant. The Off-Site Parking Arrangements included certain specified improvements to ALC's  Lot 5 (a vacant lot) to accommodate 14 parking spaces. These improvements (the "Lot 5 Improvements") included the following: (a) grading of the unimproved Lot 5 (an undeveloped portion of the Debtor's real property) and permit approvals, (b) paving and striping of Lot 5 in accordance with County requirements; and (c) relocation of the sprinkler fixtures, so that no fewer than 14 vehicles can be parked on Lot 5. [RJN, Exhibit "H"] Without the Lot 5 Improvements, there would be (and is) an undue parking burden on the Fitness Quadrant, which otherwise would have an inadequate number of parking spaces to accommodate Fitness Quadrant employees and visitors. *Id.*

6. Following the Petition Date, a significant dispute arose between Garikian and the Estate when the former debtor-in-possession proposed its First (Doc 160) and Second Amended

**OPPOSITION BY  THE GEORGE GARIKIAN LIVING TRUST TO "MOTION TO APPROVE AGREEMENT WITH EAST WEST BANK FOR: (1) SETTLEMENT OF STATE COURT ACTION; (2) RELIEF FROM STAY; AND (3) DISMISSAL OF NINTH CIRCUIT APPEAL" DECLARATION OF DANIEL I. BARNESS**

16

(Doc 293) Plans.  The First Amended Plan was silent as to assumption/rejection; and the

Second Amended Plan would have effected a rejection of the Parking Leases and purportedly

the Indemnity Agreement[10].  In response to this state of affairs, Garikian filed a motion

seeking an order compelling assumption or rejection of the parking leases. (Doc 145).  I

caused that motion to be withdrawn when the parties subsequently reached their settlement.

7.     On or about January 20, 2018, Garikian and the former debtor-in-possession reached a

settlement agreement (the "Garikian Settlement"), which I viewed as a better alternative to

the extensive and costly litigation which would have arisen from the Estate's targeted

rejections.  Among other things, the settlement included Debtor's performance of the Lot 5

Improvements, which had previously been stalled since the 2015 purchase and sale

transaction.

8.     Among other arrangements embodied by the Garikian Settlement, the Debtor was to assume

the two Parking Leases, and Garikian was to withdraw its Indemnity Proof of Claim for $5

million (Doc 369-1, RJN, Exhibit "H").

9.     On January 25, 2019, the Debtor filed a Motion (Doc 125) seeking Court-approval and

authority to enter into the Garikian Settlement, which EWB opposed  [Doc 406].  On June

24, 2018, the Court issued its order granting the Garikian Settlement Motion. [(Doc 561);

RJN, Exhibit "I"].  It took from the initial filing of Debtor's Motion for approval of the

Garikian Settlement on January 26, 2018 until June 24, 2018 -- a period of over five

months-- just for the litigation process concerning the Settlement to run its course.

10.    Finally, following the Court's  OSC (Doc 929), the Court ordered the appointment of a

Chapter 11 trustee. On or about October 23, 2019, Jason Rund (the "Trustee") accepted such

appointment, and at present is so serving  (Doc  965).

---

[10]     I have disputed on the record that the Indemnity Agreement is "executory" in nature.

**OPPOSITION BY  THE GEORGE GARIKIAN LIVING TRUST TO "MOTION TO APPROVE
AGREEMENT WITH EAST WEST BANK FOR: (1) SETTLEMENT OF STATE COURT
ACTION; (2) RELIEF FROM STAY; AND (3) DISMISSAL OF NINTH CIRCUIT APPEAL"
DECLARATION OF DANIEL I. BARNESS**

17

11.     The Garikian Settlement Agreement resulted from extensive negotiations between Debtor and the Garikian Trust, in all of which I participated.  The considerable time, effort and expense spent to resolve the parking issues which stem from Garikian's  2015 acquisition of the Market Quadrant from ALC ultimately led to the settlement.  The aim of the Garikian Settlement was to avoid long, drawn-out, expensive litigation; to meet the County requirements; to provide a means by which Debtor might increase the value of its property, and to mitigate a significant multimillion-dollar risk looming over Garikian's Market Quadrant, which I view as a risk similarly facing any current or subsequent owner; transferee or transferor of the Fitness Quadrant, unless the Lot 5 Improvements are made prior to any transfer.  At the time of the Trustee's appointment, Garikian and the former debtor-in-possession were well on  their way to consummating the terms of the Garikian Settlement, and accomplishing the Lot 5 Improvements.

I declare under penalty of perjury that the foregoing is true and correct and that this Declaration was executed this  January 15, 2020 at Los Angeles, California.


/s/ *Daniel I. Barness*

_____

Daniel I. Barness

**OPPOSITION BY  THE GEORGE GARIKIAN LIVING TRUST TO "MOTION TO APPROVE AGREEMENT WITH EAST WEST BANK FOR: (1) SETTLEMENT OF STATE COURT ACTION; (2) RELIEF FROM STAY; AND (3) DISMISSAL OF NINTH CIRCUIT APPEAL" DECLARATION OF DANIEL I. BARNESS**

18

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding.  My business address is:
**BARNESS & BARNESS, LLP,** 13636 Ventura Blvd., Los Angeles, CA 91423

A true and correct copy of the foregoing document, entitled: "**OPPOSITION BY THE GEORGE GARIKIAN LIVING TRUST TO "MOTION TO APPROVE AGREEMENT WITH EAST WEST BANK FOR: (1) SETTLEMENT OF STATE COURT ACTION; (2) RELIEF FROM STAY; AND (3) DISMISSAL OF NINTH CIRCUIT APPEAL" DECLARATION OF DANIEL I. BARNESS"** will be served or was served  (a) on the judge in chambers in the form and manner required by LBR  LBR 5005-2(d) or was served (a) on the judge in chambers in the form and manner required by LBR 5005-2(d) and (b) in the manner indicated below.

**I. TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING ("NEF")** – Pursuant to controlling General Order(s) and Local Bankruptcy Rule(s) ("LBR"), the foregoing document will be served by the court via NEF and hyperlink to the document. On 1/15/2020,  I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following person(s) are on the Electronic Mail Notice List to receive NEF transmission at the email address(es) indicated below:

Daniel I. Barness, Daniel@BarnessLaw.com /Attorney for The George Garikian Family Trust, Creditor
 Lisa Lenherr  l@tiemlaw.com; sml@tiemlaw.com / Former Attorney for Debtor
 Ron  Maroko  ron.maroko@usdoj.gov /Attorney for United States Trustee
James A. Tiemstra  jat@tiemlaw.com; sml@tiemlaw.com / Former Attorney for Debtor
United States Trustee (LA)  ustpregion16.la.ecf@usdoj.gov/ United States Trustee
Hatty K. Yip  hatty.yip@usdoj.gov /Attorney for United States Trustee
Lois Moonitz Jacobs,  lois.jacobs@kralikjacobs.com /Attorneys for East West Bank
Bernard R. Given,  bgiven@loeb.com/ Attorneys for East West Bank
J Scott Bovitz  bovitz@bovitz-spitzer.com /Attorney for Dorn-Platz Management

■Service information continued on attached page

**II.  SERVED BY U.S. MAIL OR OVERNIGHT MAIL** (indicate method for each person or entity served)**:**
On 1/15/2020I served the following person(s) and/or entity(ies) at the last known address(es) in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States Mail, first class, postage prepaid, and/or with an overnight mail service addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge will be completed no later than 24 hours after the document is filed.

Hon. Sheri Bluebond
United States Bankruptcy Court - Central District of California
255 E. Temple Street,/Courtroom 1539
Los Angeles, CA 90012

■Service information continued on attached page

**III.  SERVED BY PERSONAL DELIVERY, FACSIMILE TRANSMISSION OR EMAIL** (indicate method for each person or entity served): Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on_____, I served the following person(s) and/or entity(ies) by personal delivery, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows.  Listing the judge here constitutes a declaration that personal delivery on the judge will be completed no later than 24 hours after the document is filed.

□Service information continued on attached page

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

| | | |
|---|---|---|
| 1/15/2020 | Daniel I. Barness | */s Daniel I. Barness* |
| *Date* | *Type Name* | *Signature* |

**I. TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING ("NEF")** (contd)

Anastasia.bessey@kralikjacobs.com  Attorneys for East West Bank
Christopher Celentino    chris.celentino@dinsmore.com, caron.burke@dinsmore.com
ll@tiemlaw.com, sml@tiemlaw.com
Ron Maroko   Office of the United States Trustee    ron.maroko@usdoj.gov Gregory M Salvato
gsalvato@salvatolawoffices.com, Attorney for Debtor
calendar@salvatolawoffices.com;jboufadel@salvatolawoffices.com, Attorney for Debtor
gsalvato@ecf.info.com, Attorney for Debtor

# EXHIBIT "3"

1  TIMOTHY J. YOO (SBN 155531)
   tjy@lnbyb.com
2  CARMELA T. PAGAY (SBN 195603)
   ctp@lnbyb.com
3  LEVENE, NEALE, BENDER, YOO & BRILL L.L.P.
   10250 Constellation Boulevard, Suite 1700
4  Los Angeles, CA  90067
   Telephone: (310) 229-1234
5  Facsimile: (310) 229-1244

6  Attorneys for Jason Rund
   Chapter 11 Trustee

7

8                 UNITED STATES BANKRUPTCY COURT

9                 CENTRAL DISTRICT OF CALIFORNIA
                      LOS ANGELES DIVISION
10

11 In re                              Case No. 2:17-bk-14276-BB

12 ALTADENA LINCOLN CROSSING, LLC,    Chapter 11

13                      Debtor.        **CHAPTER 11 TRUSTEE'S REPLY TO**
                                       **OPPOSITIONS TO MOTION TO**
14                                     **APPROVE COMPROMISE UNDER**
                                       **FRBP 9019; DECLARATION OF**
15                                     **JASON RUND IN SUPPORT THEREOF**

16                                     Date:  January 15, 2020
                                       Time:  11:00 a.m.
17                                     Place:  Courtroom 1539
                                               U.S. Bankruptcy Court
18                                             255 E. Temple Street
                                               Los Angeles, California
19

20 **TO THE HONORABLE SHERI BLUEBOND, UNITED STATES BANKRUPTCY**

21 **JUDGE, DEBTOR AND ALL PARTIES IN INTEREST**:

22      Jason Rund, the Chapter 11 trustee ("Trustee") for the bankruptcy estate of Altadena

23 Lincoln Crossing, LLC ("Debtor"), respectfully submits this Reply to the Oppositions filed by

24 the Debtor and The George Garikian Living Trust ("Garikian") to the subject settlement motion

25 ("Motion").

26 ///

27 ///

28 ///

                                    1

**I.**

**INTRODUCTION**

While it is not surprising that the Debtor is objecting given the longstanding rift between the Debtor's insiders and East West Bank ("EWB"), the response is without merit.  After a thorough analysis, the Trustee has determined in his business judgment that the settlement is in the best interest of the estate, which judgment should be subject to deference.  The Debtor's opposition improperly seeks to substitute the Debtor's judgment for that of the Trustee.  "The court is not permitted to substitute its own judgment for that of the bankruptcy trustee when analyzing the sufficiency of a compromise." *In re Roger*, 393 F.Supp.3d 940, 968 (C.D. Cal. 2019). By corollary, another party (such as an administrative creditor or the ousted insiders of a former debtor-in-possession) may not substitute its judgment for that of the trustee. *See id.*

Garikian's opposition is equally without merit and fails to mention that EWB subordinated its deeds of trust to Garikian's leases back in 2015.  As such, the proposed settlement does not and could not diminish or impair Garikian's rights as a lessee.

Unlike the wait-and-see approach of the Debtor, the proposed settlement guaranties $1,500,000 to the estate <u>now</u>, significantly cuts off future legal fees, and ultimately releases EWB's claims against the estate.  Thus, the Trustee believes that the Agreement is in the best interest of the estate and that it should be approved.

**II.**

**SETTLEMENT DOES NOT IMPAIR GARIKIAN'S RIGHTS**

Garikian reads too much into the proposed settlement.  The Agreement with EWB simply paves the way for EWB to foreclose on the Property.  The foreclosure, however, will not impair or impact Garikian since EWB clearly subordinated to Garikian's leases back in 2015.  In other words, Garikian's leasehold rights will survive any foreclosure sale by EWB.

Garikian's rights and responsibilities as well as those of EWB are governed by the relevant instruments of record — namely, the two Parking Leases and the Subordination and Non-Disturbance Agreements (the "SNDAs").  Given the provisions of the SNDAs, which subject and subordinate EWB's deed of trust to Garikian's rights under the leases and obligate

2

1   EWB not to interfere with Garikian's leasehold rights, the Trustee submits that Garikian has no

2   standing or basis to complain about the estate's settlement with EWB.  The harms imagined by

3   Garikian are conjectual at best, and they do not present any basis for second-guessing the

4   Trustee's business judgment. True and correct copies of the SNDAs are attached as <u>Exhibit 1</u> to

5   the Declaration of Jason Rund.

6          Next, Garikian incorrectly argues that the "Garikian Settlement Agreement binds the

7   Estate, and its representative, including the Trustee" (Garikian Opp. at 10:3-4).  The Garikian

8   Settlement Agreement was expressly conditioned on confirmation of a plan of reorganization,

9   and that agreement terminated unless it closed by June 30, 2018, or such later date as the parties

10  agreed to in writing.  (Doc 369-1 at ¶¶ 13(A)(2) and 14.)  Garikian presented no evidence of any

11  extension entered into before the Trustee's appointment, and the Trustee agreed to none

12  thereafter.  In fact, the Court's records seem to indicate that the parties never even took the first

13  step of establishing a segregated account to perform the work on the parking lot (at least there

14  were no records of such an account in the Monthly Operating Reports).  Because the Garikian

15  Settlement Agreement has expired by its terms, it is a nullity.

16         The Trustee respectfully submits that Garikian's opposition should be overruled based

17  on the foregoing.

18                                          **III.**

19              <u>**THE SETTLEMENT IS IN THE BEST INTEREST OF THE ESTATE**</u>

20         The four mandatory factors to be considered in the context of a proposed compromise

21  under Rule 9019 are as follows:

22         1)    the probability of success of the litigation;

23         2)    any impediments to collection;

24         3)    the complexity, expense, inconvenience, and delay of litigation; and

25         4)    the interest of creditors with deference to their reasonable opinions.

26  *In re A & C Properties*, 784 F.2d 1377, 1380-81 (9th Cir. 1986), cert. den. sub. nom. *Martin v.*

27  *Robinson*, 479 U.S. 854 (1989); *Arden v. Motel Partners (In re Arden)*, 176 F.3d 1226, 1228

28  (9th Cir. 1999). "[I]n determining whether to propose a compromise, a trustee need not burden

3

the estate 'with costs and expenses arising out of all manner of questions that may be presented

for litigation.'" *Burton v. Ulrich (In re Schmitt)*, 215 B.R. 417, 425 (B.A.P. 9th Cir. 1997).

"Ordinarily, the position of the trustee is afforded deference, particularly where business

judgment is entailed in the analysis." *Simantob v. Claims Prosecutor, L.L.C. (In re Lahijani)*,

325 B.R. 282, 289 (B.A.P. 9th Cir. 2005). "[A] court generally gives deference to a trustee's

business judgment in deciding whether to settle a matter…" *Goodwin v. Mickey Thompson*

*Entertainment Group, Inc. (In re Mickey Thompson Entertainment Group, Inc.)*, 292 B.R. 415,

420 (B.A.P. 9th Cir. 2003). Finally, "the court is not permitted to substitute its own judgment for

that of the bankruptcy trustee when analyzing the sufficiency of a compromise." *In re Roger*,

393 F.Supp.3d 940, 968 (C.D. Cal. 2019). By corollary, another party (such as an administrative

creditor or the ousted insiders of a former debtor-in-possession) may not substitute its judgment

for that of the trustee. *See id.*

Debtor's opposition fails to raise any reason for the Court to substitute the Debtor's

judgment for the Trustee's business judgment. The compromise should be approved as fair,

reasonable, and as a valid exercise of the Trustee's business judgment as follows:

      A.     <u>The Trustee has proven that all four *A&C* factors, on balance, weigh in favor</u>
                  <u>of approving the settlement.</u>

           i.     <u>The probability of success factor.</u>

As the Trustee noted in the Motion, there is absolutely no guaranty that the estate

would prevail on the Cross-Complaint pending in the state court. As also noted, the case is

not yet even at issue. In fact, although the Debtor obtained relief from the automatic stay on

June 12, 2019 [Doc 893], the Debtor never amended the Cross-Complaint.[1] Thus, none of

the information that the Debtor alludes to in its opposition has been presented in the state

court action. Furthermore, the F&F LLC case is unrelated and the Trustee does not put as

much weight as the Debtor regarding that case (as well as the other cases described in

Debtor's opposition).

---

[1] The Order appointing the Trustee was not entered until October 7, 2019 [Doc 968].

While the Debtor and its counsel, Encore Law, have expressed unreserved confidence in their ability to prosecute the Cross-Complaint successfully, this is obviously just one side of the story.  EWB holds the contrary view -- that the Debtor's Cross-Complaint has no merit.  Not reflected in the Debtor's recitation is the fact that the Debtor was able to complete the construction with the funds provided by the EWB loan, to lease up and earn revenue from the Property for over ten years.  Even though the Debtor was unwilling to repay the loan when it matured, EWB entered into thirteen forbearance agreements with the Debtor rather than foreclosing, giving the Debtor another eight years to repay.  Each of those forbearance agreements contained releases, which the Trustee believes would bar the claims asserted by the Debtor in the Cross-Complaint.

The conclusion by Encore that "Debtor has incurred more than $22 million in damages" is without any basis and unsupported by any admissible evidence or an opinion of a qualified witness who has no direct financial stake in pursuing the alleged claims.  It is, therefore, given little weight by the Trustee.  This is especially true since the Debtor never provided any value for its claims in its Statement of Financial Affairs filed in this case [Doc 99-3] nor did it list its Cross-Complaint in its Schedule A/B as a personal property asset [Doc 16].  Debtor made no effort at all to prosecute the Cross-Complaint until it moved for relief from stay in May 2019 [Doc 883], after (1) this Court denied confirmation of the Debtor's Sixth Plan of Reorganization [Doc 846]; (2) the District Court reversed the Claim Objection Order and upheld EWB's right to recover default interest [Doc 840]; and (3) EWB was granted adequate protection in lieu of relief from stay [Docs 853, 871].  The asset that the Debtor now contends has such substantial value was not even included as a source of payment under any of the Debtor's plans up to that point.

Even if there was some potential for recovery in the Debtor's Cross-Complaint, the time and cost of litigation would outweigh any benefit to creditors.  While Encore has agreed to reduce its hourly rates, it has not agreed to handle the Cross-Complaint solely on a contingency basis.  As a result, not only would any litigation proceeds be reduced by Encore's contingency fee but the Debtor's affiliate, SF Red, would seek reimbursement for

1    any legal fees and costs it paid before any funds would be available to the estate's creditors.

2    For these reasons, there can be no assurance that any such recovery would exceed the $1.5

3    million settlement amount to be paid by EWB now.

4         As to the Ninth Circuit appeal, while the Debtor maintains that the District Court's

5    ruling was erroneous, the Trustee believes that overturning that decision is not the most likely

6    outcome.  As part of his analysis, the Trustee found another matter before the Ninth Circuit

7    dealing with a default rate of interest. In a recent decision, the panel analyzed many of the

8    same circumstances that were applicable here and upheld a 35% default interest under

9    Arizona law.[2]  *Epicenter Partners, L.L.C. v. CPF Vaseo Ass'n, LLC (In re Epicenter*

10   *Partners, L.L.C.)*, 2020 U.S. App. LEXIS 996, __ Fed. Appx. __ (9th Cir. Jan. 9, 2020).  A

11   true and correct copy of the opinion is attached as Exhibit 3 to the Declaration of Jason Rund.

12        Beyond what the Trustee believes is a "tell" by the Ninth Circuit of how it will decide

13   on the subject appeal, the cost of the appeal will be considerable and the estate lacks the

14   resources to fund this litigation.  Finally, the Debtor criticizes the Trustee for including all

15   secured liens that have been asserted against the estate in making his assessment that there

16   would be no equity in the Property even if EWB's default interest was disallowed.  The

17   Trustee properly considered all of these liens in his analysis since all are still of record

18   against the Property, and the insiders only agreed to convert their claims to equity based on a

19   plan that was never confirmed.

20        The Court does not need to rule upon disputed facts and questions of law or conduct a

21   "mini-trial" to rule on the settlement motion.  *Burton v. Ulrich (In re Schmitt)*, 215 B.R. 417,

22   423 (9th Cir. BAP 1997).  Here, the Trustee adequately investigated the Cross-Complaint and

23   the Ninth Circuit appeal and believes that the terms of the Settlement Agreement are

24   reasonable and in the best interest of the estate.

25

26

27   _____

28   **[2]** Although Arizona does not have a statute similar to Cal. Civ. Code § 1671(b), nearly the same
     factors were considered by the Bankruptcy Appellate Panel and the Ninth Circuit when they affirmed the
     bankruptcy court's finding that the agreed-upon contract rate of interest is not an unenforceable penalty.

    ii.  <u>Impediment to collection.</u>

  Debtor agrees with the Trustee that collection is not an issue with EWB.  However, the Debtor complains of a 90-day delay in payment throughout its opposition.  It is worth noting that the Debtor's wait-and-see plan foresees a payment many year later – assuming everything goes its way.

  To avoid belaboring this point, the Trustee requested and EWB agreed to make the settlement payment within 3 business days of a final order approving the settlement and relief from stay.  Assuming the Motion is granted, the Trustee and EWB will enter into an agreement substantially in the form of the Amendment to Settlement Agreement and General Releases attached as <u>Exhibit 2</u> to the Declaration of Jason Rund.

    iii.  <u>The complexity, expense, inconvenience, and delay of litigation.</u>

  The Trustee's business judgment is sound with respect to the complexity factor to approve the compromise. In fact, the Debtor does not dispute that the litigation of the Cross-Complaint and the Ninth Circuit appeal is very <u>complex</u>.  It also does not dispute that the <u>delay</u> of completing the lender liability case will be significant.  It also seems to agree that the litigation will be <u>expensive</u> but argues that the estate is not burdened with the funding. This last point is confusing since the funding party (*i.e.*, San Fernando Red) will eventually seek reimbursement from the very same estate.  As argued in the Motion, the bleeding (of legal fees) must stop.

  In sum, the Debtor fails to explain why the Trustee's analysis of the ongoing expense, delay, and inconvenience to the estate by continued litigation efforts was in any way erroneous.

    iv.  <u>The interest of creditors with deference to their reasonable opinions.</u>

  Debtor claims that the proposed settlement would render the estate administratively insolvent and that it is not in the best interest of the estate.  In support of its claim, the Debtor points to paragraph 4 of the Declaration of Alicia Barclay in which San Fernando Red ("SF Red") asserts reimbursement claims for 5 professionals.  As the Court is aware, SF Red sought payment of these same claims less than a month ago in its Application for Payment of

Administrative Expenses filed on December 23, 2019 [Doc 1008]. The Trustee and creditor

Bromley, LLC opposed the Application and, as a result, SF Red withdrew the Application on

January 9, 2020 [Doc 1021].

Here, as was the case with its Application, the Debtor provides no evidence that SF Red

actually paid for any of the professionals. More importantly, there is nothing in the opposition

to establish that the services were necessary or whether the services provided any benefit to the

estate. In fact, the employment applications filed with this Court for the various professionals

conflict with SF Red's requests:

1. Andela Consulting Group.

*Motion for Order Authorizing Debtor to Employ Expert Consultant Thomas A. Tarter*

was filed on October 13, 2017 [Doc 267]. Mr. Tarter, in his declaration (paragraph 11), states,

"The Debtor is not financially responsible for payment to me or the Firm." It is difficult to

understand how the estate (which had absolutely no financial obligations to the professional) all

of a sudden became liable just because the professional was paid by another entity.

2. Encore Law Group.

*Order Approving Debtor's Motion to Employ Litigation Counsel Justin P. Karczag and*

*Encore Law Group, LLP* was entered on September 26, 2019 [Doc 954]. Paragraph D to the

Order specifically states, "As between the Debtor and guarantor SF Red, SF Red shall not seek

reimbursement from the Debtor for its payments and advances to Encore under the Revised

Retainer Agreement, which payment shall be deemed an equity contribution of SF Red to the

Debtor." Hence, the Application improperly seeks this payment.

3. Valeo Schultz, MAI.

*Application by Debtor Altadena Lincoln Crossing LLC for Order Authorizing*

*Employment of Valeo Schultz, MAI as Consultant and Expert Witness* was filed on December

12, 2018 [Doc 740]. Mr. Schultz, in his declaration (paragraph 11), states, "The Debtor is not

financially responsible for payment to me." As was the case with Andela Consulting Group, it is

difficult to understand how the estate (which had absolutely no financial obligations to the

professional) all of a sudden became liable just because the professional was paid by another

8

entity.

    4.  <u>Arnold and Porter</u>.

There is no mention of Arnold and Porter in the Court's docket.  Further, there is no reference in the Application regarding what services were rendered by Arnold and Porter or how its services benefitted the estate.

    5.  <u>Salvato Law Office</u>.

*Application by Debtor-in-Possession to Employ Salvato Law Offices as Bankruptcy Counsel* was filed on June 26, 2017 [Doc 124].  Besides for the fee advance of $25,000 from SF Red, there is nothing contained in the employment application that allows the professional to be paid by SF Red.  Quite the opposite is true.  Paragraph 9 of the employment applications states, "<u>The Debtor has agreed that additional compensation for professional fees and costs will be paid from the Debtor's estate to the extent allowed and in accordance with the Local Rules, subject to review and approval under Bankruptcy Code Section 330</u>."

  Salvato Law Offices never filed a fee application.  Instead, SF Red advanced funds to the professional without any order of the Court – suggesting that these advances were contributions made by an insider to protect its equity interest.  This may explain why the numerous versions of the Debtor's reorganization plans never mentioned SF Red's claims asserted in the opposition.

Based on the foregoing, it appears that the only professional used by the Debtor that may have a valid administrative expense would be Salvato Law Offices.  Assuming that it files a fee application and the entire amount sought is approved, Salvato Law Offices would have an administrative claim for about $752,500.  The Trustee's handle under Section 326 is estimated to be around $83,250 (based on total distribution of $2 million), and the Trustee's counsel's fees and costs were approximately $60,000 as of December 31, 2019.

The foregoing administrative claims total only $895,750.  Even after anticipated fees and costs to carry out the terms of the settlement agreement and to close the bankruptcy case, the Trustee believes that there will be significant funds available to pay priority and general unsecured creditors in this case.

9

B.    Auction Procedure Is Not Required

As its last argument, the Debtor seeks an auction procedure.  However, the Debtor acknowledges that no one has expressed an interest to overbid, including the insiders (Galletly Decl., Paragraph 2).  The Trustee acknowledges that a Rule 9019 compromise can simultaneously implicate the sale provisions under Section 363. *In re Mickey Thompson Entertainment Group, Inc.*, 292 B.R. 415, 421 (9th Cir. BAP 2003).  However, when the only potential bidder is the Debtor's insider, which affirmatively stated that it is not willing to overbid, there is no reason to require an overbidding procedure.  *In re Esterlina Vineyards & Winery, LLC*, 2019 Bankr. LEXIS 760; 2018 WL 1354331 (9th Cir. BAP Jan. 25, 2018).

For all of the foregoing reasons, the Court should not allow the Debtor to substitute its opinion in place of the Trustee's business judgment.

**IV.**

**<u>CONCLUSION</u>**

WHEREFORE, the Trustee prays that the Court overrule the oppositions and grant the Motion in its entirety.

DATED: January 22, 2020

LEVENE, NEALE, BENDER, YOO
& BRILL L.L.P.

By:    */s/ Timothy J. Yoo*
TIMOTHY J. YOO
CARMELA T. PAGAY
Attorneys for Jason Rund
Chapter 11 Trustee

10

# DECLARATION OF JASON RUND

I, Jason Rund, declare as follows:

1.      I am the duly-appointed, qualified, and acting Chapter 11 Trustee for the bankruptcy estate of Altadena Lincoln Crossing, LLC. I have personal knowledge of the matters set forth herein and if called as a witness could and would testify competently thereto. I submit this Declaration in support of the subject Motion to Approve Agreement with East West Bank for: (1) Settlement of State Court Action; (2) Relief from Stay; and (3) Dismissal of Ninth Circuit Appeal.

2.      True and correct copies of the Subordination and Non-Disturbance Agreements, recorded as Inst. Nos. 20150054317 and 20150054318 are attached as Exhibit 1 and are incorporated herein by reference.

3.      A true and correct copy of the Amendment to Settlement Agreement and General Releases between the estate and East West Bank is attached as Exhibit 2 and is incorporated herein by reference.

4.      A true and correct copy of the opinion, *Epicenter Partners, L.L.C. v. CPF Vaseo Ass'n, LLC (In re Epicenter Partners, L.L.C.)*, 2020 U.S. App. LEXIS 996, __ Fed. Appx. __ (9th Cir. Jan. 9, 2020) is attached as Exhibit 3 and is incorporated herein by reference.

5.      My handle under Section 326 is estimated to be around $83,250 (based on total distribution of $2 million). I am informed that the fees and costs of the Levene Neale firm were approximately $60,000 as of December 31, 2019. I am also informed based on San Fernando Red's application for payment of administrative expenses that that the fees and costs of Salvato Law Offices were approximately $752,500. The foregoing administrative claims total only $895,750. Even after anticipated fees and costs to carry out the terms of the settlement

1 | agreement and to close the bankruptcy case, I believe there will be significant funds available to

2 | pay priority and general unsecured creditors in this case.

3 |     I declare under penalty of perjury under the laws of the United States of America that the

4 | foregoing is true and correct and that this declaration was executed on January 22, 2020 at El

5 | Segundo, California.

6 |

7 |                                                    JASON RUND

8 |

9 |

10 |

11 |

12 |

13 |

14 |

15 |

16 |

17 |

18 |

19 |

20 |

21 |

22 |

23 |

24 |

25 |

26 |

27 |

28 |

12

# Exhibit 1

000013



**This page is part of your document - DO NOT DISCARD**

## 20150054317





Pages:
0037

**Recorded/Filed in Official Records
Recorder's Office, Los Angeles County,
California**

**01/15/15 AT 08:00AM**

| | |
|---|---|
| FEES: | 141.00 |
| TAXES: | 0.00 |
| OTHER: | 0.00 |
| PAID: | 141.00 |



**L E A D S H E E T**



201501150300014

00010072000



006600786

**SEQ:
23**

DAR - Title Company (Hard Copy)



**THIS FORM IS NOT TO BE DUPLICATED**          T72



LOS ANGELES,CA                     Page 1 of 37            Printed on 1/17/2020 11:57:52 AM
Document: AG 2015.54317

000014

## CHICAGO TITLE COMPANY

<u>RECORDING REQUESTED BY &
WHEN RECORDED RETURN TO:</u>                    )
)
East West Bank                                  )
9300 Flair Drive, 6th Floor                     )
El Monte, CA  91731                             )
Attn: Loan Servicing                            )
)



01/15/2015

*20150054317*

_____            (Space Above This Line For Recorder's Use)

### SUBORDINATION AGREEMENT AND
### AGREEMENT OF NON-DISTURBANCE AND ATTORNMENT
(EWB Form – Rev. 2-2007)

     This Subordination Agreement and Agreement of Non-Disturbance and Attornment ("Agreement")
is made and entered into as of this 8th day of January 2015, among (i) East West Bank ("Lender"), (ii) The
George Garikian Living Trust ("Tenant") and (iii) Altadena Lincoln Crossing, LLC ("Owner"), with reference
to the following:

### RECITALS

     A.     Lender has made or is proposing to make a loan (the "Loan") to Owner secured or to be
secured by a deed of trust (the "Deed of Trust") on the real property legally described in <u>Exhibit A</u> attached
hereto and the improvements thereon (together, the "Property").  The Deed of Trust and any and all other
documents evidencing or relating to the Loan shall be referred to as the "Loan Documents".

     B.     Tenant has leased or is proposing to lease certain parking spaces and trash enclosure at
the Property (collectively, the "Premises") (the lease and all amendments thereto being referred to as the
"Lease").
                                                                        **UNRECORDED LEASE**
     C.     Lender and Tenant desire to enter into this Agreement under which Tenant subordinates
the Lease and its interest in the Property and agrees to attorn to Lender and under which Lender agrees
to not disturb Tenant's possession of the Premises, all to the extent set forth herein, and so long as
Tenant is not in default under the Lease.

     NOW THEREFORE, with reference to the foregoing recitals and for good and valuable
consideration, the receipt and sufficiency of which is hereby acknowledged, the parties to this Agreement
agree as follows:

     1.     <u>Subordination</u>.  The Lease, and the rights, if any, of Tenant in, to and under the Lease
and the Premises, are hereby subjected and subordinated to the lien of the Deed of Trust, it being
understood and agreed that the foregoing subordination shall apply to any and all increases, renewals,
modifications, extensions, substitutions, replacements and/or consolidations of the Deed of Trust,
provided that any and all such increases, renewals, modifications, extensions, substitutions, replacements
and/or consolidations shall nevertheless be subject to the terms of this Agreement.

     2.     <u>Tenant Not to Be Disturbed</u>.  So long as Tenant is not in default in the payment of rent or
of any of the terms, covenants or conditions of the Lease on Tenant's part to be performed (beyond any
period given Tenant in the Lease to cure such default) and Tenant attorns to Lender as provided herein,
(a) Tenant's possession of the Premises shall not be diminished or interfered with by Lender, and (b)
Lender will not join Tenant as a party defendant in any action or proceeding foreclosing the Deed of Trust

0002266⁴-X49



unless such joinder is necessary to foreclose the Deed of Trust and then only for such purpose and not for the purpose of terminating the Lease.

3.   Tenant to Attorn To Lender.   If Lender shall become the owner of the Premises or the Premises shall be sold by reason of foreclosure or other proceedings brought to enforce the Deed of Trust or the Premises shall be transferred by deed in lieu of foreclosure, the Lease shall continue in full force and effect as a direct Lease between the then owner of the Premises, who shall succeed to the rights and duties of the Landlord and Tenant.  Tenant shall attorn to Lender or any other such owner as its Landlord, said attornment to be effective and self-operative without the execution of any further instruments.  Tenant hereby waives the provisions of any statute or rule of law, now or hereafter in effect, which may give or purport to give Tenant any right or election to terminate or otherwise adversely affect the Lease and the obligations of Tenant thereunder as a result of any such foreclosure or deed-in-lieu of foreclosure.

4.   Notice of Default; Rent Payments to Lender.   In the event that Lender notifies Tenant of a default under the Deed of Trust and requests Tenant to pay its rent and all other sums due under the Lease to Lender, Tenant shall pay such sums directly to Lender, or as Lender may otherwise request, without any further consent of Owner.

5.   Limitations.   Lender (and any successor or assignee of Lender) shall not be (i) liable for any act or omission of Borrower or any predecessor-in-interest, (ii) subject to any offsets, counterclaims or defenses which Tenant may have against Borrower or any predecessor-in-interest, (iii) liable for any security deposit or payment of rent (for more than one month in advance of the date due under the Lease) made by Tenant to Borrower or any predecessor-in-interest, except to the extent actually received by Lender, (iv) liable for any construction, repair allowances or other allowances or payments to be made by Landlord under the Lease (except in the event such party shall be bound to perform the obligations the successor landlord under the Lease, in which event such party shall be bound to perform the obligations of the landlord under the Lease), or (v) obligated to expand the Premises, construct additional improvements or otherwise expend funds which are capital in nature except for items or ordinary maintenance and repair for the Premises or the property in which it is located.  Notwithstanding any term of the Lease, upon foreclosure of the Deed of Trust, or acceptance of a deed in lieu thereof or other similar transfer, any environmental/hazardous materials indemnity and/or reimbursement provisions under the Lease shall not be applicable to, or enforceable against, Lender, any successor in interest to or assignee of Lender and/or any purchaser at foreclosure and any transferee thereof. If Lender becomes the owner of the Property or the Property is sold to a third party by reason of foreclosure or other proceedings brought to enforce the Deed of Trust or the Property is conveyed by deed-in-lieu of foreclosure, Tenant agrees that, notwithstanding anything to the contrary contained in the Lease, after such foreclosure sale or conveyance by deed-in-lieu of foreclosure, Lender has no personal liability to Tenant under the Lease and Tenant shall look solely to the Borrower for satisfaction of any of its remedies for collection of a judgment or other judicial process requiring payment of money by the landlord to Tenant in the nature of advance rents or security deposits.  Further, in the event Lender transfers its interest in this Lease to a third party, Lender shall be automatically freed and released, from and after the date of such transfer or conveyance, of all liability for the performance of any covenants and agreements which accrue after the date of such transfer of Lender's interest.

6.   Modification; Notice and Cure Rights.   The Lease shall not be amended, modified or supplemented, nor will the lease be terminated (except as set forth in the Lease after a default and after the notice and cure rights set forth below) or any party having liability under the Lease be released by the other, without the prior written consent of Lender.  Tenant shall not terminate or seek to terminate the Lease until Tenant has given written notice, by registered or certified mail, return receipt requested, of said act or omission to Lender, which notice shall be addressed to East West Bank, 9300 Flair Drive, 6th Floor, El Monte, CA 91731; and until a period of time equal to the greater of: (a) the time allowed Lessor under the Lease or (b) thirty days following such notice has elapsed, during which period Lender has the right, but not the obligation, to remedy such act, omission or other matter.  If possession by Lender of the Property is necessary to effect such remedy and would be commercially reasonable, then the period of

2

000016



time for remedying such act or omission shall include a reasonable period of time for Lender to gain
possession of the Premises, whether by foreclosure or otherwise.

     7.    <u>Tenant Representations and Warranties</u>.  Tenant hereby represents and warrants that (a)
the Lease is solely and exclusively for the Premises and/or the Property identified in Exhibit "A" attached to
this Agreement, (b) the Lease is not a "master lease" for any other premises and/or property leased by
Tenant and/or Landlord, (c) any default under the Lease, and the exercise of Landlord's rights and
remedies in connection with such default, shall only impact and/or effect Tenant's obligations with respect
to the Premises and/or the Property, and (d) any default by Tenant under any other lease with Landlord or
any other landlord, and the exercise of any such landlord's rights and remedies in connection with such
default, shall not affect Tenant's obligations under the Lease.

     8.    <u>Miscellaneous</u>.  This Agreement and each and every covenant, agreement and other
provision hereof shall be binding upon and shall inure to the benefit of the parties hereto and their
representatives, successors and assigns. This Agreement may not be modified orally or in any manner
other than by an agreement in writing signed by the parties hereto or their respective successors in
interest.  The term "Lender" as used throughout this Agreement includes any successor or assign of
Lender and any holder(s) of any interest in the indebtedness secured by the Deed of Trust.  This
Agreement and the rights and duties of the parties hereunder shall be governed for all purposes by the law
of the State of California and the law of the United States applicable to transactions within such state.
This Agreement may be executed in multiple counterparts, and by the different parties hereto in separate
counterparts, each of which when so executed and delivered shall be deemed to be one and the same
instrument with the same signature as if all parties to this Agreement had signed the same signature
page.

IN WITNESS WHEREOF, the parties hereto have each caused this Agreement to be executed as of the
date first above written.


Owner:

**Altadena Lincoln Crossing, LLC**

By:    DPP Altadena LLC,
a Delaware limited liability company
Its Manager

      By:    Altadena-Dorn Platz, LLC
      a California limited liability company
      Its Manager

          By:_____
          Name:    Greg Galletly
          Its:     Manager


Tenant:

**GEORGE GARIKIAN, Trustee of The George Garikian Living Trust**

3

000017

## CALIFORNIA ALL- PURPOSE ACKNOWLEDGMENT

> A Notary Public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

State of California          } ss.
County of ___Los Angeles___  }

On ___January 12, 2015___ before me, ___Ruth Baudoin, Notary Public___,
personally appeared ___Greg Galletly___

who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

RUTH BAUDOIN
Commission # 2059999
Notary Public - California
Los Angeles County
My Comm. Expires Apr 1, 2018

Place Notary Seal Above

_____
SIGNATURE OF NOTARY PUBLIC

### OPTIONAL INFORMATION
*Though this section is optional, completing this information can deter alteration of the document or fraudulent reattachment of this form to an unintended document.*

**CAPACITY CLAIMED BY SIGNER (PRINCIPAL)**
☐ Individual
☐ Corporate Officer
_____
TITLE(S)
☐ Partner(s) - ☐ Limited ☐ General
☐ Attorney-in-Fact
☐ Trustee(s)
☐ Guardian/Conservator
☐ Other:_____
_____

Signer is Representing: _____
_____
NAME OF PERSON(S) OR ENTITY(IES)

**DESCRIPTION OF ATTACHED DOCUMENT**

_____
TITLE OR TYPE OF DOCUMENT

_____
NUMBER OF PAGES

_____
DATE OF DOCUMENT

_____
SIGNER(S) OTHER THAN NAMED ABOVE

## CALIFORNIA ALL- PURPOSE ACKNOWLEDGMENT

A Notary Public or other officer completing this certificate verifies only the identity of the individual who signed the
document to which this certificate is attached. and not the truthfulness, accuracy, or validity of that document.

State of California             } ss.
County of ___Los Angeles___     }

On ___January 12, 2015___ before me, ___Ruth Baudoin, Notary Public___,
personally appeared _____George Garikian_____,

who proved to me on the basis of satisfactory evidence to
be the person(s) whose name(s) is/are subscribed to the
within instrument and acknowledged to me that
he/she/they executed the same in his/her/their authorized
capacity(ies), and that by his/her/their signature(s) on the
instrument the person(s), or the entity upon behalf of
which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of
the State of California that the foregoing paragraph is true
and correct.

WITNESS my hand and official seal.

RUTH BAUDOIN
Commission # 2059999
Notary Public - California
Los Angeles County
My Comm. Expires Apr 1, 2018

_____
SIGNATURE OF NOTARY PUBLIC

Place Notary Seal Above

## OPTIONAL INFORMATION
*Though this section is optional, completing this information can deter alteration of the document or fraudulent
reattachment of this form to an unintended document.*

**CAPACITY CLAIMED BY SIGNER (PRINCIPAL)**        **DESCRIPTION OF ATTACHED DOCUMENT**
☐  Individual
☐  Corporate Officer
     _____
             TITLE(S)                                    _____
☐  Partner(s) - ☐ Limited ☐ General                         TITLE OR TYPE OF DOCUMENT
☐  Attorney-in-Fact
☐  Trustee(s)
☐  Guardian/Conservator                                  _____
☐  Other:_____                                     NUMBER OF PAGES

                                                        _____
Signer is Representing: _____                      DATE OF DOCUMENT

_____                              _____
NAME OF PERSON(S) OR ENTITY(IES)                         SIGNER(S) OTHER THAN NAMED ABOVE

000019

7

Lender:

EAST WEST BANK

BY:
Title:    Robert Lo, Executive Vice President

(ALL SIGNATURES MUST BE ACKNOWLEDGED)

4

## CALIFORNIA ALL-PURPOSE ACKNOWLEDGMENT

**CIVIL CODE § 1189**

> A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

State of California

County of _Los Angeles_ )

On _January 12, 2015_ before me, _Cornelia S. Ho, Notary Public_,
    Date                 Here Insert Name and Title of the Officer

personally appeared _Robert Lo_
                      Name(s) of Signer(s)

who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

CORNELIA S. HO
Commission # 2038868
Notary Public - California
Los Angeles County
My Comm. Expires Aug 26, 2017

Signature _____
                Signature of Notary Public

Place Notary Seal Above

―――――――――― **OPTIONAL** ――――――――――
*Though this section is optional, completing this information can deter alteration of the document or fraudulent reattachment of this form to an unintended document.*

**Description of Attached Document**
Title or Type of Document: _____ Document Date: _____
Number of Pages: _____ Signer(s) Other Than Named Above: _____

**Capacity(ies) Claimed by Signer(s)**

| Signer's Name: _____ | Signer's Name: _____ |
|---|---|
| ☐ Corporate Officer — Title(s): _____ | ☐ Corporate Officer — Title(s): _____ |
| ☐ Partner — ☐ Limited ☐ General | ☐ Partner — ☐ Limited ☐ General |
| ☐ Individual    ☐ Attorney in Fact | ☐ Individual    ☐ Attorney in Fact |
| ☐ Trustee    ☐ Guardian or Conservator | ☐ Trustee    ☐ Guardian or Conservator |
| ☐ Other: _____ | ☐ Other: _____ |
| Signer Is Representing: _____ | Signer Is Representing: _____ |

©2014 National Notary Association • www.NationalNotary.org • 1-800-US NOTARY (1-800-876-6827)    Item #5907

9

EXHIBIT A
LEGAL DESCRIPTION

All that certain real property situated in the County of Los Angeles, State of California,
described as follows:

PARCEL 1:

Those portions of Lots 1, 2 and 3 of Scribner's Tract, as shown on a map recorded in Book 22, Page
192 of Maps, in the office of the County Recorder of said County, described as follows:

Beginning at the intersection of the Southerly line of the Northerly 40 feet of said Lot 2 with the
Westerly line of said Lot 2; thence Northerly along said Westerly 22,67 feet to the true point of
beginning, said true point of beginning also being the beginning of a curve concave Northeasterly
having a radius of 25 feet tangent to said Westerly line and tangent to a line parallel line with and
distant 50 feet Northeasterly measured at right angles from a line which bears South 72° 37' 55"
East and passes through a point in the centerline of Lincoln Avenue 80 feet wide as shown on said
map distant North 0° 37' 50" West thereof 74,91 feet from a line parallel with and 30 feet Southerly
measured at right angles from the Southerly line of said Lot 1 of said tract; thence Southeasterly
along said curve 31.41 feet to said first mentioned parallel line; thence South 72° 37' 55" East 8.31
feet to the beginning of a tangent curve concave Northeasterly and having a radius of 950 feet;
thence Southeasterly along said last mentioned curve 138.96 feet to the Easterly line of said Lot 1;
thence Northerly along the Easterly lines of said Lots 1, 2 and 3 to the Northerly line of the Southerly
20 feet of said Lot 3; thence Westerly along said last mentioned Northerly line to the Westerly line
of said Lot 3; thence Southerly along the Westerly lines of said Lost 2 and 3 to the true point of
beginning.

Said land is also shown on Certificate of Compliance recorded January 20, 2006 as Instrument No. 06-
0148328 of Official Records.

PARCEL 2:

Lot 38 of Scribner's Tract, as shown on a map recorded in Book 22, Page 192 of Maps, in the office of
the County Recorder of said County.

Except therefrom those portions of said lots included within a strip of land 50 feet wide the Southerly
boundary of which is described as follows:

Beginning at a point in the centerline of Lincoln Avenue 80 feet side as shown on said map distant
North 0° 37' 50" West thereon 74.91 feet from a line parallel with and 30 feet Southerly measured
at right angles from the Southerly line of Lot 1 of said tract, thence South  72° 37' 55" East 52.29
feet to the beginning of a curve concave to the North having a radius of 1000 feet tangent to
last mentioned course and tangent to a line parallel with and 20 feet Southerly measured at right
angles from the Southerly line of said Lot 35; thence Easterly along said curve 313.63 feet to said

5

000022

last mentioned parallel line; thence South 89° 23' 55" East along said last mentioned parallel line 100
feet.

Said land is also shown on Certificate of Compliance recorded January 20, 2006 as Instrument No. 06-
0148328 of Official Records.

PARCEL 3:

The North 30 feet of Lot 3 and the South 10 feet of Lot 4 of Scribner's Tract, as shown on a map
recorded in Book 22, Page 192 of Maps, in the office of the County Recorder of said County.

Said land is also shown on Certificate of Compliance recorded January 20, 2006 as Instrument No. 06-
0148328 of Official Records.

PARCEL 4:

That portion of Lot 4 beginning at a point 10 feet North of the Southwest corner of Lot 4; thence
North 21.70 feet; thence East 160 feet; thence South 21.70 Feet; thence West 160 feet to the
point of beginning of Scribner's Tract, as shown on a map recorded in Book 22, Page 192 of Maps,
in the office of the County Recorder of said County.

Said land is also shown on Certificate of Compliance recorded January 20, 2006 as Instrument No. 06-
0148328 of Official Records.

PARCEL 5:

The North 18.30 feet of Lot 4 and all of Lot 5, except the North 8.30 feet thereof of Scribner's
Tract, as shown on a map recorded in Book 22, Page 192 of Maps, in the office of the County
Recorder of said County.

Said land is also shown on Certificate of Compliance recorded January 20, 2006 as Instrument No. 06-
0148328 of Official Records.

PARCEL 6:

The South 12 feet of Lot 6 and North 8.30 feet of Lot 5 of Scribner's Tract, Rancho San Pasqual, as
shown on a map recorded in Book 22, Page 192 of Maps, in the office of the County Recorder of said
County,

Said land is also shown on Certificate of Compliance recorded January 20, 2006 as Instrument No. 06-
0148328 of Official Records.

PARCEL 7:

Lot 6 of Scribner's Tract, in the Rancho San Pasqual, as shown on a map recorded in Book 22, Page
192 of Maps, in the office of the County Recorder of said County.

Except therefrom the Southerly 12.00 feet thereof.

6

000023

Branch :F01,User :LEST                    Comment:                         Station Id :VSF5

Said land is also shown on Certificate of Compliance recorded January 20, 2006 as Instrument No. 06-0148328 of Official Records.

PARCEL 8:

Lot 7 of Scribner's Tract, as shown on a map recorded in Book 22, Page 192 of Maps, in the office of the County Recorder of said County.

Said land is also shown on Certificate of Compliance recorded January 20, 2006 as Instrument No. 06-0148328 of Official Records.

PARCEL 9:

Lot 9 of Scribner's Tract, as shown on a map recorded in Book 22, Page 192 of Maps, in the office of the County Recorder of said County.

Said land is also shown on Certificate of Compliance recorded January 20, 2006 as Instrument No. 06-0148328 of Official Records.

PARCEL 10:

Lot 8 of Scribner's Tract, as shown on a map recorded in Book 22, Page 192 of Maps, in the office of the County Recorder of said County.

Said land is also shown on Certificate of Compliance recorded January 20, 2006 as Instrument No. 06-0148328 of Official Records.

PARCEL 11:

Lots 35, 36 and 37 of Scribner's Tract, as shown on a map recorded in Book 22, Page 192 of Maps, in the office of the County Recorder of said County.

EXCEPT therefrom those portions of said lot included within a strip of land 50 feet wide, the Southerly boundary of which is described as follows:

Beginning at a point in the centerline of Lincoln Avenue 80 feet wide as shown on said map distant North 0° 37' 50" West thereon 74.91 feet from a line parallel with and 30 feet Southerly measured at right angles from the Southerly line of Lot 1 of said tract; thence South 72° 37' 55" East 52.29 feet to the beginning of a curve concave to the North having a radius of 1000 feet tangent to said last mentioned course and tangent to a line parallel with and 20 feet Southerly measured at right angles from the Southerly line of said Lot 35; thence Easterly along said curve 313.65 feet to said last mentioned parallel line; thence North 89° 23' 55" East along said last mentioned parallel line 100 feet.

Said land is also shown on Certificate of Compliance recorded January 20, 2006 as Instrument No. 06-0148328 of Official Records.

Assessor's Parcel Number: 5827-018-041

7

000024

*iv*

## PARKING SPACE AND TRASH ENCLOSURE LEASE

THIS PARKING SPACE AND TRASH ENCLOSURE LEASE (this "Lease") is made and entered into as of the 8th day of January, 2015 by and between ALTADENA LINCOLN CROSSING LLC, a Delaware limited liability corporation, ("Landlord") and GEORGE GARIKIAN, Trustee of the George Garikian Living Trust ("Tenant").

R E C I T A L S :

A    Landlord owns that certain parking structure (the "Parking Structure") located at 376 Acacia Street and the trash enclosure (the "Trash Enclosure") located on the ground floor of 2220 Lincoln Avenue that is situated on the land described on Exhibit "A" attached hereto and incorporated herein by this reference (the "Land").

B    Tenant is (or is about to become) the owner of that certain property known as Altadena Lincoln Crossing Market Quadrant ("Market Quadrant") located at 2230-2260 Lincoln Avenue, Altadena, CA  91001.  Landlord and Tenant understand that Los Angeles County has asserted that the Market Quadrant does not contain adequate parking spaces as required by applicable laws, codes and/or ordinances.

C    Landlord and Tenant desire that Tenant shall lease sixteen (16) parking spaces (in the Parking Structure) and use of the trash bins in the Trash Room from Landlord on the terms and conditions set forth below.

A G R E E M E N T :

NOW, THEREFORE, for good and valuable consideration, the receipt and adequacy of which are hereby acknowledged, the parties hereto agree as follows:

1.    Grant of Lease.  In consideration of the rents reserved in this Lease and the obligations herein to be observed and performed by Tenant, Landlord hereby leases to Tenant, and Tenant takes and accepts from Landlord, sixteen (16) spaces in the Parking Structure, which spaces are generally shown on Exhibit "B" attached hereto and incorporated herein by this reference, and use of the trash bins in the Trash Room.  Landlord shall promptly cause all of such spaces to be marked in a manner designated by Tenant so that they can only be used for the purposes set forth in this Lease. Landlord shall ensure that the parking requirements of all of the tenant leases ("Tenant Leases") affecting the Market Quadrant as of the date of this Lease (under the tenant leases as they exist as of the date of this Lease) shall at all times be satisfied by Landlord with regard to the spaces demised under this Lease (along with the 162 onsite parking spaces at the Market Quadrant), it being understood that such assurance by Landlord shall not cover any code changes or voluntary modifications by Tenant to the Market Quadrant parking that reduces the available parking spaces thereon.

-- 1 --

000025

13

2.   Relocation. Landlord shall have the right to relocate the spaces within the Parking Structure from time to time in a manner reasonably acceptable to Tenant, provided that such relocation shall not violate any parking rights of tenants under the Tenant Leases as they exist as of the date of this Lease. Tenant accepts the Parking Structure in "as is" condition as of the date hereof, subject to the provisions of this Lease. Tenant acknowledges that it is familiar with the condition of the Parking Structure and that it has had an opportunity to make and has made all inspections of the Parking Structure which it deems necessary or appropriate to ascertain the condition of the Parking Structure.

3.   Term. The term of this Lease (the "**Term**") shall begin on the date hereof (the "**Effective Date**"), and shall expire 99 years hereafter.

4.   Rent. Tenant shall pay as "**Rent**", the sum of $1 (one dollar) per year, receipt of which for the entire Term is hereby acknowledged, for the lease of the sixteen (16) parking spaces, and there will be no charge to the users of the spaces. In addition, so long as Tenant or the tenants under the Tenant Leases (or successor tenants in the premises demised under the Tenant Leases) elect to use the trash bins in the Trash Enclosure on a regular basis, Tenant shall pay as "**Rent**", 25% of the cost of the trash bin rentals. Landlord shall rent from a third party vendor trash bins to accommodate the trash for the Landlord and the Tenant (it being understood that Tenant shall have the right to discontinue its right to use such trash bins from time to time by thirty (30) days' notice to Landlord and in such event the Rent for the trash bin use shall discontinue as allocable to the same time period). The current cost of the trash bins is $935 per month total. Landlord shall invoice Tenant on a monthly basis, and such Rent shall be due within thirty (30) days of the date of the invoice. Landlord shall have the right to increase or decrease the number of bins or frequency of service at its sole discretion; on any increase or decrease the Rent for the bins shall be increased or reduced proportionately, however any increase will require thirty (30) days written notice to Tenant. Landlord's rental and/or service agreements for the trash bins shall be made on an arm's length and fair market basis only.

5.   Taxes and Assessments.

(a) Taxes and Assessments.   Landlord shall pay before they become delinquent all "**Impositions**," as defined in Section 5(b) hereof, which may be levied, assessed or imposed upon the Land and the Parking Structure or any part thereof which shall become due and payable during the Term and any extension thereof. The foregoing shall not be construed so as to impose any liability upon Landlord for the payment of any income tax of Tenant or personal property tax on property owned by Tenant.

(b) Impositions. For purposes hereof, the term "**Impositions**" shall include all taxes, assessments, and other governmental charges applicable to or assessed against the Land, or the Parking Structure, or any portion thereof, including the personal property owned by Landlord and used in connection therewith, whether federal, state, county, or municipal and whether assessed by taxing districts or authorities presently taxing the Land and the Parking Structure or the operation thereof, or by other taxing authorities subsequently created, or

-- 2 --

000026

(4

otherwise, and any other taxes and assessments attributable to or assessed against all or any part of the Land and the Parking Structure or their operation.

6.    Utilities. Landlord shall not charge Tenant for domestic water or electricity or any other utilities supplied to or serving the Parking Structure.

7.    Use. Tenant shall use the Parking Structure throughout the Term solely for the purpose of providing parking facilities to employees and/or invitees of Tenant or other tenants or occupants of the Market Quadrant, and shall use the Trash Enclosure solely for the purpose of the tenants of the Market Quadrant disposing of their trash in the provided trash bins (except that the supermarket tenant on the Market Quadrant shall not dispose of its trash in those trash bins in the Trash Enclosure), and for no other purpose whatsoever without the express written consent of Landlord, which consent shall not be unreasonably withheld, conditioned or delayed. Tenant shall use reasonable efforts to utilize the Parking Structure and Trash Enclosure in a clean, safe, careful, lawful, businesslike, and efficient manner at all times during the Term, it being understood that Tenant has no obligation to repair or improve or modify the Parking Structure or Trash Enclosure in any way in connection with this covenant.

    (a)    Directional Signs and Arrows. Landlord shall be responsible, at its sole cost and expense, for the placement of directional signs and arrows within the Parking Structure, and for the placement of any signs required for the Trash Enclosure.

    (b)    License Numbers. Tenant shall furnish Landlord with its employees' license numbers (who park in the Parking Structure) within ten (10) days after request by Landlord from time to time, but not more frequently than six (6) times per calendar year during the Lease Term.

    (c)    Hazardous Materials. Tenant shall not place any "**Hazardous Materials**" (as defined in Section 8 below) in, on, or about the Parking Structure without the prior written consent of Landlord, to be withheld in Landlord's sole discretion. Without limiting Landlord's other remedies, if the presence of Hazardous Materials on or about the Parking Structure and/or the Land, caused by Tenant results in any contamination, Tenant shall, at its sole expense, promptly take all actions as are necessary to return the Parking Structure and/or the Land to the condition existing prior to the introduction of any such Hazardous Material; provided, however, that Landlord's approval of such actions shall first be obtained. For purposes of this Section 7(c), use of the premises by customers with motor vehicles containing "**petroleum products**" or other "**hazardous materials**" shall not constitute a "**placement of Hazardous Materials**" by Tenant.

8.    Compliance with Laws. Tenant shall, at its sole cost and expense, faithfully observe and fully comply with all applicable Federal, State, County and Municipal laws, rules, regulations, ordinances and other requirements now in force or which may hereinafter be in force, in the use of the Parking Structure, including without limitation, any such laws, rules, regulations, ordinances and other requirements relating to Tenant's use of Hazardous Materials, it being understood that Tenant has no obligation to repair or improve or modify the Parking Structure or

-- 3 --

000027



Trash Enclosure in any way in connection with this covenant. Landlord shall, at its sole cost and expense, faithfully observe and fully comply with all applicable Federal, State, County and Municipal laws, rules, regulations, ordinances and other requirements now in force or which may hereinafter be in force, in the use of the Parking Structure, including without limitation, any such laws, rules, regulations, ordinances and other requirements relating to Landlord's or any third party's use of Hazardous Materials. For purposes of this Lease, "**Hazardous Materials**" mean "**petroleum products**", "**hazardous substances**", "**hazardous waste**", "**hazardous materials**", "**toxic substances**", "**contamination**" and "**pollution**" giving those terms the broadest meaning now or thereafter accorded by statutes, regulations or court decisions in the jurisdiction in which the Parking Structure are located and shall include products and materials found to have adverse effects on the environment or the health and safety of persons. Hazardous Materials also means any hazardous, toxic, explosive, noxious or radioactive substance, material, matter, or waste which is or becomes regulated by any federal, state, or local law, rule, regulation, code, ordinance, or any other governmental restriction or requirement.

9.    Insurance.

(a) Tenant's Insurance. Tenant, at Tenant's expense, shall procure and maintain in effect the following insurance in connection with its use of the parking spaces, throughout the Term of this Lease and any extension thereof: Commercial general liability insurance with a combined single limit of not less than One Million Dollars ($1,000,000.00) for property damage and bodily and personal injury, including coverage for any liability of Tenant under this Lease.

(b) Certificates of Insurance. Tenant shall furnish to Landlord within thirty (30) business days following the date hereof, certificates of insurance evidencing all insurance which Tenant is required to maintain pursuant to this Lease and Tenant shall deposit copies of all policies with Landlord. Tenant shall also furnish Landlord with satisfactory evidence of timely payment of the premiums for such policies at least thirty (30) days prior to the renewal date or expiration of the term of coverage thereunder, and a certificate or certificates setting forth the terms of such policies.

(c) Failure to Maintain Insurance. If Tenant fails to provide or to keep in force any or all of the insurance policies required hereunder, or should such insurance not be approved by Landlord and Tenant fails to provide insurance acceptable to Landlord within forty-eight (48) hours after written notice of such disapproval from Landlord, Landlord may, without assuming any obligation in connection therewith, procure such insurance at Tenant's expense. In such event, Tenant shall pay to Landlord all costs incurred in procuring such insurance, upon demand by Landlord, without prejudice to any other rights and remedies of Landlord under this Lease.

(d) Compliance With Insurer Requirements. Tenant shall not knowingly conduct or permit to be conducted in, on, or about the Parking Structure any activity, or place any equipment in, on, or about the Parking Structure, which will invalidate the insurance coverage in effect or increase the rate of fire

-- 4 --

000028

insurance or other insurance on the Parking Structure, and Tenant shall comply
with all requirements and regulations of Tenant's and Landlord's casualty and
liability insurers.

(e) Landlord Insurance. Landlord shall at its sole cost and
expense, insure the Parking Structure against all matters typically addressed in an
"all risks" policy, with full replacement cost coverage, with insurers admitted in
the State of California. Landlord shall also procure and maintain in effect the
following insurance in connection with the parking spaces, throughout the Term
of this Lease and any extension thereof: Commercial general liability insurance
with a combined single limit of not less than One Million Dollars ($1,000,000.00)
(or such other amounts as are commercially reasonable) for property damage and
bodily and personal injury, including coverage for any liability of Landlord under
this Lease.

10.    Indemnity and Waiver. Tenant hereby indemnifies, defends and holds Landlord
harmless from and against: (a) any and all liens, claims, demands, costs, expenses and liabilities
but only to the extent same are caused by negligence, misconduct or other fault of Tenant, its
agents or employees, which arise from (i) Tenant's use of the Parking Structure, or (ii) from any
activity or thing done, permitted or suffered by Tenant or its agents, or employees in or about the
Parking Structure; (b) any and all claims, costs, penalties, expenses and liabilities to the extent
same are caused by (i) any breach or default in the performance of any obligation on Tenant's part
to be performed under the terms of this Lease, or (ii) Tenant's violations of or Tenant's
non-compliance with any governmental requirements or insurance requirements, or (iii) any
negligent act, misconduct or other fault of Tenant, or any of its agents, contractors, or employees;
and (c) all costs, attorneys' fees, expenses and liabilities incurred by Landlord in defending any
such claims or any actions or proceedings brought against Landlord in connection with any Tenant
violations of the express provisions of this Lease. To the extent of the foregoing indemnity in case
any actions or proceedings be brought against Landlord by reason of any such claims, Tenant,
upon notice from Landlord, shall defend the same at Tenant's expense by counsel satisfactory to
Landlord. The foregoing indemnity shall be in addition to Tenant's obligation to supply the
insurance required by Section 9 and not in discharge of or substitution therefor. Landlord hereby
indemnifies, defends and holds Tenant harmless from and against: (a) any and all liens, claims,
demands, costs, expenses and liabilities but only to the extent same are caused by negligence,
misconduct or other fault of Landlord, its agents or employees, which arise from (i) any party's
(other than Tenant's) use of the Parking Structure, or (ii) from any activity or thing done, permitted
or suffered by Landlord or its agents, or employees in or about the Parking Structure; (b) any and
all claims, costs, penalties, expenses and liabilities to the extent same are caused by (i) any breach
or default in the performance of any obligation on Landlord 's part to be performed under the terms
of this Lease, or (ii) Landlord 's violations of or Landlord's non-compliance with any governmental
requirements or insurance requirements, or (iii) any negligent act, misconduct or other fault of
Landlord, or any of its agents, contractors, or employees; and (c) all costs, attorneys' fees, expenses
and liabilities incurred by Tenant in defending any such claims or any actions or proceedings
brought against Tenant in connection with any Landlord violations of the express provisions of
this Lease. To the extent of the foregoing indemnity in case any actions or proceedings be brought
against Tenant by reason of any such claims, Landlord, upon notice from Tenant, shall defend the
same at Landlord 's expense by counsel satisfactory to Tenant. The foregoing indemnities shall be

-- 5 --

000029

17

in addition to the obligations to supply the insurance required by Section 9 and not in discharge of or substitution therefor. The provisions of this Section 10 shall survive the expiration or termination of this Lease with respect to any damage, injury, or death occurring before such expiration or termination. Notwithstanding anything contained in this Section 9 to the contrary, Landlord shall not be liable to Tenant for any claims to the extent caused by the negligence, misconduct or other fault of Landlord, its agents, employees, representatives, or contractors to the extent such claims are covered by the types of insurance Tenant is to maintain pursuant to Section 9.

11.    Exemption of Landlord from Liability. Tenant hereby agrees that Landlord shall not be liable for injury or damage which may be sustained by the person, goods, ware, merchandise or property of Tenant, its employees, invitees or customers, or by any other person in or about the Parking Structure caused by or resulting from fire, steam, electricity, gas, water or rain which may leak or flow from or into any part of the Parking Structure, or from the breakage, leakage, obstruction or other defects of the pipes, sprinklers, wires, appliances, plumbing, air conditioning or lighting fixtures in or about the Parking Structure, whether such damage or injury results from conditions arising upon the Parking Structure or form other sources, except to the extent same are caused by the negligence, misconduct or other fault of Landlord, its agents or employees.

12.    Estoppel Certificate.

(a) Within ten (10) business days after written request by Landlord, Tenant shall execute and deliver to Landlord an estoppel certificate certifying as to such facts and agreeing to such other matters as Landlord may reasonably request. Such estoppel certificate shall substantially conform to all of the terms set forth in the estoppel certificate attached to this Lease as Exhibit "C". The failure of Tenant to execute, acknowledge and deliver to Landlord an estoppel certificate in accordance with Landlord's written request within such ten (10) business day period shall constitute an acknowledgment by Tenant of the matters set forth in the written request, and in such event Tenant hereby authorizes and appoints Landlord to act as Tenant's attorney-in-fact to execute such estoppel certificate.

(b) Within ten (10) business days after written request by Tenant, Landlord shall execute and deliver to Tenant an estoppel certificate certifying as to such facts and agreeing to such other matters as Tenant may reasonably request. The failure of Landlord to execute, acknowledge and deliver to Tenant an estoppel certificate in accordance with Tenant's written request within such ten (10) business day period shall constitute an acknowledgment by Landlord of the matters set forth in the written request, and in such event Landlord hereby authorizes and appoints Landlord to act as Landlord's attorney-in-fact to execute such estoppel certificate.

13.    Repairs and Maintenance. Landlord shall, during the term of this Lease, maintain the Parking Structure and all improvements thereto safe and secure, in good order, condition, and repair, including, without limitation, the periodic cleaning of the Parking Structure, and striping of parking spaces and painting of directional signs/arrows therein except for (i) reasonable wear and

-- 6 --

000030

18

tear and (ii) damage caused by any reason other than the negligence, misconduct or other fault of Tenant, its agents or employees, in connection herewith, the repair of which damage shall be the obligation of Landlord hereunder.

14.    Indemnity.    Landlord shall at all times indemnify, defend (with counsel satisfactory to Tenant), and hold harmless Tenant, and its affiliates, partners, managers, employees, officers, agents, family members, trustees, beneficiaries, heirs, attorneys, lenders, successors and assigns (collectively, "Indemnitee Parties"), from and against any and all liabilities, suits, actions, debts, obligations, judgments, charges, demands, claims, costs, losses (including without limitation loss of use of the Parking Structure and/or lost rents), damages, recoveries, settlements, and expenses (including but not limited to attorneys' fees and costs), of any nature, whatsoever suffered or incurred by Indemnitee Parties or any of them which arise out of, relate to and/or result from (i) any assertion by B&V Enterprises, Inc. ("SK"), the tenant under a lease with Landlord (as predecessor in interest to Tenant) dated April 1, 2008 (the "SK Lease"), that section 18.5 of the SK Lease (or any other provision of the SK Lease related to parking, in effect on the date of this Lease) has been violated due to the failure to provide exclusivity rights of SK in thirty (30) parking spaces in the Parking Structure, (ii) any assertion that the Market Quadrant violates applicable laws, codes or ordinances, in effect as of the date of this lease, regarding the provision of parking spaces based on Tenant Leases in effect on the date of this Lease (so long as Tenant maintains the 162 onsite parking spaces at the Market Quadrant), and/or (iii) any and all damages and claims that arise in the event that Tenant, after pursuing diligently and in good faith, is unable to procure from Los Angeles County a parking permit for the Property pursuant to file no. RPKP 201300005 (R2013-01662), and/or any act or omission by Landlord which adversely impacts said parking permit once issued (which may include, without limitation, any construction by Landlord on property owned by Landlord or its successors or assigns which results in a violation of such parking permit or the conditions applicable thereto).

15.    Alterations.    Tenant shall not make or suffer any change, alterations, additions, improvements, removal or replacement of improvements in or upon the Parking Structure nor make any contract therefor without first procuring Landlord's written consent, which consent shall not be unreasonably withheld, conditioned or delayed.

16.    Damage to or Destruction of the Parking Structure.

(a)    Definition.    Throughout this Lease, the phrase "**totally unfit for use and occupancy by Tenant**" shall mean and is hereby defined as the damage to fifty percent (50%) or more of the Parking Structure.

(b)    Partial Damage.    In the event of any damage which does not render the Parking Structure totally unfit for use and occupancy by Tenant, this Lease shall remain in full force and effect.    Landlord shall, with reasonable diligence, and in any event within not more than sixty (60) calendar days after the occurrence giving rise to the damage, cause the Parking Structure to be repaired and restored to the same general condition in which they existed immediately prior to the occurrence of said damage.

-- 7 --

19

(c) <u>Total Damage</u>.  In the event of any damage which renders the Parking Structure totally unfit for use and occupancy by Tenant, this Lease shall remain in full force and effect.  Landlord shall, with reasonable diligence, and in any event within not more than sixty (60) calendar days after the occurrence giving rise to the damage, commence the repair and restoration of the Parking Structure, to be repaired and restored to the same general condition in which they existed immediately prior to the occurrence of said damage, and thereafter diligently pursue the same to completion.

(d) <u>Landlord's Failure to Complete Repairs</u>.  In the event that Landlord does not comply with the time limits described in Sections 16(b) and 16(c) above, Tenant may (i) terminate this Lease and all its obligations hereunder forthwith by giving written notice to Tenant; and such termination shall be effective as of and from the date said notice is received by Tenant, or (ii) 30 days after a notice to Landlord to complete required repairs, undertake such repairs and restoration to the Parking Structure, and Landlord shall reimburse Tenant, within twenty (20) days of presentation of invoice, for the out-of-pocket expenses thereof paid to third parties.

17.    <u>Condemnation</u>.

(a) <u>Partial Condemnation</u>.  In the event of a taking under the power of eminent domain or conveyance under the threat of eminent domain (in either case, a "**Condemnation**"), and such Condemnation does not render the Parking Structure totally unfit for use and occupancy by Tenant, this Lease shall remain in full force and effect.  Landlord shall, with reasonable diligence, and in any event within not more than sixty (60) calendar days after the Condemnation, cause the remaining portions of the Parking Structure to be repaired and restored to the same general condition in which they existed immediately prior to the occurrence of said damage.

(b) <u>Total Condemnation</u>.  In the event of a Condemnation which renders the Parking Structure totally unfit for use and occupancy by Tenant, Landlord and Tenant shall each have the option to terminate this Lease as provided hereafter.  If Tenant or Landlord fail to exercise said option to terminate this Lease, this Lease shall remain in full force and effect.  Landlord shall, with reasonable diligence, and in any event within not more than sixty (60) calendar days after the Condemnation, cause the Parking Structure to be repaired and restored to the same general condition in which they existed immediately prior to the occurrence of said damage, or replaced with comparable improvements reasonably acceptable to Tenant.

(c) <u>Option to Terminate</u>.  The option to terminate this Lease granted to Tenant and Landlord in Section 17(b) above shall be exercised by Tenant or Landlord (as the case may be) by giving written notice of such exercise to the other within thirty (30) calendar days following the events giving rise to the damage.  If Tenant or Landlord shall exercise said option, and give said notice,

-- 8 --

000032

𝒲

then this Lease shall terminate effective upon the date set forth in such notice (which is in any event shall not be in excess of sixty (60) days following the Condemnation and the Rent and other payments required to be made hereunder shall abate as of and from such termination date).

(d) Condemnation Awards.  Each party shall have the right to pursue its maximum allowable claim for an award or payment in connection with any Condemnation.

(e) Landlord's Failure to Complete Repairs.  In the event that Landlord does not complete the repairs and restoration to the Parking Structure within the time limits described in Sections 17(a) and 17(b) above, Tenant may (i) terminate this Lease and all its obligations hereunder forthwith by giving written notice to Landlord; and such termination shall be effective as of and from the date said notice is received by Landlord, or (ii) 30 days after a notice to Landlord to complete required repairs, undertake such repairs and restoration to the Parking Structure, and Landlord shall reimburse Tenant, within twenty (20) days of presentation of invoice, for the out-of-pocket expenses thereof paid to third parties.

18.  Defaults by Tenant and Landlord's Remedies.

(a) Events of Default.  The occurrence of any one or more of the following events (each, an "**Event of Default**") with respect to any of the Parking Structure shall constitute a material default and breach of this Lease by Tenant:

(i)  Any failure by Tenant to observe and perform any other material provision of this Lease to be observed or performed by Tenant, where such failure continues for thirty (30) days after written notice thereof by Landlord to Tenant, unless a shorter period of time for such observance or performance is otherwise expressly set forth in this Lease; provided, however, that if the nature of such default is such that the same cannot reasonably be cured within such thirty (30) day period, Tenant shall not be deemed to be in default if Tenant shall within such period commence such cure and thereafter diligently prosecute the same to completion. However, if Tenant commits a payment default hereunder, after thirty (30) days written notice to Tenant without a cure, Landlord may exercise any remedy available at law or in equity, including but not limited to termination of this Lease.

(b) Landlord's Remedies.  In the event of any such default by Tenant, then Landlord shall be entitled to any remedies available at law or in equity including, without limitation, the remedies provided under Section 1951.2 and Section 1951.4 of the California Civil Code.

19.  Defaults by Landlord. Except with regard to payment defaults, Landlord shall not be in default hereunder unless Landlord fails to perform or observe any of the covenants, provisions or conditions contained in this Lease on its part to be performed or observed within

-- 9 --

000033

21

thirty (30) days after written notice of default or, if more than thirty (30) days shall be required because of the nature of the default, unless Landlord fails to proceed diligently to cure such default after written notice given by tenant thereof.  However, if Landlord commits a payment default hereunder, after five (5) days written notice, Tenant may exercise any remedy available at law or in equity, including but not limited to termination of this Lease.

20.   Subordination and Attornment.

(a) Subordination.  Provided that Tenant is not disturbed in its quiet enjoyment of the Parking Structure, upon request of Landlord or any mortgagee, deed of trust trustee or beneficiary, or lessor of Landlord, Tenant shall in writing, within ten (10) business days after written request by Landlord, subordinate its rights hereunder to the lien of any mortgage or deed of trust now or hereinafter in force against the Land, or the Parking Structure and to all advances made or hereafter to be made upon the security thereof and all renewals, modifications, consolidations and replacement thereof, and to any lease in which Landlord is lessee, and any modifications, refuels, and replacements thereof. Such instrument of subordination shall substantially conform to all of the terms set forth in the subordination agreement attached to this Lease as Exhibit "D". Any such mortgagee, trustee or beneficiary may at its option subordinate its mortgage or deed of trust to this Lease. Landlord shall promptly upon the execution of this Lease obtain from its secured lender a non-disturbance agreement in favor of Tenant, in form and content acceptable to Tenant.

(b) Attornment.  In the event any proceedings are brought for the foreclosure of such lien, or in the event of the exercise of the power of sale under any mortgage or deed of trust made by the Landlord covering the Parking Structure, or should the lease in which Landlord is lessee be terminated, Tenant shall, at the election of the Successor to Landlord upon any such foreclosure or on sale or termination, attorn to the successor to Landlord upon any such foreclosure or sale or termination and recognize such successor as the Landlord under this Lease.  Tenant covenants and agrees to execute and deliver, upon demand by Landlord and in the form requested by Landlord, and within ten (10) business days of written demand by Landlord, any additional documents evidencing the aforementioned subordination of this Lease with respect to any lease in which Landlord is lessee or with respect to the lien of any such mortgage or deed of trust.

21.   Lease Runs with the Land; Assignment, Subletting and Encumbrance. The rights and obligations of Landlord and Tenant hereunder shall run with the land, and any successor owner of the Market Quadrant shall be vested with all of the rights of the Tenant hereunder, and any successor owner of the Fitness Quadrant shall be vested with and bound by all of the obligations of Landlord hereunder, and, notwithstanding anything to the contrary herein, no consent of the Landlord shall be required in connection with the assignment of the Tenant's rights under this Lease to a successor owner of the Market Quadrant. Except as provided in the foregoing sentence, Tenant shall not voluntarily or involuntarily assign, transfer, mortgage or otherwise encumber this

-- 10 --

000034

ZL

Lease or any interest of Tenant herein, in whole or in part (an "**Assignment**"), or sublet the whole or any part of the Parking Structure, or permit the Parking Structure or any part thereof to be used or occupied by others, except as contemplated by this Lease, without first obtaining in each and every instance the prior written consent of Landlord; provided, however, that the use of the Parking Structure by Tenant's supermarket tenant or its successors, employees and/or invitees, and/or the use by Tenant's other tenants and/or their employees or invitees, shall not constitute an Assignment. If this Lease or any interest herein is assigned, or if the whole or any part of the Parking Structure is sublet or used or occupied by others without Landlord's prior written consent (to the extent such consent is required herein), then Tenant shall continue to remain liable for the full performance of all obligations under this Lease to be performed or observed by Tenant, and Tenant shall not be released from its obligations under this lease in any manner.

22.    Notices. Whenever, under this Lease, provision is made for any demand, notice, or declaration of any kind or where it is deemed desirable or necessary by either party to give or serve any such notice, demand or declaration to the other, it shall be in writing and either served personally or sent by overnight courier or sent by registered mail or certified mail, return receipt requested, with postage prepaid, addressed to Tenant or Landlord, as **the case** may be, at the address specified below.

To Landlord:

     Greg Galletly
     Altadena Lincoln Crossing, LLC
     210 S. Orange Grove Blvd.
     Pasadena, California 91105

To Tenant:

     The George Garikian Living Trust
     1211 Cortez Dr.
     Glendale, CA 91207

Either party may by like notice at any time and from time to time designate a different address to which notices shall be sent. Such notices, demands or declarations shall be deemed sufficiently served or given for all purposes hereunder, unless otherwise specified in this Lease, either (a) if personally served, upon such service, (b) if sent by overnight courier, the following business day, or (c) if mailed, two (2) business days after the time of mailing or on the date of receipt shown on the return receipt, whichever is earlier.

23.    Waiver.

     (a) The waiver by Landlord of any breach of any term or condition of this Lease shall not be deemed to be a waiver of any subsequent reach of the same or of any other term or condition of this Lease. The subsequent acceptance of rent due under this Lease or any other monetary obligations of Tenant by

-- 11 --

000035

23

Landlord shall not be deemed to be a waiver of any preceding breach by Tenant of any term or condition of this Lease, other than the failure of Tenant to make the particular payment so accepted, regardless of Landlord's knowledge of such preceding breach at the time of acceptance of such rent. No term or condition of this Lease shall be deemed to have been waived by Landlord unless Landlord shall expressly waive the same in writing to Tenant.

(b) The waiver by Tenant of any breach of any term or condition of this Lease shall not be deemed to be a waiver of any subsequent reach of the same or of any other term or condition of this Lease. The subsequent acceptance of rent due under this Lease or any other monetary obligations of Landlord by Tenant shall not be deemed to be a waiver of any preceding breach by Landlord of any term or condition of this Lease, other than the failure of Landlord to make the particular payment so accepted, regardless of Tenant's knowledge of such preceding breach at the time of acceptance of such rent. No term or condition of this Lease shall be deemed to have been waived by Tenant unless Tenant shall expressly waive the same in writing to Landlord.

24.    Miscellaneous.

(a) Relationship of the Parties. Nothing herein contained, either in the method of computing rent or otherwise, shall create between the parties hereto, or be relied upon by others as creating, any relationship or partnership, association, joint venture or otherwise. The sole relationship of the parties hereto shall be that of landlord and tenant. All persons employed by Tenant to operate the Parking Structure shall be deemed to be employees of Tenant and not of Landlord, and neither Tenant nor its employees shall have any authority to act as the agent of the Landlord. Neither party shall be liable for debts incurred by the other except as specifically otherwise provided herein.

(b) Applicable Law. The laws of the State of California shall govern the validity, performance and enforcement of this Lease.

(c) Successors. Except as expressly provided herein, the terms and agreements as contained in this Lease shall apply to, run in favor of and shall be binding upon and inure to the benefit of the parties hereto, and their respective heirs, executors, administrators, personal representatives and assigns and successors-in-interest.

(d) Entire Agreement. This Lease and the exhibits attached hereto and forming a part hereof set forth all the obligations, covenants, promises, agreements, conditions and understandings between Landlord and Tenant concerning the Parking Structure. All exhibits attached hereto and referenced herein are incorporated herein by this reference. All prior communications, negotiations, arrangements, representations, agreements and understandings, whether oral or written, between the parties hereto, and their representatives, are merged herein and extinguished. Except as herein otherwise provided, no

-- 12 --

000036

24

subsequent alteration, amendment, change or addition to this Lease shall be binding upon Landlord or Tenant unless reduced to writing and signed by both parties.

(e) Tenant as Corporation or Partnership. If Tenant executes this Lease as corporation or partnership, then Tenant and the persons executing this Lease on behalf of Tenant represent and warrant that such entity is duly qualified to do business in California and that the individuals executing this Lease on Tenant's behalf are duly authorized to execute and deliver this Lease on its behalf.

(f) Captions. The titles of sections herein are inserted only as a matter of convenience and in no way define, limit, construe or describe the scope or intent of the sections of this Lease.

(g) Severability. If any term of this Lease or the application thereof to any person or circumstance shall, to any extent, be invalid or unenforceable, the remainder of this Lease, or the application of such term to persons or circumstances other than those as to which it is held invalid or unenforceable, shall not be affected thereby, and each term of this Lease shall be valid and be enforced to the fullest permitted by law.

(h) Force Majeure. Any prevention, delay or stoppage due to strikes, lockouts, labor disputes, acts of God, inability to obtain labor or materials or reasonable substitutes therefor, governmental restrictions, regulations or controls, enemy or hostile governmental action, civil commotion, fire or other casualty, or any other cause, whether similar or dissimilar to the foregoing, beyond the reasonable control of the Landlord or Tenant, shall excuse the performance by such party for a period equal to any such prevention, delay or stoppage.

(i) Attorney's Fees. In the event that any time following the date hereof, either Landlord or Tenant shall institute any action or proceeding against the other relating to the provisions of this Lease, or any default hereunder, then and in that event, the party not prevailing in such action or preceding shall reimburse the prevailing party for all costs and expenses, including attorneys' fees and expenses incurred therein by the prevailing party.

(j) Brokers. Landlord and Tenant each warrant and represent to each other that it has had no dealing with any broker or finder in connection with this Lease and that it knows of no other person who is or might be entitled to a commission, finder's fee or other like payment in connection with this Lease and each does hereby agree to indemnify, defend and hold the other party harmless from and against any and all loss, liability, costs, fees (including, without limitation, attorneys' fees), claims and expenses that the other party may incur should such warranty and representation prove incorrect.

-- 13 --

000037

Branch :F01,User :LEST                    Comment:                    Station Id :VSF5



(k) <u>Time is of the Essence</u>.  Time is of the essence with respect to the performance of every provision of this Lease in which time of performance is a factor.

(l) <u>Amendments in Writing</u>.  This Lease may only be changed, modified or amended by an instrument in writing, executed by the parties hereto.

(m)<u>Accord and Satisfaction</u>.  No payment by Tenant or receipt by Landlord of a lesser amount than the monthly rent provided for herein shall be deemed to be other than on account of the earliest stipulated rent, nor shall any endorsement of statement on any check or any letter accompanying any check or payment as rent be deemed an accord and satisfaction, and Landlord may accept such check payment without prejudice to Landlord's right to key cover the balance of such rent or pursue any other remedy provided for in this Lease.

(n)  Recording.  Upon the execution of this Lease, the parties shall sign, acknowledge and record in the Official Records of Los Angeles County, California a short form memorandum of this Lease, in form and content designated by Tenant.

## [END OF TEXT; SIGNATURES APPEAR ON FOLLOWING PAGE]

-- 14 --

26

IN WITNESS WHEREOF, the parties hereto have executed this Lease as of the date first above written.

**Altadena Lincoln Crossing LLC,**
a Delaware limited liability company

By:     DPP Altadena LLC,
        a Delaware limited liability company
        Its Manager

        By:     Altadena-Dorn Platz, LLC
        a California limited liability company
        Its Manager

        By: _____
        Name:     Greg Galletly
        Its:  Manager

**George Garikian, Trustee of The George
Garikian Living Trust**

By: _____
Name: George Garikian
Its:    Trustee

--15--

000039

27

## EXHIBIT "A"

All that certain real property situated in the County of Los Angeles, State of California,
described as follows:

PARCEL 1:

Those portions of Lots 1, 2 and 3 of Scribner's Tract, as shown on a map recorded in Book
22, Page 192 of Maps, in the office of the County Recorder of said County, described as
follows:

Beginning at the intersection of the Southerly line of the Northerly 40 feet of said Lot 2
with the Westerly line of said Lot 2; thence Northerly along said Westerly 22,67 feet to the
true point of beginning, said true point of beginning also being the beginning of a curve
concave Northeasterly having a radius of 25 feet tangent to said Westerly line and tangent
to a line parallel line with and distant 50 feet Northeasterly measured at right angles from a
line which bears South 72° 37' 55" East and passes through a point in the centerline of
Lincoln Avenue 80 feet wide as shown on said map distant North 0° 37' 50" West thereof
74,91 feet from a line parallel with and 30 feet Southerly measured at right angles from the
Southerly line of said Lot 1 of said tract; thence Southeasterly along said curve 31.41 feet
to said first mentioned parallel line; thence South 72° 37' 55" East 8.31 feet to the
beginning of a tangent curve concave Northeasterly and having a radius of 950 feet; thence
Southeasterly along said last mentioned curve 138.96 feet to the Easterly line of said Lot 1;
thence Northerly along the Easterly lines of said Lots 1, 2 and 3 to the Northerly line of the
Southerly 20 feet of said Lot 3; thence Westerly along said last mentioned Northerly line to
the Westerly line of said Lot 3; thence Southerly along the Westerly lines of said Lost 2 and
3 to the true point of beginning.

Said land is also shown on Certificate of Compliance recorded January 20, 2006 as
Instrument No. 06-0148328 of Official Records.

PARCEL 2:

Lot 38 of Scribner's Tract, as shown on a map recorded in Book 22, Page 192 of Maps, in the
office of the County Recorder of said County.

Except therefrom those portions of said lots included within a strip of land 50 feet wide the
Southerly boundary of which is described as follows:

Beginning at a point in the centerline of Lincoln Avenue 80 feet side as shown on said map
distant North 0° 37' 50" West thereon 74.91 feet from a line parallel with and 30 feet
Southerly measured at right angles from the Southerly line of Lot 1 of said tract; thence
South 72° 37' 55" East 52.29 feet to the beginning of a curve concave to the North having
a radius of 1000 feet tangent to said last mentioned course and tangent to a line parallel
with and 20 feet Southerly measured at right angles from the Southerly line of said Lot 35;
thence Easterly along said curve 313.63 feet to said last mentioned parallel line; thence
South 89° 23' 55" East along said last mentioned parallel line 100 feet.

Said land is also shown on Certificate of Compliance recorded January 20, 2006 as
Instrument No. 06-0148328 of Official Records.

-- 16 --

000040

Branch :F01,User :LEST                                Comment:                                Station Id :VSF5



PARCEL 3:

The North 30 feet of Lot 3 and the South 10 feet of Lot 4 of Scribner's Tract, as shown on a map recorded in Book 22, Page 192 of Maps, in the office of the County Recorder of said County.

Said land is also shown on Certificate of Compliance recorded January 20, 2006 as Instrument No. 06-0148328 of Official Records.

PARCEL 4:

That portion of Lot 4 beginning at a point 10 feet North of the Southwest corner of Lot 4; thence North 21.70 feet; thence East 160 feet; thence South 21.70 Feet; thence West 160 feet to the point of beginning of Scribner's Tract, as shown on a map recorded in Book 22, Page 192 of Maps, in the office of the County Recorder of said County.

Said land is also shown on Certificate of Compliance recorded January 20, 2006 as Instrument No. 06-0148328 of Official Records.

PARCEL 5:

The North 18.30 feet of Lot 4 and all of Lot 5, except the North 8.30 feet thereof of Scribner's Tract, as shown on a map recorded in Book 22, Page 192 of Maps, in the office of the County Recorder of said County.

Said land is also shown on Certificate of Compliance recorded January 20, 2006 as Instrument No. 06-0148328 of Official Records.

PARCEL 6:

The South 12 feet of Lot 6 and North 8.30 feet of Lot 5 of Scribner's Tract, Rancho San Pasqual, as shown on a map recorded in Book 22, Page 192 of Maps, in the office of the County Recorder of said County,

Said land is also shown on Certificate of Compliance recorded January 20, 2006 as Instrument No. 06-0148328 of Official Records.

PARCEL 7:

Lot 6 of Scribner's Tract, in the Rancho San Pasqual, as shown on a map recorded in Book 22, Page 192 of Maps, in the office of the County Recorder of said County.

Except therefrom the Southerly 12.00 feet thereof.

Said land is also shown on Certificate of Compliance recorded January 20, 2006 as Instrument No. 06-0148328 of Official Records.

PARCEL 8:

-- 17 --

000041

29

Lot 7 of Scribner's Tract, as shown on a map recorded in Book 22, Page 192 of Maps, in the office of the County Recorder of said County.

Said land is also shown on Certificate of Compliance recorded January 20, 2006 as Instrument No. 06-0148328 of Official Records.

PARCEL 9:

Lot 9 of Scribner's Tract, as shown on a map recorded in Book 22, Page 192 of Maps, in the office of the County Recorder of said County.

Said land is also shown on Certificate of Compliance recorded January 20, 2006 as Instrument No. 06-0148328 of Official Records.

PARCEL 10:

Lot 8 of Scribner's Tract, as shown on a map recorded in Book 22, Page 192 of Maps, in the office of the County Recorder of said County.

Said land is also shown on Certificate of Compliance recorded January 20, 2006 as Instrument No. 06-0148328 of Official Records.

PARCEL 11:

Lots 35, 36 and 37 of Scribner's Tract, as shown on a map recorded in Book 22, Page 192 of Maps, in the office of the County Recorder of said County.

EXCEPT therefrom those portions of said lot included within a strip of land 50 feet wide, the Southerly boundary of which is described as follows:

Beginning at a point in the centerline of Lincoln Avenue 80 feet wide as shown on said map distant North 0° 37' 50" West thereon 74.91 feet from a line parallel with and 30 feet Southerly measured at right angles from the Southerly line of Lot 1 of said tract; thence South 72° 37' 55" East 52.29 feet to the beginning of a curve concave to the North having a radius of 1000 feet tangent to said last mentioned course and tangent to a line parallel with and 20 feet Southerly measured at right angles from the Southerly line of said Lot 35; thence Easterly along said curve 313.65 feet to said last mentioned parallel line; thence North 89° 23' 55" East along said last mentioned parallel line 100 feet.

Said land is also shown on Certificate of Compliance recorded January 20, 2006 as Instrument No. 06-0148328 of Official Records.

Assessor's Parcel Number: 5827-018-041

-- 18 --

000042

Branch :F01,User :LEST                    Comment:                                              Station Id :VSF5

30

EXHIBIT "B"
PARKING SPACES

-19-

000043

Branch :F01,User :LEST                                        Comment:                                        Station Id :VSF5



000044

32

EXHIBIT "C"
ESTOPPEL CERTIFICATE FORM

-20-

33

**STANDARD ESTOPPEL CERTIFICATE - BY LESSEE**

TO WHOM IT MAY CONCERN:

RE: Lease ("Lease") dated _____ by and between _____
as Lessor, and _____ as Lessee,
concerning the real property known as: _____
_____

("Premises"), which Lease was amended _____
and guaranteed by _____
("Guarantor(s)") (it will be presumed no amendments or guarantees exist unless they are specified above).

Lessee hereby certifies as follows:

1. True copies of the above referenced Lease as amended and the guarantees, if any, are attached hereto marked Exhibit "1" (Attach a copy of Lease, all amendments and guarantees.) Other than the documents included in Exhibit 1 there are no oral or written agreements or understandings between the Lessor and Lessee with respect to the Premises except (if there are no exceptions, write "NONE") _____

2. The Lease term commenced on _____ and expires on _____

3. The current monthly rent and expense pass-through, if any, are as follows:

|  | Amount | Day of Month Due | Paid Up Through | Year |
|---|---|---|---|---|
| Rent | | | | |
| Pass Through | | | | |

No rents or pass-throughs have been prepaid except as reflected in the Lease. (It will be presumed that no expense pass-throughs are currently required unless set forth above.)

4. The current amount of security deposit held by Lessor is $ _____

5. The Lease has not been modified, orally or in writing, since its execution, except as hereinabove identified. The Lease is in full force and effect and contains the entire agreement between Lessor and Lessee, except (if there are no exceptions, write "NONE"): _____

6. The improvements and space required to be provided by Lessor have been furnished and completed in all respects to the satisfaction of Lessee, and all promises of an inducement nature by Lessor have been fulfilled except (if there are no exceptions, write "NONE"): _____

7. Lessee has no knowledge of any uncured defaults by Lessor or Lessee under the Lease, except (if there are no exceptions, write "NONE"): _____

8. There are no disputes between Lessor and Lessee concerning the Lease, the Premises or the improvements therein or thereon, except (if there are no exceptions, write "NONE"): _____

9. Lessee is in full and complete possession of the Premises and has not assigned or sublet any portion of the Premises, except (if there are no exceptions, write "NONE"): _____

10. Lessee has no knowledge of any prior sale, transfer, assignment or encumbrance of the Lessor's interest in the Lease, except (if there are no exceptions, write "NONE"): _____

11. Lessee has made no alterations or additions to the Premises, except (if there are no exceptions, write "NONE"): _____

If alterations or additions have been made by Lessee, Lessee represents that to the best of its knowledge, all such alterations and additions were done in accordance with the terms of the Lease and in compliance with all applicable laws, rules and regulations, except (if there are no exceptions, write "NONE"): _____

12. The guarantees of the Guarantors named above are still in full force and effect, except (if there are no exceptions, write "NONE"): _____

13. Lessee is not currently the subject of a bankruptcy proceeding and to the best of its knowledge neither Lessor nor any Guarantor is involved in such a proceeding, except (if there are no exceptions, write "NONE"): _____

PAGE 1 OF 2

©2000 - AIR COMMERCIAL REAL ESTATE ASSOCIATION                    FORM TSER-3-6/07E

000046

34

14.  Lessee is aware that buyers, lenders and others will rely upon the statements made in this Estoppel Certificate, and has therefore adjusted the language hereof as necessary to make it an accurate statement of the current facts concerning the Lease.  If no such adjustments have been made, said parties may rely upon the statements in this form as printed.

15.  Additional Items (if there are no additional items, write "NONE"):



DATE: _____, 20___
        (Fill in date of execution)

BY:            _____
Name Printed:  _____
Title:         _____
Address:       _____
               _____
Telephone: (____) _____
Facsimile: (____) _____
Email:         _____

NOTICE:  These forms are often modified to meet changing requirements of law and industry needs.  Always write or call to make sure you are utilizing the most current form:  AIR Commercial Real Estate Association,  500 N Brand Blvd, Suite 900, Glendale, CA 91203.
Telephone No. (213) 687-8777.  Fax No.: (213) 687-8616.

DRAFT

DRAFT

PAGE 2 OF 2

©2000 - AIR COMMERCIAL REAL ESTATE ASSOCIATION                    FORM TSER-3-8/07E

*35*

EXHIBIT "D"
SNDA FORM

RECORDING REQUESTED BY &          )
WHEN RECORDED RETURN TO:          )
                                  )
_____           )
_____           )
_____           )
_____           )
                                  )

_____

(Space Above This Line For Recorder's Use)

**SUBORDINATION AGREEMENT AND**
**AGREEMENT OF NON-DISTURBANCE AND ATTORNMENT**
(EWB Form – Rev. 2-2007)

This Subordination Agreement and Agreement of Non-Disturbance and Attornment ("Agreement") is made and entered into as of this __ day of _____, 20__, among (i) _____ ("Lender"), (ii) _____ ("Tenant") and (iii) _____ ("Owner"), with reference to the following:

RECITALS

A.      Lender has made or is proposing to make a loan (the "Loan") to Owner secured or to be secured by a deed of trust (the "Deed of Trust") on the real property legally described in Exhibit A attached hereto and the improvements thereon (together, the "Property"). The Deed of Trust and any and all other documents evidencing or relating to the Loan shall be referred to as the "Loan Documents".

B.      Tenant has leased or is proposing to lease certain parking spaces at the Property (the "Premises") (the lease and all amendments thereto being referred to as the "Lease").

C.      Lender and Tenant desire to enter into this Agreement under which Tenant subordinates the Lease and its interest in the Property and agrees to attorn to Lender and under which Lender agrees to not disturb Tenant's possession of the portion of the Premises all to the extent set forth herein, and so long as Tenant is not in default under the Lease.

NOW THEREFORE, with reference to the foregoing recitals and for good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties to this Agreement agree as follows:

1.      Subordination. The Lease, and the rights, if any, of Tenant in, to and under the Lease and the Premises, are hereby subjected and subordinated to the lien of the Deed of Trust, it being understood and agreed that the foregoing subordination shall apply to any and all increases, renewals, modifications, extensions, substitutions, replacements and/or consolidations of the Deed of Trust, provided that any and all such increases, renewals, modifications, extensions, substitutions, replacements and/or consolidations shall nevertheless be subject to the terms of this Agreement.

2.      Tenant Not to Be Disturbed. So long as Tenant is not in default in the payment of rent or of any of the terms, covenants or conditions of the Lease on Tenant's part to be performed (beyond any period given Tenant in the Lease to cure such default) and Tenant attorns to Lender as provided herein,

-21-

000048



(a) Tenant's possession of the Premises shall not be diminished or interfered with by Lender, and (b) Lender will not join Tenant as a party defendant in any action or proceeding foreclosing the Deed of Trust unless such joinder is necessary to foreclose the Deed of Trust and then only for such purpose and not for the purpose of terminating the Lease.

3.   Tenant to Attorn To Lender.  If Lender shall become the owner of the Premises or the Premises shall be sold by reason of foreclosure or other proceedings brought to enforce the Deed of Trust or the Premises shall be transferred by deed in lieu of foreclosure, the Lease shall continue in full force and effect as a direct Lease between the then owner of the Premises, who shall succeed to the rights and duties of the Landlord and Tenant.  Tenant shall attorn to Lender or any other such owner as its Landlord, said attornment to be effective and self-operative without the execution of any further instruments.  Tenant hereby waives the provisions of any statute or rule of law, now or hereafter in effect, which may give or purport to give Tenant any right or election to terminate or otherwise adversely affect the Lease and the obligations of Tenant thereunder as a result of any such foreclosure or deed-in-lieu of foreclosure.

4.   Notice of Default; Rent Payments to Lender.  In the event that Lender notifies Tenant of a default under the Deed of Trust and requests Tenant to pay its rent and all other sums due under the Lease to Lender, Tenant shall pay such sums directly to Lender, or as Lender may otherwise request, without any further consent of Owner.

5.   Limitations.  Lender (and any successor or assignee of Lender) shall not be (i) liable for any act or omission of Borrower or any predecessor-in-interest, (ii) subject to any offsets, counterclaims or defenses which Tenant may have against Borrower or any predecessor-in-interest, (iii) liable for any security deposit or payment of rent (for more than one month in advance of the date due under the Lease) made by Tenant to Borrower or any predecessor-in-interest, except to the extent actually received by Lender, (iv) liable for any construction, repair allowances or other allowances or payments to be made by Landlord under the Lease (except in the event that Lender or such successor or assignee become the successor landlord under the Lease, in which event such party shall be bound to perform the obligations of the landlord under the Lease), or (v) obligated to expand the Premises, construct additional improvements or otherwise expend funds which are capital in nature except for items or ordinary maintenance and repair for the Premises or the property in which it is located.  Notwithstanding any term of the Lease, upon foreclosure of the Deed of Trust, or acceptance of a deed in lieu thereof or other similar transfer, any environmental/hazardous materials indemnity and/or reimbursement provisions under the Lease shall not be applicable to, or enforceable against, Lender, any successor in interest to or assignee of Lender and/or any purchaser at foreclosure and any transferee thereof. If Lender becomes the owner of the Property or the Property is sold to a third party by reason of foreclosure or other proceedings brought to enforce the Deed of Trust or the Property is conveyed by deed-in-lieu of foreclosure, Tenant agrees that, notwithstanding anything to the contrary contained in the Lease, after such foreclosure sale or conveyance by deed-in-lieu of foreclosure, Lender has no personal liability to Tenant under the Lease and Tenant shall look solely to the Borrower for satisfaction of any of its remedies for collection of a judgment or other judicial process requiring payment of money by the landlord to Tenant in the nature of advance rents or security deposits.  Further, in the event Lender transfers its interest in this Lease to a third party, Lender shall be automatically freed and released, from and after the date of such transfer or conveyance, of all liability for the performance of any covenants and agreements which accrue after the date of such transfer of Lender's interest.

5.   Modification; Notice and Cure Rights.  The Lease shall not be amended, modified or supplemented, nor will the lease be terminated (except as set forth in the Lease after a default and after the notice and cure rights set forth below) or any party having liability under the Lease be released by the other, without the prior written consent of Lender.  Tenant shall not terminate or seek to terminate the Lease until Tenant has given written notice, by registered or certified mail, return receipt requested, of said act or omission to Lender, which notice shall be addressed to _____; and until a period of time equal to the greater of: (a) the time allowed Lessor under the Lease or (b) thirty days following such notice has elapsed, during which period Lender has the right, but not the obligation, to remedy such act, omission or other matter.  If possession by Lender of the Property is necessary to effect such remedy and would be commercially reasonable,

-22-

000049

37

then the period of time for remedying such act or omission shall include a reasonable period of time for Lender to gain possession of the Premises, whether by foreclosure or otherwise.

6.    Tenant Representations and Warranties.  Tenant hereby represents and warrants that (a) the Lease is solely and exclusively for the Premises and/or the Property identified in Exhibit "A" attached to this Agreement, (b) the Lease is not a "master lease" for any other premises and/or property leased by Tenant and/or Landlord, (c) any default under the Lease, and the exercise of Landlord's rights and remedies in connection with such default, shall only impact and/or effect Tenant's obligations with respect to the Premises and/or the Property, and (d) any default by Tenant under any other lease with Landlord or any other landlord, and the exercise of any such landlord's rights and remedies in connection with such default, shall not affect Tenant's obligations under the Lease.

7.    Miscellaneous.  This Agreement and each and every covenant, agreement and other provision hereof shall be binding upon and shall inure to the benefit of the parties hereto and their representatives, successors and assigns. This Agreement may not be modified orally or in any manner other than by an agreement in writing signed by the parties hereto or their respective successors in interest. The term "Lender" as used throughout this Agreement includes any successor or assign of Lender and any holder(s) of any interest in the indebtedness secured by the Deed of Trust.  This Agreement and the rights and duties of the parties hereunder shall be governed for all purposes by the law of the State of California and the law of the United States applicable to transactions within such state.  This Agreement may be executed in multiple counterparts, and by the different parties hereto in separate counterparts, each of which when so executed and delivered shall be deemed to be one and the same instrument with the same signature as if all parties to this Agreement had signed the same signature page.

IN WITNESS WHEREOF, the parties hereto have each caused this Agreement to be executed as of the date first above written.

Owner:

_____

BY:    _____
Title:    _____

Tenant:

_____

BY:    _____
Title:    _____

Lender:

_____

BY:    _____
Title:    _____


    (ALL SIGNATURES MUST BE ACKNOWLEDGED)


-23-

000050



**This page is part of your document - DO NOT DISCARD**




# 20150054318


Pages:
0037

**Recorded/Filed in Official Records
Recorder's Office, Los Angeles County,
California**

**01/15/15 AT 08:00AM**

| | |
|---|---|
| FEES: | 141.00 |
| TAXES: | 0.00 |
| OTHER: | 0.00 |
| PAID: | 141.00 |



**L E A D S H E E T**



201501150300014

**00010072001**



006600786

**SEQ:
24**

**DAR - Title Company (Hard Copy)**



**THIS FORM IS NOT TO BE DUPLICATED**          T72



CHICAGO TITLE COMPANY

RECORDING REQUESTED BY &                    )
WHEN RECORDED RETURN TO:                    )
                                            )
East West Bank                              )
9300 Flair Drive, 6th Floor                 )
El Monte, CA 91731                          )
Attn: Loan Servicing                        )
                                            )



01/15/2015

*20150054318*

_____          (Space Above This Line For Recorder's Use)

**SUBORDINATION AGREEMENT AND**

**AGREEMENT OF NON-DISTURBANCE AND ATTORNMENT**

(EWB Form – Rev. 2-2007)

    This Subordination Agreement and Agreement of Non-Disturbance and Attornment ("Agreement")
is made and entered into as of this 8th day of January 2015, among (i) East West Bank ("Lender"), (ii) The
George Garikian Living Trust ("Tenant") and (iii) Altadena Lincoln Crossing, LLC ("Owner"), with reference
to the following:

**RECITALS**

    A.    Lender has made or is proposing to make a loan (the "Loan") to Owner secured or to be
secured by a deed of trust (the "Deed of Trust") on the real property legally described in Exhibit A attached
hereto and the improvements thereon (together, the "Property"). The Deed of Trust and any and all other
documents evidencing or relating to the Loan shall be referred to as the "Loan Documents".

    B.    Tenant has leased or is proposing to lease certain parking spaces at the Property
(collectively, the "Premises") (the lease and all amendments thereto being referred to as the "Lease").

    C.    Lender and Tenant desire to enter into this Agreement under which Tenant subordinates
the Lease and its interest in the Property and agrees to attorn to Lender and under which Lender agrees
to not disturb Tenant's possession of the Premises, all to the extent set forth herein, and so long as
Tenant is not in default under the Lease.

UNRECORDED LEASE

    NOW THEREFORE, with reference to the foregoing recitals and for good and valuable
consideration, the receipt and sufficiency of which is hereby acknowledged, the parties to this Agreement
agree as follows:

    1.    Subordination. The Lease, and the rights, if any, of Tenant in, to and under the Lease
and the Premises, are hereby subjected and subordinated to the lien of the Deed of Trust, it being
understood and agreed that the foregoing subordination shall apply to any and all increases, renewals,
modifications, extensions, substitutions, replacements and/or consolidations of the Deed of Trust,
provided that any and all such increases, renewals, modifications, extensions, substitutions, replacements
and/or consolidations shall nevertheless be subject to the terms of this Agreement.

    2.    Tenant Not to Be Disturbed. So long as Tenant is not in default in the payment of rent or
of any of the terms, covenants or conditions of the Lease on Tenant's part to be performed (beyond any
period given Tenant in the Lease to cure such default) and Tenant attorns to Lender as provided herein,
(a) Tenant's possession of the Premises shall not be diminished or interfered with by Lender, and (b)
Lender will not join Tenant as a party defendant in any action or proceeding foreclosing the Deed of Trust
unless such joinder is necessary to foreclose the Deed of Trust and then only for such purpose and not for
the purpose of terminating the Lease.

RECORDED CONCURRENTLY HEREWITH

0002664-X49 247

Branch :F01,User :LEST                    Comment:                                    Station Id :VSF5



3.    Tenant to Attorn To Lender.  If Lender shall become the owner of the Premises or the Premises shall be sold by reason of foreclosure or other proceedings brought to enforce the Deed of Trust or the Premises shall be transferred by deed in lieu of foreclosure, the Lease shall continue in full force and effect as a direct Lease between the then owner of the Premises, who shall succeed to the rights and duties of the Landlord and Tenant.  Tenant shall attorn to Lender or any other such owner as its Landlord, said attornment to be effective and self-operative without the execution of any further instruments.  Tenant hereby waives the provisions of any statute or rule of law, now or hereafter in effect, which may give or purport to give Tenant any right or election to terminate or otherwise adversely affect the Lease and the obligations of Tenant thereunder as a result of any such foreclosure or deed-in-lieu of foreclosure.

4.    Notice of Default; Rent Payments to Lender.  In the event that Lender notifies Tenant of a default under the Deed of Trust and requests Tenant to pay its rent and all other sums due under the Lease to Lender, Tenant shall pay such sums directly to Lender, or as Lender may otherwise request, without any further consent of Owner.

5.    Limitations.  Lender (and any successor or assignee of Lender) shall not be (i) liable for any act or omission of Borrower or any predecessor-in-interest, (ii) subject to any offsets, counterclaims or defenses which Tenant may have against Borrower or any predecessor-in-interest, (iii) liable for any security deposit or payment of rent (for more than one month in advance of the date due under the Lease) made by Tenant to Borrower or any predecessor-in-interest, except to the extent actually received by Lender, (iv) liable for any construction, repair allowances or other allowances or payments to be made by Landlord under the Lease (except in the event such party shall be bound to perform the obligations of the landlord under the Lease, in which event such party shall be bound to perform the obligations of the landlord under the Lease), or (v) obligated to expand the Premises, construct additional improvements or otherwise expend funds which are capital in nature except for items or ordinary maintenance and repair for the Premises or the property in which it is located.  Notwithstanding any term of the Lease, upon foreclosure of the Deed of Trust, or acceptance of a deed in lieu thereof or other similar transfer, any environmental/hazardous materials indemnity and/or reimbursement provisions under the Lease shall not be applicable to, or enforceable against, Lender, any successor in interest to or assignee of Lender and/or any purchaser at foreclosure and any transferee thereof. If Lender becomes the owner of the Property or the Property is sold to a third party by reason of foreclosure or other proceedings brought to enforce the Deed of Trust or the Property is conveyed by deed-in-lieu of foreclosure, Tenant agrees that, notwithstanding anything to the contrary contained in the Lease, after such foreclosure sale or conveyance by deed-in-lieu of foreclosure, Lender has no personal liability to Tenant under the Lease and Tenant shall look solely to the Borrower for satisfaction of any of its remedies for collection of a judgment or other judicial process requiring payment of money by the landlord to Tenant in the nature of advance rents or security deposits.  Further, in the event Lender transfers its interest in this Lease to a third party, Lender shall be automatically freed and released, from and after the date of such transfer or conveyance, of all liability for the performance of any covenants and agreements which accrue after the date of such transfer of Lender's interest.

6.    Modification; Notice and Cure Rights.  The Lease shall not be amended, modified or supplemented, nor will the lease be terminated (except as set forth in the Lease after a default and after the notice and cure rights set forth below) or any party having liability under the Lease be released by the other, without the prior written consent of Lender.  Tenant shall not terminate or seek to terminate the Lease until Tenant has given written notice, by registered or certified mail, return receipt requested, of said act or omission to Lender, which notice shall be addressed to East West Bank, 9300 Flair Drive, 6th Floor, El Monte, CA 91731; and until a period of time equal to the greater of: (a) the time allowed Lessor under the Lease or (b) thirty days following such notice has elapsed, during which period Lender has the right, but not the obligation, to remedy such act, omission or other matter.   If possession by Lender of the Property is necessary to effect such remedy and would be commercially reasonable, then the period of time for remedying such act or omission shall include a reasonable period of time for Lender to gain possession of the Premises, whether by foreclosure or otherwise.

2

000053



7.    Tenant Representations and Warranties.  Tenant hereby represents and warrants that (a) the Lease is solely and exclusively for the Premises and/or the Property identified in Exhibit "A" attached to this Agreement, (b) the Lease is not a "master lease" for any other premises and/or property leased by Tenant and/or Landlord, (c) any default under the Lease, and the exercise of Landlord's rights and remedies in connection with such default, shall only impact and/or effect Tenant's obligations with respect to the Premises and/or the Property, and (d) any default by Tenant under any other lease with Landlord or any other landlord, and the exercise of any such landlord's rights and remedies in connection with such default, shall not affect Tenant's obligations under the Lease.

8.    Miscellaneous.  This Agreement and each and every covenant, agreement and other provision hereof shall be binding upon and shall inure to the benefit of the parties hereto and their representatives, successors and assigns. This Agreement may not be modified orally or in any manner other than by an agreement in writing signed by the parties hereto or their respective successors in interest.  The term "Lender" as used throughout this Agreement includes any successor or assign of Lender and any holder(s) of any interest in the indebtedness secured by the Deed of Trust.  This Agreement and the rights and duties of the parties hereunder shall be governed for all purposes by the law of the State of California and the law of the United States applicable to transactions within such state. This Agreement may be executed in multiple counterparts, and by the different parties hereto in separate counterparts, each of which when so executed and delivered shall be deemed to be one and the same instrument with the same signature as if all parties to this Agreement had signed the same signature page.

IN WITNESS WHEREOF, the parties hereto have each caused this Agreement to be executed as of the date first above written.

Owner:

**Altadena Lincoln Crossing, LLC**

By:    DPP Altadena LLC,
a Delaware limited liability company
Its Manager

     By:    Altadena-Dorn Platz, LLC
     a California limited liability company
     Its Manager

     By: _____
     Name:  Greg Galletly
     Its:    Manager

Tenant:
**GEORGE GARIKIAN, Trustee of The George Garikian Living Trust**

     GEORGE GARIKIAN
     3

000054

## CALIFORNIA ALL- PURPOSE ACKNOWLEDGMENT

> A Notary Public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

State of California        } ss.
County of __Los Angeles__     }

On __January 12, 2015__ before me, ___Ruth Baudoin, Notary Public___,
personally appeared _____Greg Galletly_____,

who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

*Signature* _____
SIGNATURE OF NOTARY PUBLIC

**RUTH BAUDOIN**
Commission # 2059999
Notary Public - California
Los Angeles County
My Comm. Expires Apr 1, 2018

Place Notary Seal Above

### OPTIONAL INFORMATION
*Though this section is optional, completing this information can deter alteration of the document or fraudulent reattachment of this form to an unintended document.*

**CAPACITY CLAIMED BY SIGNER (PRINCIPAL)**
☐ Individual
☐ Corporate Officer
_____
TITLE(S)
☐ Partner(s) - ☐ Limited ☐ General
☐ Attorney-in-Fact
☐ Trustee(s)
☐ Guardian/Conservator
☐ Other:_____
_____

Signer is Representing: _____
_____
NAME OF PERSON(S) OR ENTITY(IES)

**DESCRIPTION OF ATTACHED DOCUMENT**

_____
TITLE OR TYPE OF DOCUMENT

_____
NUMBER OF PAGES

_____
DATE OF DOCUMENT

_____
SIGNER(S) OTHER THAN NAMED ABOVE

Branch :F01,User :LEST                    Comment:                                    Station Id :VSF5

## CALIFORNIA ALL- PURPOSE ACKNOWLEDGMENT

> A Notary Public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

State of California        } ss.
County of ___Los Angeles___     }

On ___January 12, 2015___ before me, ___Ruth Baudoin, Notary Public___,
personally appeared _____George Garikian_____

who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

> **RUTH BAUDOIN**
> Commission # 2059999
> Notary Public - California
> Los Angeles County
> My Comm. Expires Apr 1, 2018

_Signature_

SIGNATURE OF NOTARY PUBLIC

Place Notary Seal Above

### OPTIONAL INFORMATION
*Though this section is optional, completing this information can deter alteration of the document or fraudulent reattachment of this form to an unintended document.*

**CAPACITY CLAIMED BY SIGNER (PRINCIPAL)**
☐ Individual
☐ Corporate Officer
_____
TITLE(S)
☐ Partner(s) - ☐ Limited ☐ General
☐ Attorney-in-Fact
☐ Trustee(s)
☐ Guardian/Conservator
☐ Other:_____
_____

Signer is Representing: _____
_____
NAME OF PERSON(S) OR ENTITY(IES)

**DESCRIPTION OF ATTACHED DOCUMENT**

_____
TITLE OR TYPE OF DOCUMENT

_____
NUMBER OF PAGES

_____
DATE OF DOCUMENT

_____
SIGNER(S) OTHER THAN NAMED ABOVE

Branch :F01,User :LEST                    Comment:                                    Station Id :VSF5

7

Lender:

EAST WEST BANK

BY:
Title:    Robert Lo, Executive Vice President

(ALL SIGNATURES MUST BE ACKNOWLEDGED)

4

000057

## CALIFORNIA ALL-PURPOSE ACKNOWLEDGMENT

**CIVIL CODE § 1189**

A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

State of California

County of _Los Angeles_ )

On _January 10, 2015_ before me, _Cornelia S. Ho, Notary Public_
     *Date*                      *Here Insert Name and Title of the Officer*

personally appeared _Robert Lo_
                       *Name(s) of Signer(s)*

who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

Signature _____
             *Signature of Notary Public*

> CORNELIA S. HO
> Commission # 2038668
> Notary Public - California
> Los Angeles County
> My Comm. Expires Aug 26, 2017

*Place Notary Seal Above*

─────────────── **OPTIONAL** ───────────────

*Though this section is optional, completing this information can deter alteration of the document or fraudulent reattachment of this form to an unintended document.*

**Description of Attached Document**
Title or Type of Document: _____ Document Date: _____
Number of Pages: _____ Signer(s) Other Than Named Above: _____

**Capacity(ies) Claimed by Signer(s)**

| | |
|---|---|
| Signer's Name: _____ | Signer's Name: _____ |
| ☐ Corporate Officer — Title(s): _____ | ☐ Corporate Officer — Title(s): _____ |
| ☐ Partner — ☐ Limited ☐ General | ☐ Partner — ☐ Limited ☐ General |
| ☐ Individual ☐ Attorney in Fact | ☐ Individual ☐ Attorney in Fact |
| ☐ Trustee ☐ Guardian or Conservator | ☐ Trustee ☐ Guardian or Conservator |
| ☐ Other: _____ | ☐ Other: _____ |
| Signer Is Representing: _____ | Signer Is Representing: _____ |

©2014 National Notary Association • www.NationalNotary.org • 1-800-US NOTARY (1-800-876-6827)  Item #5907

9

EXHIBIT A
LEGAL DESCRIPTION

All that certain real property situated in the County of Los Angeles, State of California, described as follows:

PARCEL 1:

Those portions of Lots 1, 2 and 3 of Scribner's Tract, as shown on a map recorded in Book 22, Page 192 of Maps, in the office of the County Recorder of said County, described as follows:

Beginning at the intersection of the Southerly line of the Northerly 40 feet of said Lot 2 with the Westerly line of said Lot 2; thence Northerly along said Westerly 22,67 feet to the true point of beginning, said true point of beginning also being the beginning of a curve concave Northeasterly having a radius of 25 feet tangent to said Westerly line and tangent to a line parallel line with and distant 50 feet Northeasterly measured at right angles from a line which bears South 72° 37' 55" East and passes through a point in the centerline of Lincoln Avenue 80 feet wide as shown on said map distant North 0° 37' 50" West thereof 74,91 feet from a line parallel with and 30 feet Southerly measured at right angles from the Southerly line of said Lot 1 of said tract; thence Southeasterly along said curve 31.41 feet to said first mentioned parallel line; thence South 72° 37' 55" East 8.31 feet to the beginning of a tangent curve concave Northeasterly and having a radius of 950 feet; thence Southeasterly along said last mentioned curve 138.96 feet to the Easterly line of said Lot 1; thence Northerly along the Easterly lines of said Lots 1, 2 and 3 to the Northerly line of the Southerly 20 feet of said Lot 3; thence Westerly along said last mentioned Northerly line to the Westerly line of said Lot 3; thence Southerly along the Westerly lines of said Lost 2 and 3 to the true point of beginning.

Said land is also shown on Certificate of Compliance recorded January 20, 2006 as Instrument No. 06-0148328 of Official Records.

PARCEL 2:

Lot 38 of Scribner's Tract, as shown on a map recorded in Book 22, Page 192 of Maps, in the office of the County Recorder of said County.

Except therefrom those portions of said lots included within a strip of land 50 feet wide the Southerly boundary of which is described as follows:

Beginning at a point in the centerline of Lincoln Avenue 80 feet side as shown on said map distant North 0° 37' 50" West thereon 74.91 feet from a line parallel with and 30 feet Southerly measured at right angles from the Southerly line of Lot 1 of said tract; thence South 72° 37' 55" East 52.29 feet to the beginning of a curve concave to the North having a radius of 1000 feet tangent to said last mentioned course and tangent to a line parallel with and 20 feet Southerly measured at right angles from the Southerly line of said Lot 35; thence Easterly along said curve 313.63 feet to said

5

000059

Branch :F01,User :LEST                    Comment:                    Station Id :VSF5

(X)

last mentioned parallel line; thence South 89° 23' 55" East along said last mentioned parallel line 100 feet.

Said land is also shown on Certificate of Compliance recorded January 20, 2006 as Instrument No. 06-0148328 of Official Records.

PARCEL 3:

The North 30 feet of Lot 3 and the South 10 feet of Lot 4 of Scribner's Tract, as shown on a map recorded in Book 22, Page 192 of Maps, in the office of the County Recorder of said County.

Said land is also shown on Certificate of Compliance recorded January 20, 2006 as Instrument No. 06-0148328 of Official Records.

PARCEL 4:

That portion of Lot 4 beginning at a point 10 feet North of the Southwest corner of Lot 4; thence North 21.70 feet; thence East 160 feet; thence South 21.70 Feet; thence West 160 feet to the point of beginning of Scribner's Tract, as shown on a map recorded in Book 22, Page 192 of Maps, in the office of the County Recorder of said County.

Said land is also shown on Certificate of Compliance recorded January 20, 2006 as Instrument No. 06-0148328 of Official Records.

PARCEL 5:

The North 18.30 feet of Lot 4 and all of Lot 5, except the North 8.30 feet thereof of Scribner's Tract, as shown on a map recorded in Book 22, Page 192 of Maps, in the office of the County Recorder of said County.

Said land is also shown on Certificate of Compliance recorded January 20, 2006 as Instrument No. 06-0148328 of Official Records.

PARCEL 6:

The South 12 feet of Lot 6 and North 8.30 feet of Lot 5 of Scribner's Tract, Rancho San Pasqual, as shown on a map recorded in Book 22, Page 192 of Maps, in the office of the County Recorder of said County,

Said land is also shown on Certificate of Compliance recorded January 20, 2006 as Instrument No. 06-0148328 of Official Records.

PARCEL 7:

Lot 6 of Scribner's Tract, in the Rancho San Pasqual, as shown on a map recorded in Book 22, Page 192 of Maps, in the office of the County Recorder of said County.

Except therefrom the Southerly 12.00 feet thereof.

6

000060

Said land is also shown on Certificate of Compliance recorded January 20, 2006 as Instrument No. 06-0148328 of Official Records.

PARCEL 8:

Lot 7 of Scribner's Tract, as shown on a map recorded in Book 22, Page 192 of Maps, in the office of the County Recorder of said County.

Said land is also shown on Certificate of Compliance recorded January 20, 2006 as Instrument No. 06-0148328 of Official Records.

PARCEL 9:

Lot 9 of Scribner's Tract, as shown on a map recorded in Book 22, Page 192 of Maps, in the office of the County Recorder of said County.

Said land is also shown on Certificate of Compliance recorded January 20, 2006 as Instrument No. 06-0148328 of Official Records.

PARCEL 10:

Lot 8 of Scribner's Tract, as shown on a map recorded in Book 22, Page 192 of Maps, in the office of the County Recorder of said County.

Said land is also shown on Certificate of Compliance recorded January 20, 2006 as Instrument No. 06-0148328 of Official Records.

PARCEL 11:

Lots 35, 36 and 37 of Scribner's Tract, as shown on a map recorded in Book 22, Page 192 of Maps, in the office of the County Recorder of said County.

EXCEPT therefrom those portions of said lot included within a strip of land 50 feet wide, the Southerly boundary of which is described as follows:

Beginning at a point in the centerline of Lincoln Avenue 80 feet wide as shown on said map distant North 0° 37' 50" West thereon 74.91 feet from a line parallel with and 30 feet Southerly measured at right angles from the Southerly line of Lot 1 of said tract; thence South 72° 37' 55" East 52.29 feet to the beginning of a curve concave to the North having a radius of 1000 feet tangent to said last mentioned course and tangent to a line parallel with and 20 feet Southerly measured at right angles from the Southerly line of said Lot 35; thence Easterly along said curve 313.65 feet to said last mentioned parallel line; thence North 89° 23' 55" East along said last mentioned parallel line 100 feet.

Said land is also shown on Certificate of Compliance recorded January 20, 2006 as Instrument No. 06-0148328 of Official Records.

Assessor's Parcel Number: 5827-018-041

7

000061

Branch :F01,User :LEST                    Comment:                                    Station Id :VSF5

12

## PARKING SPACE LEASE

THIS PARKING SPACE LEASE (this "Lease") is made and entered into as of the 8th day of January, 2015 by and between ALTADENA LINCOLN CROSSING LLC, a Delaware limited liability corporation, ("Landlord") and George Garikian, Trustee of The George Garikian Living Trust ("Tenant").

### R E C I T A L S :

A       Landlord owns that certain parking structure (the "Parking Structure") located at 376 Acacia Street and the trash enclosure (the "Trash Enclosure") located on the ground floor of 2220 Lincoln Avenue that is situated on the land described on Exhibit "A" attached hereto and incorporated herein by this reference (the "Land").

B       Tenant is (or is about to become) the owner of that certain property known as Altadena Lincoln Crossing Market Quadrant ("Market Quadrant") located at 2230-2260 Lincoln Avenue, Altadena, CA  91001.  Landlord and Tenant understand that Los Angeles County has asserted that the Market Quadrant does not contain adequate parking spaces as required by applicable laws, codes and/or ordinances.

C       Landlord and Tenant desire that Tenant shall lease fourteen (14) parking spaces (in the Parking Structure) and use of the trash bins in the Trash Room from Landlord on the terms and conditions set forth below.

### A G R E E M E N T :

NOW, THEREFORE, for good and valuable consideration, the receipt and adequacy of which are hereby acknowledged, the parties hereto agree as follows:

1.       Grant of Lease.  In consideration of the rents reserved in this Lease and the obligations herein to be observed and performed by Tenant, Landlord hereby leases to Tenant, and Tenant takes and accepts from Landlord, fourteen (14) spaces in the Parking Structure, which spaces are generally shown on Exhibit "B" attached hereto and incorporated herein by this reference, and use of the trash bins in the Trash Room. Landlord shall promptly cause all of such spaces to be marked in a manner designated by Tenant so that they can only be used for the purposes set forth in this Lease. Landlord shall ensure that the parking requirements of all of the tenant leases ("Tenant Leases") affecting the Market Quadrant as of the date of this Lease (under the tenant leases as they exist as of the date of this Lease) shall at all times be satisfied by Landlord with regard to the spaces demised under this Lease (along with the 162 onsite parking spaces at the Market Quadrant), it being understood that such assurance by Landlord shall not cover any code changes or voluntary modifications by Tenant to the Market Quadrant parking that reduces the available parking spaces thereon (and if this covenant is not met, Tenant shall have the right, without limitation, to require that Landlord provide alternative parking for tenants under the Tenant Leases on lot 5, as described below).  This Lease is separate from and in addition to another

000062

Branch :F01,User :LEST                                   Comment:                                   Station Id :VSF5

*13*

lease between Landlord and Tenant being executed more or less concurrent herewith which
provides for a separate sixteen (16) parking spaces in the Parking Structure.

       2.    <u>Relocation</u>. Landlord shall have the right to relocate the spaces within the Parking
Structure from time to time in a manner reasonably acceptable to Tenant, provided that such
relocation shall not violate any parking rights of tenants under the Tenant Leases as they exist as
of the date of this Lease. . Tenant accepts the Parking Structure in "as is" condition as of the date
hereof, subject to the provisions of this Lease. Tenant acknowledges that it is familiar with the
condition of the Parking Structure and that it has had an opportunity to make and has made all
inspections of the Parking Structure which it deems necessary or appropriate to ascertain the
condition of the Parking Structure.

       3.    <u>Term</u>. The term of this Lease (the "**Term**") shall begin on the date hereof (the
"**Effective Date**"), and shall expire 99 years hereafter.

       4.    <u>Rent</u>. Tenant shall pay as "**Rent**", the sum of $1 (one dollar) per year, receipt of
which for the entire **Term** is hereby acknowledged, for the lease of the fourteen (14) parking
spaces, and there will be no charge to the users of the spaces.

       5.    <u>Taxes and Assessments</u>.

           (a) <u>Taxes and Assessments</u>.  Landlord shall pay before they
become delinquent all "**Impositions**," as defined in Section 5(b) hereof, which
may be levied, assessed or imposed upon the Land and the Parking Structure or
any part thereof which shall become due and payable during the Term and any
extension thereof.  The foregoing shall not be construed so as to impose any
liability upon Landlord for the payment of any income tax of Tenant or personal
property tax on property owned by Tenant.

           (b) <u>Impositions</u>.  For purposes hereof, the term "**Impositions**"
shall include all taxes, assessments, and other governmental charges applicable to
or assessed against the Land, or the Parking Structure, or any portion thereof,
including the personal property owned by Landlord and used in connection
therewith, whether federal, state, county, or municipal and whether assessed by
taxing districts or authorities presently taxing the Land and the Parking Structure
or the operation thereof, or by other taxing authorities subsequently created, or
otherwise, and any other taxes and assessments attributable to or assessed against
all or any part of the Land and the Parking Structure or their operation.

       6.    <u>Utilities</u>. Landlord shall not charge Tenant for domestic water or electricity or any
other utilities supplied to or serving the Parking Structure.

       7.    <u>Use</u>. Tenant shall use the Parking Structure throughout the Term solely for the
purpose of providing parking facilities to employees and/or invitees of Tenant or other tenants or
occupants of the Market Quadrant, and shall use the Trash Enclosure solely for the purpose of the
tenants of the Market Quadrant disposing of their trash in the provided trash bins (except that the
supermarket tenant on the Market Quadrant shall not dispose of its trash in those trash bins in the
Trash Enclosure), and for no other purpose whatsoever without the express written consent of

-2-

000063

(4

Landlord, which consent shall not be unreasonably withheld, conditioned or delayed. Tenant shall use reasonable efforts to utilize the Parking Structure and Trash Enclosure in a clean, safe, careful, lawful, businesslike, and efficient manner at all times during the Term, it being understood that Tenant has no obligation to repair or improve or modify the Parking Structure or Trash Enclosure in any way in connection with this covenant.

(a) Directional Signs and Arrows. Landlord shall be responsible, at its sole cost and expense, for the placement of directional signs and arrows within the Parking Structure, and for the placement of any signs required for the Trash Enclosure.

(b) License Numbers. Tenant shall furnish Landlord with its employees' license numbers (who park in the Parking Structure) within ten (10) days after request by Landlord from time to time, but not more frequently than six (6) times per calendar year during the Lease Term.

(c) Hazardous Materials. Tenant shall not place any "**Hazardous Materials**" (as defined in Section 8 below) in, on, or about the Parking Structure without the prior written consent of Landlord, to be withheld in Landlord's sole discretion. Without limiting Landlord's other remedies, if the presence of Hazardous Materials on or about the Parking Structure and/or the Land, caused by Tenant results in any contamination, Tenant shall, at its sole expense, promptly take all actions as are necessary to return the Parking Structure and/or the Land to the condition existing prior to the introduction of any such Hazardous Material; provided, however, that Landlord's approval of such actions shall first be obtained. For purposes of this Section 7(c), use of the premises by customers with motor vehicles containing "**petroleum products**" or other "**hazardous materials**" shall not constitute a "**placement of Hazardous Materials**" by Tenant.

8.    Compliance with Laws. Tenant shall, at its sole cost and expense, faithfully observe and fully comply with all applicable Federal, State, County and Municipal laws, rules, regulations, ordinances and other requirements now in force or which may hereinafter be in force, in the use of the Parking Structure, including without limitation, any such laws, rules, regulations, ordinances and other requirements relating to Tenant's use of Hazardous Materials, it being understood that Tenant has no obligation to repair or improve or modify the Parking Structure or Trash Enclosure in any way in connection with this covenant. Landlord shall, at its sole cost and expense, faithfully observe and fully comply with all applicable Federal, State, County and Municipal laws, rules, regulations, ordinances and other requirements now in force or which may hereinafter be in force, in the use of the Parking Structure, including without limitation, any such laws, rules, regulations, ordinances and other requirements relating to Landlord's or any third party's use of Hazardous Materials. For purposes of this Lease, "**Hazardous Materials**" mean "**petroleum products**", "**hazardous substances**", "**hazardous waste**", "**hazardous materials**", "**toxic substances**", "**contamination**" and "**pollution**" giving those terms the broadest meaning now or thereafter accorded by statutes, regulations or court decisions in the jurisdiction in which the Parking Structure are located and shall include products and materials found to have adverse effects on the environment or the health and safety of persons. Hazardous Materials also means any hazardous, toxic, explosive, noxious or radioactive substance, material, matter, or waste which

-3-



is or becomes regulated by any federal, state, or local law, rule, regulation, code, ordinance, or any other governmental restriction or requirement.

    9.    <u>Insurance</u>.

    (a) <u>Tenant's Insurance</u>.  Tenant, at Tenant's expense, shall procure and maintain in effect the following insurance in connection with its use of the parking spaces, throughout the Term of this Lease and any extension thereof: Commercial general liability insurance with a combined single limit of not less than One Million Dollars ($1,000,000.00) for property damage and bodily and personal injury, including coverage for any liability of Tenant under this Lease.

    (b) <u>Certificates of Insurance</u>.  Tenant shall furnish to Landlord within thirty (30) business days following the date hereof, certificates of insurance evidencing all insurance which Tenant is required to maintain pursuant to this Lease and Tenant shall deposit copies of all policies with Landlord.  Tenant shall also furnish Landlord with satisfactory evidence of timely payment of the premiums for such policies at least thirty (30) days prior to the renewal date or expiration of the term of coverage thereunder, and a certificate or certificates setting forth the terms of such policies.

    (c) <u>Failure to Maintain Insurance</u>.  If Tenant fails to provide or to keep in force any or all of the insurance policies required hereunder, or should such insurance not be approved by Landlord and Tenant fails to provide insurance acceptable to Landlord within forty-eight (48) hours after written notice of such disapproval from Landlord, Landlord may, without assuming any obligation in connection therewith, procure such insurance at Tenant's expense.  In such event, Tenant shall pay to Landlord all costs incurred in procuring such insurance, upon demand by Landlord, without prejudice to any other rights and remedies of Landlord under this Lease.

    (d) <u>Compliance With Insurer Requirements</u>.  Tenant shall not knowingly conduct or permit to be conducted in, on, or about the Parking Structure any activity, or place any equipment in, on, or about the Parking Structure, which will invalidate the insurance coverage in effect or increase the rate of fire insurance or other insurance on the Parking Structure, and Tenant shall comply with all requirements and regulations of Tenant's and Landlord's casualty and liability insurers.

    (e) <u>Landlord Insurance</u>.  Landlord shall at its sole cost and expense, insure the Parking Structure against all matters typically addressed in an "all risks" policy, with full replacement cost coverage, with insurers admitted in the State of California. Landlord shall also procure and maintain in effect the following insurance in connection with the parking spaces, throughout the Term of this Lease and any extension thereof: Commercial general liability insurance with a combined single limit of not less than One Million Dollars ($1,000,000.00) (or such other amounts as are commercially reasonable) for property damage and

-4-

Branch :F01,User :LEST                        Comment:                              Station Id :VSF5



bodily and personal injury, including coverage for any liability of Landlord under this Lease.

10.     Indemnity and Waiver.  Tenant hereby indemnifies, defends and holds Landlord harmless from and against:  (a) any and all liens, claims, demands, costs, expenses and liabilities but only to the extent same are caused by negligence, misconduct or other fault of Tenant, its agents or employees, which arise from (i) Tenant's use of the Parking Structure, or (ii) from any activity or thing done, permitted or suffered by Tenant or its agents, or employees in or about the Parking Structure; (b) any and all claims, costs, penalties, expenses and liabilities to the extent same are caused by (i) any breach or default in the performance of any obligation on Tenant's part to be performed under the terms of this Lease, or (ii) Tenant's violations of or Tenant's non-compliance with any governmental requirements or insurance requirements, or (iii) any negligent act, misconduct or other fault of Tenant, or any of its agents, contractors, or employees; and (c) all costs, attorneys' fees, expenses and liabilities incurred by Landlord in defending any such claims or any actions or proceedings brought against Landlord in connection with any Tenant violations of the express provisions of this Lease. To the extent of the foregoing indemnity in case any actions or proceedings be brought against Landlord by reason of any such claims, Tenant, upon notice from Landlord, shall defend the same at Tenant's expense by counsel satisfactory to Landlord.  The foregoing indemnity shall be in addition to Tenant's obligation to supply the insurance required by Section 9 and not in discharge of or substitution therefor.  Landlord hereby indemnifies, defends and holds Tenant harmless from and against:  (a) any and all liens, claims, demands, costs, expenses and liabilities but only to the extent same are caused by negligence, misconduct or other fault of Landlord, its agents or employees, which arise from (i) any party's (other than Tenant's) use of the Parking Structure, or (ii) from any activity or thing done, permitted or suffered by Landlord or its agents, or employees in or about the Parking Structure; (b) any and all claims, costs, penalties, expenses and liabilities to the extent same are caused by (i) any breach or default in the performance of any obligation on Landlord 's part to be performed under the terms of this Lease, or (ii) Landlord 's violations of or Landlord's non-compliance with any governmental requirements or insurance requirements, or (iii) any negligent act, misconduct or other fault of Landlord, or any of its agents, contractors, or employees; and (c) all costs, attorneys' fees, expenses and liabilities incurred by Tenant in defending any such claims or any actions or proceedings brought against Tenant in connection with any Landlord violations of the express provisions of this Lease. To the extent of the foregoing indemnity in case any actions or proceedings be brought against Tenant by reason of any such claims, Landlord, upon notice from Tenant, shall defend the same at Landlord 's expense by counsel satisfactory to Tenant.  The foregoing indemnities shall be in addition to the obligations to supply the insurance required by Section 9 and not in discharge of or substitution therefor.  The provisions of this Section 10 shall survive the expiration or termination of this Lease with respect to any damage, injury, or death occurring before such expiration or termination.  Notwithstanding anything contained in this Section 9 to the contrary, Landlord shall not be liable to Tenant for any claims to the extent caused by the negligence, misconduct or other fault of Landlord, its agents, employees, representatives, or contractors to the extent such claims are covered by the types of insurance Tenant is to maintain pursuant to Section 9.

11.     Exemption of Landlord from Liability.  Tenant hereby agrees that Landlord shall not be liable for injury or damage which may be sustained by the person, goods, ware, merchandise or property of Tenant, its employees, invitees or customers, or by any other person in or about the

000066

17

Parking Structure caused by or resulting from fire, steam, electricity, gas, water or rain which may leak or flow from or into any part of the Parking Structure, or from the breakage, leakage, obstruction or other defects of the pipes, sprinklers, wires, appliances, plumbing, air conditioning or lighting fixtures in or about the Parking Structure, whether such damage or injury results from conditions arising upon the Parking Structure or form other sources, except to the extent same are caused by the negligence, misconduct or other fault of Landlord, its agents or employees.

12.   Estoppel Certificate.

(a) Within ten (10) business days after written request by Landlord, Tenant shall execute and deliver to Landlord an estoppel certificate certifying as to such facts and agreeing to such other matters as Landlord may reasonably request. Such estoppel certificate shall substantially conform to all of the terms set forth in the estoppel certificate attached to this Lease as Exhibit "C". The failure of Tenant to execute, acknowledge and deliver to Landlord an estoppel certificate in accordance with Landlord's written request within such ten (10) business day period shall constitute an acknowledgment by Tenant of the matters set forth in the written request, and in such event Tenant hereby authorizes and appoints Landlord to act as Tenant's attorney-in-fact to execute such estoppel certificate.

(b) Within ten (10) business days after written request by Tenant, Landlord shall execute and deliver to Tenant an estoppel certificate certifying as to such facts and agreeing to such other matters as Tenant may reasonably request. The failure of Landlord to execute, acknowledge and deliver to Tenant an estoppel certificate in accordance with Tenant's written request within such ten (10) business day period shall constitute an acknowledgment by Landlord of the matters set forth in the written request, and in such event Landlord hereby authorizes and appoints Landlord to act as Landlord's attorney-in-fact to execute such estoppel certificate.

13.   Repairs and Maintenance.   Landlord shall, during the term of this Lease, maintain the Parking Structure and all improvements thereto safe and secure, in good order, condition, and repair, including, without limitation, the periodic cleaning of the Parking Structure, and striping of parking spaces and painting of directional signs/arrows therein except for (i) reasonable wear and tear and (ii) damage caused by any reason other than the negligence, misconduct or other fault of Tenant, its agents or employees, in connection herewith, the repair of which damage shall be the obligation of Landlord hereunder.

14.   Indemnity.  Landlord shall at all times indemnify, defend (with counsel satisfactory to Tenant), and hold harmless Tenant, and its affiliates, partners, managers, employees, officers, agents, family members, trustees. beneficiaries, heirs, attorneys, lenders, successors and assigns (collectively, "Indemnitee Parties"), from and against any and all liabilities, suits, actions, debts, obligations, judgments, charges, demands, claims, costs, losses (including without limitation loss of use of the Parking Structure and/or lost rents), damages, recoveries, settlements, and expenses (including but not limited to attorneys' fees and costs), of any nature, whatsoever suffered or incurred by Indemnitee Parties or any of them which arise out of, relate to and/or result from (i)

-6-

000067



any assertion by B&V Enterprises, Inc. ("SK"), the tenant under a lease with Landlord (as predecessor in interest to Tenant) dated April 1, 2008 (the "SK Lease"), that section 18.5 of the SK Lease (or any other provision of the SK Lease related to parking, in effect on the date of this Lease) has been violated due to the failure to provide exclusivity rights of SK in thirty (30) parking spaces in the Parking Structure, (ii) any assertion that the Market Quadrant violates applicable laws, codes or ordinances, in effect as of the date of this lease, regarding the provision of parking spaces based on Tenant Leases in effect on the date of this Lease (so long as Tenant maintains the 162 onsite parking spaces at the Market Quadrant), (iii) any and all damages and claims that arise in the event that Tenant, after pursuing diligently and in good faith, is unable to procure from Los Angeles County a parking permit for the Property pursuant to file no. RPKP 201300005 (R2013-01662), and/or any act or omission by Landlord which adversely impacts said parking permit once issued (which may include, without limitation, any construction by Landlord on property owned by Landlord or its successors or assigns which results in a violation of such parking permit or the conditions applicable thereto), (iv) any failure by Landlord to ensure that the parking provided under this lease cannot be and is not altered except with further Los Angeles County approval (and Landlord shall not further amend the approved Revised Exhibit "A" REA201400423 to remove or modify those parking spaces without Tenant's reasonable written consent), and/or (v) any failure by Landlord to, promptly following the recordation of this lease, diligently pursue the improvements to lot 5 so that it can be used for parking purposes in compliance with the approved Revised Exhibit "A" REA201400423, and complete such improvements at least thirty (30) days prior to the scheduled hearing date for the parking permit application RPKP201300005. Landlord represents and warrants that the Revised Exhibit "A" application has been approved, and covenants that the lot 5 (as described in Exhibit "C" attached hereto) shall be "tied" to and remain a part of the Fitness Quadrant by an instrument approved by Los Angeles County in writing so that Tenant's parking permit will not be adversely impacted.

15.   Alterations.  Tenant shall not make or suffer any change, alterations, additions, improvements, removal or replacement of improvements in or upon the Parking Structure nor make any contract therefor without first procuring Landlord's written consent, which consent shall not be unreasonably withheld, conditioned or delayed.

16.   Damage to or Destruction of the Parking Structure.

(a)   Definition.  Throughout this Lease, the phrase "**totally unfit for use and occupancy by Tenant**" shall mean and is hereby defined as the damage to fifty percent (50%) or more of the Parking Structure.

(b)   Partial Damage.  In the event of any damage which does not render the Parking Structure totally unfit for use and occupancy by Tenant, this Lease shall remain in full force and effect.  Landlord shall, with reasonable diligence, and in any event within not more than sixty (60) calendar days after the occurrence giving rise to the damage, cause the Parking Structure to be repaired and restored to the same general condition in which they existed immediately prior to the occurrence of said damage.

(c)   Total Damage.  In the event of any damage which renders the Parking Structure totally unfit for use and occupancy by Tenant, this Lease shall

-7-

000068

(9

remain in full force and effect.  Landlord shall, with reasonable diligence, and in any event within not more than sixty (60) calendar days after the occurrence giving rise to the damage, commence the repair and restoration of the Parking Structure, to be repaired and restored to the same general condition in which they existed immediately prior to the occurrence of said damage, and thereafter diligently pursue the same to completion.

(d) Landlord's Failure to Complete Repairs.  In the event that Landlord does not comply with the time limits described in Sections 16(b) and 16(c) above, Tenant may (i) terminate this Lease and all its obligations hereunder forthwith by giving written notice to Tenant; and such termination shall be effective as of and from the date said notice is received by Tenant, or (ii) 30 days after a notice to Landlord to complete required repairs, undertake such repairs and restoration to the Parking Structure, and Landlord shall reimburse Tenant, within twenty (20) days of presentation of invoice, for the out-of-pocket expenses thereof paid to third parties.

17.    Condemnation.

(a) Partial Condemnation.  In the event of a taking under the power of eminent domain or conveyance under the threat of eminent domain (in either case, a "**Condemnation**"), and such Condemnation does not render the Parking Structure totally unfit for use and occupancy by Tenant, this Lease shall remain in full force and effect.  Landlord shall, with reasonable diligence, and in any event within not more than sixty (60) calendar days after the Condemnation, cause the remaining portions of the Parking Structure to be repaired and restored to the same general condition in which they existed immediately prior to the occurrence of said damage.

(b) Total Condemnation.  In the event of a Condemnation which renders the Parking Structure totally unfit for use and occupancy by Tenant, Landlord and Tenant shall each have the option to terminate this Lease as provided hereafter.  If Tenant or Landlord fail to exercise said option to terminate this Lease, this Lease shall remain in full force and effect.  Landlord shall, with reasonable diligence, and in any event within not more than sixty (60) calendar days after the Condemnation, cause the Parking Structure to be repaired and restored to the same general condition in which they existed immediately prior to the occurrence of said damage, or replaced with comparable improvements reasonably acceptable to Tenant.

(c) Option to Terminate.  The option to terminate this Lease granted to Tenant and Landlord in Section 17(b) above shall be exercised by Tenant or Landlord (as the case may be) by giving written notice of such exercise to the other within thirty (30) calendar days following the events giving rise to the damage.  If Tenant or Landlord shall exercise said option, and give said notice, then this Lease shall terminate effective upon the date set forth in such notice (which is in any event shall not be in excess of sixty (60) days following the

-8-

2b

Condemnation and the Rent and other payments required to be made hereunder shall abate as of and from such termination date).

(d) Condemnation Awards. Each party shall have the right to pursue its maximum allowable claim for an award or payment in connection with any Condemnation.

(e) Landlord's Failure to Complete Repairs. In the event that Landlord does not complete the repairs and restoration to the Parking Structure within the time limits described in Sections 17(a) and 17(b) above, Tenant may (i) terminate this Lease and all its obligations hereunder forthwith by giving written notice to Landlord; and such termination shall be effective as of and from the date said notice is received by Landlord, or (ii) 30 days after a notice to Landlord to complete required repairs, undertake such repairs and restoration to the Parking Structure, and Landlord shall reimburse Tenant, within twenty (20) days of presentation of invoice, for the out-of-pocket expenses thereof paid to third parties.

18. Defaults by Tenant and Landlord's Remedies.

(a) Events of Default. The occurrence of any one or more of the following events (each, an "**Event of Default**") with respect to any of the Parking Structure shall constitute a material default and breach of this Lease by Tenant:

(i) Any failure by Tenant to observe and perform any other material provision of this Lease to be observed or performed by Tenant, where such failure continues for thirty (30) days after written notice thereof by Landlord to Tenant, unless a shorter period of time for such observance or performance is otherwise expressly set forth in this Lease; provided, however, that if the nature of such default is such that the same cannot reasonably be cured within such thirty (30) day period, Tenant shall not be deemed to be in default if Tenant shall within such period commence such cure and thereafter diligently prosecute the same to completion. However, if Tenant commits a payment default hereunder, after thirty (30) days written notice to Tenant without a cure, Landlord may exercise any remedy available at law or in equity, including but not limited to termination of this Lease.

(b) Landlord's Remedies. In the event of any such default by Tenant, then Landlord shall be entitled to any remedies available at law or in equity including, without limitation, the remedies provided under Section 1951.2 and Section 1951.4 of the California Civil Code.

19. Defaults by Landlord. Except with regard to payment defaults, Landlord shall not be in default hereunder unless Landlord fails to perform or observe any of the covenants, provisions or conditions contained in this Lease on its part to be performed or observed within thirty (30) days after written notice of default or, if more than thirty (30) days shall be required because of the nature of the default, unless Landlord fails to proceed diligently to cure such default

-9-

21

after written notice given by tenant thereof. However, if Landlord commits a payment default hereunder, after five (5) days written notice, Tenant may exercise any remedy available at law or in equity, including but not limited to termination of this Lease.

20.    Subordination and Attornment.

(a) Subordination. Provided that Tenant is not disturbed in its quiet enjoyment of the Parking Structure, upon request of Landlord or any mortgagee, deed of trust trustee or beneficiary, or lessor of Landlord, Tenant shall in writing, within ten (10) business days after written request by Landlord, subordinate its rights hereunder to the lien of any mortgage or deed of trust now or hereinafter in force against the Land, or the Parking Structure and to all advances made or hereafter to be made upon the security thereof and all renewals, modifications, consolidations and replacement thereof, and to any lease in which Landlord is lessee, and any modifications, refuels, and replacements thereof. Such instrument of subordination shall substantially conform to all of the terms set forth in the subordination agreement attached to this Lease as Exhibit "D". Any such mortgagee, trustee or beneficiary may at its option subordinate its mortgage or deed of trust to this Lease. Landlord shall promptly upon the execution of this Lease obtain from its secured lender a non-disturbance agreement in favor of Tenant, in form and content acceptable to Tenant.

(b) Attornment. In the event any proceedings are brought for the foreclosure of such lien, or in the event of the exercise of the power of sale under any mortgage or deed of trust made by the Landlord covering the Parking Structure, or should the lease in which Landlord is lessee be terminated, Tenant shall, at the election of the Successor to Landlord upon any such foreclosure or on sale or termination, attorn to the successor to Landlord upon any such foreclosure or sale or termination and recognize such successor as the Landlord under this Lease. Tenant covenants and agrees to execute and deliver, upon demand by Landlord and in the form requested by Landlord, and within ten (10) business days of written demand by Landlord, any additional documents evidencing the aforementioned subordination of this Lease with respect to any lease in which Landlord is lessee or with respect to the lien of any such mortgage or deed of trust.

21.    Lease Runs with the Land; Assignment, Subletting and Encumbrance. The rights and obligations of Landlord and Tenant hereunder shall run with the land, and any successor owner of the Market Quadrant shall be vested with all of the rights of the Tenant hereunder, and any successor owner of the Fitness Quadrant shall be vested with and bound by all of the obligations of Landlord hereunder, and, notwithstanding anything to the contrary herein, no consent of the Landlord shall be required in connection with the assignment of the Tenant's rights under this Lease to a successor owner of the Market Quadrant. Except as provided in the foregoing sentence, Tenant shall not voluntarily or involuntarily assign, transfer, mortgage or otherwise encumber this Lease or any interest of Tenant herein, in whole or in part (an "**Assignment**"), or sublet the whole or any part of the Parking Structure, or permit the Parking Structure or any part thereof to be used or occupied by others, except as contemplated by this Lease, without first obtaining in each and every instance the prior written consent of Landlord; provided, however, that the use of the Parking

-10-

000071

22

Structure by Tenant's supermarket tenant or its successors, employees and/or invitees, and/or the use by Tenant's other tenants and/or their employees or invitees, shall not constitute an Assignment. If this Lease or any interest herein is assigned, or if the whole or any part of the Parking Structure is sublet or used or occupied by others without Landlord's prior written consent (to the extent such consent is required herein), then Tenant shall continue to remain liable for the full performance of all obligations under this Lease to be performed or observed by Tenant, and Tenant shall not be released from its obligations under this lease in any manner.

22.    Notices.  Whenever, under this Lease, provision is made for any demand, notice, or declaration of any kind or where it is deemed desirable or necessary by either party to give or serve any such notice, demand or declaration to the other, it shall be in writing and either served personally or sent by overnight courier or sent by registered mail or certified mail, return receipt requested, with postage prepaid, addressed to Tenant or Landlord, as **the case** may be, at the address specified below.

To Landlord:

Greg Galletly
Altadena Lincoln Crossing, LLC
210 S. Orange Grove Blvd.
Pasadena, California 91105

To Tenant:

The George Garikian Living Trust
1211 Cortez Dr.
Glendale, CA 91207

Either party may by like notice at any time and from time to time designate a different address to which notices shall be sent.  Such notices, demands or declarations shall be deemed sufficiently served or given for all purposes hereunder, unless otherwise specified in this Lease, either (a) if personally served, upon such service, (b) if sent by overnight courier, the following business day, or (c) if mailed, two (2) business days after the time of mailing or on the date of receipt shown on the return receipt, whichever is earlier.

23.    Waiver.

(a) The waiver by Landlord of any breach of any term or condition of this Lease shall not be deemed to be a waiver of any subsequent reach of the same or of any other term or condition of this Lease.  The subsequent acceptance of rent due under this Lease or any other monetary obligations of Tenant by Landlord shall not be deemed to be a waiver of any preceding breach by Tenant of any term or condition of this Lease, other than the failure of Tenant to make the

-11-

000072

23

particular payment so accepted, regardless of Landlord's knowledge of such preceding breach at the time of acceptance of such rent. No term or condition of this Lease shall be deemed to have been waived by Landlord unless Landlord shall expressly waive the same in writing to Tenant.

(b) The waiver by Tenant of any breach of any term or condition of this Lease shall not be deemed to be a waiver of any subsequent reach of the same or of any other term or condition of this Lease. The subsequent acceptance of rent due under this Lease or any other monetary obligations of Landlord by Tenant shall not be deemed to be a waiver of any preceding breach by Landlord of any term or condition of this Lease, other than the failure of Landlord to make the particular payment so accepted, regardless of Tenant's knowledge of such preceding breach at the time of acceptance of such rent. No term or condition of this Lease shall be deemed to have been waived by Tenant unless Tenant shall expressly waive the same in writing to Landlord.

24.    Miscellaneous.

(a) Relationship of the Parties. Nothing herein contained, either in the method of computing rent or otherwise, shall create between the parties hereto, or be relied upon by others as creating, any relationship or partnership, association, joint venture or otherwise. The sole relationship of the parties hereto shall be that of landlord and tenant. All persons employed by Tenant to operate the Parking Structure shall be deemed to be employees of Tenant and not of Landlord, and neither Tenant nor its employees shall have any authority to act as the agent of the Landlord. Neither party shall be liable for debts incurred by the other except as specifically otherwise provided herein.

(b) Applicable Law. The laws of the State of California shall govern the validity, performance and enforcement of this Lease.

(c) Successors. Except as expressly provided herein, the terms and agreements as contained in this Lease shall apply to, run in favor of and shall be binding upon and inure to the benefit of the parties hereto, and their respective heirs, executors, administrators, personal representatives and assigns and successors-in-interest.

(d) Entire Agreement. This Lease and the exhibits attached hereto and forming a part hereof set forth all the obligations, covenants, promises, agreements, conditions and understandings between Landlord and Tenant concerning the Parking Structure. All exhibits attached hereto and referenced herein are incorporated herein by this reference. All prior communications, negotiations, arrangements, representations, agreements and understandings, whether oral or written, between the parties hereto, and their representatives, are merged herein and extinguished. Except as herein otherwise provided, no subsequent alteration, amendment, change or addition to this Lease shall be

-12-

000073

24

binding upon Landlord or Tenant unless reduced to writing and signed by both parties.

(e) <u>Tenant as Corporation or Partnership</u>. If Tenant executes this Lease as corporation or partnership, then Tenant and the persons executing this Lease on behalf of Tenant represent and warrant that such entity is duly qualified to do business in California and that the individuals executing this Lease on Tenant's behalf are duly authorized to execute and deliver this Lease on its behalf.

(f) <u>Captions</u>. The titles of sections herein are inserted only as a matter of convenience and in no way define, limit, construe or describe the scope or intent of the sections of this Lease.

(g) <u>Severability</u>. If any term of this Lease or the application thereof to any person or circumstance shall, to any extent, be invalid or unenforceable, the remainder of this Lease, or the application of such term to persons or circumstances other than those as to which it is held invalid or unenforceable, shall not be affected thereby, and each term of this Lease shall be valid and be enforced to the fullest permitted by law.

(h) <u>Force Majeure</u>. Any prevention, delay or stoppage due to strikes, lockouts, labor disputes, acts of God, inability to obtain labor or materials or reasonable substitutes therefor, governmental restrictions, regulations or controls, enemy or hostile governmental action, civil commotion, fire or other casualty, or any other cause, whether similar or dissimilar to the foregoing, beyond the reasonable control of the Landlord or Tenant, shall excuse the performance by such party for a period equal to any such prevention, delay or stoppage.

(i) <u>Attorney's Fees</u>. In the event that any time following the date hereof, either Landlord or Tenant shall institute any action or proceeding against the other relating to the provisions of this Lease, or any default hereunder, then and in that event, the party not prevailing in such action or preceding shall reimburse the prevailing party for all costs and expenses, including attorneys' fees and expenses incurred therein by the prevailing party.

(j) <u>Brokers</u>. Landlord and Tenant each warrant and represent to each other that it has had no dealing with any broker or finder in connection with this Lease and that it knows of no other person who is or might be entitled to a commission, finder's fee or other like payment in connection with this Lease and each does hereby agree to indemnify, defend and hold the other party harmless from and against any and all loss, liability, costs, fees (including, without limitation, attorneys' fees), claims and expenses that the other party may incur should such warranty and representation prove incorrect.

(k) <u>Time is of the Essence</u>. Time is of the essence with respect to the performance of every provision of this Lease in which time of performance is a factor.

-13-

000074

Branch :F01,User :LEST                              Comment:                                    Station Id :VSF5

25

(l) <u>Amendments in Writing</u>.  This Lease may only be changed, modified or amended by an instrument in writing, executed by the parties hereto.

(m) <u>Accord and Satisfaction</u>.  No payment by Tenant or receipt by Landlord of a lesser amount than the monthly rent provided for herein shall be deemed to be other than on account of the earliest stipulated rent, nor shall any endorsement of statement on any check or any letter accompanying any check or payment as rent be deemed an accord and satisfaction, and Landlord may accept such check payment without prejudice to Landlord's right to key cover the balance of such rent or pursue any other remedy provided for in this Lease.

(n) Recording.  Upon the execution of this Lease, the parties shall sign, acknowledge and record in the Official Records of Los Angeles County, California a short form memorandum of this Lease, in form and content designated by Tenant.


**[END OF TEXT; SIGNATURES APPEAR ON FOLLOWING PAGE]**

-14-

000075

𝒰ₒ

IN WITNESS WHEREOF, the parties hereto have executed this Lease as of the date first above written.

**Altadena Lincoln Crossing LLC,**
a Delaware limited liability company

By:     DPP Altadena LLC,
        a Delaware limited liability company
        Its Manager

        By:     Altadena-Dorn Platz, LLC
        a California limited liability company
        Its Manager

                By: _____
                Name: ____ Greg Galletly
                Its:      Manager

**George Garikian, Trustee of The George Garikian Living Trust**

By: _____
Name: __George Garikian__
Its: __Trustee__

-- 15 --

000076

27

## EXHIBIT "A"

All that certain real property situated in the County of Los Angeles, State of California, described as follows:

PARCEL 1:

Those portions of Lots 1, 2 and 3 of Scribner's Tract, as shown on a map recorded in Book 22, Page 192 of Maps, in the office of the County Recorder of said County, described as follows:

Beginning at the intersection of the Southerly line of the Northerly 40 feet of said Lot 2 with the Westerly line of said Lot 2; thence Northerly along said Westerly 22,67 feet to the true point of beginning, said true point of beginning also being the beginning of a curve concave Northeasterly having a radius of 25 feet tangent to said Westerly line and tangent to a line parallel line with and distant 50 feet Northeasterly measured at right angles from a line which bears South 72° 37' 55" East and passes through a point in the centerline of Lincoln Avenue 80 feet wide as shown on said map distant North 0° 37' 50" West thereof 74,91 feet from a line parallel with and 30 feet Southerly measured at right angles from the Southerly line of said Lot 1 of said tract; thence Southeasterly along said curve 31.41 feet to said first mentioned parallel line; thence South 72° 37' 55" East 8.31 feet to the beginning of a tangent curve concave Northeasterly and having a radius of 950 feet; thence Southeasterly along said last mentioned curve 138.96 feet to the Easterly line of said Lot 1; thence Northerly along the Easterly lines of said Lots 1, 2 and 3 to the Northerly line of the Southerly 20 feet of said Lot 3; thence Westerly along said last mentioned Northerly line to the Westerly line of said Lot 3; thence Southerly along the Westerly lines of said Lost 2 and 3 to the true point of beginning.

Said land is also shown on Certificate of Compliance recorded January 20, 2006 as Instrument No. 06-0148328 of Official Records.

PARCEL 2:

Lot 38 of Scribner's Tract, as shown on a map recorded in Book 22, Page 192 of Maps, in the office of the County Recorder of said County.

Except therefrom those portions of said lots included within a strip of land 50 feet wide the Southerly boundary of which is described as follows:

Beginning at a point in the centerline of Lincoln Avenue 80 feet side as shown on said map distant North 0° 37' 50" West thereon 74.91 feet from a line parallel with and 30 feet Southerly measured at right angles from the Southerly line of Lot 1 of said tract; thence South  72° 37' 55" East 52.29 feet to the beginning of a curve concave to the North having a radius of 1000 feet tangent to said last mentioned course and tangent to a line parallel with and 20 feet Southerly measured at right angles from the Southerly line of said Lot 35; thence Easterly along said curve 313.63 feet to said last mentioned parallel line; thence South 89° 23' 55" East along said last mentioned parallel line 100 feet.

-- 16 --

000077



Said land is also shown on Certificate of Compliance recorded January 20, 2006 as Instrument No. 06-0148328 of Official Records.

PARCEL 3:

The North 30 feet of Lot 3 and the South 10 feet of Lot 4 of Scribner's Tract, as shown on a map recorded in Book 22, Page 192 of Maps, in the office of the County Recorder of said County.

Said land is also shown on Certificate of Compliance recorded January 20, 2006 as Instrument No. 06-0148328 of Official Records.

PARCEL 4:

That portion of Lot 4 beginning at a point 10 feet North of the Southwest corner of Lot 4; thence North 21.70 feet; thence East 160 feet; thence South 21.70 Feet; thence West 160 feet to the point of beginning of Scribner's Tract, as shown on a map recorded in Book 22, Page 192 of Maps, in the office of the County Recorder of said County.

Said land is also shown on Certificate of Compliance recorded January 20, 2006 as Instrument No. 06-0148328 of Official Records.

PARCEL 5:

The North 18.30 feet of Lot 4 and all of Lot 5, except the North 8.30 feet thereof of Scribner's Tract, as shown on a map recorded in Book 22, Page 192 of Maps, in the office of the County Recorder of said County.

Said land is also shown on Certificate of Compliance recorded January 20, 2006 as Instrument No. 06-0148328 of Official Records.

PARCEL 6:

The South 12 feet of Lot 6 and North 8.30 feet of Lot 5 of Scribner's Tract, Rancho San Pasqual, as shown on a map recorded in Book 22, Page 192 of Maps, in the office of the County Recorder of said County,

Said land is also shown on Certificate of Compliance recorded January 20, 2006 as Instrument No. 06-0148328 of Official Records.

PARCEL 7:

Lot 6 of Scribner's Tract, in the Rancho San Pasqual, as shown on a map recorded in Book 22, Page 192 of Maps, in the office of the County Recorder of said County.

Except therefrom the Southerly 12.00 feet thereof.

-- 17 --

29

Said land is also shown on Certificate of Compliance recorded January 20, 2006 as
Instrument No. 06-0148328 of Official Records.

PARCEL 8:

Lot 7 of Scribner's Tract, as shown on a map recorded in Book 22, Page 192 of Maps, in the
office of the County Recorder of said County.

Said land is also shown on Certificate of Compliance recorded January 20, 2006 as
Instrument No. 06-0148328 of Official Records.

PARCEL 9:

Lot 9 of Scribner's Tract, as shown on a map recorded in Book 22, Page 192 of Maps, in the
office of the County Recorder of said County.

Said land is also shown on Certificate of Compliance recorded January 20, 2006 as
Instrument No. 06-0148328 of Official Records.

PARCEL 10:

Lot 8 of Scribner's Tract, as shown on a map recorded in Book 22, Page 192 of Maps, in the
office of the County Recorder of said County.

Said land is also shown on Certificate of Compliance recorded January 20, 2006 as
Instrument No. 06-0148328 of Official Records.

PARCEL 11:

Lots 35, 36 and 37 of Scribner's Tract, as shown on a map recorded in Book 22, Page 192 of
Maps, in the office of the County Recorder of said County.

EXCEPT therefrom those portions of said lot included within a strip of land 50 feet wide, the
Southerly boundary of which is described as follows:

Beginning at a point in the centerline of Lincoln Avenue 80 feet wide as shown on said map
distant North 0° 37' 50" West thereon 74.91 feet from a line parallel with and 30 feet
Southerly measured at right angles from the Southerly line of Lot 1 of said tract; thence
South 72° 37' 55" East 52.29 feet to the beginning of a curve concave to the North having a
radius of 1000 feet tangent to said last mentioned course and tangent to a line parallel with
and 20 feet Southerly measured at right angles from the Southerly line of said Lot 35;
thence Easterly along said curve 313.65 feet to said last mentioned parallel line; thence
North 89° 23' 55" East along said last mentioned parallel line 100 feet.

Said land is also shown on Certificate of Compliance recorded January 20, 2006 as
Instrument No. 06-0148328 of Official Records.

Assessor's Parcel Number: 5827-018-041

-- 18 --

000079

Branch :F01,User :LEST                              Comment:                                          Station Id :VSF5

30

EXHIBIT "B"
PARKING SPACES

-- 19 --

000080



32

EXHIBIT "C"
ESTOPPEL CERTIFICATE FORM

-- 20 --

000082

Branch :F01,User :LEST                    Comment:                              Station Id :VSF5

33

STANDARD ESTOPPEL CERTIFICATE - BY LESSEE

TO WHOM IT MAY CONCERN:

RE: Lease ("Lease") dated _____ , by and between _____

as Lessor, and _____ as Lessee,
concerning the real property known as: _____

("Premises"), which Lease was amended _____
and guaranteed by _____
("Guarantor(s)") (It will be presumed no amendments or guarantees exist unless they are specified above).

Lessee hereby certifies as follows:

1.  True copies of the above referenced Lease as amended and the guarantees, if any, are attached hereto marked Exhibit "1" (Attach a copy of Lease, all amendments and guarantees.) Other than the documents included in Exhibit 1 there are no oral or written agreements or understandings between the Lessor and Lessee with respect to the Premises except (if there are no exceptions, write "NONE") _____

2.  The Lease term commenced on _____ and expires on _____

3.  The current monthly rent and expense pass-through, if any, are as follows:

| | Amount | Day of Month Due | Paid Up Through | Year |
|---|---|---|---|---|
| Rent | | | | |
| Pass Through | | | | |

No rents or pass-throughs have been prepaid except as reflected in the Lease. (It will be presumed that no expense pass-throughs are currently required unless set forth above.)

4.  The current amount of security deposit held by Lessor is $ _____

5.  The Lease has not been modified, orally or in writing, since its execution, except as hereinabove identified. The Lease is in full force and effect and contains the entire agreement between Lessor and Lessee, except (if there are no exceptions, write "NONE"):

6.  The improvements and space required to be provided by Lessor have been furnished and completed in all respects to the satisfaction of Lessee, and all promises of an inducement nature by Lessor have been fulfilled except (if there are no exceptions, write "NONE"): _____

7.  Lessee has no knowledge of any uncured defaults by Lessor or Lessee under the Lease, except (if there are no exceptions, write "NONE"):

8.  There are no disputes between Lessor and Lessee concerning the Lease, the Premises or the improvements therein or thereon, except (if there are no exceptions, write "NONE"):

9.  Lessee is in full and complete possession of the Premises and has not assigned or sublet any portion of the Premises, except (if there are no exceptions, write "NONE"):

10. Lessee has no knowledge of any prior sale, transfer, assignment or encumbrance of the Lessor's interest in the Lease, except (if there are no exceptions, write "NONE"):

11. Lessee has made no alterations or additions to the Premises, except (if there are no exceptions, write "NONE"): _____

If alterations or additions have been made by Lessee, Lessee represents that to the best of its knowledge, all such alterations and additions were done in accordance with the terms of the Lease and in compliance with all applicable laws, rules and regulations, except (if there are no exceptions, write "NONE"):

12. The guarantees of the Guarantors named above are still in full force and effect, except (if there are no exceptions, write "NONE"):

13. Lessee is not currently the subject of a bankruptcy proceeding and to the best of its knowledge neither Lessor nor any Guarantor is involved in such a proceeding, except (if there are no exceptions, write "NONE"):

PAGE 1 OF 2

©2000 - AIR COMMERCIAL REAL ESTATE ASSOCIATION                    FORM TSER-3-6/97E

14. Lessee is aware that buyers, lenders and others will rely upon the statements made in this Estoppel Certificate, and has therefore adjusted the language hereof as necessary to make it an accurate statement of the current facts concerning the Lease. If no such adjustments have been made, said parties may rely upon the statements in this form as printed.

15. Additional Items (If there are no additional items, write "NONE"):



DATE: _____, 20___
    (Fill in date of execution)

BY: _____
Name Printed: _____
Title: _____
Address: _____
_____
Telephone: ( ___ ) _____
Facsimile: ( ___ ) _____
Email: _____

NOTICE: These forms are often modified to meet changing requirements of law and industry needs. Always write or call to make sure you are utilizing the most current form: AIR Commercial Real Estate Association, 500 N Brand Blvd, Suite 900, Glendale, CA 91203. Telephone No. (213) 687-8777. Fax No.: (213) 687-8616.



PAGE 2 OF 2

©2000 - AIR COMMERCIAL REAL ESTATE ASSOCIATION                    FORM TSER-3-5/07E

35

EXHIBIT "D"
SNDA FORM


RECORDING REQUESTED BY &    )
WHEN RECORDED RETURN TO:    )
                            )
_____      )
_____      )
_____      )
                            )

_____

                                        (Space Above This Line For Recorder's Use)

**SUBORDINATION AGREEMENT AND
AGREEMENT OF NON-DISTURBANCE AND ATTORNMENT**
(EWB Form – Rev. 2-2007)

     This Subordination Agreement and Agreement of Non-Disturbance and Attornment ("Agreement") is made and entered into as of this __ day of _____, 20__, among (i) _____ ("Lender"), (ii) _____ ("Tenant") and (iii) _____ ("Owner"), with reference to the following:

RECITALS

     A.    Lender has made or is proposing to make a loan (the "Loan") to Owner secured or to be secured by a deed of trust (the "Deed of Trust") on the real property legally described in <u>Exhibit A</u> attached hereto and the improvements thereon (together, the "Property"). The Deed of Trust and any and all other documents evidencing or relating to the Loan shall be referred to as the "Loan Documents".

     B.    Tenant has leased or is proposing to lease certain parking spaces at the Property (the "Premises") (the lease and all amendments thereto being referred to as the "Lease").

     C.    Lender and Tenant desire to enter into this Agreement under which Tenant subordinates the Lease and its interest in the Property and agrees to attorn to Lender and under which Lender agrees to not disturb Tenant's possession of the portion of the Premises all to the extent set forth herein, and so long as Tenant is not in default under the Lease.

     NOW THEREFORE, with reference to the foregoing recitals and for good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties to this Agreement agree as follows:

     1.    <u>Subordination</u>. The Lease, and the rights, if any, of Tenant in, to and under the Lease and the Premises, are hereby subjected and subordinated to the lien of the Deed of Trust, it being understood and agreed that the foregoing subordination shall apply to any and all increases, renewals, modifications, extensions, substitutions, replacements and/or consolidations of the Deed of Trust, provided that any and all such increases, renewals, modifications, extensions, substitutions, replacements and/or consolidations shall nevertheless be subject to the terms of this Agreement.

-- 21 --

Branch :F01,User :LEST
Comment:
Station Id :VSF5

36

2.   <u>Tenant Not to Be Disturbed</u>.  So long as Tenant is not in default in the payment of rent or of any of the terms, covenants or conditions of the Lease on Tenant's part to be performed (beyond any period given Tenant in the Lease to cure such default) and Tenant attorns to Lender as provided herein, (a) Tenant's possession of the Premises shall not be diminished or interfered with by Lender, and (b) Lender will not join Tenant as a party defendant in any action or proceeding foreclosing the Deed of Trust unless such joinder is necessary to foreclose the Deed of Trust and then only for such purpose and not for the purpose of terminating the Lease.

3.   <u>Tenant to Attorn To Lender</u>.  If Lender shall become the owner of the Premises or the Premises shall be sold by reason of foreclosure or other proceedings brought to enforce the Deed of Trust or the Premises shall be transferred by deed in lieu of foreclosure, the Lease shall continue in full force and effect as a direct Lease between the then owner of the Premises, who shall succeed to the rights and duties of the Landlord and Tenant.  Tenant shall attorn to Lender or any other such owner as its Landlord, said attornment to be effective and self-operative without the execution of any further instruments.  Tenant hereby waives the provisions of any statute or rule of law, now or hereafter in effect, which may give or purport to give Tenant any right or election to terminate or otherwise adversely affect the Lease and the obligations of Tenant thereunder as a result of any such foreclosure or deed-in-lieu of foreclosure.

4.   <u>Notice of Default; Rent Payments to Lender</u>.  In the event that Lender notifies Tenant of a default under the Deed of Trust and requests Tenant to pay its rent and all other sums due under the Lease to Lender, Tenant shall pay such sums directly to Lender, or as Lender may otherwise request, without any further consent of Owner.

5.   <u>Limitations</u>.  Lender (and any successor or assignee of Lender) shall not be (i) liable for any act or omission of Borrower or any predecessor-in-interest, (ii) subject to any offsets, counterclaims or defenses which Tenant may have against Borrower or any predecessor-in-interest, (iii) liable for any security deposit or payment of rent (for more than one month in advance of the date due under the Lease) made by Tenant to Borrower or any predecessor-in-interest, except to the extent actually received by Lender, (iv) liable for any construction, repair allowances or other allowances or payments to be made by Landlord under the Lease (except in the event that Lender or such successor or assignee become the successor landlord under the Lease, in which event such party shall be bound to perform the obligations of the landlord under the Lease), or (v) obligated to expand the Premises, construct additional improvements or otherwise expend funds which are capital in nature except for items or ordinary maintenance and repair for the Premises or the property in which it is located.  Notwithstanding any term of the Lease, upon foreclosure of the Deed of Trust, or acceptance of a deed in lieu thereof or other similar transfer, any environmental/hazardous materials indemnity and/or reimbursement provisions under the Lease shall not be applicable to, or enforceable against, Lender, any successor in interest to or assignee of Lender and/or any purchaser at foreclosure and any transferee thereof. If Lender becomes the owner of the Property or the Property is sold to a third party by reason of foreclosure or other proceedings brought to enforce the Deed of Trust or the Property is conveyed by deed-in-lieu of foreclosure, Tenant agrees that, notwithstanding anything to the contrary contained in the Lease, after such foreclosure sale or conveyance by deed-in-lieu of foreclosure, Lender has no personal liability to Tenant under the Lease and Tenant shall look solely to the Borrower for satisfaction of any of its remedies for collection of a judgment or other judicial process requiring payment of money by the landlord to Tenant in the nature of advance rents or security deposits.  Further, in the event Lender transfers its interest in this Lease to a third party, Lender shall be automatically freed and released, from and after the date of such transfer or conveyance, of all liability for the performance of any covenants and agreements which accrue after the date of such transfer of Lender's interest.

5.   <u>Modification; Notice and Cure Rights</u>.  The Lease shall not be amended, modified or supplemented, nor will the lease be terminated (except as set forth in the Lease after a default and after the notice and cure rights set forth below) or any party having liability under the Lease be released by the other, without the prior written consent of Lender.  Tenant shall not terminate or seek to terminate the Lease until Tenant has given written notice, by registered or certified mail, return receipt requested, of said act or omission to Lender, which notice shall be addressed to
_____; and until a period of time equal to the greater of: (a) the time

-- 22 --

000086

3-7

allowed Lessor under the Lease or (b) thirty days following such notice has elapsed, during which period Lender has the right, but not the obligation, to remedy such act, omission or other matter.  If possession by Lender of the Property is necessary to effect such remedy and would be commercially reasonable, then the period of time for remedying such act or omission shall include a reasonable period of time for Lender to gain possession of the Premises, whether by foreclosure or otherwise.

6.    Tenant Representations and Warranties.  Tenant hereby represents and warrants that (a) the Lease is solely and exclusively for the Premises and/or the Property identified in Exhibit "A" attached to this Agreement, (b) the Lease is not a "master lease" for any other premises and/or property leased by Tenant and/or Landlord, (c) any default under the Lease, and the exercise of Landlord's rights and remedies in connection with such default, shall only impact and/or effect Tenant's obligations with respect to the Premises and/or the Property, and (d) any default by Tenant under any other lease with Landlord or any other landlord, and the exercise of any such landlord's rights and remedies in connection with such default, shall not affect Tenant's obligations under the Lease.

7.    Miscellaneous.  This Agreement and each and every covenant, agreement and other provision hereof shall be binding upon and shall inure to the benefit of the parties hereto and their representatives, successors and assigns. This Agreement may not be modified orally or in any manner other than by an agreement in writing signed by the parties hereto or their respective successors in interest. The term "Lender" as used throughout this Agreement includes any successor or assign of Lender and any holder(s) of any interest in the indebtedness secured by the Deed of Trust.  This Agreement and the rights and duties of the parties hereunder shall be governed for all purposes by the law of the State of California and the law of the United States applicable to transactions within such state.  This Agreement may be executed in multiple counterparts, and by the different parties hereto in separate counterparts, each of which when so executed and delivered shall be deemed to be one and the same instrument with the same signature as if all parties to this Agreement had signed the same signature page.

IN WITNESS WHEREOF, the parties hereto have each caused this Agreement to be executed as of the date first above written.

**Owner:**

_____
BY:    _____
Title:    _____

**Tenant:**

_____
BY:    _____
Title:    _____

**Lender:**

_____
BY:    _____
Title:    _____

**(ALL SIGNATURES MUST BE ACKNOWLEDGED)**

-- 23 --

000087

# Exhibit 2

# AMENDMENT TO SETTLEMENT AGREEMENT AND GENERAL RELEASES

This Amendment (the "**Amendment**"),dated effective as of December 17, 2019, to the Settlement Agreement and General Releases dated as of December 17, 2019 (the "**Agreement**"), by and between Jason M. Rund, the duly appointed Chapter 11 Trustee (the "**Trustee**") for the bankruptcy estate (the "**Estate**") of Altadena Lincoln Crossing, LLC (the "**Debtor**"), on the one hand, and East West Bank ("**EWB**"), on the other hand.  The Trustee and EWB are referred to collectively as the "**Parties**" and each individually as a "**Party**."  Capitalized terms are as defined in the Agreement unless otherwise noted.

Whereas, the Agreement provides that the Settlement Payment shall be made by EWB within ninety (90) calendar days following the entry of an order approving the Agreement;

Whereas, the Parties agree and acknowledge that the timing of the Settlement Payment Deadline as currently stated in the Agreement is not a material term and the Parties are willing to advance this date, together with such other provisions that are based thereon, subject to the terms of this Amendment as provided below; and

Whereas, the above Recitals are incorporated and made part of this Amendment and the Agreement.

Now, therefore, the Parties hereby agree as follows:

1.      Paragraph 2 of the Agreement, entitled "Payment," shall be amended to provide that EWB shall pay the Trustee the Settlement Payment within three (3) business after the order granting the Trustee's "Motion to Approve Agreement With East West Bank For: (1) Settlement Of State Court Action; (2) Relief From Stay; and (3) Dismissal Of Ninth Circuit Appeal" [Doc. 1000] and the orders granting the Trustee's "Motion To Approve Stipulation Granting Secured Creditor East West Bank Relief From Stay Pursuant to 11 U.S.C. § 362(d)(2)" and granting EWB relief from stay [Doc. 1004] have become final and non-appealable (the "**Settlement Payment Deadline**").

2.      Paragraph 6 of the Agreement, entitled "Management of Property," shall be amended to provide that the Trustee shall continue to manage and operate the Property pursuant to the existing cash collateral stipulation (Doc. 992) until the earlier of EWB's foreclosure of the Property or ninety (90) after entry of the order approving this Agreement.

3.      Paragraph 7, entitled "Trustee's Release of EWB," and Paragraph 8, entitled "EWB's Release of the Trustee," shall be amended to provide that the releases set forth therein shall be effective upon the execution of the trustee's deed following the trustee's sale of the Property under the First TD.

1

000089

4.      Paragraph 9 of the Agreement, entitled "Release of Unknown Claims," shall be amended to provide that it pertains to Sections 7 and 8 of the Agreement

5.      **Except as expressly amended hereby, all other terms, provisions, recitals, covenants and conditions of the Agreement shall remain unchanged, fully effective and enforceable.**

IN WITNESS WHEREOF, the Parties hereto have caused this Amendment to the Agreement to be duly executed and delivered, the Amendment shall become part of the Agreement and shall become effective as of the date and year first listed above.


_____

Jason M. Rund, Chapter 11 Trustee of the
Bankruptcy Estate of Altadena Lincoln Crossing, LLC


EAST WEST BANK


By_____
    Its_____


2

000090

# Exhibit 3

**NOT FOR PUBLICATION**

UNITED STATES COURT OF APPEALS

FOR THE NINTH CIRCUIT

FILED

JAN 9 2020

MOLLY C. DWYER, CLERK
U.S. COURT OF APPEALS

| | |
|---|---|
| In re: EPICENTER PARTNERS, L.L.C.; GRAY MEYER FANNIN, L.L.C., | No. 18-60018 |
| Debtors, | BAP No. 17-1216 |
| ------------------------------- | MEMORANDUM[*] |
| EPICENTER PARTNERS, L.L.C.; GRAY MEYER FANNIN, L.L.C., | |
| Appellants, | |
| v. | |
| CPF VASEO ASSOCIATION, LLC, | |
| Appellee. | |

Appeal from the Ninth Circuit
Bankruptcy Appellate Panel
Kurtz, Lafferty III, and Brand, Bankruptcy Judges, Presiding

Argued and Submitted October 23, 2019
San Francisco, California

Before: WALLACE and BRESS, Circuit Judges, and ENGLAND,[**] District Judge.

---

[*]    This disposition is not appropriate for publication and is not precedent except as provided by Ninth Circuit Rule 36-3.

[**]    The Honorable Morrison C. England, Jr., United States District Judge for the Eastern District of California, sitting by designation.

Appellants-Debtors, Epicenter Partners LLC and Gray Meyer Fannin LLC (Debtors), entered into a litigation financing agreement with Ganymede Investments Limited (Ganymede), by which Ganymede agreed to fund certain litigation in return for the funds advanced and 40% of any recovery. Debtors obtained a favorable judgment in that litigation, which they then settled in exchange for an assignment of a leasehold interest of land. Debtors and Ganymede then revised their litigation funding agreement to resolve the entire outstanding obligation for a $50,713,000 liquidated sum, a debt reflected in a note (Ganymede Note) secured by a deed of trust on the leasehold. As relevant here, after Debtors filed for Chapter 11 bankruptcy, Appellee-Creditor, CPF Vaseo Associates, LLC (CPF), asserted secured claims based on the Ganymede note, which CPF had purchased from Ganymede.

The bankruptcy court upheld CPF's claims with post-petition interest at the contract rate. The Bankruptcy Appellate Panel affirmed. We have jurisdiction under 28 U.S.C. section 158(d). Applying Arizona law to construe the parties' contracts and both Arizona law and federal bankruptcy law to determine whether the post-petition contract interest rate is valid under section 506(b) of the Bankruptcy Code, we affirm the bankruptcy court.

The bankruptcy court did not err by holding that Debtors owed $50,713,000 in non-contingent debt. In the Ganymede Note, Debtors "promise[d] to pay . . . the

2

principal sum of FIFTY MILLION SEVEN HUNDRED THIRTEEN THOUSAND AND NO/100 DOLLARS ($50,713,000.00) plus interest calculated on a daily basis . . . from and after the Maturity Date." The bankruptcy court properly relied on the unambiguous language of the transaction documents to conclude that the "Liquidated Sum" referred to the principal amount due after the debt matured. *See Grosvenor Holdings, L.C. v. Figueroa*, 218 P.3d 1045, 1050 (Ariz. Ct. App. 2009) ("Where the intent of the parties is expressed in clear and unambiguous language, there is no need or room for construction or interpretation . . . .") (internal quotation marks and citation omitted).

The bankruptcy court did not err in holding that $50,713,000 was the true amount of the negotiated debt. The revised litigation funding agreement contained a discount payment scheme, but that was an incentive to reward Debtors for early payment rather than an unenforceable penalty. Debtors' failure to make an early payment did not increase the fixed amount owed. Because the discounted payment scheme did not depend on a breach of contract, there was no liquidated damages provision to evaluate. *See Dobson Bay Club II DD, LLC v. La Sonrisa de Siena, LLC*, 393 P.3d 449, 451 (Ariz. 2017) (defining a liquidated damages provision as one in which "[p]arties to a contract . . . agree in advance to the amount of damages for any breach") (citation omitted).

The Debtors have also not demonstrated that the bankruptcy court erred in awarding CPF interest at the 35% annual contract rate (interest that CPF has represented it will not be able to collect because under the substantially consummated bankruptcy plan, it purchased the collateral representing Debtors' assets). The Ganymede Note secured the debt by a first position lien and a security interest in Debtors' leasehold interest. CPF was an oversecured creditor entitled to pendency interest under section 506(b). *See United States v. Ron Pair Enter., Inc.*, 489 U.S. 235, 241 (1989).

Assuming the 35% annual interest was a default rate, we "apply a presumption of allowability for the contracted for default rate, provided that the rate is not unenforceable under applicable nonbankruptcy law." *Gen. Elec. Capital Corp. v. Future Media Prods., Inc.*, 547 F.3d 956, 961 (9th Cir. 2008) (internal quotation marks and citation omitted). Here, the bankruptcy court correctly presumed that the 35% contract rate was valid, and Debtors failed to rebut the presumption by showing that the interest rate was an unenforceable penalty under Arizona law. Because under the parties' agreement the Debtors had paid no interest for years before the maturity date, the bankruptcy court concluded that the interest rate reasonably forecasted the harm that Ganymede would suffer if the debt was not paid on time and compensated CPF if Debtors failed to pay the debt when the debt matured. *See Dobson Bay Club II DD, LLC*, 393 P.3d at 452–53.

4

The bankruptcy court also did not abuse its discretion in finding that Debtors failed to rebut the presumption based on equitable considerations. *See Future Media Prods., Inc.*, 547 F.3d at 961   In weighing the equities, we have rejected "the creation of a bright line rule" in favor of a consideration of the facts and circumstances of each case. *Id.* at 962.

The bankruptcy court identified factors unique to this case, including that Debtors enjoyed many years of zero interest prior to the maturity date, in finding that the default rate compensated CPF for the risk of nonpayment. The bankruptcy court articulated and considered the full scope of the bankruptcy proceedings. The bankruptcy court, which was familiar with the proceedings as a whole, also identified no associated harm to third parties, nor have the Debtors done so. Under all of these circumstances, the debtors have not provided any basis for overturning the bankruptcy court's determinations, and we thus conclude that Debtors failed to meet their burden of rebutting the presumption based on the totality of the circumstances. *Id.* at 961. Based on the record before it, the bankruptcy court did not abuse its discretion in declining to make an equitable adjustment of the contract rate. *See In re Anderson*, 833 F.2d 834, 836 (9th Cir. 1987) ("We review awards and denials of post-petition interest for abuse of discretion, as a matter of equity").

**AFFIRMED.**

000096

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding.  My business address is:
10250 Constellation Blvd., Suite 1700, Los Angeles, CA 90067

A true and correct copy of the foregoing document entitled (*specify*): **CHAPTER 11 TRUSTEE'S REPLY TO OPPOSITIONS TO MOTION TO APPROVE COMPROMISE UNDER FRBP 9019** will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner stated below:

**1. TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**:  Pursuant to controlling General Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document. On (*date*) **_January 22, 2020_**, I checked the CM/ECF docket for this bankruptcy case and determined that the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:

SEE ATTACHED NEF SERVICE LIST.

☒  Service information continued on attached page

**2. SERVED BY UNITED STATES MAIL**:
On (*date*) **_January 22, 2020_**, I served the following persons and/or entities at the last known addresses in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail, first class, postage prepaid, and addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge will be completed no later than 24 hours after the document is filed.

Hon. Sheri Bluebond
USBC – Central District of CA
255 E. Temple St
Suite 1534 / Ctrm 1539
Los Angeles, CA 90012

☐  Service information continued on attached page

**3. SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL** (state method for each person or entity served):  Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on (*date*) _____, I served the following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows.  Listing the judge here constitutes a declaration that personal delivery on, or overnight mail to, the judge will be completed no later than 24 hours after the document is filed.

☐  Service information continued on attached page

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

| January 22, 2020 | Megan Wertz | /s/ Megan Wertz |
|---|---|---|
| *Date* | *Printed Name* | *Signature* |

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

June 2012

**F 9013-3.1.PROOF.SERVICE**

**1.** <u>**TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**</u>:

- Daniel I Barness     daniel@barnesslaw.com
- Anastasia E Bessey     anastasia.bessey@kralikjacobs.com,
  lois.jacobs@kralikjacobs.com,rina.ross@kralikjacobs.com,aeblaw@gmail.com
- Mikel R Bistrow     mikel.bistrow@dinsmore.com, caron.burke@dinsmore.com
- J Scott Bovitz     bovitz@bovitz-spitzer.com
- Peter W Bowie     peter.bowie@dinsmore.com,
  caron.burke@dinsmore.com;cindy.renteria@dinsmore.com
- Christopher Celentino     chris.celentino@dinsmore.com,
  caron.burke@dinsmore.com;SDCMLFiles@DINSMORE.COM
- Oscar Estrada     oestrada@ttc.lacounty.gov
- Bernard R Given     bgiven@loeb.com,
  mortiz@loeb.com;ladocket@loeb.com;bgiven@ecf.courtdrive.com
- Mark S Horoupian     mhoroupian@sulmeyerlaw.com,
  dwalker@sulmeyerlaw.com;mhoroupian@ecf.inforuptcy.com
- Lois M Jacobs     lois.jacobs@kralikjacobs.com,
  anastasia.bessey@kralikjacobs.com,rina.ross@kralikjacobs.com
- Kenneth G Lau     kenneth.g.lau@usdoj.gov
- Lisa Lenherr     ll@tiemlaw.com, bankruptcy@wendel.com
- Carmela Pagay     ctp@lnbyb.com
- Brian A Procel     bprocel@millerbarondess.com,
  rdankwa@millerbarondess.com;docket@millerbarondess.com
- Uzzi O Raanan     uraanan@DanningGill.com, DanningGill@gmail.com;uraanan@ecf.inforuptcy.com
- Ronald N Richards     ron@ronaldrichards.com,
  morani@ronaldrichards.com,justin@ronaldrichards.com
- Jason M Rund (TR)     trustee@srlawyers.com, jrund@ecf.axosfs.com
- Gregory M Salvato     gsalvato@salvatolawoffices.com,
  calendar@salvatolawoffices.com;jboufadel@salvatolawoffices.com;gsalvato@ecf.inforuptcy.com
- John P Schock     schockandschock@yahoo.com
- John N Tedford     jtedford@DanningGill.com, danninggill@gmail.com;jtedford@ecf.inforuptcy.com
- James A Tiemstra     jat@tiemlaw.com, sml@tiemlaw.com
- United States Trustee (LA)     ustpregion16.la.ecf@usdoj.gov
- Timothy J Yoo     tjy@lnbyb.com

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*June 2012*                                                                                   **F 9013-3.1.PROOF.SERVICE**

# EXHIBIT "4"

# United States Bankruptcy Court
## Central District of California
### Los Angeles
### Judge Sheri Bluebond, Presiding
### Courtroom 1539 Calendar

**Wednesday, January 29, 2020**                                    **Hearing Room    1539**

---

10:00 AM
**2:17-14276    Altadena Lincoln Crossing LLC**                                    **Chapter 11**

> **#12.00**    Trustee's Motion to Approve Compromise Under Rule 9019 with East West
> Bank for:
>
> (1) Settlement of State Court Action
>
> (2) Relief From Stay
>
> (3) Dismissal of Ninth Circuit Appeal
>
> fr. 1-15-20
>
>                    Docket        1000

**Courtroom Deputy:**

   1/22/2020 - John N. Tedford, (310) 277-0077, has been approved for
   telephonic appearance on 1/29/20 @ 10

**Tentative Ruling:**

   12/27/19 -- Court granted ex parte application by debtor to continue hearing
   to January 29, 2020 at 10:00 a.m.  OFF CALENDAR FOR JANUARY 15,
   2020.

   Tentative Ruling for January 29, 2020:

   Court agrees with trustee that the Garikian Agreement has never "closed" or
   become effective because a plan was never confirmed.  Garikian retains
   whatever rights it would otherwise have had prior to entering into the
   settlement agreement.  If the existence of its liens and claims impairs the
   value of the property, that will not be the estate's issue after EWB has
   foreclosed.  That will be EWB's problem.  Approval of the proposed
   compromise would not give rise to a breach of the settlement agreement, and
   the compromise is not a disguised attempt to undo the court's prior order
   approving the Garikian settlement.

   With regard to the Bromley/OPICS objection, court will not resolve in this

**United States Bankruptcy Court**
**Central District of California**
**Los Angeles**
**Judge Sheri Bluebond, Presiding**
**Courtroom 1539 Calendar**

**Wednesday, January 29, 2020**                                    **Hearing Room    1539**

10:00 AM
**CONT...      Altadena Lincoln Crossing LLC**                                    **Chapter 11**

context whether anyone is in a position to assert a lien of any kind on any settlement proceeds obtained by the trustee as a result of this settlement.  If there really are genuine disputes about this, there are other procedural vehicles available for the resolution of such disputes.

Court is not prepared to reconvert the case to chapter 11 to permit the debtor to attempt to confirm yet another plan of reorganization.  Now that the case is in chapter 7, the Court will look to/consider/evaluate the trustee's business judgment utilizing the relevant four factors, not that of the former debtor in possession.  Trustee has outlined his reasons for believing that the proposed settlement is in the best interests of the estate as compared with litigating the lender liability action and the appeal, and the Court is prepared to defer to the trustee's business judgment on these issues.  Trustee has diligently analyzed the issues and formed a reasonable judgment based on available information, and the resulting settlement is, in the court's view, well within the range of reasonableness.  The fact that the debtor would prefer a different approach is not a sufficient reason for the court to deny approval of the proposed settlement.

With regard to the stipulated relief from stay, the Court is concerned about the provision of the stipulation that provides for the relief to be binding in any future bankruptcy case, no matter who the debtor may be, for an indefinite period.  This may well be beyond the authority of the court.  Court would grant relief from stay that would be binding in any case commenced by the debtor or any affiliate or insider of the debtor for an indefinite period, but with regard to any other persons or entities, order should only be binding for a period of two years after recordation of the order granting relief from stay. Subject to this modification, if the parties are still willing to proceed with the compromise, grant motion and approve compromise(s) between EWB and the trustee.

| **Party Information** |
|---|

**Debtor(s):**

Altadena Lincoln Crossing LLC                    Represented By
                                                 Lisa  Lenherr
                                                 Gregory M Salvato

# United States Bankruptcy Court
## Central District of California
### Los Angeles
### Judge Sheri Bluebond, Presiding
### Courtroom 1539 Calendar

**Wednesday, January 29, 2020**                                              **Hearing Room    1539**

<u>10:00 AM</u>
**CONT...    Altadena Lincoln Crossing LLC**                                              **Chapter 11**

   <u>**Movant(s):**</u>
   Jason M Rund (TR)                          Represented By
                                             Timothy J Yoo

   <u>**Trustee(s):**</u>

   Jason M Rund (TR)                          Represented By
                                             Timothy J Yoo

# EXHIBIT "4a"

1   TIMOTHY J. YOO (State Bar No. 155531)
    tjy@lnbyb.com
2   CARMELA T. PAGAY (State Bar No. 195603)
    ctp@lnbyb.com
3   LEVENE, NEALE, BENDER, YOO & BRILL L.L.P.
    10250 Constellation Boulevard, Suite 1700
4   Los Angeles, CA 90067
    Telephone: (310) 229-1234
5   Facsimile: (310) 229-1244

6   Attorneys for Jason Rund
    Chapter 11 Trustee
7

FILED & ENTERED

FEB 05 2020

CLERK U.S. BANKRUPTCY COURT
Central District of California
BY wesley    DEPUTY CLERK

8              **UNITED STATES BANKRUPTCY COURT**

9              **CENTRAL DISTRICT OF CALIFORNIA**

10             **LOS ANGELES DIVISION**

11

12   In re                                  Case No. 2:17-bk-14276-BB

13   ALTADENA LINCOLN CROSSING, LLC,        Chapter 11

14              Debtor.                      **ORDER GRANTING MOTION TO
                                            APPROVE AGREEMENT WITH
15                                          EAST WEST BANK FOR: (1)
                                            SETTLEMENT OF STATE COURT
16                                          ACTION; (2) RELIEF FROM STAY;
                                            AND (3) DISMISSAL OF NINTH
17                                          CIRCUIT APPEAL

18                                          Date:   January 29, 2020
                                            Time:   10:00 a.m.
19                                          Place:  Courtroom 1539
                                                    U.S. Bankruptcy Court
20                                                  255 E. Temple Street
                                                    Los Angeles, California 90012
21

22        The Motion to Approve Agreement with East West Bank for: (1) Settlement of State

23   Court Action; (2) Relief from Stay; and (3) Dismissal of Ninth Circuit Appeal ("Motion"), filed

24   by Jason Rund, the Chapter 11 trustee (the "Trustee") for the bankruptcy estate of Altadena

25   Lincoln Crossing, LLC ("Debtor"), came on for hearing on January 29, 2020, at 10:00 a.m., in the

26   above-entitled Court before the Honorable Sheri Bluebond, United States Bankruptcy Judge.

27   Timothy J. Yoo of Levene, Neale, Bender, Yoo & Brill L.L.P. appeared on behalf of the Trustee.

28   Other appearances are as noted on the Court's record.

The Court, having considered the Motion, the supporting declaration and exhibits, the oppositions filed by the Debtor and The George Garikian Living Trust, the response filed by Bromley LLC and OPICS Real Estate Investments & Brokerage LLC to the Motion, and the replies filed by the Trustee and East West Bank ("EWB"), having considered the arguments of counsel, and for the findings and reasons stated on the record, including as set forth in the Court's Tentative Ruling (as amended),

**IT IS HEREBY ORDERED** that:

1.    The Motion is **GRANTED**;

**2.**    The *Settlement Agreement and General Releases* dated December 17, 2019, as amended by that certain Amendment attached to the Trustee's reply as <u>Exhibit 2</u> ("Agreement"), is **APPROVED;**

3.    The Trustee and EWB are authorized and directed to take any and all steps necessary to effectuate the Agreement; and

4.    Notwithstanding anything to the contrary stated in Paragraph 7 of the Agreement (Trustee's Release of EWB), the release of EWB by the Trustee shall only release the claims that the Trustee has authority to release personally, in his capacity as the Trustee or on behalf of the bankruptcy estate.

**IT IS SO ORDERED.**

# # #

Date: February 5, 2020

Sheri Bluebond
United States Bankruptcy Judge

2

# EXHIBIT "5"

1  Daniel I. Barness
    SBN 104203, Daniel@BarnessLaw.com
2  **BARNESS & BARNESS**, LLP
    13636 Ventura Blvd.
3  Los Angeles, CA 91423
    Telephone:  (310) 594-3011
4  Facsimile:  (818) 906-2638

5  Attorneys for **The George Garikian Living Trust**, Applicant

6

7                **UNITED STATES BANKRUPTCY COURT**

                    **CENTRAL DISTRICT OF CALIFORNIA**
8
                        **LOS ANGELES DIVISION**
9

10                                                 Case No. 2:17-bk-14276 BB
                                              )
                                              )    Chapter 7
11   In re                                    )
                                              )    **APPLICATION BY THE GEORGE**
12   ALTADENA LINCOLN CROSSING, LLC,          )    **GARIKIAN LIVING TRUST FOR**
                                              )    **ALLOWANCE AND PAYMENT OF**
13                                            )    **ADMINISTRATIVE EXPENSES;**
                Debtor.                       )    **DECLARATIONS**
                                              )    **OF GEORGE GARIKIAN AND**
14                                            )    **DANIEL I BARNESS**
                                              )
15                                            )    **[REQUEST FOR JUDICIAL NOTICE**
                                              )    **filed concurrently]**
16                                            )
                                              )
17   _____        )
                                              )
18                                                 DATE:        July 15, 2020
                                                   TIME:        11:00 A.M.
19                                                 CRTRM:       1539
                                                                255 E. Temple Street
20                                                              Los Angeles, CA 90012

21

22

23

24

25

26

27

28

# <u>TABLE OF CONTENTS</u>

I.   INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   2

II.  STATEMENT OF FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   3

III. DISCUSSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   10

     A. Applicable Authorities Support Granting This Application . . . . . . . . . . .   10

     1.   Overview . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   11

     2.   The Cost of the Lot 5 Improvements Was an "Actual and Necessary
          Expense of  Preserving the Estate" . . . . . . . . . . . . . . . . . . . . . . . . . .   12

     3.   The Garikian Claims Arise from the Estate's  Postpetition Breaches of a
          Court-Approved Stipulation, Which As a Matter of Law Should Be
          Accorded Administrative Expense Priority, As Should Stipulated
          Attorneys' Fees . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   13

          (a)   The Garikian Settlement Agreement is an Executory Contract .   13

          (b)   The Estate Breached the Garikian Settlement Agreement . . . . .   14

          (c)   Damages Arising  from the Estates's  Breach of Garikian Are
                Readily Determinable  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   14

          (d)   As a matter of Law, Garikian is entitled to recover its Attorneys'
                Fees As An Administrative Expense  . . . . . . . . . . . . . . . . . . . .   16

     4.   Debtor's Breach of an Executory Post-petition Contract Gives Rise to a
          Claim for Damages as an Administrative Expense . . . . . . . . . . . . . . .   16

     5.   Attorneys' Fees  Arising from Debtor's Steps to Reject Indemnity
          Agreement -- Liquidated By Agreement -- Are Compensable
          to Garikian . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   17

     6.   As the Functional Equivalent of a Section 363 Sale, the Transfers to
          EWB Free and Clear of Liens,  Retrospective "Adequate Protection" of
          the Garikian Junior Lien is Appropriate . . . . . . . . . . . . . . . . . . . . . .   18

IV.  CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   20

DECLARATION OF GEORGE GARIKIAN . . . . . . . . . . . . . . . . . . . . . . . . . . . .   21

DECLARATION OF DANIEL I. BARNESS . . . . . . . . . . . . . . . . . . . . . . . . . . . .   27

# TABLE OF AUTHORITIES

## United States Supreme Court Cases

*Lingle v. Chevron U.S.A. Inc.*,544 U.S. 528, 125 S. Ct. 2074, 161 L. Ed. 2d 876 (2005) . . . . . . 18

*NLRB v. Bildisco & Bildisco* (1984) 79 L. Ed. 2d 482, 104 S. Ct. 1188, 465 U.S. 513, 531, 543 . 13

*Penn Central Transp. Co. v. New York City*, 438 U.S. 104, 98 S. Ct. 2646, 57
L. Ed. 2d 63 (1978)) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

## Federal Appellate Cases

*Gallardo v. Lynch*, 12-72326 (9th Cir. 2016) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*Irmas Family Trust v. Madden (In re Madden)* 185 B.R. 815 (9th Cir. BAP 1995). . . . . . . . . . 17

*Precision Industries, Inc., and Circo Leasing Co., LLC v. Qualitech Steel Sbq, LLC, ( in Re: Qualitech Steel Corp.)* 327 F.3d 537, 548 (7th Cir. 2003). . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*Pinnacle Rest. at Big Sky, LLC v. CH SP Acquisitions, LLC (In re of Spanish Peaks Holdings II, LLC) - 862* F.3d 1148 (9th Cir. 2017) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19-20

*Teamsters Indus. Sec. Fund v. World Sales, Inc. (In re World Sales, Inc.)*, 183 B.R. 872, 878 (9th Cir. BAP 1995). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15-17

*United States Department of Interior v. Elliott*, 761 F.2d 168 (4th Cir.1985). . . . . . . . . . . . . 12

## District/ Bankruptcy Court Cases

*Eastern Retailers Serv. Corp. v. Argonaut Ins. Co. (In re Ames Dep't Stores, Inc.)*, 1995 WL 311764, 1995 U.S. Dist. LEXIS 6704 (S.D.N.Y.1995**)** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

## Statutes

## United States Code, Title 11

503(b)(1)(A) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 10, 11, *passim*

363(e) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

363(f) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

365 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

365(d)(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

365(f). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

## Federal Rules of  Bankruptcy Procedure

Rule 9019 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

**Treatises**

Countryman, <u>Executory Contracts in Bankruptcy</u>, Part I, 57 Minn. L.Rev. 439, 460
(1973) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

By this Application, the George Garikian Living Trust (hereinafter called "Applicant"; the "Garikian

Trust" or "Garikian") seeks the allowance and payment of $110,000 as and for the below–described

administrative expenses arising under 11 U.S.C. § 503(b)(1)(A).

## I.    **INTRODUCTION**

Following litigation by Garikian with the former debtor-in-possession (the "Former DIP")

Garikian entered into an executory contract with the latter, by way of a Court–approved Settlement

Agreement which, among other things, provided for the reduction of the Garikian secured claim

from $5 million to $60,000 (liquidating the amount of Garikian's attorneys' fees), and designated

$50,000 for the below–defined Lot 5 Improvements, which would have been made during the course

of the Chapter 11 proceedings, but for the conversion of the case and the below-described Settlement

Agreement between the Trustee and East West Bank ("EWB"), the major secured creditor herein.

The Garikian Settlement Agreement, Applicant's executory contract with this bankruptcy

estate (the "Estate") was breached when, following the appointment of a Chapter 11 trustee and

thereafter conversion of the case to one under Chapter 7, that Settlement Agreement was effectively

rendered unperformable by the Estate:  Through its settlement with East West Bank ("EWB"), the

Estate divested itself not only of the real property on which the Lot 5 Improvements were to be

made, but also the collateral which was to secured Garikian's claim for $60,000 (reduced from not

less than $5 million).   Pursuant to that settlement between the Trustee and EWB (The "Trustee-

EWB Settlement Agreement"), in exchange for a payment of $1 million by EWB, the Estate's real

property, which had served as collateral for the Garikian secured claim, was transferred to EWB by

way of a stipulation for relief from stay.  This ultimately resulted in EWB acquiring the property at

its foreclosure sale, and by way of the same settlement, dismissal of the Ninth Circuit Appeal (the

"Ninth Circuit Appeal") extinguishing the Estate's claims and causes of action which were the

**APPLICATION BY THE GARIKIAN LIVING TRUST FOR ALLOWANCE AND
PAYMENT OF ADMINISTRATIVE EXPENSES; DECLARATIONS OF GEORGE
GARIKIAN AND DANIEL I BARNESS**

2

subject of that appeal.

As a consequence of the Trustee's settlement, the Estate's obligations under the Garikian Settlement Agreement were not performed (or any longer performable). That breach and/or rejection gives rise to a claim in favor of Applicant as follows: (1) $50,000 for the Estate's failure to perform the below–defined Lot 5 Improvements; and (2) $60,000 as the agreed-upon, contractually-based attorneys' fees and covered by the Court's approval of the Garikian Settlement Agreement.

Accordingly, the Garikian Trust respectfully requests that the Court grant this Application, and allow and order payment of not less than $110,000 as and for the Garikian administrative expense claim.

## II.    STATEMENT OF FACTS

The following facts are established by the record of these proceedings; the concurrently-filed Request for Judicial Notice ("RJN"); and by the annexed declarations of George Garikian ("Garikian Declaration") and Daniel I. Barness ("Barness Declaration"):

1.    This case was commenced on April 7, 2017 (the "Petition Date") (Doc 1). From the Petition Date until October 3, 2019, when a Chapter 11 trustee was appointed (Doc 968), Debtor had been acting as debtor in possession herein. After close to two years of litigation concerning eight iterations of a plan of reorganization by the DIP (Doc 943), and after appeals by EWB regarding its default interest assessed against Debtor -- culminating in the Estate's Ninth Circuit appeal -- on October 7, 2019, the Court entered an order appointing a Chapter 11 trustee, followed by the acceptance of such appointment by Jason Rund (the "Chapter 11 Trustee") [(Doc 965); Barness Declaration, ¶ 1].

2.    Initially (prior to the Petition Date), Debtor's predecessor-entity Altadena Lincoln Crossing,

---

**APPLICATION BY THE GARIKIAN LIVING TRUST FOR ALLOWANCE AND PAYMENT OF ADMINISTRATIVE EXPENSES; DECLARATIONS OF GEORGE GARIKIAN AND DANIEL I BARNESS**                                                      3

LLC ("ALC")[1] owned an integrated singular shopping center (the "ALC Center") consisting of two quadrants -- the Fitness Quadrant, which had as its anchor tenant a 24-Hour Fitness facility (the "Fitness Quadrant"); and (across the street) the Market Quadrant, which had as its anchor tenant Super King Market [2](the "Market Quadrant").   A covenant in favor of  Los Angeles County entitled "Covenant and Agreement to Hold Property as One Parcel " (the "County Covenant") that was  recorded on December 7, 2005[3] required that the ALC Center not be legally divided, *i.e.*,  that the Fitness Quadrant and the Market Quadrant be maintained as a singular ALC Center, versus two legally divided parcels with two separate centers. [Barness Declaration, ¶ 2, RJN, Exhibit "B"]

3.     In order to effect a sale to Garikian of  the Market Quadrant that would conform to Los Angeles County requirements and lead to the release of the County's subdivision restriction, the parties (ALC and Garikian), as part of the documentation of their purchase and sale agreement dated January 15, 2015[4] (the "Purchase and Sale Agreement" or "PSA") also entered into the Leases and the Indemnity Agreement, which were incorporated into and made part of the Purchase and Sale Agreement and documentation. [(Doc 412); RJN, Exhibit "A"] Among other things, these agreements were intended to achieve formal compliance with County requirements regarding the Off-Site Parking Arrangements – a condition for the release of the County Covenant which otherwise would have prevented  the division of the

---

[1]     As used herein, "ALC" will mean  the pre-petition Debtor (aka the Former DIP).

[2]     As used hereinafter, "SK Market" will refer to B&V Enterprises, Inc. dba SK Market.

[3]     See RJN, Exhibit "B" and the previous Garikian Declaration [(Doc 412, ¶¶ 1-7; RJN, Exhibit "A".]

[4]     [(Doc 412), ¶¶ 1-7; RJN, Exhibit "A"]

formerly integrated (undivided) ALC Center [Barness Declaration, ¶ 3].  A Memorandum of

Lease covering the 14-Space Parking Lease [RJN, Exhibit "C"] and a Memorandum of Lease

covering the 16-Space Parking Lease [RJN, Exhibit "D"] were recorded on January15, 2015

in Los Angeles County.  The Indemnity [RJN, Exhibit "E"] The Deed of Trust  [RJN, Exhibit

"F"] was executed in order to secure the Debtor's obligations under the Indemnity

Agreement, and was also recorded on January 15, 2015 in Los Angeles County.   The

template for these arrangements is set forth in correspondence between the County and

George Garikian, which is part of the record of these proceedings   [RJN, Exhibit "A" ( bates

#'s 12-14)].

4.     The Purchase and Sale Agreement[5] contains the following provision, among others, regarding

attorneys fees:

> "Seller [ALC] shall prior to the issuance of the parking permit described in paragraph
> below date make such improvements to lot 5 so that it can be used for the purposes
> described in the applicable Parking Lease in compliance with applicable law**.  Seller
> shall indemnify**, defend and hold harmless **Buyer** [Garikian] (and its related successors
> and assigns) from and against any and all claims, losses, costs and expenses (**including**
> but not limited to  **attorneys' fees and costs**) which arise out of or relate to  . . .  (c) **the
> failure to complete the improvements described in the preceding sentence [i.e., the
> "Lot 5 Improvements"]** promptly following the close of escrow for the sale of the
> Property.  **Such indemnity** shall, at Buyer's request, **be further set forth in an
> instrument that is secured by a deed of trust on Seller's** remaining **properties**
> comprising the shopping center and adjacent properties of which the Property is a part . . .
> " [Emphasis added.]

5.     As a result of these transactions, ALC (the Estate's predecessor) retained the Fitness

Quadrant and conveyed the Market Quadrant to Garikian.  The sale transaction, without

more, however, would have been impermissible, because it would have left Garikian's

---

[5]     A true and correct copy of the Fifth Amendment to the PSA  (highlighted for ease of
reference) is attached to the Garikian Declaration as Exhibit "A" and incorporated
herein by this reference.

---

**APPLICATION  BY THE GARIKIAN  LIVING TRUST FOR ALLOWANCE AND
PAYMENT OF ADMINISTRATIVE EXPENSES; DECLARATIONS OF GEORGE
GARIKIAN AND DANIEL I BARNESS**                                                                 5

Market Quadrant without sufficient parking according to County requirements and would

have been in abrogation of the parties' agreements with the County upon which withdrawal of

the County Covenant was conditioned [Barness Declaration, ¶ 3].   So, following  guidelines

approved by the County, the parties entered into a number of ancillary agreements, including:

(1) an Indemnity Agreement [ RJN, Exhibit "E" ]: (2) the 14-Space Parking Lease [RJN,

Exhibit "F" ]; and (3) the 16-Space Parking Lease [RJN, Exhibit "D" ][6].

6.     These agreements implemented the County-approved arrangements allocating on ALC's

Fitness Quadrant 30 parking spaces, to be granted to the (Garikian's) Market Quadrant to

adjust for the loss of parking resulting from dividing the integrated Center into two

separately-owned parts. The obligations under the Indemnity Agreement were secured by a

deed of trust to the Fitness Quadrant in favor of Garikian [RJN, Exhibit "F"][7].   The Off-Site

---

[6]     Doc 91, pp.34-36 (RJN, Exhibit "E") will hereinafter be called the "Indemnity
Agreement" and the 14-Space Lease and the 16-Space Lease will hereinafter be
called collectively the "Parking Leases".

[7]     The Indemnity Agreement provides indemnification by ALC against the risks of "(i)
any assertion by [SK Market] that section 18.5 of the [SK Market Lease] (or any
other provision of the [SK Market Lease] related to parking, in effect on the date of
this Indemnity Agreement) has been violated due to the failure to provide exclusivity
rights of SK in thirty (30) parking spaces in the [Parking Structure], (ii) any assertion
that the property violates applicable laws, codes or ordinances, in effect as of the
date of this Indemnity Agreement, regarding the provision of parking
spaces based on Tenant Leases in effect on the date of this Indemnitee
(sic) Agreement (so long as Tenant maintains the 162 onsite parking
spaces at the Market Quadrant), (iii) any and all damages and claims that
arise in the event that [Garikian], after pursuing diligently and in good
faith, is unable to procure from Los Angeles County a parking permit for
the Property pursuant to file no. RPKP 201300005 (R2013 -- 01662) (the
"Parking Permit"), and/or (iv) [Debtor's] breach of or default with regard
to any of its covenants under that certain Fifth Amendment to Standard
Offer, Agreement and Escrow Instructions for Purchase of Real Estate,
dated as of November 18, 2014 [copy attached, but omitted here]. This
Agreement shall survive the closing under the PSA [Purchase and Sale Agreement]
and the recording of the conveyance deed for the Property to [Garikian]." [RJN,
Exhibit "E"]

---

**APPLICATION  BY THE GARIKIAN  LIVING TRUST FOR ALLOWANCE AND
PAYMENT OF ADMINISTRATIVE EXPENSES; DECLARATIONS OF GEORGE
GARIKIAN AND DANIEL I BARNESS**                                              6

Parking Arrangements agreed by the parties (the "Off-Site Parking Arrangements") also included certain specified improvements to ALC's Lot 5 (a vacant lot) to accommodate 14 parking spaces. These improvements (the "Lot 5 Improvements") included the following: (a) grading of the unimproved Lot 5 (an undeveloped portion of the Debtor's real property) and permit approvals, (b) paving and striping of Lot 5 in accordance with County requirements; and (c) relocation of the sprinkler fixtures, so that no fewer than 14 vehicles can be parked on Lot 5. (RJN, Exhibit "A" at pp. 7-8). Without the Lot 5 Improvements, there would be an undue parking burden on the Fitness Quadrant, which otherwise would have an inadequate number of parking spaces to accommodate employees and visitors. *Id.*

7. As of commencement of Debtor's Chapter 11 case, it had **not** made the Lot 5 Improvements, necessitating the filing of a Proof of Claim based on the Indemnity Agreement. A true and correct copy of the Indemnity Proof of Claim filed on behalf of Garikian is attached to the RJN as Exhibit "G", in addition to a separately-filed proof of claim with respect to the Leases [Garikian Declaration, ¶ 3; Claim # 12].

8. Following the Petition Date, a significant dispute arose between Garikian and the Estate when the Former DIP proposed its First Amended (Doc 160) and Second Amended (Doc 293) Plans. The First Amended Plan was silent as to assumption/rejection of the Garikian Agreements; and the Second Amended Plan would have effected a rejection of the Parking Leases and the Indemnity Agreement. In response to this state of affairs, Garikian filed a motion seeking an order compelling assumption or rejection of the parking leases [Doc 145; Barness Declaration, ¶ 4]. Garikian's rejection motion was withdrawn when the parties subsequently reached a settlement, which is described below. [Barness Declaration, ¶ 4].

**APPLICATION BY THE GARIKIAN LIVING TRUST FOR ALLOWANCE AND PAYMENT OF ADMINISTRATIVE EXPENSES; DECLARATIONS OF GEORGE GARIKIAN AND DANIEL I BARNESS**

7

9.    On or about January 20, 2018, Garikian and the Former DIP reached a settlement agreement
(the "Garikian Settlement Agreement"), which was viewed as a better alternative to the
extensive and costly litigation which would have arisen from the Estate's targeted rejections.
Among other things, the settlement included the Former DIP's performance of the Lot 5
Improvements, which had previously been stalled since the 2015 purchase and sale
transaction.  [Barness Declaration, ¶ 5]

10.    Among other arrangements embodied by the Garikian Settlement, the was to assume the two
Parking Leases, and Garikian was to withdraw its Indemnity Proof of Claim for $5 million
(Doc 361-9, RJN, Exhibit "H") [Barness Declaration, ¶ 6].

11.    On January 25, 2019, after more than a year of litigation and negotiations, the Former DIP
filed a Motion (Doc 125, RJN, Exhibit "J" ) (the "Garikian Settlement Approval Motion"),
seeking Court-approval and authority to enter into the Garikian Settlement. Among other
things, the Garikian Settlement Motion specifically requested authorization for the Debtor to
expend $50,000 for the Lot 5 Improvements [Barness Declaration, ¶ 7].  On June 24, 2018,
the Court issued its order granting the Garikian Settlement Motion.  That Order states: "The
Debtor's use of EWB's cash collateral is APPROVED in the amount actually expended for
the parking lot construction but not to exceed $50,000.00"  [Doc 561, RJN, Exhibit "I", *Id.*]

The $50,000 figure was based upon the Debtor's estimate of the cost of completion of the Lot
5 Improvements. However, after Debtor retained construction consultants, it was determined
that that figure might, in fact be a low estimate,  because of drainage issues that would need
to be addressed in completing those improvements [Barness Declaration, ¶ 8].  Indeed, EWB
stated in its objection to the use of $50,000 in cash collateral for the Lot 5 Improvements that
indeed Debtor's estimate could be low, stating: ". . *There is no assurance that the actual costs
would fit within this budget or any showing how any cost overruns would be addressed if*

1    *Debtor's estimate proves to be incorrect*. [See excerpt from the EWB Objection to the

2    Garikian Settlement, RJN, Exhibit "K".]

12.    Finally, following the Court's  OSC (Doc 929), the Court ordered the appointment of a

Chapter 11 trustee. On or about October 23, 2019, Jason Rund (the "Trustee") accepted

appointment as Chapter 11 Trustee, and at present is so serving.  [(Doc  965); Barness

Declaration, ¶ 1]

13.    The Settlement Agreement resulted from extensive negotiations between Debtor and the

Garikian Trust.  The considerable time, effort and expense spent to resolve the parking issues

which stem from Garikian's 2015 acquisition of the Market Quadrant from ALC ultimately

led to the Garikian Settlement Agreement.  The aim of the Settlement Agreement was to

avoid long, drawn-out, expensive litigation; to meet the County requirements (regarding the

Off-site Parking Arrangements); to provide a means by which Debtor might increase the

value of its property, and to mitigate a significant multimillion-dollar risk looming over

Garikian's Market Quadrant without the Lot 5 Improvements. At the time of the Trustee's

appointment, Garikian and the Former DIP  were well on  their way to consummating the

terms of the Garikian Settlement, and accomplishing the Lot 5 Improvements, but all such

efforts were halted by that appointment [Barness Declaration, ¶ 9].

14.    By Order entered February 5, 2020 entitled "*Order Granting Motion to Approve Agreement

with East West Bank For: (1) Settlement of State Court Action; (2) Relief from Stay; and (3)

Dismissal of Ninth Circuit Appeal*" [Doc 1035; RJN Exhibit "L"], the Court granted a Motion

(the "Trustee's EWB Settlement Motion") for approval of settlement between EWB and the

Chapter 11 Trustee (the "EWB-Trustee Settlement"), which provided, among other things,

that EWB was to pay the Estate the sum of $1,500,000 in exchange for  (1) dismissal of the

Estate's state court  action against EWB; (2) dismissal of the Ninth Circuit appeal; and (3)

relief from stay so that EWB could foreclose on the Fitness Quadrant[8]. [See "Trustee's EWB Settlement Motion", Doc 1000, p.2:16-19.]

15.    On March 15, 2020, the Court entered its order [Doc 1051] entitled "*Order Granting Chapter 11 Trustee's Motion for Order:(1) Converting Case to Chapter 7; (2) Authorizing Continued Employment of Certain Professionals Employed During Chapter 11 Case; (3) Establishing a Bar Date for Filing Administrative Expense Claims Arising During Debtor's Chapter 11 Bankruptcy Case; and (4) Authorizing Trustee to Operate Business of Debtor Pursuant to 11 U.S.C. § 721*" (the "Conversion Order").

16.    Pursuant to the EWB-Trustee Settlement, EWB effected a foreclosure against the Fitness Quadrant, resulting in a divestiture of the Estate's title to that Property. [See Barness Declaration, ¶ 11 and RJN, Exhibit "P".]

## III.    **DISCUSSION**

### A.    **Applicable Authorities Support Granting This Application**

Section 503(b)(1)(A) provides:

(b) After notice and a hearing, there shall be allowed, administrative expenses,  other than claims allowed under section 502(f) of this title.[9]

including--

(1) (A) the actual, necessary costs and expenses of preserving the estate.

---

[8]    The "Property" which is the subject of the  EWB-Trustee Settlement Agreement is described as the "commercial and residential real property located at the corner of Lincoln Avenue and  Woodbury Road in Altadena, California (Doc 1000, p.3:11-14), which corresponds exactly  to the "Fitness Quadrant" described hereinabove. In other words, that settlement agreement provided for relief from stay for EWB to foreclose upon the Fitness Quadrant [Barness  Declaration, ¶ 11].

[9]    Section 502(f), covering "gap" expenses incurred by the estate during the period from the filing of a petition to the entry of an order for relief in <u>involuntary</u> proceedings, is inapplicable in this case.

---

**APPLICATION  BY THE GARIKIAN  LIVING TRUST FOR ALLOWANCE AND PAYMENT OF ADMINISTRATIVE EXPENSES; DECLARATIONS OF GEORGE GARIKIAN AND DANIEL I BARNESS**

10

### 1. **Overview**

The bases for the treatment of the above-described Garikian claims as administrative expenses under Section 503(b)(1)(A) [10] are: (1) This Estate[11] breached the Court-approved Garikian Settlement Agreement; (2) The $50,000 claim amount is an amount the Former DIP determined to be the value of the Lot 5 Improvements; (3) The $60,000 attorney fee amount arises from a contractual fee provision, which was assumed by the Estate, with the $60,000 amount determined consensually (and approved by the Court)  as the liquidated amount for Garikian's attorneys fees; and (4) The transactions by which the Estate was divested of its real property and its ability to have the EWB claim amount judicially reduced in order to yield equity for the Estate and collateral coverage for the Garikian $60,000 secured claim, were accomplished through what was effectively a sale free and clear of liens, as to which the Garikian secured claim of $60,000 should be accorded "adequate protection" under the Court's broad equitable powers.[12]  Both the $50,000 in damages and the $60,000 in attorneys fees were specifically approved by the Court, and therefore, should be accorded administrative expense priority pursuant to Section 503((b)(1)(A).

---

[10]    Unless otherwise specified, statutory references are to the United States Bankruptcy Code, U.S.C.A. Title 11.

[11]    As used herein, "Estate" shall have the same meaning as in Subchapter III, section 541 et seq. of the Bankruptcy Code, and will refer to the  estate of the above–captioned entity  "Altadena Lincoln Crossing, LLC"  in its Chapter 11 and Chapter 7 proceedings.

[12]     Under section 105(a): "*The court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title*."

APPLICATION  BY THE GARIKIAN  LIVING TRUST FOR ALLOWANCE AND
PAYMENT OF ADMINISTRATIVE EXPENSES; DECLARATIONS OF GEORGE
GARIKIAN AND DANIEL I BARNESS

11

**2.  The Cost of the Lot 5 Improvements Was an "Actual and Necessary Expense of Preserving the Estate".**

Applicant seeks recovery of $50,000 (the minimum value of the Lot 5 Improvements) as an actual and necessary expense of preserving the Estate.  Debtor recognized the necessity of making those improvements to comply with Los Angeles County requirements, making a specific provision in its Plan for coverage of the Lot 5 Improvement $50,000 expense.  [See, *e.g.,* excerpt from Former DIP's Seventh Amended Plan (Doc 902 at p.22, RJN Exhibit "L" .]  Furthermore, by its order entered on June 24, 2018 [Doc 561; RJN, Exhibit "I"], the Court in effect determined the benchmark (albeit "not to exceed") value of the Lot 5 Improvements to be $50,000.

To put it somewhat differently, if during the pendency of its Chapter 11 case, the Former DIP had incurred $50,000 to comply with a  County-mandated requirement -- *i.e.,* performance of the Lot 5 Improvements -- there would be no question about the character of such an expenditure as an "actual and necessary expense of preserving the estate." [See, *e.g., United States Department of Interior v. Elliott*, 761 F.2d 168 (4th Cir.1985) (court  found that civil environmental penalties assessed postpetition were administrative expenses.) .   The  Lot 5 Improvements were also "necessary", in that if completed, a substantial cloud on title to the Fitness Quadrant that could have impeded its sale or re-finance was removed [Garikian Declaration, ¶ 4).

Because of the  transfer of title to the Fitness Quadrant to EWB pursuant to the Trustee-EWB Settlement, the Debtor, divested of its title and possession, is no longer in a position to order, complete, and cover the cost of that required work, which nevertheless must be completed in accordance with County Requirements. [Garikian  Declaration].

In addition to clearing the Estate's  Fitness-Quadrant title problem, completion of the Lot 5 Improvements would also have benefitted the Estate, because, had it not forfeited the Fitness Quadrant to EWB, that property would have been available to the Estate for sale, finance or reorganization [Barness Declaration, ¶¶ 3-5] .

3. **The Garikian Claims Arise from the Estate's  Postpetition Breaches of a Court –**
**Approved Stipulation, Which As a Matter of Law Should Be Accorded Administrative**
**Expense Priority, As Should Stipulated Attorneys' Fees.**

**(a)** **The Garikian Settlement Agreement is an Executory Contract.**

First, the Garikian Settlement Agreement, which was entered into after the Petition Date, and the implementation of which was specifically authorized by Court order [RJN, Exhibit "I"],  is unquestionably an "executory contract", exactly fitting the Vern Countryman definition  adopted by the Supreme Court in *NLRB v. Bildisco & Bildisco* (1984) 79 L. Ed. 2d 482, 104 S. Ct. 1188, 465 U.S. 513, 531, 543,  a contract "on which performance remains due to some extent on both sides." . 465 U.S. at 531, note 6.    [See, also *Eastern Retailers Serv. Corp. v. Argonaut Ins. Co. (In re Ames Dep't Stores, Inc.)*, 1995 WL 311764, 1995 U.S. Dist. LEXIS 6704 (S.D.N.Y.1995), defining an executory contract in bankruptcy as "a contract under which the obligation of both the bankrupt and the other party to the contract are so far unperformed that the failure of either to complete performance would constitute a material breach excusing the performance of the other." *Id.* at 1995 WL 311764, *2, 1995 U.S. Dist. LEXIS 6704, *6, citing Vern Countryman, Executory Contracts in Bankruptcy, Part I, 57 Minn. L.Rev. 439, 460 (1973).]

Here, under the Garikian Settlement Agreement, Garikian was to procure certain Los Angeles County entitlements; to amend its Indemnity Proof of Claim; and to withdraw its Lease – related proofs of claim. [Barness Declaration, RJN, Exhibit "H, Bates # 78-81"].  While Garikian did indeed procure County approval for the Lot 5 Improvements, [Garikian Declaration, ¶ 5], the progress and completion of which was reported to the Court at various hearings and in Garikian's filings [Barness Declaration, ¶ 8], by the time of the EW Foreclosure, the Estate's obligation to perform the Lot 5 Improvements had not been performed, and remained unperformed at the time of the foreclosure [Garikian Declaration, ¶ 6].

**(b)**     <u>The Estate Breached the Garikian Settlement Agreement.</u>

Although Garikian was ready, willing and able to  fulfill its requirements following completion of the Lot 5 Improvements, (consisting of Court-filings by Garikian), the Estate breached by failing to perform the Lot 5 Improvements [Garikian Declaration, ¶ 6; Barness Declaration, ¶ 9].

By  entering into and implementing the Trustee-EWB Settlement (over Garikian's objection)[13], the Estate committed a further breach of the postpetition Garikian Settlement Agreement. [This point was made in Garikian's Opposition to the motion for approval of the Trustee-EWB Settlement Agreement:  "*The Garikian Settlement Agreement binds the Estate, and its representatives, including the Trustee. As such, the Trustee should not be permitted to effect its breach, which he has initiated by filing the Motion. The Estate's obligation to perform the Lot 5 Improvements is a central component of that settlement agreement*".  [Doc 1022, p.10:3-6; Barness Declaration].

**(c)**     <u>Damages Arising  from the Estates's  Breach of Garikian Are Readily Determinable.</u>

As demonstrated above, the value of the Lot 5 Improvements, *i.e.,* the cost of those improvements, was stated by the Debtor on numerous occasions to be not less than $50,000. Indeed, EWB contended that the actual cost of the improvements could exceed $50,000.  It therefore stands to reason that the value of Garikian's administrative expense claim arising from Debtor's failure to perform its Lot 5 Improvement obligation(s) should be in that same amount, which is a fair, if not extremely conservative,  measure of the damages arising from Debtor's postpetition breach [Garikian Declaration, ¶ 9].

As shown in the Garikian Declaration, it is foreseeable that any third–party owner of the Fitness Quadrant (other than EWB) will not undertake the Lot 5 Improvements without some form of consideration, *e.g*., payment by Garikian of the construction costs. Though $50,000 is the construction-cost figure estimated by the principals of the Former DIP, the actual costs could easily

---

[13]     [Doc 1022]

**APPLICATION  BY THE GARIKIAN  LIVING TRUST FOR ALLOWANCE AND PAYMENT OF ADMINISTRATIVE EXPENSES; DECLARATIONS OF GEORGE GARIKIAN AND DANIEL I BARNESS**

14

exceed that amount, possibly by a significant amount, as indeed did happen [Garikian Declaration, ¶

7].[14]  Furthermore, at least presently, there is no indication that EWB would cover such costs.

[Garikian Declaration, ¶ 8].   Consequently, the key relationship with SK Market is now in potential

jeopardy a result of implementation of the Trustee-EWB Settlement[15].  Finally, because this state of

uncertainty could well require that Garikian now be compelled to seek further professional advice

and assistance which could also prove to be quite costly [Garikian Declaration, ¶ 9], there is now an

"anxiety factor" which wasn't there before the consummation of the Trustee-EWB Settlement.  While

this stress might not be strictly compensable, the Court is asked to note and take that factor into

consideration as well.

    As  a measure of the damages Garikian has and will have suffered as a result of the Estate's

breach, $50,000 could well  be at the low-end:  The financial risk Garikian now faces as a

consequence of the Trustee's breach, given the complex legal issues that have arisen, could easily

dwarf $50,000 [Garikian Declaration, ¶ 9].   In its (overruled) Opposition to the Trustee-EWB

Settlement, Garikian showed how a  breach of the Garikian Settlement could result in a damage

claim of  "not less than $5 million" [RJN, Exhibit "O"].   In connection with Garikian's Indemnity

Proof of Claim [RJN, Exhibit "G", it was determined that the damages arising from the Estate's

reneging on its agreement to make the Lot 5 Improvements were fairly stated therein as "unknown,

but not less than $5 million" after consideration of the economic consequences of a claim by SK

Market of any inadequacy in the parking arrangements to which it had contracted. The economic

---

[14]    Indeed, according to counsel's understanding, that $50,000 estimate did not include
the cost of resolving a drainage issue caused by the required relocation of a large
pipe fixture on the property necessary to accommodate parking for 14 vehicles. This
was also reported to the Court in various hearings [Barness Declaration, ¶ 8]. That
this "drainage" issue was not addressed within the $50,000 budget can be seen in Mr.
Galletly's 9/12/19 Declaration [See, *e.g.,* excerpt at Doc 944-1, p.25; RJN, Exhibit
"N"].

[15]    What would happen if, for example, the new owner, considering itself not to be
bound by any prior agreements regarding  the Lot 5 Improvement, refuses to
implement those Improvements, or seeks to expand its own parking - space
availability without the Lot 5 Improvements, ultimately reducing the number of
spaces available to SK Market?

---

**APPLICATION  BY THE GARIKIAN  LIVING TRUST FOR ALLOWANCE AND
PAYMENT OF ADMINISTRATIVE EXPENSES; DECLARATIONS OF GEORGE
GARIKIAN AND DANIEL I BARNESS**

value of the SK Lease based on the number of months reserved under that lease was over

$5,000,000, so "not less than $5 million" was a good estimate [Garikian

Declaration, ¶ 10].  More specifics of the derivation of that figure can be found in RJN, Exhibit "A',

bates # 11-12]:

> "I *[Mr. Garikian] derived the "not less than $5 million" stated in the Trust's proofs of claim as follows: The current annual revenue which the Trust derives from the SK  Lease is $897,187.32. By the SK Lease's end-date of July 1, 2023 (in almost six years ), the Trust would have received a total income of approximately $5,158,827.   In the event the Trust were to default under the SK Lease because of its inability to provide SK with adequate, code-required parking, the Trust would stand to lose this guaranteed revenue stream.  Also, pursuant to the SK Lease, the Trust would be required to pay for relocation costs and other costs incurred by SK's having to move out of the Market Quadrant.  That could easily fall in the range of $2,000,000 to $4,000,000. Since code-required parking allocation is based on square footage and use, the marketability of the SK space would be greatly impaired, as would the overall value of the Market Quadrant. This damage has yet to be calculated. This . . . would also trigger default(s) by the Trust under its loan obligation. The consequences of such a default would increase the Trust's losses by several more million dollars. Thus the $5 million estimate of the Trust's damages is certainly on the very low end, and in fact, I believe such damages could approach $8 million to $14 million." Id.*

### (d)    As a matter of Law, Garikian is entitled to recover its Attorneys' Fees As An Administrative Expense.

Courts have long recognized that claims arising from a debtor's breaches of a postpetition

agreement are to be accorded administrative expense priority.  [*See, e.g., Teamsters Indus. Sec. Fund
v. World Sales, Inc. (In re World Sales, Inc.)*, 183 B.R. 872, 878 (9th Cir. BAP 1995) (a claim based

on payments due under an unrejected collective bargaining agreement for post-petition work,

together with liquidated damages, interest and attorneys' fees arising out of the post-petition breach

of the agreement, is entitled to treatment as an administrative expense).]

* * *

### 4.    Debtor's Breach of an Executory Post-petition Contract Gives Rise to a Claim for Damages as an Administrative Expense.

Section 365(d)(2) provides:

> (2)  In a case under chapter 9, 11, 12, or 13 of this title, the trustee may assume or reject an executory contract or unexpired lease of residential real property or of personal property of the debtor at any time before the confirmation of a plan but the court, on the request of any party to such contract or lease, may order the trustee to determine within a specified

period of time whether to assume or reject such contract or lease.

The actions by the Estate – – first by failing to perform the Lot 5 Improvements, and then by taking the steps to implement the Trustee-EWB Settlement Agreement, thereby divesting the Estate of its Fitness Quadrant, and  dislodging Garikian's lien, constitute a *de facto* rejection of that agreement, as well as an actual breach.  Damages arising from a rejection of an executory contract which had previously been assumed by the Estate are entitled to administrative expense priority, as are damages arising from an estate's actual breach of a postpetition contract. [See, *e.g., In re World Sales*, 183 B.R.  at 878, and *Irmas Family Trust v. Madden (In re Madden)* 185 B.R. 815 (9th Cir. BAP 1995).] In this case, damages are compensable to Garikian both as a consequence of the Estate's *de facto* rejection and its actual breach by entering into the Trustee-EWB Settlement Agreement [Barness Declaration].

## 5. Attorneys' Fees  Arising from Debtor's Steps to Reject Indemnity Agreement -- Liquidated By Agreement -- Are Compensable to Garikian.

The Indemnity Agreement was a key component of the arrangements embodied in the Garikian Settlement Agreement. Initially, the Debtor proposed a plan which would have sought approval of rejection of the Indemnity Agreement and the Leases [Barness Declaration, ¶ 4].

The Attorneys' Fee provision of  Indemnity Agreement specifically entitles Garikian to recover attorneys' fees and costs for Debtor's failure to implement the Lot 5 Improvements. [Garikian Declaration, ¶ 2]

According to Ninth Circuit authority, if a claim is allowed as an administrative expense claim, and if the claim includes entitlement to attorneys' fees, such fees are also entitled to administrative expense priority  [See, *e.g., In re World Sales*, 183 B.R. at 878, and *Irmas Family Trust v. Madden (In re Madden)* 185 B.R. 815 (9th Cir. BAP 1995).]

Although Garikian's actual attorneys fees are well in excess of the amount stipulated by the parties [Barness Declaration, ¶], the Garikian Settlement Agreement also contained the parties'

**APPLICATION  BY THE GARIKIAN  LIVING TRUST FOR ALLOWANCE AND PAYMENT OF ADMINISTRATIVE EXPENSES; DECLARATIONS OF GEORGE GARIKIAN AND DANIEL I BARNESS**

17

agreement regarding liquidation of Garikian's attorneys fee claim at $60,000.  *Id.*  Also, as discussed

below, that same $60,000  attorney-fee amount  reflected the parties agreement regarding the

liquidation of the Garikian secured claim, which by their agreement would substantially reduce the

claim from "not less than $5 million" to $60,000.  *Id.*

### 6. As the Functional Equivalent of a Section 363 Sale, the Transfers to EWB Free and Clear of Liens,  Retrospective "Adequate Protection" of the Garikian Junior Lien is Appropriate.

Section 363(e) states "on request of an entity that has an interest in property  . . .  proposed to be

. . .  sold  . . .  by the trustee, the court, with or without a hearing, shall prohibit or condition such  . . .

sale  . . .  as is necessary to provide adequate protection of such interest."   Upon such a request, a

bankruptcy court is obligated to ensure that such interests are adequately protected."  *Precision*

*Industries, Inc., and Circo Leasing Co., LLC v. Qualitech Steel Sbq, LLC, ( in Re: Qualitech Steel*

*Corp.*) 327 F.3d 537, 548 (7th Cir. 2003).

Although, of course, the Court in this case approved a settlement entailing transfers of estate

property, it did **not expressly** order a free-and-clear sale of the Fitness Quadrant, as a practical

matter, it did so.  To the extent that sale/transfer was approved without regard to Garikian's

"adequate protection" rights, as would have been required under section 363(e), it is respectfully

submitted that the Court might now remedy this omission, in the exercise of its equitable powers

under section 105, by determining that Garikian's claim *should have been* afforded adequate

protection then, and so award Garikian its attorneys fees of $60,000 as an administrative expense on

that additional ground.

The transfers made as a result of the Trustee-EWB settlement, though technically  not covered by

section 363, can be seen as the functional equivalent of a sale free and clear of liens and interests.  In

*Mark Franzen v. United States*, 08-56181 (9th Cir. 2011), for example, the Ninth Circuit adopted  a

"functional equivalence" analysis  to determine that a procedure undertaken by one of the parties was

the "functional equivalent" of an action in interpleader, and treated it as such.  [ See also *Gallardo v.*

*Lynch*, 12-72326 (9th Cir. 2016) (applying a "functional equivalence" analysis), and  the Supreme

Court's  decision *in  Lingle v. Chevron U.S.A. Inc.*,544 U.S. 528, 125 S. Ct. 2074, 161 L. Ed. 2d 876

(2005), in which it described the result in *Penn Central*[16] , as having been based on a functional

equivalence analysis as  between a regulatory action, on the one hand, and a "classic taking", on the

other.544 U.S. at 539. ]

Here, Estate property in the form of the Fitness Quadrant and the Estate's Ninth Circuit Appeal

were, in effect, "sold" to EWB, which then acquired the Fitness Quadrant at foreclosure and by way

of stipulated dismissals, dispatched the Estate's causes of action against EWB and its Ninth Circuit

Appeal -- which were  aimed at establishing that the EWB claim should be stripped of its penalty

features, such as default-rate interest,  and that the Estate should have offsetting claims against it, all

of which would have rendered the EWB claim fully secured, and made Debtor's reorganization

possible.

Pursuant to the Trustee-EWB Settlement, EWB paid the estate $1 million in exchange for which:

the Trustee dismissed the Estate's Ninth Circuit Appeal; stipulated to a lift-stay order permitting

EWB to foreclose on the Fitness Quadrant.

As shown above, the value of the Garikian lien on the Debtor's Fitness Quadrant was not less

than the $60,000-amount, which  the parties stipulated would be the reduced Garikian secured claim

amount.  As a consequence of the Trustee EWB Settlement, EWB pursued foreclosure and

ultimately foreclosed upon the Fitness Quadrant. [RJN, Exhibit "P"] [Barness Declaration, ¶ ].

As a further basis for allowance of the $60,000 lien claim, Garikian refers to the  Ninth Circuit

opinion in *Pinnacle Rest. at Big Sky, LLC v. CH SP Acquisitions, LLC (In re of Spanish Peaks*

*Holdings II, LLC)* - 862 F.3d 1148 (9th Cir. 2017)  ("*Pinnacle*") as a basis for its request for  a *nun*

*pro tunc* order granting it "adequate protection".  The Ninth Circuit in *Pinnacle* dealt with an

apparent clash between section 363(f) and section 365(f), and as in this case, there was a *de facto*

---

[16]     *Penn Central Transp. Co. v. New York City*, 438 U.S. 104, 98 S. Ct. 2646, 57 L. Ed.
2d 63 (1978)

rejection under section 365[17].

The Ninth Circuit's resolution in favor of sale-free-and-clear concepts over arguably competing 365(f) concepts in *Pinnacle* can be instructive in this case:  Here, the "adequate protection" concept, that *would* have operated  to protect Garikian in a section 363(f) sale context, was swept aside by the grant of the Estate's Rule 9019 Motion, without regard to Garikian's lien on the Fitness Quadrant.

In the final analysis, this series of transactions was, in effect, a sale free and clear of the Garikian lien, but with no consideration given to the form of "adequate protection that should be afforded to Garikian.  Thus, an **additional** basis for awarding $60,000 as attorneys' fees, would be a retroactive application of  "adequate protection"  of Garikian's secured claim against the Estate and its former real property interests in the Fitness Quadrant that was "sold" to EWB by way of the Trustee-EWB Settlement.

## IV. CONCLUSION

The bases for allowance of a $110,000 administrative expense claim in favor of Garikian is twofold:

(1)   As a result of the Trustee-EWB Settlement, there was a *de facto* rejection and breach of the Postpetition, Court- approved, Garikian Settlement Agreement. Damages resulting from that breach are in the amount of $50,000 – – liquidated by way of the parties' Settlement; judicial determinations; the Former DIP's judicial declarations; a key provision of the Former DIP's various Reorganization Plans;  and even pleadings on

---

[17]   The issue resolved by the Ninth Circuit was one of first impression in the circuit: whether a Chapter 7 Trustee's sale of the Chapter 7 Debtor's real property under 11 U.S.C. § 363(f) was free and clear of unexpired leases to the property. In *Pinnacle,* the Ninth Circuit adopted the "Minority Approach" in dealing with conflicts between sections 363 and 365. *Pinacle* at 13-15.  Contrasting the "Majority Approach" -- that § 365(h) would trump §363(f), and the lessee would prevail --- and the "Minority Approach" that § 363(f) allows for the sale of the property free and clear of "any interest" without expressly excluding a leasehold interest, and hus§ 363(f) 3nd § 365(h) do not conflict at all, the Ninth Circuit adopted the Minority Approach. *Id.*

---

behalf of EWB regarding the Lot 5 Improvements (stating EWB's belief that the $50,000 figure might be low).  The sum of $50,000 is therefor an appropriate and fair measure of damages to Garikian flowing from the Estate's breach.

(2)    By way of the Court-approved Garikian Settlement Agreement, the parties agreed that attorney's fees payable to Garikian for enforcement of its rights under the Indemnity Agreement – – which the Former DIP initially sought to reject – – was liquidated at $60,000 (though actual fees expended were well in excess of that amount), and the Court is additionally  asked to award this amount as "adequate protection" that might have been granted to Garikian, had the "sale" of the Fitness Quadrant been conducted pursuant to section 363 (f).

For the foregoing reasons, Garikian respectfully requests that the court/Court allow Garikian and administrative expense claim in an amount not less than $110,000.

Dated: May 29, 2020          Respectfully submitted,

BARNESS & BARNESS LLP

By: */s/ Daniel I. Barness*

Daniel I. Barness
Attorneys for The George Garikian
Living Trust, Creditor

1

## DECLARATION OF GEORGE GARIKIAN

2

I, **GEORGE GARIKIAN**, declare:

3

4          I am the Trustee of The George Garikian Living Trust, *aka* The George Garikian Family

5     Trust, (the "**Garikian Trust**"), formerly a secured creditor herein.   In addition to serving as

6     Trustee of the Garikian Trust, I am also an attorney at law, licensed since 1992 to practice

7     law in the state of California.  Prior to retiring from the active practice of law, I had been an

8     attorney with the Los Angeles County Department of Water and Power, dealing exclusively

9     with its real estate issues, such as land use; permitting; and zoning issues.   I have personal

10    knowledge of the facts set forth herein,  and if called as a witness, I could and would

11    competently testify thereto.  I make this Declaration in support of the Application  by the

12    George Garikian  Living Trust for Allowance and Payment of Administrative Expenses (the

13    "Application")[18], which requests that the Court allow the Garikian Trust's claim for  $110,000

14    as an administrative expense.

15    1.     Initially (prior to the Petition Date), Debtor's predecessor-entity (ALC) owned an

16
17           integrated singular shopping center (the "ALC Center") consisting of two quadrants -- the

           Fitness Quadrant, which had as its anchor tenant a 24-Hour Fitness facility (the "Fitness

18
           Quadrant"); and (across the street) the Market Quadrant, which had as its anchor tenant

19
           Super King Market (the "Market Quadrant").   A covenant in favor of  Los Angeles

20

21

22    ─────────────────

          [18]      Unless otherwise defined, capitalized terms used herein shall have the same
23              meanings as in the Application to which this Declaration is attached.

24

25

26

27

28

**APPLICATION  BY THE GEORGE GARIKIAN  LIVING TRUST FOR
ALLOWANCE AND PAYMENT OF ADMINISTRATIVE EXPENSES;
DECLARATIONS OF GEORGE GARIKIAN AND DANIEL I BARNESS**

22

County (the "County Covenant") that was  recorded on December 7, 2005[19] required that

the ALC Center not be legally divided, in other words that the Fitness Quadrant and the

Market Quadrant be maintained as a singular ALC Center, versus two legally divided

parcels comprising two separate centers.

2.    The Purchase and Sale Agreement, a true and correct copy of which  (highlighted for

ease of reference) is attached hereto as Exhibit "A" and incorporated herein by this

reference, contains the following provision, among others, regarding attorneys' fees:

"Seller [ALC] shall prior to the issuance of the parking permit described in paragraph
below date make such improvements to lot 5 so that it can be used for the purposes
described in the applicable Parking Lease in compliance with applicable law.  **Seller
shall indemnify**, defend and hold harmless **Buyer** [Garikian] (and its related successors
and assigns) from and against any and all claims, losses, costs and expenses (**including**
but not limited to  **attorneys' fees and costs**) which arise out of or relate to  . . (c) **the
failure to complete the improvements described in the preceding sentence [i.e., the
"Lot 5 Improvements"**] promptly following the close of escrow for the sale of the
Property.  **Such indemnity** shall, at Buyer's request, **be further set forth in an
instrument that is secured by a deed of trust on Seller's** remaining **properties**
comprising the shopping center and adjacent properties of which the Property is a part..."
[Emphasis added.]

3.    As of commencement of Debtor's  Chapter 11 case, ALC  had **not** made the Lot 5

Improvements, necessitating the filing of a Proof of Claim based on the Indemnity

Agreement, in addition to a separately filed proof of claim with respect to the Leases.

4.    It is my view that the  Lot 5 Improvements were a necessary expenditure by the Estate, in

that if completed, a substantial cloud on title to the Fitness Quadrant that could have

impeded its sale or refinance was removed.

---

[19]    [Doc 412, ¶ 1; RJN, Exhibit "A"]

5.      Among other things, the Settlement Agreement between the Debtor and the Garikian Trust pertains to the Off-Site Parking Arrangements agreed upon between the parties  as part of a resolution of various disputes and claims between them.  The Settlement Agreement is incorporated into the Plan.  The Off-Site Parking Arrangements were the subject of Permit Applications (collectively, the "**Permit Application**") seeking approval of those arrangements by the Los Angeles County Regional Planning Department ("**Regional Planning**").  I was an active participant in prosecuting the Permit Application before Regional Planning, and was in regular communication with its representatives, including Ms. Jolie Hui.  Ms. Hui informed me by a July 9, 2019 email chain that Regional Planning had confirmed approval of the plans (i.e., the Permit Application) which had been submitted on behalf of the Garikian Trust.  That email includes a link[20] to the "approval document".  A true and correct copy of a 1/2/2019 printout of the  approval document referenced in Ms. Hui's email is attached hereto as Exhibit "B".

6.      Although, pursuant to the Settlement Agreement, I worked actively to procure, and did indeed procure, County approval for the Lot 5 Improvements, by the time of the EW Foreclosure, the Estate's "Lot 5 Improvements" obligation had not been performed.

7.      Based on my experience as a real-estate attorney, it is my opinion that it is foreseeable that any third–party owner of the Fitness Quadrant (other than EWB) will not undertake the Lot 5 Improvements without some form of consideration, such as payment by the Garikian Trust of the construction costs. Though $50,000 is the construction-cost figure

---

[20]      https://epicla.lacounty.gov/SelfService/#/plan/0e765e26 ]36b1 ]4b05 ]a0db ]23dc234dff 2c

estimated by Alicia Barclay and Greg Galletly, principals and/or employees of the
Former DIP, the actual costs could easily exceed that amount, possibly by a significant
amount, as indeed did happen in this case:  It is my  understanding that the $50,000
estimate did not include the cost of resolving a drainage issue caused by the relocation of
a large pipe fixture on the property, so as to have the space to accommodate parking for
16 vehicles.

8.    At least at present, there is no indication that EWB would cover the costs of the Lot 5
Improvement.   It is my opinion that the key relationship with SK Market is now in
potential jeopardy a result of implementation of the Trustee-EWB Settlement.  As an
example, if  a new Fitness Quadrant owner (other than EWB), considers itself not to be
bound by any prior agreements regarding  the Lot 5 Improvement, and refuses to
implement those Improvements, or seeks to expand its own parking - space availability
without the Lot 5 Improvements, ultimately reducing the number of spaces available to
SK Market, I would foresee a significant legal dispute as between the Garikian Trust and
SK Market.

9.    Additionally, this state of  uncertainty could well require that the Garikian Trust must
now seek further professional advice and assistance which could also prove to be quite
costly.  Because of the above-described situation resulting from implantation of the
Trustee's settlement with EWB, I have sources of worry and anxiety which did not exist
before.   It is my opinion that $50,000 as measure of the damages the Garikian Trust has
and will have suffered as a result of the Estate's breach, could well  be at the low-end, and
that the financial risk the Trust  now faces as a consequence of the  Estate's breach, given

the complex legal issues that now exist, could easily dwarf $50,000.

10.    In connection with the Indemnity Proof of Claim, I determined that the damages arising from the Estate's reneging on its agreement to make the Lot 5 Improvements were fairly stated therein as "unknown, but not less than $5 million" after considering the economic consequences of a claim by SK Market of any inadequacy in the parking arrangements to which it had contracted. The economic value of the SK Lease based on the number of months reserved under that lease was more than $5,000,000, so "not less than $5 million" was a good estimate.

///

1        I declare under penalty of perjury under the laws of the United States of America that the

2    foregoing is true and correct and that this Declaration was executed this May 28, 2020 at Glendale,

3    California.

                   George Garikian

**APPLICATION  BY THE GEORGE GARIKIAN  LIVING TRUST FOR
ALLOWANCE AND PAYMENT OF ADMINISTRATIVE EXPENSES;
DECLARATIONS OF GEORGE GARIKIAN AND DANIEL I BARNESS**    26

## DECLARATION OF DANIEL I. BARNESS

I am an attorney at law duly licensed to practice before the courts of the State of California and before this Court.    I am a partner in the law firm of Barness & Barness LLP, counsel for the George Garikian Living Trust (the "Garikian Trust" or "Garikian").   I have been a practicing attorney, primarily in the area of bankruptcy, since 1982.   In connection with my representation of Garikian, I have familiarized myself with the matters described in the Docket, and know the facts below either from my own knowledge or from a  review of the Docket regarding the described events or circumstances.  The facts stated herein are known to me personally to be true, and if called upon to testify as to the truth of such facts, I could and would so testify.   In forming the conclusions stated herein, I considered the following matters, all of which are matters of record and/or have been set forth in pleadings and other materials previously filed on behalf of Garikian.  References to "Doc" and "RJN" in this Declaration are to the corresponding docket item or Request for Judicial Notice exhibit, respectively, each of which I reviewed before making this Declaration.  Further, as part of familiarizing myself with the background facts of this matter, I also reviewed the various pre-petition documents which are discussed below.

1.   This case was commenced on April 7, 2017 (the "Petition Date") (Doc 1).  From the Petition Date until October 3, 2019, when a Chapter 11 trustee was appointed (Doc 968), Debtor had been acting as debtor in possession herein.  After close to two years of litigation concerning eight iterations of a plan of reorganization by the former debtor in possession (Doc 943), and after appeals regarding EWB's default interest assessed against Debtor -- culminating Debtor's Ninth Circuit appeal -- on October 7, 2019, the Court entered an order appointing a Chapter 11 trustee, followed by the acceptance of such appointment by Jason Rund (the

1    "Chapter 11 Trustee")  (Doc  965).  Thereafter, on March 13, 2020,  the case was converted

2    to one under Chapter 7  [Doc 1051].

2.    Initially (prior to the Petition Date), Debtor's predecessor-entity Altadena Lincoln Crossing,

LLC ("ALC") owned an integrated singular shopping center (the "ALC Center") consisting

of two quadrants -- the Fitness Quadrant, which had as its anchor tenant a 24-Hour Fitness

facility (the "Fitness Quadrant"); and (across the street) the Market Quadrant, which had as

its anchor tenant Super King Market (the "Market Quadrant").   A covenant in favor of  Los

Angeles County entitled "Covenant and Agreement to Hold Property as One Parcel " (the

"County Covenant") that was  recorded on December 7, 2005 required that the ALC Center

not be legally divided, *i.e.*,  that the Fitness Quadrant and the Market Quadrant be maintained

as a singular ALC Center, rather than two legally divided parcels with two separate centers.

3.    In order to effect a sale of  the Market Quadrant that would conform to Los Angeles County

requirements and lead to the release of the County's subdivision restriction, the parties (ALC

and Garikian), as part of the documentation of their purchase and sale agreement dated

January 15, 2015[21] (the "Purchase and Sale Agreement") also entered into the Leases and the

Indemnity Agreement, which were incorporated into and made part of the Purchase and Sale

Agreement and documentation. [(Doc 412); RJN, Exhibit "A"] Among other things, these

agreements were intended to achieve formal compliance with County requirements regarding

the Off-Site Parking Arrangements – a condition for the release of the County Covenant

which otherwise would have prevented  the division of the formerly integrated (undivided)

---

[21]    [(Doc 412), ¶¶ 1-7; RJN, Exhibit "A"]

**APPLICATION  BY THE GEORGE GARIKIAN  LIVING TRUST FOR
ALLOWANCE AND PAYMENT OF ADMINISTRATIVE EXPENSES;
DECLARATIONS OF GEORGE GARIKIAN AND DANIEL I BARNESS**    29

ALC Center.  A Memorandum of Lease covering the 14-Space Parking Lease [RJN, Exhibit "C"] and a Memorandum of Lease covering the 16-Space Parking Lease [RJN, Exhibit "D"] were recorded on January 15, 2015 in Los Angeles County.  The Indemnity [RJN, Exhibit "E"] The Deed of Trust  [RJN, Exhibit "F"] was executed in order to secure the Debtor's obligations under the Indemnity Agreement, and was also recorded on January 15, 2015 in Los Angeles County.   The template for these arrangements is set forth in correspondence between the County and Garikian, which is part of the record of these proceedings, which I reviewed prior to making this Declaration.   [RJN, Exhibit "A"].

4.    Following the Petition Date, a significant dispute arose between Garikian and the Estate when the Former DIP proposed its First (Doc 160) and Second Amended (Doc 293) Plans.  The First Amended Plan was silent as to assumption/rejection of the Indemnity Agreement or the Leases; but the Second Amended Plan would have effected a rejection of the Parking Leases and purportedly the Indemnity Agreement.  In response to this state of affairs, Garikian filed a motion seeking an order compelling assumption or rejection of the parking leases. (Doc 145).  I caused that motion to be withdrawn when the parties subsequently reached their settlement.

5.    On or about January 20, 2018, Garikian and the Former DIP reached a settlement agreement (the "Garikian Settlement"), which I viewed as a better alternative to the extensive and costly litigation which would have arisen from the Estate's targeted rejections.  Among other things, the settlement included Debtor's performance of the Lot 5 Improvements, which had previously been stalled since the 2015 purchase and sale transaction.

**APPLICATION  BY THE GEORGE GARIKIAN  LIVING TRUST FOR
ALLOWANCE AND PAYMENT OF ADMINISTRATIVE EXPENSES;
DECLARATIONS OF GEORGE GARIKIAN AND DANIEL I BARNESS**

30

6.  Among other arrangements embodied by the Garikian Settlement, the Debtor was to assume the two Parking Leases, and Garikian was to withdraw its (secured) Indemnity Proof of Claim for $5 million, replacing it with a $60,000 secured claim to cover Garikian's attorneys' fees.  (Doc 369-1, RJN, Exhibit "H").

7.  On January 25, 2019, after more than a year of litigation and negotiations, the Former DIP filed a Motion (Doc 125) seeking approval of the Garikian Settlement Agreement, and authority to enter into the Garikian Settlement. Among other things, the Garikian Settlement Motion specifically requested authorization for the Debtor to expend $50,000 for the Lot 5 Improvements.  On June 24, 2018, the Court issued its order granting the Garikian Settlement Motion.  That Order states: "The Debtor's use of EWB's cash collateral is APPROVED in the amount actually expended for the parking lot construction but not to exceed $50,000.00" [Doc 561, RJN, Exhibit "I"].

8.  My understanding is that the $50,000 figure was based upon the Debtor's estimate of the cost of completion of the Lot 5 Improvements, including discussions with the Former DIP's Alicia Barclay in which I participated. However, some time later, after Debtor retained construction consultants, it was determined that the $50,000 figure might, in fact be a low estimate, because of drainage issues stemming from the relocation of a large pipe fixture that would need to be addressed in completing those improvements.  At various hearings which I attended, progress regarding the Lot-5-Improvement process was reported to the Court.

9.  Although at the time of the Trustee's appointment, Garikian and the Former DIP were well on their way to consummating the terms of the Garikian Settlement, and accomplishing the

1    Lot 5 Improvements, that progress went by the wayside:  The Former DIP was unable to

2    complete the Lot 5 Improvements or otherwise complete its performance under the Garikian

3    Settlement Agreement, because following the Court's  OSC (Doc 929), it ordered the

4    appointment of a Chapter 11 trustee. On or about October 23, 2019, Jason Rund (the

5    "Trustee") accepted such appointment, and at present is so serving  (Doc  965).

6

7    10.    By order entered on April 30, 2020 [Doc 1067], the Court approved  the Trustee-EWB

8        Settlement, the consequence of which was a dismissal of the Estate's Ninth Circuit Appeal;

9        dismissal of the Estate's counter-claims against EWB; and forfeiture by the Estate of its

10       interest in, and title to, the Fitness Quadrant.

11   11.    Pursuant to the EWB-Trustee Settlement, EWB effected a foreclosure against the Fitness

12       Quadrant, resulting in a divestiture of the Estate's title to that Property [RJN, Exhibit "P"].

13       I declare under penalty of perjury that the foregoing is true and correct and that this

14   Declaration was executed this  May 28, 2020 at Los Angeles, California.

15

16           /s/ *Daniel I. Barness*
            _____
17           Daniel I. Barness

18

19

20

21

22

23

24

25

26

27

28

---

**APPLICATION  BY THE GEORGE GARIKIAN  LIVING TRUST FOR
ALLOWANCE AND PAYMENT OF ADMINISTRATIVE EXPENSES;
DECLARATIONS OF GEORGE GARIKIAN AND DANIEL I BARNESS**

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

EXHIBIT "A"

**APPLICATION BY THE GEORGE GARIKIAN LIVING TRUST FOR**
**ALLOWANCE AND PAYMENT OF ADMINISTRATIVE EXPENSES;**
**DECLARATIONS OF GEORGE GARIKIAN AND DANIEL I BARNESS**

33

### Fifth Amendment to Standard Offer, Agreement and Escrow Instructions
### for Purchase of Real Estate (Non-Residential)

This Fifth Amendment to Standard Offer, Agreement and Escrow Instructions for Purchase of Real Estate is made as of this ___ th day of November, 2014 (this "**Fifth Amendment**") by and between George Garikian, Trustee of the George Garikian Living Trust ("**Buyer**"), and Altadena Lincoln Crossing, LLC, a Delaware limited liability company ("**Seller**"), with reference to the following:

A. Buyer and Seller entered into that certain Standard Offer, Agreement and Escrow Instructions for Purchase of Real Estate executed on or about August 26, 2014 for the purchase of certain real property located at 2230-68 Lincoln Avenue, Altadena, California, as amended by four (4) prior amendments to such agreement (collectively, as amended, the "**Agreement**").

B. Buyer and Seller desire to further amend the Agreement on the terms and conditions set forth below. Capitalized terms used below but not otherwise defined herein shall have the meaning given to such terms in the Agreement.

### AGREEMENT:

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, Buyer and Seller agree to amend the Agreement as follows:

1. Conditioned on all of the matters set forth in the Agreement and in this Fifth Amendment, Buyer hereby waives the Buyer's Contingencies.

2. In addition to the closing conditions in favor of Buyer under the Agreement, the following shall be conditions precedent to Buyer's obligations to complete the purchase of the Property (and shall be deemed included in paragraph 35 of the Agreement):

   a. The documentation requirements of Buyer's lender, which may include without limitation tenant estoppels and SNDAs, and approval of environmental studies, shall be fulfilled to the lender's satisfaction, and the lender shall have funded its purchase money loan, or terms and conditions approved by Buyer.

   b. Buyer and Seller shall have entered into a new parking lease or leases on terms and conditions approved by Buyer, providing for sixteen (16) parking spaces in the garage at 376 Acacia Street, Altadena (the "Garage"), and, subject to paragraph 3 below, fourteen (14) parking spaces on lot 5 (which lot 5 is shown in Exhibit "A" attached hereto), which is adjacent to the Property (the "Parking Leases"), or in the Garage. Said parking spaces on lot 5 shall have been incorporated into the Revised Exhibit "A" application (R2004-00402 and RCUP 200700155 and parking permit case RPKP 200600011), and said lot 5 shall be "tied" to the remainder of Seller's property that is adjacent to the Property by an instrument approved by Los Angeles County in writing to ensure that the provided parking cannot be altered except with further Los Angeles County approval (and Seller shall not further amend said application to remove or modify

1

036

## Fifth Amendment to Standard Offer, Agreement and Escrow Instructions
## for Purchase of Real Estate (Non-Residential)

This Fifth Amendment to Standard Offer, Agreement and Escrow Instructions for Purchase of Real Estate is made as of this __th day of November, 2014 (this "**Fifth Amendment**") by and between George Garikian, Trustee of the George Garikian Living Trust ("**Buyer**"), and Altadena Lincoln Crossing, LLC, a Delaware limited liability company ("**Seller**"), with reference to the following:

A. Buyer and Seller entered into that certain Standard Offer, Agreement and Escrow Instructions for Purchase of Real Estate executed on or about August 26, 2014 for the purchase of certain real property located at 2230-68 Lincoln Avenue, Altadena, California, as amended by four (4) prior amendments to such agreement (collectively, as amended, the "**Agreement**").

B. Buyer and Seller desire to further amend the Agreement on the terms and conditions set forth below. Capitalized terms used below but not otherwise defined herein shall have the meaning given to such terms in the Agreement.

## AGREEMENT:

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, Buyer and Seller agree to amend the Agreement as follows:

1. Conditioned on all of the matters set forth in the Agreement and in this Fifth Amendment, Buyer hereby waives the Buyer's Contingencies.

2. In addition to the closing conditions in favor of Buyer under the Agreement, the following shall be conditions precedent to Buyer's obligations to complete the purchase of the Property (and shall be deemed included in paragraph 35 of the Agreement):

   a. The documentation requirements of Buyer's lender, which may include without limitation tenant estoppels and SNDAs, and approval of environmental studies, shall be fulfilled to the lender's satisfaction, and the lender shall have funded its purchase money loan, or terms and conditions approved by Buyer.

   b. Buyer and Seller shall have entered into a new parking lease or leases on terms and conditions approved by Buyer, providing for sixteen (16) parking spaces in the garage at 376 Acacia Street, Altadena (the "Garage"), and, subject to paragraph 3 below, fourteen (14) parking spaces on lot 5 (which lot 5 is shown in Exhibit "A" attached hereto), which is adjacent to the Property (the "Parking Leases"), or in the Garage. Said parking spaces on lot 5 shall have been incorporated into the Revised Exhibit "A" application (R2004-00402 and RCUP 200700155 and parking permit case RPKP 200600011), and said lot 5 shall be "tied" to the remainder of Seller's property that is adjacent to the Property by an instrument approved by Los Angeles County in writing to ensure that the provided parking cannot be altered except with further Los Angeles County approval (and Seller shall not further amend said application to remove or modify

1

those parking spaces without Buyer's express written consent; this covenant shall survive the close of escrow).

   c.  Schedule B exception 27 (set forth in the Title Company's preliminary report for the Property dated April 11, 2014 for order no. 00022664-x49) shall have been terminated as a matter of record and shall not be included in any title policy issued on the closing.

3.  Seller shall prior to the scheduled closing date procure (x) fully executed amendments to the leases between Seller and one or more tenants of the Property (to the extent necessary) such that the Garage has lawful and adequate parking for such tenants and their employees and/or invitees, as reasonably determined by Buyer, and (y) the written consent of Los Angeles County, on terms and conditions acceptable to Buyer, to the concept that such tenants' employee and other parking needs as set forth in such tenants' leases and/or the requirements of applicable codes or ordinances regarding the provision of parking spaces are satisfied by the Parking Leases (using lot 5 or the Garage). Seller shall also procure executed non-disturbance agreements from all of its secured lenders in favor of Buyer with regard to the Parking Leases, in form and content acceptable to Buyer, prior to the scheduled closing date. Seller shall prior to the issuance of the parking permit described in paragraph 5 below date make such improvements to lot 5 so that it can be used for the purposes described in the applicable Parking Lease in compliance with applicable law. Seller shall indemnify, defend and hold harmless Buyer (and its related successors and assigns) from and against any and all claims, losses, costs and expenses (including but not limited to attorneys' fees and costs) which arise out of or relate to (a) any assertion by B&V Enterprises, Inc. ("SK"), the tenant under a lease with Seller dated April 1, 2008 (the "SK Lease"), that section 18.5 of the SK Lease (or any other provision of the SK Lease related to parking has been violated due to the failure to provide exclusivity rights of SK in thirty (30) parking spaces in the Garage, and/or (b) any assertion that the Property violates applicable laws, codes or ordinances regarding the provision of parking spaces, and/or (c) the failure to complete the improvements described in the preceding sentence promptly following the close of escrow for the sale of the Property. Such indemnity shall, at Buyer's request, be further set forth in an instrument that is secured by a deed of trust on Seller's remaining properties comprising the shopping center and adjacent properties of which the Property is a part (which will record on the closing date), and in such event Seller shall cause its secured lender to provide a non-disturbance agreement regarding said deed of trust, in form and content reasonably acceptable to Buyer, as a closing condition in favor of Buyer (which will be deemed added to the closing conditions set forth in paragraph 35 of the Agreement). The foregoing provisions shall survive the close of escrow.

4.  Seller shall immediately comply with all of the covenants and conditions applicable to Seller that are contained in that certain letter from Buyer to Kristina Kulczycki, a copy of which is attached hereto as Exhibit "B" and by this reference incorporated herein.

5.  Upon the closing, Seller shall execute and deliver to Buyer an indemnity agreement in form and content designated by Buyer which will protect Buyer from damages and

2

claims that arise in the event that Buyer is unable to procure from Los Angeles County a parking permit for the Property pursuant to file no. RPKP 201300005 (R2013-01662). Such indemnity agreement shall be secured by a deed of trust on Seller's remaining property that is in the vicinity of and/or adjacent to the Property. Seller shall procure the written consent to said deed of trust from its lender on such other property, in form and content acceptable to Buyer. The said indemnity agreement and deed of trust will terminate if and when such parking permit is issued on terms and conditions acceptable to Buyer.

6. Seller shall use its best efforts to procure such documents and consents as may be needed in order to waive the condition set forth in paragraph 40(a) of the Agreement.

7. The scheduled closing date is hereby moved to December 19, 2014, provided, however, that if all of the conditions in favor of Buyer have not been fully satisfied by said date, Buyer shall have the right to extend said date to January 15, 2015.

8. The Purchase Price is hereby amended to be $15,225,000.00.

9. This Fifth Amendment shall be governed by and construed in accordance with the laws of the State of California.

10. All rights and obligations of the parties hereunder shall be binding upon and inure to the benefit of the parties and the successors and assigns of each such party.

11. This Fifth Amendment may be executed in any number of counterparts, each of which shall be effective only upon delivery and thereafter shall be deemed an original, and all of which shall be taken to be one and the same instrument, for the same effect as if all parties hereto had signed the same signature page. In the event of any conflict between the provisions of the Agreement and the provisions of this Fifth Amendment, the provisions of this Fifth Amendment shall control.

IN WITNESS WHEREOF, the parties hereto have executed this Fifth Amendment as of the day and year first above written.

George Garikian, Trustee of the George
Garikian Living Trust

ALTADENA LINCOLN CROSSING, LLC,
a Delaware limited liability company

By: _____
Name: Gura Coursey
Its: Managen

3

EXHIBIT "A"
LOT 5

EXHIBIT "B"

October 30, 2014

Ms. Kristina Kulczycki
Regional Planning Assistant II
Zoning Permits East
Department of Regional Planning
320 West Temple Street, 13th floor
Los Angeles, CA 90012

Re: Lincoln Crossing Parking

Dear Ms. Kulczycki:

This letter sets forth the anticipated structure of the resolution of the potential parking issues in
relation to the referenced property, and the requested termination of the covenant and agreement
made by Altadena Lincoln Crossing, LLC ("ALC") for the benefit of the County of Los Angeles,
which is dated December 7, 2006 and was recorded in the Official Records of Los Angeles County as
Instrument No. 06-2724403 (the "Restrictive Instrument"), as follows:

1.    As you know, The George Garikian Living Trust ("Buyer") is under contract to purchase the
"Market Quadrant" portion of the Lincoln Crossing shopping center project, which portion has a
common street address of 2230-2268 Lincoln Ave., Altadena, CA (the "Subject Property"), from
ALC. ALC will continue to own the "Fitness Quadrant" portion of the Lincoln Crossing project.
ALC has agreed to allow Buyer to take over and continue with the existing parking permit case
RPKP 201300005 (R2013-01662), with the application being amended to have the Buyer's name.

2.    ALC will provide travel information kiosks and displays situated in common areas and
work with project site tenants to produce and distribute alternative travel mode and rideshare
opportunities information to employees. Said kiosks and displays shall contain no advertisements
or be located in such a way that it would take from the current landscaping and parking space.

3.    We anticipate that prior to the Restrictive Instrument being terminated and removed as a matter
of record affecting title to the Subject Property, the parking areas of the Market Quadrant will
be restriped by ALC to ensure that all spaces are of the correct dimensions and meet code. If ALC
fails to complete the restriping by the time that the sale escrow for the Subject Property closes, Buyer
will complete the restriping project.

4.    To ameliorate any shortage in onsite parking for the Subject Property, Buyer and ALC have
agreed to enter into a 99 year lease to provide up to thirty (30) parking spaces in the parking structure

5

located at 376 Acacia Street which is owned by ALC; a draft of that lease is attached hereto as Exhibit "A". Buyer and ALC have agreed that a short form memorandum of the parking lease will be recorded. ALC will cause its lender to provide a non-disturbance agreement with regard to the parking lease so that even a foreclosure of the deed of trust which encumbers the land on which the parking structure is built will not terminate the lease.

5.    ALC has agreed to withdraw its request for the Conditional Use Permit and Parking Permit for lot 5 of the Lincoln Crossing project (R2013-01660 (RPKP 201300006) and RCUP-201300082). ALC shall submit an official letter requesting the withdrawal with seven (7) business days following the execution of this agreement.

6.    ALC has agreed to file a Revised Exhibit "A" application (R2004-0402 and RCUP 2007-00115 and parking permit case RPKP 200600011) to update the current layout of the Fitness Quadrant site, to update the parking table, and to identify the bike parking for the reduction in necessary parking spaces. In addition the necessary bike parking will be installed in the Fitness and Market Quadrants per code. ALC has also agreed to not use the parking structure in relation to the development and/or operation of lot 5 of the Lincoln Crossing project, and that parking will be provided on said lot 5 for all future improvements on that lot. The revised exhibit "A" shall be submitted with in seven (7) business days following the execution of this agreement. Buyer needs written confirmation from the county that the foregoing matters are approved.

7.    ALC has agreed that the parking spaces for the Market Quadrant in the parking structure will be clearly identified and parking in these spaces will be restricted to Market Quadrant employees.

8.    Attached hereto as Exhibit "B" is an analysis of the available parking usage at the Lincoln Crossing project.

9.    We will not be able to obtain a loan and close the purchase of the Subject Property unless the Restrictive Instrument is terminated and removed. Accordingly, it is critical that the County agree to terminate and remove the Restrictive Instrument as a matter of record concurrently with the closing of Buyer's purchase of the Subject Property, the recordation of the memorandum of the 99 year lease, and upon inspecting the restriped parking to determine that it matches the approved site plan and that the new bike parking meets code.

10.    Time is of the essence in this transaction and we would like to close the transaction by the end of November. Prior to Buyer spending additional funds in connection with its loan commitment, Buyer would like the County to review and approve this term sheet and enter into an agreement incorporating the above matters.

Please call me with any questions regarding the foregoing. Thank you.

George Garikian, for The George
Garikian Living Trust

Agreed, acknowledged and confirmed.

6

Altadena Lincoln Crossing, LLC

By: _____
Its: _____

EXHIBIT "A"
PARKING LEASE

## EXHIBIT "B"
### PARKING AVAILABILITY ANALYSIS

As currently developed, the Fitness Quadrant site has 182 parking spaces required for the gym (based on an occupancy load determination of 545), the 9 existing 1-bedroom apartment units require 14 parking spaces, the retail spaces take up 8,422 square feet and require 34 parking spaces, and the Subway restaurant has an occupancy load determination of 30 which would require 10 parking spaces. The total number of required parking based on the current uses of the Fitness Quadrant site is 240 spaces. Following is the breakdown:

**Fitness Quadrant parking calculations**

Current uses on the site:

| | | |
|---|---|---|
| 24-Hour Fitness Gym | 545 OL / 3 = | 182 |
| 9 Existing 1-BR apartment units | (9 x 1.5 = 13.5) | 14 |
| Retail (Bldg 3) | 8,422 / 250= | 34 |
| Subway | 30 OL / 3 = | 10 |

Total                                          240 spaces required

                                               244 spaces are provided

Therefore, there are 4 available parking spaces that could be utilized by the Market Quadrant if authorized through a parking permit.

If section 22.52.1081 is applied (which allows for a 5% reduction in parking if bike parking is provided above the amount that is required by the code), then that would reduce the number of required parking spaces by 12. Therefore, **only 228 spaces would be required and the Fitness Quadrant would have 16 additional spaces that could be used by the Market Quadrant.**

If the Market Quadrant also applies the 5% bike parking reduction, then the required parking will be reduced by 9 spaces (from 187 to 178 required spaces...162 spaces are provided). **Therefore, the Market Quadrant would only be missing 16 spaces.**



1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22

EXHIBIT "B"

23
24
25
26
27
28

**APPLICATION BY THE GEORGE GARIKIAN LIVING TRUST FOR
ALLOWANCE AND PAYMENT OF ADMINISTRATIVE EXPENSES;
DECLARATIONS OF GEORGE GARIKIAN AND DANIEL I BARNESS**

34

**Subject:**                    FW: 2260 Lincoln Avenue (Market Quadrant)


From: **Jolee Hui** <JHui@planning.lacounty.gov>
Date: Mon, Jul 9, 2018 at 5:21 PM
Subject: RE: 2260 Lincoln Avenue (Market Quadrant)
To: George Garikian <ggarikian@calcarwash.com>
Cc: Rodney Khan <khanconsulting@aol.com>


Good afternoon George,

I had some technical issue with my digital signature but I was finally able to digitally approved the plans today. The
approved document is available for download online.


Visit  https://epicla.lacounty.gov/SelfService/#/plan/0e765e26-36b1-4b05-a0db-23dc234dff2c and click on
"Attachments" tab.

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding.  My business address is:

Barness & Barness LLP, 13636 Ventura Blvd., Los Angeles, CA 91423

A true and correct copy of the foregoing document entitled: APPLICATION  BY THE GEORGE GARIKIAN  LIVING TRUST FOR ALLOWANCE AND PAYMENT OF ADMINISTRATIVE EXPENSES; DECLARATIONS OF GEORGE GARIKIAN AND DANIEL I BARNESS will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner stated below:

**1.  TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**:  Pursuant to controlling General Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document. On ___5/29/20___, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:

Chapter 7 Trustee, Jason M. Rund: trustee@srlawyers.com
United States Trustee (LA): ustpregion16.la.ecf@usdoj.gov
Counsel for Debtor: Gregory Salvato, gsalvato@salvatolawoffices.com
Counsel for Trustee: Timothy J. Yoo, tjy@lnbyb.com
Daniel I Barness daniel@barnesslaw.com
Anastasia E Bessey anastasia.bessey@kralikjacobs.com,
lois.jacobs@kralikjacobs.com,rina.ross@kralikjacobs.com,aeblaw@gmail.com
Mikel R Bistrow mikel.bistrow@dinsmore.com, caron.burke@dinsmore.com
J Scott Bovitz bovitz@bovitz-spitzer.com
Peter W Bowie peter.bowie@dinsmore.com, caron.burke@dinsmore.com;cindy.renteria@dinsmore.com Christopher
Celentino chris.celentino@dinsmore.com,
caron.burke@dinsmore.com;SDCMLFiles@DINSMORE.COM
Oscar Estrada oestrada@ttc.lacounty.gov
Bernard R Given bgiven@loeb.com, mortiz@loeb.com;ladocket@loeb.com;bgiven@ecf.courtdrive.com
Mark S Horoupian mhoroupian@sulmeyerlaw.com,
dwalker@sulmeyerlaw.com;mhoroupian@ecf.inforuptcy.com
Lois M Jacobs lois.jacobs@kralikjacobs.com
Kenneth G Lau kenneth.g.lau@usdoj.gov
Lisa Lenherr ll@tiemlaw.com, bankruptcy@wendel.com
Brian A Procel bprocel@millerbarondess.com, rdankwa@millerbarondess.com;docket@millerbarondess.com
Uzzi O Raanan uor@dgdk.com, DanningGill@gmail.com;uraanan@ecf.inforuptcy.com
Ronald N Richards ron@ronaldrichards.com, morani@ronaldrichards.com,justin@ronaldrichards.com
John N Tedford jtedford@dgdk.com, danninggill@gmail.com;jtedford@ecf.inforuptcy.com
James A Tiemstra jat@tiemlaw.com, sml@tiemlaw.com    ☐

Service information continued on attached page

**2.  SERVED BY UNITED STATES MAIL:**
On April 14, 2020, I served the following persons and/or entities at the last known addresses in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States Mail, first class, postage prepaid, and addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge will be completed no later than 24 hours after the document is filed.

☒

Service information continued on attached page

**3.  SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL** (state method for each person or entity served):  Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on _____, I served the following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows.  Listing the judge here constitutes a declaration that personal delivery on, or overnight mail to, the judge will be completed no later than 24 hours after the document is filed.    ☐

Service information continued on attached page

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

| 5/29/2020 | Daniel I. Barness | /s/ Daniel I. Barness |
|-----------|-------------------|------------------------|
| Date | Printed Name | Signature |

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*June 2012*                                                                    **F 9013-3.1.PROOF.SERVICE**

Gregory M Salvato on behalf of Interested Party Courtesy NEF
gsalvato@salvatolawoffices.corri,
calendar@salvatolawoffices.com;jboufadel@salvatolawoffices.com;gsalvato@ecf.inforuptcy.com
John P Schock on behalf of Petitioning Creditor San Fernando Red, LLC
schockandschock@yahoo.com
John N Tedford, IV on behalf of Creditor Bromley, LLC
jtedford@DanningGill.com, danninggill@gmail.com;jtedford@ecf.inforuptcy.com
John N Tedford, IV on behalf of Creditor OPICS Real Estate Investments & Brokerage, LLC
jtedford@DanningGill.com, danninggill@gmail.com;jtedford@ecf.inforuptcy.com
James A Tiemstra on behalf of Creditor Tiemstra Law Group, PC
jat@tiemlaw.com, sml@tiemlaw.com
James A Tiemstra on behalf of Interested Party BGM Pasadena, LLC
jat@tiemlaw.com, sml@tiemlaw.com
United States Trustee (LA)
ustpregion 16.la.ecf@usdoj.gov
Timothy J Yoo on behalf of Interested Party Courtesy NEF
tjy@lnbyb.com
Timothy J Yoo on behalf of Trustee Jason_M Rund (TR)
tiv@lnbvb.com
Daniel I Barness on behalf of Creditor The George Garikian Family Trust
daniel@bamesslaw.com
Anastasia E Bessey on behalf of Creditor EAST WEST BANK
anastasia.bessey@kralikjacobs.com,
lois.jacobs@kralikjacobs.com,rina.ross@kralikjacobs.com,aeblaw@gmail.com
Anastasia E Bessey on behalf of Interested Party Courtesy NEF
anastasia. bessey@kralikjacobs.com,
lois.jacobs@kralikjacobs.com,rina.ross@kralikjacobs.com,aeblaw@gmail.com
Mikel R Bis trow on behalf of Interested Party Courtesy NEF
mikel.bistrow@dinsmore.com, caron.burke@dinsmore.com
J Scott Bovitz on behalf of Creditor Dom Platz Management, Inc.
bovitz@bovitz-spitzer.com
peter.bowie@dinsmore.com, caron. burke@dinsmore.com;cindy.renteria@dinsmore.com
Peter W Bowie on behalf of Interested Party Peter J Mastan
peter.bowie@dinsmore.com, caron.burke@dinsmore.com;cindy.renteria@dinsmore.com
Christopher Celentino on behalf of Interested Party Courtesy NEF
chris.celentino@dinsmore.com, caron.burke@dinsmore.com;SDCMLFiles@DINSMORE.COM
Christopher Celentino on behalf of Iz,_terested Party Peter J Mastan
chris.celentino@dinsmore.com, caron.burke@dinsmore.com;SDCMLFiles@DINSMORE.COM
Oscar Estrada on behalf of Creditor LOS ANGELES COUNTY TREASURER AND TAX COLLECTOR
oestrada@ttc.lacounty.gov
Bernard R Given on behalf of Creditor EAST WEST BANK
bgiven@loeb.com, mortiz@loeb.com;ladocket@loeb.com;bgiven@ecf.courtdrive.com
Mark S Horoupian on behalf ofInterested Party B&V Enterprises, inc. dba SK Market
mhoroupian@sulmeyerlaw.com, dwalker@sulmeyerlaw.com;mhoroupian@ecf.inforuptcy.com
Lois M Jacobs on behalf of Creditor EAST WEST BANK
lois.jacobs@kralikjacobs.com, anastasia.bessey@kralikjacobs.com,rina.ross@kralikjacobs.com
Kenneth G Lau on behalf of U.S. Trustee United States Trustee (LA)
kenneth.g.lau@usdoj.gov
Lisa Lenherr on behalf of Debtor Altadena Lincoln Crossing LLC
ll@tiemlaw.com, bankruptcy@wendel.com
Carmela Pagay on behalf of Interested Party Courtesy NEF
ctp@lnbyb.com
Brian A Procel on behalf of Creditor EAST WEST BANK
bprocel@millerbarondess.com, rdankwa@millerbarondess.com;docket@millerbarondess.com
Uzzi O Raanan, ESQ on behalf of Creditor Bromley, LLC

uraanan@DanningGill.com, DanningGill@gmail.com;uraanan@ecf.inforuptcy.com
Uzzi O Raanan, ESQ on behalf of Creditor OPICS Real Estate Investments & Brokerage, LLC
uraanan@DanningGill.com, DanningGill@gmail.com;uraanan@ecf.inforuptcy.com
Ronald N Richards on behalf of Interested Party Courtesy NEF
ron@ronaldrichards.com, morani@ronaldrichards.com;justin@ronaldrichards.com
Jason M Rund (TR)
trustee@srlawyers.com, jrund@ecf.axosfs.com
Gregory M Salvato on behalf of Attorney Salvato Law Offices
gsalvato@salvatolawoffices.com,
calendar@salvatolawoffices.com;jboufadel@salvatolawoffices.com;gsalvato@ecf.inforuptcy.com
Gregory M Salvato on behalf of Debtor Altadena Lincoln Crossing LLC
gsalvato@salvatolawoffices.com,
calendar@salvatolawoffices.com;jboufadel@salvatolawoffices.com;gsalvato@ecf.inforuptcy.com

# EXHIBIT "6"

1   TIMOTHY J. YOO (SBN 155531)
    tjy@lnbyb.com
2   EVE H. KARASIK (SBN 155356)
    ehk@lnbyb.com
3   JEFFREY S. KWONG (SBN 288239)
    jsk@lnbyb.com
4   LEVENE, NEALE, BENDER, YOO & BRILL L.L.P.
    10250 Constellation Boulevard, Suite 1700
5   Los Angeles, California 90067
    Telephone: (310) 229-1234
6   Facsimile: (310) 229-1244

7   Attorneys for Jason Rund
    Chapter 7 Trustee
8

9

10              **UNITED STATES BANKRUPTCY COURT**

11              **CENTRAL DISTRICT OF CALIFORNIA**

12                  **LOS ANGELES DIVISION**

13

14   In re                              | Case No. 2:17-bk-14276-BB

15   ALTADENA LINCOLN CROSSING LLC, a    | Chapter 7
16   Delaware limited liability company,

17         Debtor.                       | **CHAPTER 7 TRUSTEE'S OBJECTION
                                         | TO "APPLICATION OF GARIKIAN
18                                       | LIVING TRUST FOR ALLOWANCE
                                         | AND PAYMENT OF
19                                       | ADMINISTRATIVE EXPENSES"
                                         | [DOC. NO. 1073]; DECLARATION OF
20                                       | JASON RUND IN SUPPORT THEREOF**

21                                       | Date:  July 15, 2020
                                         | Time:  11:00 a.m.
22                                       | Place: Courtroom 1539
                                         |        255 E. Temple Street
23                                       |        Los Angeles, CA 90012

24

25

26

27

28

                                    1

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Federal Cases**

*In re Central Idaho Forest Products*
    317 B.R. 150 (Bankr. D. Idaho 2004) ................................................................ 7

*In re Colortex Indust., Inc.*
    19 F.3d 1371 (11th Cir. 1994) .......................................................................... 7

*In re Columbia Gas System Inc.*
    50 F.3d 233 (3d Cir. 1995) ......................................................................... 9, 10

*In re Community Lending, Inc.*
    2010 WL 596445 (Bankr. N.D. Cal. 2010) ...................................................... 10

*In re Dant & Russell, Inc.*
    853 F.2d 700 (9th Cir. 1988) .......................................................................... 7

*In re Kmart Corporation*
    293 B.R. 905 (Bankr.N.D.Ill.2003) .................................................................. 7

*NLRB v. Bildisco & Bildisco*
    465 U.S. 513 (1985) ....................................................................................... 9

*Matter of Patch Graphics*
    58 B.R. 743 (Bankr. W.D.Wis.1986) ................................................................ 7

*In re Sinclair*
    92 B.R. 787 (Bankr. S.D.Ill.1988) ................................................................... 7

*In re Steffen*
    181 B.R. 981 (Bankr. W.D. Wash. 1995) ......................................................... 9

*Travelers Cas. & Sur. Co. of Am. v. Pac. Gas & Elec. Co.*
    549 U.S. 443, 127 S. Ct. 1199, 167 L. Ed. 2d 178 (2007) ................................. 8

*United States v. Cuddy*
    147 F.3d 1111 (9th Cir. 1998) ........................................................................ 6

*In re World Sales Inc.*
    183 B.R. 872 (9th Cir. BAP 1995) ............................................................ 11, 12

i

**Federal Statutes**

11 U.S.C.
   § 363 ................................................................................................ 2, 12
   § 363(e) ........................................................................................... 2, 12
   § 365 ..................................................................................................... 2
   § 503 ............................................................................................... 2, 11
   § 503(b)(1)(A) ................................................................................. 6, 7
   § 1113 .................................................................................................. 11
   § 1113(f) .............................................................................................. 12

ERISA ........................................................................................................ 11, 12

1

## <u>TABLE OF CONTENTS</u>

2

3

I.      INTRODUCTION ...............................................................................................2

4

II.     STATEMENT OF FACTS ..................................................................................3

5

III.    ARGUMENT ......................................................................................................5

6

    A.   The Estate Never "Breached" The Settlement Agreement Because the Settlement
    Agreement Never Became Effective...................................................................5

7

8

    B.   Garikian Has Failed To Meet Its Burden For Allowance Of Its Administrative Expense
    Claim....................................................................................................................6

9

    C.   The Settlement Agreement Is Not An Executory Contract................................9

10

    D.   Garikian Is Not Entitled To Any "Adequate Protection" Payments. ..............12

11

IV.     CONCLUSION .................................................................................................13

12

DECLARATION OF JASON RUND........................................................................14

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Jason Rund, the Chapter 7 trustee (the "Trustee") for the bankruptcy estate (the "Estate") of Altadena Lincoln Crossing, LLC (the "Debtor"), hereby respectfully submits this objection (the "Objection") to that certain "*Application Of George Garikian Living Trust For Allowance And Payment Of Administrative Expenses*" [Doc. No. 1073] (the "Application") filed by the George Garikian Living Trust ("Garikian").

## I.   **INTRODUCTION**[1]

Garikian's Application for allowance and payment of its asserted administrative claims is primarily premised on the Estate's alleged breach of the Settlement Agreement. ***However, the Estate never breached the Settlement Agreement because that agreement was expressly conditioned on the entry of an "order confirming [the Debtor's] Plan which provides for the assumption of the 16 Space Parking Lease and the Amended 14-Space Parking Lease," and a Court order confirming the Debtor's chapter 11 plan was never entered in this Case***. *See* (Obj. Ex. 1). Further, because the Closing under the Settlement Agreement did not occur before the Outside Termination Date of June 30, 2018 , that agreement was "terminated, and without further force or effect." *See* (Obj. Ex. 1). The Application ignores the fact that the Court, in the Tentative Ruling and EWB Settlement Order, already rejected Garikian's "breach" argument. In addition, Garikian has failed to show how the damages it allegedly sustained for the non-completion of the Improvements and its attorneys' fees represent the "actual, necessary costs and expense of preserving the [E]state" under Section 503 of the Bankruptcy Code. Nor has Garikian adequately explained: (1) how the EWB Settlement was a "*de facto* rejection" of the Settlement Agreement (which, arguably, is not even an executory contract under Section 365 of the Bankruptcy Code; or (2) why it is entitled to retroactive "adequate protection" under Section 363(e) of the Bankruptcy Code, on the basis that the EWB Settlement is the "functional equivalent" of a Section 363 sale. It is abundantly clear that Garikian is not entitled to any administrative expense claim against the Estate.

---

[1] All capitalized but undefined terms in this "Introduction" section shall have the same meanings ascribed to them in the other parts of the Objection.

## II.    STATEMENT OF FACTS

1.      On April 7, 2017, the Debtor filed a chapter 11 voluntary petition in the United States Bankruptcy Court for the Central District of California.  The case was precipitated by, among other things, a dispute with its secured lender, East West Bank ("EWB").

2.      On September 27, 2019, the Court entered an order appointing a chapter 11 trustee for the Debtor's case, *see* [Doc. No. 956]; and, on October 7, 2019, Jason Rund was appointed the chapter 11 trustee (the "Chapter 11 Trustee"), *see* [Doc. No. 968].

3.      On March 13, 2020, the Debtor's chapter 11 case was converted to a chapter 7 case.  The Trustee was appointed to serve as the chapter 7 trustee.

4.      Prior to the Trustee's appointment as chapter 11 trustee, the Debtor and Garikian entered into the "*Settlement Agreement*" [Doc. No. 369-1] dated January 20, 2018 (the "Settlement Agreement") to settle their disputes related to certain alleged parking issues associated with Garikian's purchase from the Debtor of the "Market Quadrant" portion of the Lincoln Crossing shopping center project, which has a common street address of 2230-2268 Lincoln Avenue, Altadena, California.

5.      The Debtor subsequently filed a motion for Court approval of the Settlement Agreement [Doc. No. 369] (the "Settlement Motion") on January 25, 2018, which was approved by an order entered by the Court [Doc No. 560] on June 22, 2018.  A true and correct copy of the Settlement Motion, attaching the Settlement Agreement as Exhibit 1 thereto, is attached as **Exhibit "1"** to the Declaration of Jason Rund annexed hereto (the "Rund Declaration").

6.      The closing of the Settlement Agreement ("Closing") was expressly conditioned on, among other conditions, the entry of an "***order confirming [the Debtor's] Plan*** which provides for the assumption of the 16 Space Parking Lease and the Amended 14-Space Parking Lease," and the settlement would be "deemed terminated, and without further force or effect" if the Closing failed to occur on or before June 30, 2018 (the "Outside Termination Date").  However, a Court order confirming the Debtor's chapter 11 plan was never entered in this case (the "Case").

7.     After numerous discussions with East West Bank ("EWB"), the Trustee successfully negotiated an agreement by which all of the issues and claims between the Estate and EWB will be resolved.  That agreement – memorialized in that certain "*Settlement Agreement and General Releases*" dated December 17, 2019 (the "EWB Agreement") – provided for EWB to pay  $1,500,000 to the Estate in exchange for (1) dismissal of the Estate's state court action against EWB; (2) dismissal of the Ninth Circuit appeal; and (3) relief from stay so that EWB could foreclose on the property located at the corner of Lincoln Avenue and Woodbury Road in Altadena, California (the "Property").

8.     On December 20, 2019, the Trustee filed a motion seeking, among other things, an order approving the EWB Agreement (the "EWB Settlement Motion").

9.     Garikian filed an opposition to the EWB Settlement Motion [Doc. 1022] (the "EWB Settlement Opposition") on January 15, 2020.  A true and correct copy of the EWB Settlement Opposition is attached as **Exhibit "2"** to the Rund Declaration.

10.    Shortly before the hearing, on January 29, 2020, the Court entered its tentative ruling on the EWB Settlement Motion (the "Tentative Ruling").  The Tentative Ruling rejected Garikian's objections to the EWB Settlement Motion, and stated that the "Court agrees with trustee that the Garikian Agreement has never 'closed' or become effective because a plan was never confirmed . . . . Approval of the proposed compromise would not give rise to a breach of the settlement agreement, and the compromise is not a disguised attempt to undo the court's prior order approving the Garikian settlement."  A true and correct copy of the Tentative Ruling is attached as **Exhibit "3"** to the Rund Declaration.

11.    A hearing was held on the EWB Settlement Motion on January 29, 2020; and, on February 5, 2020, the Court entered its order approving the EWB Settlement Motion [Doc. No. 1035] (the "EWB Settlement Order").  The EWB Settlement Order provided, among other things, that the EWB Settlement Motion was granted "for the findings and reasons stated on the record, including as set forth in the Court's Tentative Ruling (as amended)."  A true and correct copy of the EWB Settlement Order is attached as **Exhibit "4"** to the Rund Declaration.

12.     Despite the fact that the Settlement Agreement never became effective (because the Court never entered an order confirming the Debtor's Chapter 11 plan), Garikian has filed the Application asserting the allowance and payment of its asserted $110,000 administrative expense claim arising out of the Estate's alleged breach of the Settlement Agreement.  For the variety of reasons discussed below, the Application should be denied in its entirety.

### III.    ARGUMENT

**A.     The Estate Never "Breached" The Settlement Agreement Because the Settlement Agreement Never Became Effective.**

Despite previously making, and the Court rejecting the argument that the Estate "breached" the Settlement Agreement, Garikian once again argues that: "*The Garikian Settlement Agreement binds the Estate, and its representatives, including the Trustee. As such, the Trustee should not be permitted to effect its breach, which he has initiated by filing the Motion.  The Estate's obligation to perform the Lot 5 Improvements is a central component of that settlement agreement.*"  (App. 14:9-12).

Although unnecessary to elaborate at length (because Garikian's "breach" argument has already been rejected by the Court), the Estate never breached the Settlement Agreement because that agreement was  never effective as it was expressly conditioned on the entry of an "***order confirming [the Debtor's] Plan*** which provides for the assumption of the 16 Space Parking Lease and the Amended 14-Space Parking Lease," and a Court order confirming the Debtor's chapter 11 plan was never entered in this Case.  *See* (Obj. Ex. 1).  Further, because the Closing under the Settlement Agreement did not occur before the Outside Termination Date of June 30, 2018, that agreement was "terminated, and without further force or effect."  *See* (Obj. Ex. 1).  Garikian has presented no evidence of any modification of the conditions to the effectiveness of the Settlement Agreement or an extension of the June 30, 2018 Outside Termination Date entered into before the Trustee's appointment, and the Trustee agreed to none thereafter.  Because the Settlement Agreement was never effective and terminated by its own terms on the Outside Termination Date, it is null and void.  ***Garikian is not entitled to an administrative expense claim based on an***

*alleged breach of the terminated Settlement Agreement that never went effective.*

The Application also ignores the fact that the Court previously rejected Garikian's argument that the Estate breached the Settlement Agreement (by the Trustee's entry into the EWB Agreement or otherwise).[2]  In response to Garikian's "breach" argument discussed in the EWB Settlement Opposition, shortly before the hearing, on January 29, 2020, the Court entered its Tentative Ruling on the EWB Settlement Motion stating that the "Court agrees with trustee that the Garikian Agreement has never 'closed' or become effective because a plan was never confirmed . . . . Approval of the proposed compromise would not give rise to a breach of the settlement agreement, and the compromise is not a disguised attempt to undo the court's prior order approving the Garikian settlement."  *See* (Obj. Ex. 3).  The EWB Settlement Order specifically adopted the "findings and reasons stated" in the Tentative Ruling.  *See* (Obj. Ex. 4). Therefore, not only was the "breach" argument previously raised by Garikian, and rejected by the Court, it is now law of the case that the Estate could not have breached the terminated Settlement Agreement that never became effective.  *See United States v. Cuddy*, 147 F.3d 1111, 1114 (9th Cir. 1998) ("The law of the case doctrine provides that "a court is generally precluded from reconsidering an issue that has already been decided by the same court, or a higher court in the identical case.").

**B.**     <u>**Garikian Has Failed To Meet Its Burden For Allowance Of Its Administrative**</u>
      <u>**Expense Claim.**</u>

Section 503(b)(1)(A) of the Bankruptcy Code provides:

> "After notice and a hearing, there shall be allowed administrative expenses, other than claims allowed under section 502(f) of this title, including –
> (1)(A) the actual, necessary costs and expense of preserving the estate…."

11 U.S.C. § 503(b)(1)(A).

---

[2] Any argument that the EWB Settlement caused the Estate to breach the previously terminated Settlement Agreement is nonsensical.  The Trustee was appointed, and the EWB Settlement was entered into more than one (1) year after the Settlement Agreement terminated on its own terms.

1    The burden of proof to demonstrate that the claimant is entitled to an administrative claim

2  is upon the movant. *See, In re Kmart Corporation*, 293 B.R. 905, 909 (Bankr.N.D.Ill.2003) ("The

3  claimant has the burden of proving entitlement to an administrative expense by preponderance of

4  the evidence."); *In re Central Idaho Forest Products*, 317 B.R. 150, 155 (Bankr. D. Idaho 2004);

5  *In re Sinclair*, 92 B.R. 787, 788 (Bankr. S.D.Ill.1988); *Matter of Patch Graphics*, 58 B.R. 743,

6  745 (Bankr. W.D.Wis.1986). Section 503(b) priorities should be "narrowly" construed to

7  maximize the value of the estate for all creditors. *In re Dant & Russell, Inc.*, 853 F.2d 700, 707

8  (9th Cir. 1988). *In re Colortex Indust., Inc.*, 19 F.3d 1371, 1377 (11th Cir. 1994). The modifiers

9  "actual" and "necessary" must be observed with scrupulous care. *See* Collier on Bankruptcy,

10  Volume 4, 16th Ed. ¶503.06[1]; *Dant & Russell*, 853 F.2d at 706 ("The terms 'actual' and

11  'necessary' are ***construed narrowly so as to keep fees and administrative costs at a minimum***.")

12  (emphasis added). Courts have "broad discretion in determining whether to award administrative

13  expense priority," "limited by the clear intent of section 503(b)(1)(A): the actual and necessary

14  costs of preserving the estate." *Dant & Russell*, 853 F.2d at 707.

15    In a conclusory fashion, Garikian states that the Settlement Agreement was: (1)

16  "[n]ecessary[,] in that if completed, a substantial cloud on title to the Fitness Quadrant that could

17  have impeded its sale or re-finance was removed"; and (2) "benefitted the Estate, because, had it

18  not forfeited the Fitness Quadrant to EWB, that property would have been available to the Estate

19  for sale, finance or reorganization." (App. 12). Garikian's conjectures as to the benefits that the

20  "Lot 5 Improvements" (the "Improvements") – if hypothetically completed – would bring to the

21  Estate is insufficient to meet its burden.

22    As an initial matter, it is important to note that both Garikian and the Debtor agreed that

23  the Settlement Agreement would terminate if the conditions to closing were not met by the

24  Outside Closing Date; and, therefore, both parties anticipated the possibility that the

25  Improvements would not be completed. The Improvements were, therefore, not "necessary" for

26  the Estate's benefit because both parties bargained for a scenario in which the Settlement

27  Agreement would terminate before the Improvements were completed.

28

1    Moreover, Garikian appears to have conceded that the Improvements did not actually

2    provide any benefit to the Estate, because: (1) the Improvements were not completed, and (2)

3    there is no evidence to show that Garikian expended any funds towards completion of the

4    Improvements.  *See* (App. 12:18-21) (" . . . Debtor, divested of title and possession, is no longer

5    in a position to order, complete, and cover the cost of the required work, which nevertheless must

6    be completed in accordance with County Requirements.").

7    Garikian's further argument that the Improvements could have benefited the Debtor's

8    theoretical attempts to sell or "re-finance" is pure speculation; this is because neither events

9    occurred in this Case.  In fact, now that the Case has been converted to chapter 7, and EWB has

10    been allowed relief from stay to foreclose on the Property pursuant to the EWB Settlement

11    Agreement, it is clear that the Improvements provided no actual benefit to the Estate.

12    Relatedly, because the Settlement Agreement never became effective, no basis exists for

13    Garikian's administrative expense claim for attorneys' fees.  There has been no evidence to show

14    that Garikian's attorneys' fees represent the "actual, necessary costs and expense of preserving

15    the [E]state" and, instead, appears to have been incurred to protect Garikian's own (and not the

16    Estate's) rights and/or interests.  In any event, the fact that Garikian's claim is primarily (if not

17    solely) based on breach of the Settlement Agreement, and the Settlement Agreement does not

18    have an attorneys' fees provision is fatal to its claim for attorneys' fees.  *See Travelers Cas. &*

19    *Sur. Co. of Am. v. Pac. Gas & Elec. Co.*, 549 U.S. 443, 448, 127 S. Ct. 1199, 1203, 167 L. Ed. 2d

20    178 (2007) ("Under the American Rule, 'the prevailing litigant is ordinarily not entitled to collect

21    a reasonable attorneys' fee from the loser.' . . . This default rule can, of course, be overcome by

22    statute . . . [or] an 'enforceable contract' allocating attorney's fees.").

23    The Application is nothing more than an attempt by Garikian to get paid through a work-

24    around of the fact that the terminated Settlement Agreement never went effective, and the

25    Application should be denied.

26    ///

27    ///

28

**C.**     **The Settlement Agreement Is Not An Executory Contract.**

Garikian's next argument that consummation of the EWB Settlement was a "*de facto* rejection*" of that agreement, as well as an actual breach," entitling it to administrative expense claims against the Estate is misguided and wrong for a multitude of reasons. *See* (App. 17:5-6).

*First*, the Settlement Agreement is not an executory contract "under which the obligation of both the [Debtor] and [Garikian] are so far unperformed that the failure of either to complete performance would constitute a material ***breach*** excusing performance of the other." *In re Columbia Gas System Inc.*, 50 F.3d 233, 239 (3d Cir. 1995) (emphasis added).[3]  This is because, among other reasons: (1) the Settlement Agreement could not have been breached before closing of the settlement transaction occurred; (2) the Settlement Agreement never went effective and was, instead, terminated on the Outside Closing Date; and (3) most significantly, the Court already held that the failed proposed compromise would not give rise to a breach of the Settlement Agreement. *See* (Obj. Ex. 1); (Obj. Ex. 3) ("Court agrees with trustee that the Garikian Agreement has never 'closed' or become effective because a plan was never confirmed . . . . Approval of the proposed compromise would not give rise to a breach of the settlement agreement, and the compromise is not a disguised attempt to undo the court's prior order approving the Garikian settlement.").  In addition, Garikian has not demonstrated how the Settlement Agreement, *i.e.*, a post-petition agreement that never went effective, could be assumed or rejected by the Estate.

*Second*, any argument by Garikian that the Estate breached the Settlement Agreement by not obtaining a Court order confirming the Debtor's plan should be rejected.  In the context of interpreting settlement agreements, there is a difference between the "failure of a condition," on the one hand, and a "breach of a duty," on the other hand, because the "[n]on-occurrence of a condition is not breach by a party unless he is under a duty that the condition occur." *Columbia Gas*, 50 F.3d at 241.  Here, the inability of the Debtor to obtain a plan confirmation order is the

---

[3] *See also In re Steffen*, 181 B.R. 981, 985 (Bankr. W.D. Wash. 1995) ("Ninth Circuit courts generally view executory contracts through the prism of the Countryman definition: contracts are executory when material obligations remain to be performed by each party."); *NLRB v. Bildisco & Bildisco*, 465 U.S. 513, 522 n. 6 (1985) (executory contracts are those where "performance remain due to some extent on both sides.").

"failure of a condition," and not a "breach of a duty" under the agreement. *See Columbia Gas*, 50 F.3d at 241. In any event, as described above, it is not apparent how the Settlement Agreement could have been breached (much less assumed or rejected) prior to when the conditions for Closing of the Settlement Agreement occurred to allow for such agreement to be effective.

**Third**, even ignoring the fact that a breach of the Settlement Agreement could not have occurred prior to Closing of the Settlement Agreement, any breach of the Settlement Agreement would not entitle Garikian to administrative expense claims because the "source" of its claims arose pre-petition. As described by the bankruptcy court in *In re Community Lending, Inc.*, 2010 WL 596445 (Bankr. N.D. Cal. 2010):

> "In *Kadjevich,* the Ninth Circuit extended its 'source of the obligation' analysis beyond the context of pre-petition contracts to find that a post-petition fee award pursuant to a California fee-shifting statute still arose from a pre-petition transaction. In that case, Nicholas Kadjevich sued his brother, Robert, for fraud. Then, Robert filed a chapter 11 bankruptcy petition. **Post-petition**, the brothers agreed to settle the fraud action, but Robert breached the settlement agreement. Nicholas proceeded to judgment against his brother and obtained a ruling that Robert's bad faith conduct in refusing to honor the settlement agreement entitled Nicholas to an award of attorneys' fees. Nicholas sought payment of the post-petition fee award as an administrative expense of Robert's estate. Relying on *Abercrombie,* the Ninth Circuit rejected Nicholas' request. Although Nicholas' right to request fees, *i.e.,* Robert's bad faith conduct, accrued post-petition, the court reasoned that the **source of the obligation** to pay the fees arose pre-petition when the state court fraud action exposed Robert to liability for fraud and to a claim for fees under the fee-shifting statute. *Kadejevich,* 220 F.3d at 1020.
>
> The Pham and Buckmeyer claimants urge that the attorneys' fee award here arose out of a post-petition transaction because several key events took place after CLI filed its bankruptcy petition: 1) the filing of the adversary proceeding, 2) the chapter 7 trustee's defense of the litigation, and 3) the entry of the district court order awarding them fees. Under prevailing Ninth Circuit authority, however, none of these events transforms their attorneys' fee claim into a post-petition debt."

*Id*. at *4.

Here – although the Settlement Agreement was executed, and approved by the Court post-petition – the "source of the obligation" for Garikian's claims (damages and attorneys' fees) arose pre-petition. In fact, the Application concedes the pre-petition nature of Garikian's claims against the Estate, in which liability started accruing from when Garikian purchased the "Market

1  Quadrant" portion of the Lincoln Crossing shopping center project from the Debtor pre-petition.

2  *See* (App. 4:12-15) (" . . . as part of the documentation of their purchase and sale agreement dated

3  January 15, 2015 . . . also entered into the Leases and the Indemnity Agreement[.]"); (App. 7 ¶ 7)

4  ("As of the commencement of the Debtor's Chapter 11 case, it had **not** made the Lot 5

5  improvements, necessitating the filing of a Proof of Claim based on the Indemnity Agreement");

6  (App. 9 ¶ 13) ("The aim of the Settlement Agreement was to avoid long, drawn-out, expensive

7  litigation . . . and to mitigate a significant multimillion-dollar risk looming over Garikian's Market

8  Quadrant without the Lot 5 Improvements.").    Moreover, the fact that Garikian filed its

9  $5,000,000 proof of claim against the Estate on August 8, 2017 (*i.e.*, before the Settlement

10  Agreement was entered into), on the basis of the pre-petition "Indemnity Agreement secured by

11  2230-2260 Lincoln Ave., Altadena, California," further evidences that the "source of the

12  obligation" of these claims that Garikian may have against the Estate arose pre-petition.  As a

13  result, Garikian's damages and attorneys' fees claims are pre-petition in nature, and are not

14  entitled to administrative expense priority under Section 503 of the Bankruptcy Code.

15  *In re World Sales Inc.*, 183 B.R. 872 (9th Cir. BAP 1995) is distinguishable.  That case

16  involved a collective bargaining agreement between the debtor as employer and the General

17  Warehousemen Union, Local 598, International Brotherhood of Teamsters, AFL-CIO (the

18  "Union"), and the debtor failed to timely pay certain post-petition monthly obligations to an

19  ERISA plan. *See id*. at 874.  There, because: (1) "Section 1113 was enacted to protect employees

20  during the interim between the filing of the bankruptcy petition and court-supervised modification

21  or ultimate rejection of the CBA"; and (2) "[d]uring this period, working employees benefit the

22  estate", the Court held that "a debtor's unperformed post-petition obligations under an unmodified

23  or unrejected CBA are beyond the scope of § 365(g), and claims based on such post-petition

24  breaches must be given administrative status, even where the CBA is subsequently modified or

25  rejected pursuant to § 1113." *Id.* at 878.  It is not apparent how *World Sales* is applicable to this

26  Case.  This Case does not involve a collective bargaining agreement to which Section 1113 of the

27  Bankruptcy Code is implicated.  Moreover, the Settlement Agreement in this Case never became

28  effective, unlike the binding collective bargaining agreement in *World Sales*.  *See id*. at 874

11

("under § 11 U.S.C. § 1113(f) bound the debtor until rejection of the contract."). Lastly, unlike in *World Sales*, the Settlement Agreement did not require the Debtor to make periodic payments to Garikian in exchange for certain post-petition benefits. *See id*. at 873 ("The employees' benefit plan sought administrative priority payment for the debtor's monthly contribution to its employee's health plan and damages due on default under the terms of the debtor's unrejected collective bargaining agreement and ERISA."); *id*. at 878 ("During this period, working employees benefit the estate.").

Because the Settlement Agreement never became effective, and the "source of the obligation" of Garikian's damages and attorneys' fees claims arose pre-petition, Garikian is not entitled to any administrative expense claims against the Estate.

**D.    Garikian Is Not Entitled To Any "Adequate Protection" Payments.**

Section 363(e) of the Bankruptcy Code provides that "on request of an entity that has an interest in property used, sold, or leased, or proposed to be used, sold, or leased, by the trustee, the court . . . shall prohibit or condition such use, sale, or lease as is necessary to provide adequate protection of such interests." 11 U.S.C. § 363(e). Garikian fails to show how Section 363(e) of the Bankruptcy Code is relevant, or why Garikian is entitled to adequate protection. First and foremost, there was never a sale of the Property under Section 363 of the Bankruptcy Code. Garikian's further argument that the EWB Agreement (which allowed EWB stay relief to foreclose on the Property) is the "functional equivalent" of a sale under Section 363 of the Bankruptcy Code is absurd and the cases cited for this argument are inapposite.

Nor has Garikian cited any case where a court has allowed for what it is seeking, *i.e.*, "retroactive . . . 'adequate protection' of Garikian's secured claim." (App. 20:9-12). The EWB Agreement simply paved the way for EWB to foreclose on the Property. As the Court previously stated in the Tentative Ruling in response to similar arguments made by Garikian that its rights were being unfairly impaired by the EWB Settlement, "**Garikian retains whatever rights it would otherwise have had prior to entering into the settlement agreement. If the existence of its liens and claims impairs the value of the property, that will not be the estate's issue after EWB has foreclosed. That will be EWB's problem.**" (Obj. Ex. 3). Section 363(e) of the

Bankruptcy Code is not applicable, and does not support Garikian's request to have this Court

award it $60,000 in attorney's fees as an administrative expense claim against the Estate.

## IV.    <u>CONCLUSION</u>

**WHEREFORE**, the Trustee respectfully requests that the Court enter an order:

    1.    Denying the Application in its entirety; and

    2.    Granting such other and further relief as may be necessary or appropriate under

the circumstances.

Date:  July 1, 2020

                                     Respectfully submitted,

                                     LEVENE, NEALE, BENDER, YOO & BRILL L.L.P.

                                     By:   */s/ Timothy J. Yoo*
                                     TIMOTHY J. YOO
                                     EVE. H. KARASIK
                                     JEFFREY S. KWONG
                                     Attorneys for Jason Rund, Chapter 7 Trustee

## DECLARATION OF JASON RUND

I, Jason Rund, declare as follows:

1.     I am the duly-appointed, qualified, and acting Chapter 7 trustee for the bankruptcy estate (the "Estate") of Altadena Lincoln Crossing LLC, the debtor herein (the "Debtor").  Unless otherwise stated, I have personal knowledge of the facts set forth below and, if called to testify, would and could competently testify thereto. All capitalized terms not defined herein shall have the same meanings ascribed to them as in the Objection to which this Declaration is annexed.

2.     On April 7, 2017, Altadena Lincoln Crossing LLC (the "Debtor") filed a Chapter 11 voluntary petition in the United States Bankruptcy Court for the Central District of California. The case was precipitated by a dispute between the Debtor and its secured lender, East West Bank ("EWB").

3.     On September 27, 2019, the Court entered an order appointing a chapter 11 trustee for the Debtor's case, *see* [Doc. No. 956]; and on October 7, 2019, I was appointed the chapter 11 trustee (the "Chapter 11 Trustee"), *see* [Doc. No. 968].

4.     On March 13, 2020, the Debtor's chapter 11 case was converted to a chapter 7 case.  I was appointed to serve as the chapter 7 trustee.

5.     Prior my appointment as chapter 11 trustee, the Debtor and Garikian entered into the "*Settlement Agreement*" [Doc. No. 369-1] dated January 20, 2018 (the "Settlement Agreement") to settle their disputes related to certain alleged parking issues associated with Garikian's purchase from the Debtor of the "Market Quadrant" portion of the Lincoln Crossing shopping center project, which has a common street address of 2230-2268 Lincoln Avenue, Altadena, California.

6.     The Debtor subsequently filed a motion for Court approval of the Settlement Agreement [Doc. No. 369] (the "Settlement Motion") on January 25, 2018, which was approved by an order entered by the Court [Doc No. 560] on June 22, 2018.  A true and correct copy of the Settlement Motion, attaching the Settlement Agreement as Exhibit 1 thereto, is attached as **Exhibit "1"** hereto.

7.     The closing of the Settlement Agreement (the "Closing") was expressly conditioned on, among other conditions, the entry of an *order confirming [the Debtor's] Plan* which provides for the assumption of the 16 Space Parking Lease and the Amended 14-Space Parking Lease," and would be "deemed terminated, and without further force or effect" if the Closing failed to occur on or before June 30, 2018 (the "Outside Termination Date").  However, a Court order confirming the Debtor's chapter 11 plan was never entered in this case (the "Case").

8.     I am not aware of any modification of the conditions to the effectiveness of the Settlement Agreement or an extension of the June 30, 2018 Outside Termination Date entered into before my  appointment, and have not agreed to any such modification or extension.

9.     After numerous discussions with East West Bank ("EWB"), I successfully negotiated an agreement by which all of the issues and claims between the Estate and EWB were resolved.  That agreement – memorialized in that certain "*Settlement Agreement and General Releases*" dated December 17, 2019 (the "EWB Agreement") – provided for EWB to pay $1,500,000 to the Estate in exchange for (1) dismissal of the Estate's state court action against EWB; (2) dismissal of the Ninth Circuit appeal; and (3) relief from stay so that EWB could foreclose on the property located at the corner of Lincoln Avenue and Woodbury Road in Altadena, California (the "Property").

10.     On December 20, 2019, I filed a motion seeking, among other things, an order approving the EWB Agreement (the "EWB Settlement Motion").

11.     Garikian filed an opposition to the EWB Settlement Motion [Doc. 1022] (the "EWB Settlement Opposition") on January 15, 2020.  A true and correct copy of the EWB Settlement Opposition is attached as **Exhibit "2"** hereto.

12.     Shortly before the hearing, on January 29, 2020, the Court entered its tentative ruling on the EWB Settlement Motion (the "Tentative Ruling").  The Tentative Ruling rejected Garikian's objections to the EWB Settlement Motion, and stated that the "Court agrees with trustee that the Garikian Agreement has never 'closed' or become effective because a plan was never confirmed . . . . Approval of the proposed compromise would not give rise to a breach of the settlement agreement, and the compromise is not a disguised attempt to undo the court's prior

order approving the Garikian settlement." A true and correct copy of the Tentative Ruling is attached as **Exhibit "3"** hereto.

13.    A hearing was held on the EWB Settlement Motion on January 29, 2020 and, on February 5, 2020, the Court entered its order approving the EWB Settlement Motion [Doc. No. 1035] (the "EWB Settlement Order"). The EWB Settlement Order provided, among other things, that the EWB Settlement Motion was granted "for the findings and reasons stated on the record, including as set forth in the Court's Tentative Ruling (as amended)." A true and correct copy of the EWB Settlement Order is attached as **Exhibit "4"** hereto.

I declare and verify under penalty of perjury under the law of the United States of America that the foregoing is true and correct to the best of my knowledge.

Executed on June _29_, 2020, at El Segundo, California.

_____
JASON RUND

# EXHIBIT "1"

1  GREGORY M. SALVATO (SBN 126285)
    Gsalvato@salvatolawoffices.com
2  JOSEPH BOUFADEL (SBN 267312)
    Jboufadel@salvatolawoffices.com
3  SALVATO LAW OFFICES
  Wells Fargo Center
4  355 South Grand Avenue, Suite 2450
  Los Angeles, California 90071-9500
5  Telephone:   (213) 484-8400
  Facsimile:   (213) 402-3778
6
  Attorneys for Debtor-in-Possession
7  ALTADENA LINCOLN CROSSING LLC,
  a Delaware limited liability company

8

9  **UNITED STATES BANKRUPTCY COURT**

10  **CENTRAL DISTRICT OF CALIFORNIA**

11  **LOS ANGELES**

12

| | |
|---|---|
| 13  In re: | Case No. 2:17-bk-14276-BB |
| 14  ALTADENA LINCOLN CROSSING LLC, a Delaware limited liability company, | Chapter 11 |
| 16            Debtor. | **Motion for Order to:** |
| | **(1) Approve Compromise between Debtor Altadena Lincoln Crossing, LLC and George Garikian as Trustee of the George Garikian Living Trust;** |
| | **(2) Modify Cash Collateral Order to Approve $50,000 Expenditure Required by Compromise;** |
| | **Memorandum of Points and Authorities; Declaration of Greg Galletly in Support** |
| | Hearing Date:<br>Date:     February 28, 2018<br>Time:    10:00 a.m.<br>Place:   Courtroom 1539<br>          255 E. Temple Street<br>          Los Angeles, CA 90012 |

Salvato Law
Offices
28

# TABLE OF CONTENTS

1.    Introduction. ...................................................................................... 1

2.    Statement of Relevant Facts. .............................................................. 2

    2.1.    Garikian's Proofs of Claim Nos. 10 and 12. ...................... 2

    2.2.    The Purchase and Sale Agreement and related agreements
        between the parties. ........................................................... 3

    2.3.    The SK Market Lease. ........................................................ 4

    2.4.    The Indemnity Agreement and Memorandum of Lease
        regarding the Parking Structure Leases. ............................. 4

    2.5.    The Debtor's Settlement Agreement with Garikian to
        resolve all outstanding issues and claims. .......................... 5

    2.6.    The Order authorizing the Debtor's use of cash collateral
        through March 31, 2018. .................................................... 6

3.    Legal Arguments. ............................................................................... 7

    3.1.    Rule 9019 standard for approving a compromise and
        settlement. ......................................................................... 7

    3.2.    The settlement agreement between the Debtor and
        Garikian is fair and reasonable and should be approved. ... 8

    3.3.    Modification of the cash collateral order to authorize the
        improvements on Lot 5 is fair, reasonable, and increases
        the value of the Property. ................................................... 9

4.    Conclusion. ...................................................................................... 10

DECLARATION OF GREG GALLETLY ............................................... 11

Salvato Law
Offices

Case 2:17-bk-14276-BB    Doc 1099    Filed 07/13/20    Entered 07/13/20 17:39:09    Desc
Main Document    Page 293 of 420

## MEMORANDUM OF POINTS AND AUTHORITIES
## IN SUPPORT OF MOTION TO APPROVE COMPROMISE AND
## MODIFY CASH COLLATERAL ORDER

### 1. Introduction.

Debtor and Debtor-in-Possession Altadena Lincoln Crossing LLC (the "**Debtor**") hereby submits the attached Settlement Agreement (**Exhibit 1**) with creditor George Garikian, as Trustee of the George Garikian Living Trust ("**Garikian),** and moves the Court for an Order approving the compromise and settlement.

The Debtor and Garikian have settled their disputes with respect the various agreements executed between the parties and have resolved the disputed Proofs of Claim filed by Garikian in anticipation of the Debtor's proposed rejection of various executory contracts and leases to which Garikian is a party. As a result of the proposed compromise, the Debtor intends to assume the Indemnity Agreement, the 16-Space Parking Space Lease, and the 14-Space Parking Lease, as modified, under its Plan of Reorganization. The assumption of these agreements will thereby eliminate any basis for the projected $5 million damage claims asserted by Garikian against the Debtor's estate as a consequence of the proposed rejection of those leases and agreement.

As part of the settlement with Garikian, the Debtor also seeks an order approving a proposed modification to the Cash Collateral Order (the "Order approving Stipulation for Order Authorizing Use of Cash Collateral Through March 31, 2018") entered on January 10, 2018 [Dkt. No. 351].[1] The modification seeks approval of the deposit of $50,000 into a segregated account, and authority to use such funds exclusively to make the improvements described in the Settlement Agreement for the: (a) grading of the

---

[1] The Debtor understands that East West Bank may in fact be amenable to the proposed modification of the Cash Collateral Order as requested here, but the Debtor was unable to obtain the Bank's consent to the expenditure (requiring authorization to use cash collateral) prior to the Court's approval of the compromise with Garikian.

Salvato Law
Offices

1   unimproved Lot 5 (an undeveloped portion of the Debtor's real property) and permit

2   approvals, (b) paving and striping of Lot 5 in accordance with County requirements; and

3   (c) relocation of the sprinkler fixtures, so that no fewer than 14 vehicles can be parked on

4   Lot 5. (*See* **Exhibit 1** at ¶¶ 7-8).

5        The Settlement Agreement represents the resolution of the controversies between

6   the Debtor and Garikian on the terms and conditions set forth in the executed Settlement

7   Agreement (**Exhibit 1**), which terms are more fully described below.

8        The Debtor respectfully requests that the Court grant this Motion and approve the

9   Settlement Agreement between the parties, and approve the modification of the cash

10   collateral order to authorize the expenditure of $50,000 for parking lot improvements so

11   that the Debtor may implement the settlement and begin the necessary improvements on

12   Lot 5.

13

14   **2.  Statement of Relevant Facts.**

15        **2.1.  Garikian's Proofs of Claim Nos. 10 and 12.**

16        On April 7, 2017, the Debtor commenced this voluntary Chapter 11 bankruptcy

17   case, *In re Altadena Lincoln Crossing LLC,* Case No. 2:17-bk-14276-BB.

18        On July 18, 2017, Garikian filed a Motion to Compel Assumption or Rejection of

19   the two parking leases with the Debtor that required the Debtor to provide parking spaces

20   dedicated to the Market Quadrant. [Dkt. No. 157]. The Debtor, in response, sought

21   additional time to decide whether to assume or reject the parking space leases, as well as

22   opposing the motion on other grounds. [Dkt. No. 188].

23        On August 8, 2017, Garikian filed his Proof of Claim No. 10, seeking a claim for

24   an "unknown [amount] but not less than $5 million" secured by the Debtor's Property

25   located at 2180-2220 Lincoln Avenue, Altadena, CA 91001 based upon the anticipated

26   rejection of an indemnity agreement.

27        Also on August 8, 2017, Garikian filed his Proof of Claim No. 12, an unsecured

28   claim for an "unknown [amount] but not less than $5 million" for "damages arising from

Salvato Law
Offices

1  rejection of 99-year Parking Garage Lease."

2      Ultimately, the Debtor filed a proposed plan of reorganization proposing to reject

3  the Parking Spaces Leases and the Indemnity Agreement upon the Effective Date of the

4  Plan. Objections to the Garikian Proofs of Claim were being prepared when the parties

5  began discussions of settlement.

6          **2.2.**    **The Purchase and Sale Agreement and related agreements**

7                  **between the parties.**

8      The dispute arises from a series of pre-bankruptcy agreements between the Debtor

9  and Garikian. On or as of August 26, 2014, Garikian and the Debtor entered into the

10  "Standard Offer, Agreement and Escrow Instructions for Purchase of Real Estate (Non-

11  Residential") (the "**PSA**"), and on January 8, 2015, Garikian and Debtor entered into the

12  following additional agreements; (1) an Indemnity Agreement ("**Indemnity**

13  **Agreement**"); (2) a Deed of Trust securing the Debtor's obligations under the Indemnity

14  Agreement ("**Deed of Trust**"); (3) a 99-year lease for 16 parking spaces (the "**16-Space**

15  **Parking Lease**"); and (4) a 99-year lease for 14 parking spaces (the "**14-Space Parking**

16  **Lease**").

17      Between October 8, 2014, and January 14, 2015, the parties executed a series of

18  amendments to the PSA, including a Fifth Amendment thereto (the "**Fifth Amendment to**

19  **PSA**"). Pursuant to the foregoing Agreements (collectively the "**Purchase and Sale**

20  **Agreements**"), the Debtor agreed to sell, and Garikian agreed to purchase, the real

21  property located at and commonly known as 2230-2260 Lincoln Ave., Altadena,

22  California (described in the Purchase and Sale Agreements as the "**Market Quadrant**").

23      Prior to the sale, the Debtor was the owner of both the Market Quadrant and

24  another quadrant called, in the Purchase and Sale Agreements, the "**Fitness Quadrant.**"

25  The Parking Structure is located on the Fitness Quadrant.  Following the sale, the Debtor

26  is the Landlord and Garikian is the Tenant under the 16-Space Parking Lease and the 14-

27  Space Parking Lease (collectively the "**Parking Structure Leases**").

28  

Salvato Law
Offices

Motion for Order to Approve Compromise and to
Modify Cash Collateral Order
   -3-   
*In re Altadena Lincoln Crossing LLC, Debtor*
Case No. 2:17-bk-14276-BB

## 2.3. The SK Market Lease.

Prior to Garikian's purchase of the Market Quadrant, ALC and B&V Enterprises, Inc., dba SK Market ("**SK Market**") entered into a lease with the Debtor dated April 1, 2008, as amended (the "**SK Market Lease**"). SK Market's premises consist of 37,500 square feet, which is a portion (approximately 86.5%) of the overall 43,304 square-feet Market Quadrant footprint. Paragraph 18.5 of the SK Market Lease requires that "[SK Market] and its invitees have the non-exclusive right to park in all of the parking spaces located in the Shopping Center (including the surface parking spaces located on the Market Quadrant; the surface parking spaces located on the Fitness Quadrant; and parking spaces located in the parking structure located on the Fitness Quadrant)."

Additionally, under the SK Market Lease, SK Market is granted the exclusive right to thirty (30) parking spaces located on the top level of the Parking Structure for use by its employees. The SK Market Lease further states that the Debtor shall not do anything which: (i) reduces the amount of parking for SK Market's invitees on the Fitness Quadrant; (ii) reduces the amount of exclusive parking spaces in the Fitness Quadrant Parking structure allocated to SK Market; or (iii) reduces the parking ratio for both Quadrants (collectively the "**Shopping Center**") below the amount required by law. A Memorandum of the SK Market Lease was recorded with the Office of the Los Angeles County Recorder on August 21, 2008. The Debtor contends that it remains obligated to provide the parking spaces under the SK Market Lease.

## 2.4. The Indemnity Agreement and Memorandum of Lease regarding the Parking Structure Leases.

Paragraph 1(a) of the Indemnity Agreement between the Debtor and Garikian dated January 8, 2015, provides for the indemnification of Garikian by the Debtor against the following occurrences/events:

> "i) any assertion by [SK Market] that section 18.5 of the [SK Market Lease] (or any other provision of the [SK Market Lease] related to parking, in effect on the date of this Indemnity Agreement) has been violated due to the failure to provide exclusivity rights of SK in thirty

Salvato Law
Offices

28

(30) parking spaces in the [Parking Structure], (ii) any assertion that the property violates applicable laws, codes or ordinances, in effect as of the date of this Indemnity Agreement, regarding the provision of parking spaces based on Tenant Leases in effect on the date of this Indemnitee (sic) Agreement (so long as Tenant maintains the 162 onsite parking spaces at the Market Quadrant), (iii) any and all damages and claims that arise in the event that [Garikian], after pursuing diligently and in good faith, is unable to procure from Los Angeles County a parking permit for the Property pursuant to file no. RPKP 201300005 (R2013 -- 01662) (the "Parking Permit"), and/or (iv) [Debtor's] breach of or default with regard to any of its covenants under that certain Fifth Amendment to Standard Offer, Agreement and Escrow Instructions for Purchase of Real Estate, dated as of November 18, 2014 [copy attached, but omitted here]. This Agreement shall survive the closing under the PSA and the recording of the conveyance deed for the Property to [Garikian]."

A Memorandum of Lease covering the 14-Space Parking Lease and a Memorandum of Lease covering the 16-Space Parking Lease were recorded on January 15, 2015 in Los Angeles County. The Deed of Trust was executed in order to secure the Debtor's obligations under the Indemnity Agreement, and was also recorded on January 15, 2015 in Los Angeles County.

### 2.5.    The Debtor's Settlement Agreement with Garikian to resolve all outstanding issues and claims.

The parties have agreed to compromise Garikian's claims in order to resolve any dispute as to the Garikian Proofs of Claim, to treat the claims in this bankruptcy case, and to resolve all matters between the parties.

On or around January 20, 2018, the Debtor and Garikian entered into a final written Settlement Agreement formalizing their agreement for the allowance of the Garikian claims in the amount of $60,000, the assumption of the Indemnity Agreement and Parking Structure Leases as modified, and a plan to accomplish the improvement of Lot 5 (an undeveloped portion of the Debtor's real property) so as to satisfy the parking requirements of the County of Los Angeles, and allow Garikian to obtain the necessary parking authorization. Ultimately, the Settlement Agreement will lead to the removal of the Garikian Deed of Trust on the Property once the parking conditions have been

Salvato Law
Offices

1    satisfied and all amounts due to Garikian have been paid, and will permit the possible

2    development of Lot 5 for other, income producing uses.  (*See* Galletly Declaration) All

3    parties and all constituents of the bankruptcy estate will thereby benefit from this

4    Settlement Agreement, which will lead to an enhancement of the value of the Debtor's

5    Property.

6        Please see **Exhibit 1** for an executed copy of the Settlement Agreement that

7    includes the detailed terms of the settlement, which are incorporated herein by reference

8    as though set forth in full.

9        The Debtor's Third Amended Disclosure Statement describing the Debtor's Third

10   Amended Plan of Reorganization dated January 10, 2018 [Dkt. No. 353] contains the

11   general terms of the negotiated agreement between the Debtor and Garikian. Among other

12   things, the Third Amended Plan treats and classifies Garikian's claims as a single Class 5

13   claim in the amount of no more than $60,000, secured by the Property, and provides for

14   the assumption of the Indemnity Agreement (with modifications), the 16-Space Parking

15   Lease Agreement, and the 14-Space Parking Lease Agreement, as modified.

16       Resolution of the Garikian Claims in the manner described in the Debtor's Third

17   Amended Plan and as proposed in the Settlement Agreement, removes a significant

18   contingency of confirmation of the Plan.

19           **2.6.    The Order authorizing the Debtor's use of cash collateral**

20                   **through March 31, 2018.**

21       On January 10, 2018, the Court entered an Order approving the stipulation with

22   East West Bank [Dkt. No. 348] for the Debtor's use of cash collateral through March 31,

23   2018. [Dkt. No. 351].

24       In order for the Debtor to make the Lot 5 improvements to the Property—as part of

25   the settlement with Garikian that will remove the Garikian liens, clean title, and increase

26   the value of the Property—the cash collateral order needs to be modified to approve the

27   deposit of $50,000 into the specified segregated account and to authorize the Debtor to

28   make the improvements to Lot 5 for the purposes set forth in the Settlement Agreement.

Salvato Law
Offices

(**Exhibit 1** at ¶¶ 7-8).

As reported to East West Bank, the $50,000 is the Debtor's estimated budget amount for (1) grading plans for the improved lot and submission of grading plans for approval, (2) grading contractor, (3) asphalt paving, (4) striping, (5) lights, and (6) moving the existing water standpipe.  (*See* Galletly Declaration).

The Debtor was unable to obtain East West Bank's approval of this expenditure and authority to use cash collateral prior to the Court's approval of, or even conditional upon, the approval of the compromise and settlement with Garikian.  Thus, the Debtor requests that the modification to the cash collateral authorization be included in the Order approving this motion.

## 3. **Legal Arguments.**

### 3.1. **Rule 9019 standard for approving a compromise and settlement.**

Rule 9019(a) of the Federal Rules of Bankruptcy Procedure authorizes the Bankruptcy Court to approve a compromise or settlement on a motion by the trustee after notice and a hearing.

The court will approve a settlement that is fair, equitable, and reasonable. *In re A & C Properties*, 784 F.2d 1377, 1382 (9th Cir. 1986), citing *Protective Committee for Indep. Stockholders of TMT Trailer Ferry v. Anderson*, 390 U.S. 414, 424-25 (U.S. 1968). In evaluating the reasonableness of the proposed compromise or settlement, bankruptcy courts consider the following factors:

> "(a) The probability of success in the litigation; (b) the difficulties, if any, to be encountered in the matter of collection; (c) the complexity of the litigation involved, and the expense, inconvenience and delay necessarily attending it; and (d) the paramount interest of the creditors and a proper deference to their reasonable views in the premises."

*In re A & C Properties*, 784 F.2d at 1381.

The bankruptcy court is not required to hold a mini-trial or full evidentiary hearing before approving the settlement; otherwise, compromise would serve no purpose. *In re*

1    *Blair*, 538 F.2d 849, 851-52 (9th Cir. 1976). Instead, the court should evaluate whether the

2    settlement falls below the lowest point in the range of reasonableness. *In re Doctors Hosp.*

3    *of Hyde Park, Inc.*, 474 F.3d 421, 429-30 (7th Cir. 2007); Collier on Bankruptcy ¶

4    9019.02 (16th ed., 2017).

### 3.2.    The settlement agreement between the Debtor and Garikian is fair and reasonable and should be approved.

7        In this case, the factors weigh strongly in favor of approval of the Settlement

8    Agreement and compromise.

9        Litigating the Garikian secured claims either before this Court or the Superior

10   Court would be expensive and time-consuming, involving complicated issues of fact and

11   law that would unlikely be resolved on summary judgment. In order to avoid costly

12   litigation and to finally resolve their complex dispute, the Debtor and Garikian have

13   entered into a written settlement agreement after substantive negotiations, agreeing to the

14   allowance of the Garikian claims in the amended Plan in the amount not to exceed

15   $60,000 (representing an amount intended to cover all actual legal fees incurred to date).

16   The Debtor will also assume the Indemnity Agreement and Parking Structure Leases (as

17   modified). The settlement will also resolve a condition precedent to confirmation of the

18   proposed Plan.

19       An allowed claim of $60,000 represents a substantial discount from the alleged

20   damage amount set forth in the Garikian's Proofs of Claim Nos. 8 and 10. This discount is

21   fair and reasonable to avoid the additional expenses of any additional claim objection or

22   litigation on a matter that arises from the Proofs of Claim, and the uncertainty that

23   litigation entails.

24       By settling the Garikian claims, the parties will remove an uncertain and

25   undetermined encumbrance on title while also clearing title on the Property. As a result,

26   (assuming the disputes with East West Bank can be resolved) there will likely be equity

27   for junior lienholders whose claims would otherwise be partially unsecured (as in with

28   Dorn Platz Class 6 claim) or completely unsecured (as with the Class 7 and Class 8 claims

Salvato Law
Offices

1   of RJJ/JFP/Barlow and Bromley/Opics, respectively).

2       Furthermore, settlement at this time would free up additional time and resources

3   for the Debtor to evaluate the other claims, objections, and litigation in this case for the

4   benefit of the estate and its creditors.

5       **3.3.    Modification of the cash collateral order to authorize the**

6           **improvements on Lot 5 is fair, reasonable, and increases the**

7           **value of the Property.**

8       As part of the Settlement Agreement, the Debtor requires Court approval and

9   authorization to use $50,000 of cash collateral to improve Lot 5, an undeveloped portion

10  of the Debtor's Property.  To that end, Paragraphs 7 and 8 of the Settlement Agreement

11  provide that:

12      7. As part of its motion seeking entry of the Approval Order, ALC shall
        also seek approval of the deposit of $50,000 into a segregated Debtor-in-
13      Possession account (the "**Lot 5 Improvements Account**"), and authority
        to use such funds exclusively to make the improvements described in the
14      Purchase and Sale Agreements (the "**Improvement Work**"), consisting
        of: (a) paving and striping of Lot 5 in accordance with County
15      requirements to accommodate not fewer than 14 vehicles; and (b)
        relocation of the sprinkler fixtures so that no fewer than 14 vehicles can
16      be parked on Lot 5.
17

18      8. Upon entry of the Approval Order, ALC will deposit $50,000 into the
        Lot 5 Improvements Account. Within 60 days of the later of (1) entry of
19      the Approval Order or (2) Garikian's obtaining necessary permits from
        the County Department of Building and Safety, ALC will begin the
20      **Improvement Work**, which shall be completed not later than 30 days of
        the date first scheduled for the County hearing on the Permit Parking
21      Application.
22

23      The sum of $50,000 is the Debtor's best estimate to cover all of the anticipated

24  costs for (1) grading plans for the improved lot and submission of grading plans for

25  approval, (2) grading contractor, (3) asphalt paving, (4) striping, (5) lights, and (6) moving

26  the existing water standpipe.  (*See* Galletly Declaration).

27      East West Bank has indicated to the Debtor that it would not authorize the use of

28  the $50,000 for proposed improvements to Lot 5 absent a settlement with Garikian and

Salvato Law
Offices

1    Court approval of that settlement. Unfortunately, the Debtor was unable to secure East

2    West Bank's approval to use the required cash collateral in advance of, or conditional

3    upon, receipt of that approval of this compromise, and so the Debtor makes this request

4    for an Order for use of such cash collateral at this time.

5         Now, in order for the Debtor to make the Lot 5 improvements to the Property—as

6    part of the settlement with Garikian that will remove the Garikian liens and clean title, and

7    will increase the value of the Property with the improvements—the cash collateral order

8    needs to be modified to approve the deposit of $50,000 into a segregated account and

9    authorize the Debtor to make the improvements to Lot 5 on the specific bases set forth in

10    the Garikian Settlement Agreement. (**Exhibit 1** at ¶¶ 7-8).

11

12    **4. Conclusion.**

13         For the foregoing reasons, the Debtor respectfully requests that the Court grant the

14    Motion, approving the Settlement Agreement between the Debtor and Garikian and

15    approving modification of the cash collateral order to authorize the use of $50,000 to

16    make the Lot 5 improvements to the Property.

17

18    Dated:   January 25, 2018       SALVATO LAW OFFICES

19

20                             */s/ Gregory M. Salvato*

20                     By: _____

21                       Gregory M. Salvato

21                       Joseph Boufadel

22                     Attorneys for Debtor-in-Possession

23                     ALTADENA LINCOLN CROSSING

23                     LLC, a Delaware limited liability

24                     company

25

26

27

28

Salvato Law
Offices

# DECLARATION OF GREG GALLETLY

I, Greg Galletly, declare:

1.    I am the manager of the Debtor, Altadena Lincoln Property, LLC, a Delaware limited liability company, through my role as the manager of Altadena Dorn Platz, LLC, which is the manager of DPP Altadena, LLC, the manager of the Debtor and Debtor in Possession ("**Debtor**").

## Basis for Personal Knowledge

2.    I am actively involved in the management of the Debtor's Property, and in that connection, I have been actively engaged in the negotiations for the settlement and compromise that is the subject of this Motion.

3.    I submit this Declaration in support of the Debtor's Motion for an order to approve the proposed compromise and settlement with creditor George Garikian, as Trustee of the George Garikian Living Trust, and to approve a modification of the cash collateral order to provide for the cash expenditure required by that compromise (the "**Motion**"). The following facts are known to me of my own personal knowledge, and if called as a witness, I could and would competently testify to the truth thereof.

## Background in Debtor's Bankruptcy Case

4.    On April 7, 2017, the Debtor filed its voluntary Chapter 11 petition, commencing this bankruptcy case. [Dkt. No. 1].

5.    On July 18, 2017, Garikian filed a Motion to Compel Assumption or Rejection of the two parking leases with the Debtor that required the Debtor to provide parking spaces dedicated to the Market Quadrant. [Dkt. No. 157]. The Debtor, in response, sought additional time to decide whether to assume or reject the parking space leases, as well as opposing the motion on other grounds. [Dkt. No. 188].

6.    On August 8, 2017, Garikian filed his Proof of Claim No. 10, seeking a claim for an "unknown [amount] but not less than $5 million" secured by the Debtor's Property located at 2180-2220 Lincoln Avenue, Altadena, CA 91001 based upon the anticipated rejection of an indemnity agreement.

Salvato Law
Offices

7.      On August 8, 2017, Garikian filed his Proof of Claim No. 12, an unsecured claim for an "unknown [amount] but not less than $5 million" for "damages arising from rejection of 99-year Parking Garage Lease."

8.      Ultimately, the Debtor filed a proposed plan of reorganization proposing to reject the Parking Spaces Leases and the Indemnity Agreement upon the Effective Date of the Plan.  Objections to the Garikian Proofs of Claim were being prepared when the parties began discussions of settlement.

## Negotiations to Resolve Parking Impasse

9.      The Debtor has been actively and continuously engaged in negotiations with Mr. Garikian over the series of agreements and conditions pertaining to the parking requirements for the Market Quadrant, a portion of the Debtor's original property that had been sold to Mr. Garikian in 2015. To that end, the Debtor has worked to resolve the parking requirements for the Market Quadrant that involved two long-term leases for a total of 30 spaces in the Debtor's parking structure, which are also to be provided under a separate lease with Garikian's tenant, SK Markets.  An Indemnity Agreement protected Mr. Garikian's and SK Markets' access to those spaces, and the obligations under the Indemnity Agreement are secured by a Deed of Trust encumbering the Debtor's Property. While it was originally contemplated that he Deed of Trust was to be short-lived, for various reasons no parking permit had been secured by Mr. Garikian since 2015, and the Deed of Trust had not been removed at the time the bankruptcy case was commenced.

10.     While the Debtor believed that the Indemnity Agreement and the Deed of Trust were no longer necessary as the Debtor was already required to provide the parking under a pre-existing lease with a tenant on the Market Quadrant, ultimately, the negotiations resulted in agreement upon a mechanism for securing the necessary parking and obtaining the necessary approvals to enable the Deed of Trust to be removed in the near future.

11.     As a result of the discussions and agreement between the parties, the Debtor was able to propose a treatment of the Garikian claims in its most recent Plan of

Salvato Law Offices

Motion for Order to Approve Compromise and to    -12-    In re Altadena Lincoln Crossing LLC, Debtor
Modify Cash Collateral Order                              Case No. 2:17-bk-14276-BB

1    Reorganization to reflect a settlement that has now been finalized in a written Settlement

2    Agreement, subject to Court approval.

### Debtor's Settlement Agreement with Garikian

4    12.    The Debtor has engaged in substantive negotiations with Garikian through

5    counsel, ultimately reaching an agreement that permits the parking approval process to go

6    forward with the County of Los Angeles, resolves the outstanding dispute over rejection

7    of the Garikian leases, and allowance of a single Garikian claim in a reduced amount of

8    not more than $60,000, all of which is beneficial to the Debtor's estate.

9    13.    On or around January 20, 2018, the Debtor and Garikian entered into a final

10   written Settlement Agreement formalizing their agreement for the allowance of the

11   Garikian claims in the amount of $60,000, the Debtor's assumption of the Indemnity

12   Agreement and Parking Structure Leases as modified, and a plan to accomplish the

13   improvement of Lot 5 (an undeveloped portion of the Debtor's real property) so as to

14   satisfy the parking requirements of the County of Los Angeles, and allow Garikian to

15   obtain the necessary parking approvals. Ultimately, the Settlement Agreement will lead to

16   the removal of the Garikian Deed of Trust on the Property once the parking conditions

17   have been satisfied, and will permit the possible development of Lot 5 for other, income

18   producing uses.  All parties and all constituents of the bankruptcy estate will thereby

19   benefit from this Settlement Agreement, which will lead to an enhancement of the value

20   of the Debtor's Property.

21   14.    The Debtor believes that the Debtor's bankruptcy estate and all constituents

22   will benefit from the Settlement Agreement with Garikian, as it removes one of the

23   conditions precedent to confirmation of the Debtor's plan of reorganization, and removes

24   a major dispute between the parties and potential sizable claims that had been asserted in

25   anticipation of the Debtor's rejection of those agreements.

### Requested Modification of Cash Collateral Order

27   15.    The proposed settlement and compromise with Mr. Garikian – subject to

28   Court approval – requires the Debtor to segregate funds in the amount of $50,000 and then

Salvato Law
Offices

Motion for Order to Approve Compromise and to    -13-    In re Altadena Lincoln Crossing LLC, Debtor
Modify Cash Collateral Order    Case No. 2:17-bk-14276-BB

1    to spend those funds for certain improvements on Lot 5, an undeveloped portion of the

2    Debtor's Property, to make it usable for an additional 14 parking spaces. The

3    improvements to Lot 5 are a necessary element of the settlement, and will assist in

4    securing the necessary approval permits from the County.

5        16.    As reported to East West Bank, the $50,000 is the Debtor's estimated

6    budget amount for (1) grading plans for the improved lot and submission of grading plans

7    to the County of Los Angeles for approval, (2) the grading contractor, (3) asphalt paving,

8    (4) striping, (5) lights, and (6) moving the existing water standpipe.

9        17.    Ultimately, the Settlement Agreement will permit the Debtor to develop Lot

10   5 with the planned construction of an apartment building with eight additional units,

11   which will lead to the enhancement of the value of the Property.

12       18.    Despite the evident benefit to all parties concerned and the clear

13   enhancement to the value of the Property, East West Bank has refused to approve the use

14   of cash collateral in advance of, or even conditional upon, the Debtor first obtaining

15   approval of the Garikian settlement. Accordingly, the Debtor seeks authorization from the

16   Court to use the Bank's cash collateral, in the sum of $50,000, to implement the terms of

17   the Settlement as described in this Motion.

18       19.    There are sufficient rents held in the Debtor's Debtor in Possession bank

19   account to support this additional expenditure, without an appreciable impact upon the

20   Bank's equity cushion and cash collateral reserve. Use of the funds for improvements to

21   the Debtor's Property as proposed will not impact upon the Debtor's ability to continue its

22   monthly payments to the Bank, as provided in the Cash Collateral Order.

23       I declare under penalty of perjury under the laws of the United States of America

24   that the foregoing is true and correct.

25       Executed on January 25, 2018, at Pasadena, California.

26

27

28

Salvato Law
Offices

_____
Greg Galletly

---

Motion for Order to Approve Compromise and to      -14-      *In re Altadena Lincoln Crossing LLC, Debtor*
Modify Cash Collateral Order                                  Case No. 2:17-bk-14276-BB

1    <u>Exhibit Authenticated by Declaration</u>:

2        1.  Settlement Agreement between the Debtor and Garikian

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Salvato Law
Offices

Motion for Order to Approve Compromise and to    -15-    *In re Altadena Lincoln Crossing LLC, Debtor*
Modify Cash Collateral Order    Case No. 2:17-bk-14276-BB

Case 2:17-bk-14276-BB   Doc 309-1   Filed 01/25/18   Entered 01/25/18 17:07:16   Desc
Exhibit 1    Page 1 of 13

# EXHIBIT 1

# EXHIBIT 1

# SETTLEMENT AGREEMENT

THIS SETTLEMENT AGREEMENT (this "**Agreement**") is made as of January 20, 2018 (the "**Effective Date**") by and between ALTADENA LINCOLN CROSSING, LLC, a Delaware Limited Liability Company ("**ALC**" or "**Debtor**"), on the one hand, and George Garikian as Trustee of the George Garikian Living Trust ("**Garikian**"), on the other hand (collectively, the "**Parties**"), with reference to the following facts:

## I.    RECITALS

A.    ALC is the Debtor in Possession in Chapter 11 proceedings entitled *In re Altadena Lincoln Crossing LLC,* Case No.2:17-bk-14276 BB (the "**Case**"), now pending in the United States Bankruptcy Court for the Central District of California, Los Angeles Division (the "**Court**").  The Case was commenced on April 7, 2017 (the "**Petition Date**").

B.    ALC  is the owner of a three-story parking structure (the "**Parking Structure**"), which is adjacent to, and part of, the parcel of real property listed in Debtor's Schedule A/B filed in the Case.

C.    On or as of August 26, 2014, a date prior to the Petition Date, Garikian and ALC entered into the "Standard Offer, Agreement and Escrow Instructions for Purchase of Real Estate (Non-Residential)" for the sale of a portion of its real property  (the "**PSA**") and on January 8, 2015, Garikian and ALC entered into the following additional agreements; (1) Indemnity Agreement ("**Indemnity Agreement**") (2) Deed of Trust securing ALC's obligations under the Indemnity Agreement ("**Deed of Trust**"); (3) a 99-year lease for 16 parking spaces (the "**16-Space Parking Lease**") and (4) a 99-year lease for 14 parking spaces (the **14-Space Parking Lease**").  Between October 8, 2014, and January 14, 2015, the parties executed a series of amendments to the PSA, including a Fifth Amendment thereto ("**Fifth Amendment to PSA**").  Pursuant to the foregoing Agreements (collectively the "**Purchase and Sale Agreements**"), ALC agreed to sell, and Garikian agreed to purchase, the real property located at and commonly known as 2230-2260 Lincoln Ave., Altadena, California (described in the Purchase and Sale Agreements as the "**Market Quadrant**").  ALC is the Landlord and Garikian is the Tenant under the 16-Space Parking Lease and the 14-Space Parking Lease (collectively the "**Parking Structure Leases**").  Prior to the sale, ALC was the owner of both the Market Quadrant and another quadrant called, in the Purchase and Sale Agreements, the "**Fitness Quadrant.**" (The Parking Structure is located on the Fitness Quadrant.)

D.    Prior to Garikian's purchase of the Market Quadrant, ALC and B&V Enterprises, Inc., dba SK Market ("**SK Market**") entered into a lease dated April 1, 2008, as amended (collectively, the "**SK Market Lease**").  SK Market's premises consist of 37,500

1

square feet, which is a portion (approximately 86.5%) of the overall 43,304 square-feet
Market Quadrant footprint. Paragraph 18.5 of the SK Market Lease requires that "[SK
Market] and its invitees have the non-exclusive right to park in all of the parking spaces
located in the Shopping Center (including the surface parking spaces located on the
Market Quadrant; the surface parking spaces located on the Fitness Quadrant; and
parking spaces located in the parking structure located on the Fitness Quadrant)."
Additionally, under the SK Market Lease, SK is granted the exclusive right to thirty
(30) parking spaces located on the top level of the Parking Structure for use by SK's
employees. The Lease further states that ALC shall not do anything which: (ii) reduces
the amount of parking for SK's invitees on the Fitness Quadrant, (iii) reduces the
amount of exclusive parking spaces in the Fitness Quadrant Parking structure allocated
to SK; or (iv) reduces the parking ratio for both Quadrants (collectively the "**Shopping
Center**") below that required by law. A Memorandum of the SK Lease was recorded
with the Office of the Los Angeles County Recorder on August 21, 2008 as Instrument
No. 20081516511. Debtor contends that it remains obligated to provide the parking
spaces under the SK Lease.

E.     The Indemnity Agreement, at paragraph 1(a) thereof, provides for the indemnification of
       Garikian by ALC against the following occurrences/events:

> "i) any assertion by [SK Market] that section 18.5 of the [SK Market Lease] (or
> any other provision of the [SK Market Lease] related to parking, in effect on the
> date of this Indemnity Agreement) has been violated due to the failure to
> provide exclusivity rights of SK in thirty (30) parking spaces in the [Parking
> Structure] (ii) any assertion that the property violates applicable laws, codes or
> ordinances, in effect as of the date of this Indemnity Agreement, regarding the
> provision of parking spaces based on Tenant Leases in effect on the date of this
> Indemnitee (*sic*) Agreement (so long as Tenant maintains the 162 onsite
> parking spaces at the Market Quadrant), (iii) any and all damages and claims
> that arise in the event that [Garikian], after pursuing diligently and in good
> faith, is unable to procure from Los Angeles County a parking permit for the
> Property pursuant to file no. RPKP 201300005 (R2013 -- 01662) (the "**Parking
> Permit**"), and/or (iv) [ALC's] breach and/or default with regard to any of its
> covenants under that certain Fifth Amendment to Standard Offer, Agreement
> and Escrow Instructions for Purchase of Real Estate, dated as of November 18,
> 2014 [copy attached, but omitted here]. This Agreement shall survive the
> closing under the PSA and the recording of the conveyance deed for the
> Property to [Garikian]."

F.     A Memorandum of Lease covering the 14-Space Parking Lease to Garikian was
       recorded on or about January 15, 2015 as Instrument No.20150054311 with the Office
       of the County Recorder for the County of Los Angeles. A Memorandum of Lease
       covering the 16-Space Parking Lease to Garikian was recorded on or about January 15,
       2015 as Instrument No.20150054312 with the Office of the County Recorder for the

2

County of Los Angeles.   The Deed of Trust was executed in order to secure ALC's obligations under the Indemnity Agreement, and was recorded on January 15, 2015, as Instrument No. 20150054316 with the Office of the County Recorder for the County of Los Angeles.

G.    Prior to Garikian's purchase of the Market Quadrant, by an agreement entitled "Covenant and Agreement to Hold Property as One Parcel"  (the "**County Covenant**") recorded with the Los Angeles County Recorder's Office as Instrument 06-2724403 on December 7, 2006,  ALC had covenanted with Los Angeles County to hold the Market Quadrant and the Fitness Quadrant as one Parcel, *i.e.*, as an undivided "Shopping Center."

H.    In order to effect the transactions contemplated by the Purchase and Sale Agreements and the Parking Structure Leases, ALC requested that the County of Los Angeles release it from its obligation under the County Covenant to hold the Market Quadrant and the Fitness Quadrant as one unified Shopping Center.  The County of Los Angeles informed the parties that it wanted the shortage of parking to be addressed, and agreed to release the County Covenant, if and only if ALC met the following requirements:

(1)    That it enter into a 99-year lease with Garikian to provide thirty (30) parking spaces in the Parking Structure Lease;

(2)    That the parking area of the Market Quadrant be re-striped by ALC to ensure that all parking spaces were of the correct dimension and code-compliant;

(3)    That ALC would withdraw its request for the Conditional Use Permit and Parking Permit for the vacant lot 5 (which ALC represents is a portion of and not a separate parcel adjacent to) the Fitness Quadrant ("**Lot 5**");

(4)    That ALC could no longer build on lot 5 and it would be converted into a parking lot to satisfy the lack of adequate parking; and

(5)    That it comply with the other requirements set forth in a letter of October 13, 2014 to Ms. Kristina Kuezycki, of the Los Angeles County Department of Regional Planning / Zoning Permits East.

I.    On January 10, 2018, ALC filed in the Case its (1) amended Disclosure Statement entitled "Altadena Lincoln Crossing LLC's Third Amended Disclosure Statement Describing Third Amended Plan of Reorganization" and (2) amended Plan of Reorganization entitled "Altadena Lincoln Crossing LLC's Third Amended Plan of Reorganization dated January 10, 2018." As used herein "**Plan**" shall refer to such Third Amended Plan, as it may be further amended from time to time.

J.    On August 8, 2017, Garikian filed Claim No. 10 (the "**Indemnity Proof of Claim**") and Claim No. 12 (the  "**Lease Rejection Proof of Claim**") in the Case (collectively the **"Garikian Claims"**).  Each of the Garikian Claims states a claim amount as "unknown but not less than $5 million."

**NOW, THEREFORE, THE PARTIES AGREE AS FOLLOWS:**

## II. <u>Terms</u>

The recitals contained in paragraphs A through J above are an integral part of this Agreement and are incorporated herein by this reference, and the parties hereto, intending to be legally bound, hereby further covenant and agree as follows:

### <u>Agreement Subject to Court Approval</u>

1.      This Agreement and each of its terms shall be subject to Court approval as evidenced by entry of a final order (the "**Approval Order"**) in substantially the same form and of the same content as Exhibit "A" hereto.  Within 14 days of the complete execution of this Agreement, but not later than January 25, 2018, ALC shall file a motion with the Court seeking entry of the Approval Order, which among other things, provides that ALC is authorized to enter into this Agreement and to perform its obligations hereunder.

### <u>The Escrow</u>

2.      Upon complete execution of this Agreement, an escrow (the "**Escrow**") will be opened with First American Title Co. or such other escrow company as the parties may mutually agree in writing, and the documents listed below under the heading "Documents to be Deposited Into Escrow" shall be deposited into such Escrow as and when such documents become available.

### <u>Submittal of Parking Permit Application</u>

3.      ALC represents that it has submitted all documents within ALC's custody and control and which are required by the County to be submitted as part of the **Parking Permit Application**, as the County has acknowledged.   Garikian has submitted the Parking Permit Application to the County and requested a hearing thereon.  Garikian will transmit to ALC any information he receives from the County regarding the status of the Parking Permit Application.

### <u>Assumption of Parking Structure Leases</u>

4.      Pursuant to the terms of the compromise represented by this Agreement, ALC has filed an amended Plan of Reorganization to provide for:

> (a)  assumption of the 16-Space Parking Lease and seek an order approving the Plan and such assumption; and

4

(b) assumption of an amended 14-space Parking Lease, which amendment shall provide that its term will expire when the SK Market Lease terminates (the "**Amended 14 Space Parking Lease**"). The Amended 14-Space Parking Lease will be in substantially the same for and of the same content as Exhibit "D" hereto.

Provided that the terms of such assumption entail only the foregoing modification, Garikian will not object to such assumption of the Amended 14-Space Parking Lease or the 16-Space Parking Lease as proposed in the Debtor's amended Plan of Reorganization.

## Treatment of the SK Lease in the Plan

5.    ALC shall either: (1) Amend its Schedule G to include the SK Lease as an unexpired lease, or (2) in its Schedule A/B identify the on-going rights of SK Market to 30 spaces in the Fitness Quadrant as provided in the SK Lease. Thereafter, ALC shall either (a) seek Court approval for assumption of the SK Lease and include such assumption as part of its Plan, or (b) provide in its Disclosure Statement and Plan that SK's rights in such 30 spaces shall not be abrogated by any act initiated by ALC.

## Lot 5 Improvements/Segregated Account

6.    As part of its motion seeking entry of the Approval Order, ALC shall also seek approval of the deposit of $50,000 into a segregated Debtor-in-Possession account (the "**Lot 5 Improvements Account**"), and authority to use such funds exclusively to make the improvements described in the Purchase and Sale Agreements (the "**Improvement Work**"), consisting of: (a) paving and striping of Lot 5 in accordance with County requirements to accommodate not fewer than 14 vehicles; and (b) relocation of the sprinkler fixtures so that no fewer than 14 vehicles can be parked on Lot 5.

7.    Upon entry of the Approval Order, ALC will deposit $50,000 into the Lot 5 Improvements Account. Within 60 days of the later of (1) entry of the Approval Order or (2) Garikian's obtaining necessary permits from the County Department of Building and Safety, ALC will begin the **Improvement Work**, which shall be completed not later than 30 days of the date first scheduled for the County hearing on the Permit Parking Application.

## Availability to the Market Quadrant of 16 Parking Spaces in the Parking Structure

8.    ALC acknowledges and reaffirms its obligation to Garikian regarding the availability of parking spaces under the 16-Space Parking Lease, which provides in pertinent part in Paragraph 1 thereof that:

"Landlord [ALC] shall ensure that the parking requirements of all of the tenant leases

("Tenant Leases") affecting the Market Quadrant as of the date of this Lease (under the tenant leases as they exist as of the date of this Lease) [January 8, 2015] shall at all times be satisfied by Landlord with regard to the spaces demised under this Lease (along with the 162 onsite parking spaces at the Market Quadrant), it being understood that such assurance by Landlord shall not cover any code changes or voluntary modifications by Tenant to the Market Quadrant parking that reduces the available parking spaces thereon."

### Amendment of Indemnity Proof of Claim / Withdrawal of Lease Rejection Claim

9.    Upon full execution of this Agreement, and upon ALC's submittal of an amended Plan and disclosure statement as provided above,  Garikian will (a) file an amended Proof of Claim (the "**Amended Indemnity Claim**"), amending the Indemnity Claim (Proof of Claim No. 10)  to reduce the Garikian claim to the actual amount of  its attorneys' fees and costs incurred in the Case, not to exceed $60,000, to remain secured by the Deed of Trust and to be paid under the Debtor's plan within six months of the Effective Date; and (b)  file a Withdrawal of the Lease Rejection Proof of Claim (Proof of Claim No. 12), without prejudice to refiling.   ALC will not object, nor cause any other party to object, to the Amended Indemnity Claim, as described herein.

10.   Garikian and ALC will execute a modification of the Fifth Amendment to the PSA (the **"Modification Agreement")** in substantially the same form and of substantially the same content as Exhibit "B" hereto, providing for, among other things, that so long as Seller (ALC) continues to provide the requisite parking spaces under the SK Lease in the Parking Structure, Buyer (Garikian) shall not object to any application by ALC for the development of Lot 5 for other uses.

### Amendment of Debtor's Disclosure Statement and Plan

11.   As provided in Paragraph 4 above, upon full execution of this Agreement, Debtor shall file an amended Disclosure Statement and Plan which modify the treatment of Garikian and the Garikian claims to be consistent with the provisions hereof; including but not limited to:
    12.1   Assumption of the 16 Space Parking Space Lease
    12.2   Assumption of the 14 Space Parking Space Lease, as modified herein
    12.3   Allowance of the Amended Indemnity Claim as provided herein and payment of the Amended Indemnity Claim within six months of the Effective Date; and
    12.4   Release of the Deed of Trust upon full payment of the Amended Indemnity Claim.

### Documents To Be Deposited Into Escrow

12.   Following complete execution of this Agreement, but not later than June 30, 2018 unless extended by mutual agreement of the Parties, the following documents shall be deposited into Escrow:

6

(1)     Escrow instructions providing for the exchange/release of documents upon
        Close of Escrow (the "**Escrow Instructions**"), in substantially the same form
        and of substantially the same content as Exhibit "C" hereto;

(2)     Duplicate originals of this Agreement;

(3)     The Modification Agreement, in substantially the same form and of
        substantially the same content as Exhibit "B" hereto;

(4)     The entered Approval Order in substantially the same form and of
        substantially the same content as Exhibit "A" hereto;

(5)     The entered Order of the Court confirming Debtor's Plan, which shall have
        been amended in accordance with this Agreement to provide for the
        assumption of the 16-Space Parking Lease and the Amended 14-Space
        Parking Lease;

(6)     Issued permit(s) by the County of Los Angeles granting without conditions the
        Parking Permit Application;

(7)     The Amended 14-Space Parking Lease, in the form of Exhibit "D" hereto.

(8)     Written confirmation and photographs establishing that the Lot 5
        Improvements have been completed.


## The Closing

13.   (A)   "**Closing**" shall occur upon the occurrence of each and all of the following:

      (1)   Entry of the Approval Order as a final order and deposit of the Approval
            Order into Escrow;

      (2)   Entry of an order confirming ALC's Plan which provides for the
            assumption of the 16 Space Parking Lease and the Amended 14-Space
            Parking Lease under applicable authority, and deposit into Escrow of an
            order granting approval for the assumption of such leases;

      (3)   Deposit into Escrow of documentary and photographic evidence that the
            Lot 5 Improvements have been completed in accordance with one or
            more issued permits and the Approval Order;

      (4)   Issuance by the County of the Parking Permit in accordance with the
            Parking Permit Application and deposit into Escrow of such permit;

      (5)   Deposit into Escrow of duplicate originals of the Modification
            Agreement, signed by each of the Parties;

      (B)   Upon Closing, the following shall be delivered to each of the parties:

            To Garikian:
            (1)   A duplicate original of this Agreement, bearing an original
                  signature hereon on behalf of ALC;
            (2)   A duplicate original of the Modification Agreement, bearing an
                  original signature hereon on behalf of ALC;
            (3)   A duplicate original of the Amended 14-Space Parking Lease, bearing

7

an original signature thereon on behalf of ALC

To ALC

(1)    A duplicate original of this Agreement, bearing an original signature hereon on behalf of Garikian;

(2)    A duplicate original of the Modification Agreement, bearing an original signature thereon on behalf of Garikian;

(3)    A duplicate original of the Amended 14-Space Parking Lease, bearing an original signature thereon on behalf of ALC

(4)    A certified copy of the Parking Permit.

## Event of Non-Closing By Closing Deadline

14.    In the event Closing does not occur on or before June 30, 2018 (the "**Closing Deadline**"), or by any extension of the Closing Deadline agreed upon by the Parties in writing, this Agreement shall be deemed terminated, and without further force or effect. In such event, all items deposited into Escrow by Garikian will be returned to Garikian, and all items deposited into Escrow by ALC will be returned to ALC.

## Conversion or Appointment of Chapter 11 Trustee

15.    If, after Closing, the Case is converted to one under Chapter 7 of the Bankruptcy Code, or a Chapter 11 Trustee is appointed in the Case, this Agreement shall remain in full force and effect and binding upon any such Chapter 11 Trustee or any trustee appointed upon conversion of the Case.  In the event Closing has not occurred prior to any such Chapter 11-trustee appointment or conversion of the case,  Garikian may elect to terminate this Agreement and cancel the Escrow.  Upon such event, all items deposited into Escrow by Garikian will be returned to Garikian, and all items deposited into Escrow by ALC will be returned to the Case Trustee.

## Dismissal of ALC Bankruptcy Case

16.    In the event of a dismissal of the Case prior to Closing, the Closing requirements shall be modified by **Amended Closing Instructions** to remove any Closing requirements entailing the filing of documents in the Case or the requirements(s) of Court orders, provided such filings or Court orders have not previously been entered. In the event any such dismissal occurs after Closing, the provisions of Bankruptcy Code section 349(b) regarding "Effects of Dismissal" shall not be applicable to the transfers and agreements made pursuant to this Agreement, as set forth more fully in the form of Approval Order attached as Exhibit "A" hereto.

8

## Representations and Warranties

17.    As an inducement to Garikian to enter in this Agreement, ALC represents and warrants:

(a)    Lot 5 is an integral part of the Fitness Quadrant and is not a separate parcel.

(b)    Upon entry of the Approval Order, this Agreement will be valid, binding and enforceable against ALC in accordance with its terms, and by his sole signature hereon, Greg Galletly is authorized to enter into this Agreement on behalf of ALC;

(c)    Except as provided herein, no consent, approval or authorization of, or filing, registration or qualification with, any person or entity is required to be obtained in connection with the execution and delivery of this Agreement, or any undertaking or performance of any liability or obligation hereunder other than any such consents, authorizations and/or approvals which have been obtained.

(d)    The execution and delivery of this Agreement and the performance by ALC of its obligations hereunder will not conflict with, or result in any breach of, any judgment, writ, injunction or decree of any court or governmental authority, or any agreement or instrument to which  is a party or by which ALC is or may be bound.

(e)    With the exception of the 15 exclusive parking rights already granted by ALC to the residential tenants (9 spaces) and to two retail tenants (1 space to Eileen Chang dba 20/20 Vision, and 5 spaces to Earth Tone), ALC has not granted to any other tenant of the Fitness Quadrant any further exclusive parking rights which would impinge upon the allocation of the 16 parking spaces to the Market Quadrant.

(f)    No representation or warranty by ALC contained in this Agreement, or any certificate or other instrument, agreement or document furnished to Garikian pursuant to this Agreement or in connection with the preparation and negotiation of this Agreement contains any untrue statement of material fact or omits to state a material fact necessary to make such representation or warranty not misleading in light of the circumstances under which it was made.

18.    As an inducement to ALC to enter in this Agreement, Garikian represents and warrants:

(a)    Upon entry of the Approval Order, this Agreement will be valid, binding and enforceable against Garikian in accordance with its terms, and that George Garikian has full and complete authority to bind the Trust by his signature hereon;

(b)    Except as provided herein, no consent, approval or authorization of, or filing,

9

registration or qualification with, any person or entity is required to be obtained in connection with the execution and delivery of this Agreement, or any undertaking or performance of any liability or obligation hereunder other than any such consents, authorizations and/or approvals which have been obtained.

(c)    The execution and delivery of this Agreement and the performance by Garikian of its obligations hereunder and thereunder will not conflict with, or result in any breach of, any judgment, writ, injunction or decree of any court or governmental authority, or any agreement or instrument to which  is a party or by which Garikian is or may be bound.

(d)    No representation or warranty by Garikian contained in this Agreement, or any certificate or other instrument, agreement or document furnished to ALC pursuant to this Agreement or in connection with the preparation and negotiation of this Agreement contains any untrue statement of material fact or omits to state a material fact necessary to make such representation or warranty not misleading in light of the circumstances under which it was made.

Each party expressly acknowledges that the foregoing representations and warranties it has made herein are made to induce the other party to enter into this Agreement, and each understands that its representations and warranties made herein are being specifically relied upon by the other as a material inducement  to enter into this Agreement and to forbear from exercising rights and remedies that might otherwise be available to it.

## Execution of Further Agreements and Documents

19.    The parties shall  execute and deliver such further agreements or additional documents as may be necessary to effectuate the intent and objectives of this Agreement.

## Execution in Counterparts

20.    This Agreement may be executed in several counterparts, and all  so executed shall constitute this Agreement, that shall be binding upon all Parties hereto, regardless of whether all of the Parties are signatories to the original or to the same counterpart. Facsimile or photocopy signatures shall be considered originals.

## Construction of Agreement

21.    This Agreement is the product of negotiations and preparation by and among each Party and his/her/its attorneys. Therefore, the Parties acknowledge and agree that this Agreement shall not be deemed prepared or drafted by one party or another, and should be construed accordingly. The headings in the Agreement are for convenience only, and shall not be deemed to aid in the interpretation of this Agreement or any part hereof.

## Governing Law

22.     This Agreement shall be governed by the laws of the State of California, without giving effect to principles of conflicts of laws, and shall be construed without the aid of any canon, custom or rule of law requiring construction against the draftsman.

## Retention of Jurisdiction

23.     The parties agree that the Court may retain jurisdiction for the purpose of determining any dispute arising from this Agreement.

**IN WITNESS WHEREOF,** the undersigned have executed this Agreement as of the date set forth above, and agree as indicated herein.

———

Altadena Lincoln Crossing, LLC, Debtor in
Possession


By: Greg Galletly, Managing Member


George Garikian, Trustee of
The George Garikian Living Trust



By: George Garikian, Trustee


Exhibit Attachments:

  A) Form of Approval Order
  B) Modification to Fifth Amendment (regarding Lot 5)
  C) Escrow Instructions
  D) Amended Indemnity Proof of Claim
  E) Amended 14-Space Parking Space Lease

11

## Governing Law

22.  This Agreement shall be governed by the laws of the State of California, without giving
effect to principles of conflicts of laws, and shall be construed without the aid of any
canon, custom or rule of law requiring construction against the draftsman.

## Retention of Jurisdiction

23.  The parties agree that the Court may retain jurisdiction for the purpose of determining
any dispute arising from this Agreement.

**IN WITNESS WHEREOF**, the undersigned have executed this Agreement as of the date set
forth above, and agree as indicated herein.

_____

Altadena Lincoln Crossing. LLC, Debtor in
Possession

_____

By: Greg Galletly, Managing Member

George Garikian, Trustee of
The George Garikian Living Trust

By: George Garikian, Trustee

Exhibit Attachments:

A) Form of Approval Order
B) Modification to Fifth Amendment (regarding Lot 5)
C) Escrow Instructions
D) Amended Indemnity Proof of Claim
E) Amended 14-Space Parking Space Lease

11

Approved as to Form and Content:

Barness & Barness LLP

By: _____
        Daniel L. Barness, Esq.

Attorneys for  George Garikian, Trustee
The George Garikian Living Trust


Salvato Law Offices

By: _____
        Gregory M. Salvato, Esq.

Attorneys for Debtor in Possession
Altadena Lincoln Crossing, LLC

12

# EXHIBIT "A"

1  GREGORY M. SALVATO (SBN 126285)
        Gsalvato@salvatolawoffices.com
2  JOSEPH BOUFADEL (SBN 267312)
        Jboufadel@salvatolawoffices.com
3  SALVATO LAW OFFICES
4  Wells Fargo Center
   355 South Grand Avenue, Suite 2450
5  Los Angeles, California 90071-9500
6  Telephone:   (213) 484-8400
   Facsimile:   (213) 402-3778
7
   Attorneys for Debtor-in-Possession
8  ALTADENA LINCOLN CROSSING LLC,
   a Delaware limited liability company
9

10              **UNITED STATES BANKRUPTCY COURT**

11              **CENTRAL DISTRICT OF CALIFORNIA**

12                      **LOS ANGELES**

13

14 | In re:                          | Case No. 2:17-bk-14276-BB
15 | ALTADENA LINCOLN CROSSING        | Chapter 11
16 | LLC, a Delaware limited liability
   | company,                         | **Order Approving Debtor's Motion to**
17 |                                  | **Approve Settlement with George**
   |              Debtor.             | **Garikian as Trustee of the George**
18 |                                  | **Garikian Living Trust**
19
20 |                                  | Hearing:
21 |                                  | Date:    February ___, 2018
22 |                                  | Time:    10:00 a.m.
   |                                  | Place:   Courtroom 1539
23 |                                  |          255 E. Temple Street
24 |                                  |          Los Angeles, CA 90012
25
26
27
28

Salvato Law
Offices

---

1      The Bankruptcy Court, having considered the "Motion to Approve Settlement with

2 George Garikian as Trustee of the George Garikian Living Trust," between Debtor

3 Altadena Lincoln Crossing LLC (the "**Debtor**") and Creditor George Garikian as Trustee

4 of the George Garikian Living Trust ("**Garikian**"), through their respective counsel, filed

5 on January __, 2018 (the "**Motion**"), and for good cause appearing,

6

7      **IT IS HEREBY ORDERED THAT:**

8     1.    The Motion is granted.

9     2.    The settlement agreement between the Debtor and Garikian is approved, a

10 copy of which is attached to this Order as **Exhibit A** and is incorporated by reference as

11 though set forth in full.

12     3.    The Debtor is authorized to enter into the Settlement Agreement and take all

13 actions in performance thereof; *provided, however,* that any use of cash collateral must

14 require approval of East West Bank or a further Order of the Court.

15

16                                        ###

17

18

19

20

21

22

23

24

25

26

27

28

Salvato Law
Offices

# EXHIBIT "B"

# MODIFICATION AGREEMENT

This Agreement for the Modification of "Fifth Amendment to Standard Offer, Agreement and Escrow Instructions for Purchase of Real Estate" (the "**Fifth Amendment**") (a copy of which is attached as Exhibit "A") is made as of January 17, 2018 (the "**Effective Date**") by and between ALTADENA LINCOLN CROSSING, LLC, a Delaware Limited Liability Company ("**ALC**"), on the one hand, and George Garikian as Trustee of the George Garikian Living Trust ("**Garikian**" or the "**Trust**"), on the other hand (collectively, the "**Parties**"), pursuant to the Settlement Agreement of even date  between the Parties.

Whereas, and for the consideration set forth in the Settlement Agreement, the Parties agree that the Fifth Amendment may be, and hereby is, modified as follows:

1.    Paragraph 2(b) shall be modified to strike the words: "*(and Seller shall not further amend said application to remove or modify those parking spaces without Buyer's express written consent)*" and replace them with the words "*and, provided that Seller continues to provide the requisite parking spaces under the SK Lease, Buyer will not object to any application by Seller for the development of Lot 5 for other uses*".

2.    With the modifications set forth in Paragraph 1 above, Paragraph 2(b) of the Fifth Amendment shall hereafter read as follows:

"b. Buyer and Seller shall have entered into a new parking lease or leases on terms and conditions approved by Buyer, providing for sixteen (16) parking spaces in the garage at 376 Acacia Street, Altadena (the"Garage"), and, subject to paragraph 3 below, fourteen (14) parking spaces on Lot 5 (which Lot 5 is shown in Exhibit "A" attached hereto), which is adjacent to the Property(the"Parking Leases"), or in the Garage. Said parking spaces on Lot 5 shall have been incorporated into the Revised Exhibit "A"application (R2004-00402 and RCUP 200700155 and parking permit case RPKP 200600011 ), and said Lot 5 shall be "tied" to the remainder of Seller's property that is adjacent to the Property by an an instrument approved by Los Angeles County in writing to ensure that the provided parking cannot be altered except with further Los Angeles County approval *(and, provided that Seller continues to provide the requisite parking spaces under the SK Lease, Buyer will not object to any application by Seller for the development of Lot 5 for other uses)*; this covenant shall survive the close of escrow)."

3.    Except as modified by the foregoing, the Fifth Amendment shall in all other respects remain unmodified, and in full force and effect.

1

So Agreed.

Altadena Lincoln Crossing, LLC, Debtor in Possession

Approved as to Form and Content

Salvato Law Offices
Attorneys for Debtor in Possession

By:_____

Gregory Galletly, Managing Member

By:_____

Gregory M. Salvato, Esq.
Dated:_____

The George Garikian Living Trust

Approved as to Form and Content

Barness & Barness LLP
Attorneys for  The George Garikian Living Trust

By: _____

George Garikian, Trustee

By:_____

Daniel I. Barness, Esq.

2

# Exhibit "A"

### Fifth Amendment to PSA Lease

## Fifth Amendment to Standard Offer, Agreement and Escrow Instructions
for Purchase of Real Estate (Non-Residential)

This Fifth Amendment to Standard Offer, Agreement and Escrow Instructions for Purchase of Real Estate is made as of this ___ th day of November, 2014 (this "**Fifth Amendment**") by and between George Garikian, Trustee of the George Garikian Living Trust ("**Buyer**"), and Altadena Lincoln Crossing, LLC, a Delaware limited liability company ("**Seller**"), with reference to the following:

A. Buyer and Seller entered into that certain Standard Offer, Agreement and Escrow Instructions for Purchase of Real Estate executed on or about August 26, 2014 for the purchase of certain real property located at 2230-68 Lincoln Avenue, Altadena, California, as amended by four (4) prior amendments to such agreement (collectively, as amended, the "**Agreement**").

B. Buyer and Seller desire to further amend the Agreement on the terms and conditions set forth below. Capitalized terms used below but not otherwise defined herein shall have the meaning given to such terms in the Agreement.

### AGREEMENT:

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, Buyer and Seller agree to amend the Agreement as follows:

1. Conditioned on all of the matters set forth in the Agreement and in this Fifth Amendment, Buyer hereby waives the Buyer's Contingencies.

2. In addition to the closing conditions in favor of Buyer under the Agreement, the following shall be conditions precedent to Buyer's obligations to complete the purchase of the Property (and shall be deemed included in paragraph 35 of the Agreement):

   a. The documentation requirements of Buyer's lender, which may include without limitation tenant estoppels and SNDAs, and approval of environmental studies, shall be fulfilled to the lender's satisfaction, and the lender shall have funded its purchase money loan, or terms and conditions approved by Buyer.

   b. Buyer and Seller shall have entered into a new parking lease or leases on terms and conditions approved by Buyer, providing for sixteen (16) parking spaces in the garage at 376 Acacia Street, Altadena (the "Garage"), and, subject to paragraph 3 below, fourteen (14) parking spaces on lot 5 (which lot 5 is shown in Exhibit "A" attached hereto), which is adjacent to the Property (the "Parking Leases"), or in the Garage. Said parking spaces on lot 5 shall have been incorporated into the Revised Exhibit "A" application (R2004-00402 and RCUP 200700155 and parking permit case RPKP 200600011), and said lot 5 shall be "tied" to the remainder of Seller's property that is adjacent to the Property by an instrument approved by Los Angeles County in writing to ensure that the provided parking cannot be altered except with further Los Angeles County approval (and Seller shall not further amend said application to remove or modify

1

### Fifth Amendment to Standard Offer, Agreement and Escrow Instructions
### for Purchase of Real Estate (Non-Residential)

This Fifth Amendment to Standard Offer, Agreement and Escrow Instructions for Purchase of Real Estate is made as of this ___ th day of November, 2014 (this "**Fifth Amendment**") by and between George Garikian, Trustee of the George Garikian Living Trust ("**Buyer**"), and Altadena Lincoln Crossing, LLC, a Delaware limited liability company ("**Seller**"), with reference to the following:

A. Buyer and Seller entered into that certain Standard Offer, Agreement and Escrow Instructions for Purchase of Real Estate executed on or about August 26, 2014 for the purchase of certain real property located at 2230-68 Lincoln Avenue, Altadena, California, as amended by four (4) prior amendments to such agreement (collectively, as amended, the "**Agreement**").

B. Buyer and Seller desire to further amend the Agreement on the terms and conditions set forth below. Capitalized terms used below but not otherwise defined herein shall have the meaning given to such terms in the Agreement.

### AGREEMENT:

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, Buyer and Seller agree to amend the Agreement as follows:

1. Conditioned on all of the matters set forth in the Agreement and in this Fifth Amendment, Buyer hereby waives the Buyer's Contingencies.

2. In addition to the closing conditions in favor of Buyer under the Agreement, the following shall be conditions precedent to Buyer's obligations to complete the purchase of the Property (and shall be deemed included in paragraph 35 of the Agreement):

    a. The documentation requirements of Buyer's lender, which may include without limitation tenant estoppels and SNDAs, and approval of environmental studies, shall be fulfilled to the lender's satisfaction, and the lender shall have funded its purchase money loan, or terms and conditions approved by Buyer.

    b. Buyer and Seller shall have entered into a new parking lease or leases on terms and conditions approved by Buyer, providing for sixteen (16) parking spaces in the garage at 376 Acacia Street, Altadena (the "Garage"), and, subject to paragraph 3 below, fourteen (14) parking spaces on lot 5 (which lot 5 is shown in Exhibit "A" attached hereto), which is adjacent to the Property (the "Parking Leases"), or in the Garage. Said parking spaces on lot 5 shall have been incorporated into the Revised Exhibit "A" application (R2004-00402 and RCUP 200700155 and parking permit case RPKP 200600011), and said lot 5 shall be "tied" to the remainder of Seller's property that is adjacent to the Property by an instrument approved by Los Angeles County in writing to ensure that the provided parking cannot be altered except with further Los Angeles County approval (and Seller shall not further amend said application to remove or modify

1

those parking spaces without Buyer's express written consent; this covenant shall survive the close of escrow).

c.  Schedule B exception 27 (set forth in the Title Company's preliminary report for the Property dated April 11, 2014 for order no. 00022664-x49) shall have been terminated as a matter of record and shall not be included in any title policy issued on the closing.

3.  Seller shall prior to the scheduled closing date procure (x) fully executed amendments to the leases between Seller and one or more tenants of the Property (to the extent necessary) such that the Garage has lawful and adequate parking for such tenants and their employees and/or invitees, as reasonably determined by Buyer, and (y) the written consent of Los Angeles County, on terms and conditions acceptable to Buyer, to the concept that such tenants' employee and other parking needs as set forth in such tenants' leases and/or the requirements of applicable codes or ordinances regarding the provision of parking spaces are satisfied by the Parking Leases (using lot 5 or the Garage). Seller shall also procure executed non-disturbance agreements from all of its secured lenders in favor of Buyer with regard to the Parking Leases, in form and content acceptable to Buyer, prior to the scheduled closing date. Seller shall prior to the issuance of the parking permit described in paragraph 5 below date make such improvements to lot 5 so that it can be used for the purposes described in the applicable Parking Lease in compliance with applicable law. Seller shall indemnify, defend and hold harmless Buyer (and its related successors and assigns) from and against any and all claims, losses, costs and expenses (including but not limited to attorneys' fees and costs) which arise out of or relate to (a) any assertion by B&V Enterprises, Inc. ("SK"), the tenant under a lease with Seller dated April 1, 2008 (the "SK Lease"), that section 18.5 of the SK Lease (or any other provision of the SK Lease related to parking has been violated due to the failure to provide exclusivity rights of SK in thirty (30) parking spaces in the Garage, and/or (b) any assertion that the Property violates applicable laws, codes or ordinances regarding the provision of parking spaces, and/or (c) the failure to complete the improvements described in the preceding sentence promptly following the close of escrow for the sale of the Property. Such indemnity shall, at Buyer's request, be further set forth in an instrument that is secured by a deed of trust on Seller's remaining properties comprising the shopping center and adjacent properties of which the Property is a part (which will record on the closing date), and in such event Seller shall cause its secured lender to provide a non-disturbance agreement regarding said deed of trust, in form and content reasonably acceptable to Buyer, as a closing condition in favor of Buyer (which will be deemed added to the closing conditions set forth in paragraph 35 of the Agreement). The foregoing provisions shall survive the close of escrow.

4.  Seller shall immediately comply with all of the covenants and conditions applicable to Seller that are contained in that certain letter from Buyer to Kristina Kulczycki, a copy of which is attached hereto as Exhibit "B" and by this reference incorporated herein.

5.  Upon the closing, Seller shall execute and deliver to Buyer an indemnity agreement in form and content designated by Buyer which will protect Buyer from damages and

2

claims that arise in the event that Buyer is unable to procure from Los Angeles County a parking permit for the Property pursuant to file no. RPKP 201300005 (R2013-01662). Such indemnity agreement shall be secured by a deed of trust on Seller's remaining property that is in the vicinity of and/or adjacent to the Property. Seller shall procure the written consent to said deed of trust from its lender on such other property, in form and content acceptable to Buyer. The said indemnity agreement and deed of trust will terminate if and when such parking permit is issued on terms and conditions acceptable to Buyer.

6. Seller shall use its best efforts to procure such documents and consents as may be needed in order to waive the condition set forth in paragraph 40(a) of the Agreement.

7. The scheduled closing date is hereby moved to December 19, 2014, provided, however, that if all of the conditions in favor of Buyer have not been fully satisfied by said date, Buyer shall have the right to extend said date to January 15, 2015.

8. The Purchase Price is hereby amended to be $15,225,000.00.

9. This Fifth Amendment shall be governed by and construed in accordance with the laws of the State of California.

10. All rights and obligations of the parties hereunder shall be binding upon and inure to the benefit of the parties and the successors and assigns of each such party.

11. This Fifth Amendment may be executed in any number of counterparts, each of which shall be effective only upon delivery and thereafter shall be deemed an original, and all of which shall be taken to be one and the same instrument, for the same effect as if all parties hereto had signed the same signature page. In the event of any conflict between the provisions of the Agreement and the provisions of this Fifth Amendment, the provisions of this Fifth Amendment shall control.

IN WITNESS WHEREOF, the parties hereto have executed this Fifth Amendment as of the day and year first above written.

George Garikian, Trustee of the George
Garikian Living Trust

ALTADENA LINCOLN CROSSING, LLC,
a Delaware limited liability company

By: _____
Name: _____
Its: _____

3

EXHIBIT "A"
LOT 5

4

EXHIBIT "B"

October 30, 2014

Ms. Kristina Kulczycki
Regional Planning Assistant II
Zoning Permits East
Department of Regional Planning
320 West Temple Street, 13th floor
Los Angeles, CA 90012

Re: Lincoln Crossing Parking

Dear Ms. Kulczycki:

This letter sets forth the anticipated structure of the resolution of the potential parking issues in
relation to the referenced property, and the requested termination of the covenant and agreement
made by Altadena Lincoln Crossing, LLC ("ALC") for the benefit of the County of Los Angeles,
which is dated December 7, 2006 and was recorded in the Official Records of Los Angeles County as
Instrument No. 06-2724403 (the "Restrictive Instrument"), as follows:

1.    As you know, The George Garikian Living Trust ("Buyer") is under contract to purchase the
"Market Quadrant" portion of the Lincoln Crossing shopping center project, which portion has a
common street address of 2230-2268 Lincoln Ave., Altadena, CA (the "Subject Property"), from
ALC. ALC will continue to own the "Fitness Quadrant" portion of the Lincoln Crossing project.
ALC has agreed to allow Buyer to take over and continue with the existing parking permit case
RPKP 201300005 (R2013-01662), with the application being amended to have the Buyer's name.

2.    ALC will provide travel information kiosks and displays situated in common areas and
work with project site tenants to produce and distribute alternative travel mode and rideshare
opportunities information to employees. Said kiosks and displays shall contain no advertisements
or be located in such a way that it would take from the current landscaping and parking space.

3.    We anticipate that prior to the Restrictive Instrument being terminated and removed as a matter
of record affecting title to the Subject Property, the parking areas of the Market Quadrant will
be restriped by ALC to ensure that all spaces are of the correct dimensions and meet code. If ALC
fails to complete the restriping by the time that the sale escrow for the Subject Property closes, Buyer
will complete the restriping project.

4.    To ameliorate any shortage in onsite parking for the Subject Property, Buyer and ALC have
agreed to enter into a 99 year lease to provide up to thirty (30) parking spaces in the parking structure

5

located at 376 Acacia Street which is owned by ALC; a draft of that lease is attached hereto as Exhibit "A". Buyer and ALC have agreed that a short form memorandum of the parking lease will be recorded. ALC will cause its lender to provide a non-disturbance agreement with regard to the parking lease so that even a foreclosure of the deed of trust which encumbers the land on which the parking structure is built will not terminate the lease.

5.    ALC has agreed to withdraw its request for the Conditional Use Permit and Parking Permit for lot 5 of the Lincoln Crossing project (R2013-01660 (RPKP 201300006) and RCUP-201300082). ALC shall submit an official letter requesting the withdrawal with seven (7) business days following the execution of this agreement.

6.    ALC has agreed to file a Revised Exhibit "A" application (R2004-0402 and RCUP 2007-00115 and parking permit case RPKP 200600011) to update the current layout of the Fitness Quadrant site, to update the parking table, and to identify the bike parking for the reduction in necessary parking spaces. In addition the necessary bike parking will be installed in the Fitness and Market Quadrants per code. ALC has also agreed to not use the parking structure in relation to the development and/or operation of lot 5 of the Lincoln Crossing project, and that parking will be provided on said lot 5 for all future improvements on that lot. The revised exhibit "A" shall be submitted with in seven (7) business days following the execution of this agreement. Buyer needs written confirmation from the county that the foregoing matters are approved.

7.    ALC has agreed that the parking spaces for the Market Quadrant in the parking structure will be clearly identified and parking in these spaces will be restricted to Market Quadrant employees.

8.    Attached hereto as Exhibit "B" is an analysis of the available parking usage at the Lincoln Crossing project.

9.    We will not be able to obtain a loan and close the purchase of the Subject Property unless the Restrictive Instrument is terminated and removed. Accordingly, it is critical that the County agree to terminate and remove the Restrictive Instrument as a matter of record concurrently with the closing of Buyer's purchase of the Subject Property, the recordation of the memorandum of the 99 year lease, and upon inspecting the restriped parking to determine that it matches the approved site plan and that the new bike parking meets code.

10.    Time is of the essence in this transaction and we would like to close the transaction by the end of November. Prior to Buyer spending additional funds in connection with its loan commitment, Buyer would like the County to review and approve this term sheet and enter into an agreement incorporating the above matters.

Please call me with any questions regarding the foregoing. Thank you.

George Garikian, for The George
Garikian Living Trust

Agreed, acknowledged and confirmed.

6

Altadena Lincoln Crossing, LLC

By: _____
Its: _____

EXHIBIT "A"
PARKING LEASE

## EXHIBIT "B"
## PARKING AVAILABILITY ANALYSIS

As currently developed, the Fitness Quadrant site has 182 parking spaces required for the gym (based on an occupancy load determination of 545), the 9 existing 1-bedroom apartment units require 14 parking spaces, the retail spaces take up 8,422 square feet and require 34 parking spaces, and the Subway restaurant has an occupancy load determination of 30 which would require 10 parking spaces. The total number of required parking based on the current uses of the Fitness Quadrant site is 240 spaces. Following is the breakdown:

### Fitness Quadrant parking calculations

Current uses on the site:

| | | |
|---|---|---|
| 24-Hour Fitness Gym | 545 OL / 3 = | 182 |
| 9 Existing 1-BR apartment units | (9 x 1.5 = 13.5) | 14 |
| Retail (Bldg 3) | 8,422 / 250= | 34 |
| Subway | 30 OL / 3 = | 10 |

| | |
|---|---|
| Total | 240 spaces required |
| | 244 spaces are provided |

Therefore, there are 4 available parking spaces that could be utilized by the Market Quadrant if authorized through a parking permit.

If section 22.52.1081 is applied (which allows for a 5% reduction in parking if bike parking is provided above the amount that is required by the code), then that would reduce the number of required parking spaces by 12. Therefore, **only 228 spaces would be required and the Fitness Quadrant would have 16 additional spaces that could be used by the Market Quadrant.**

If the Market Quadrant also applies the 5% bike parking reduction, then the required parking will be reduced by 9 spaces (from 187 to 178 required spaces…162 spaces are provided). **Therefore, the Market Quadrant would only be missing 16 spaces.**

9



# EXHIBIT "C"

# JOINT ESCROW INSTRUCTIONS

These Joint Escrow Instructions are made and entered into as of  January 17, 2018 by and between, George Garikian as Trustee of the George Garikian Living Trust ("**Garikian**"), on the one hand, and ALTADENA LINCOLN CROSSING, LLC  ("**ALC**"), on the other,  pursuant to that certain Settlement Agreement of even date **(**the "**Settlement Agreement**"**)** by and between the foregoing parties (the "**Parties**"), and, if necessary, shall append, or be appended to, any Standard Escrow Instructions that may be    required by First American Title Co. Of Los Angels [OR ALTERNATE SELECTED BY THE PARTIES] (the "**Escrow Agent**")  in connection with the Settlement Agreement and Escrow Account #:_____ (the "**Escrow**").

The Escrow Agent is instructed as follows:

## I.      Documents To Be Deposited Into Escrow

Following complete execution of the Settlement Agreement, but not later than February 28, 2018, the following documents (all as defined in the Settlement Agreement)  shall be deposited into Escrow:

   (1)     These Instructions, fully executed by the Parties and/or their respective attorneys of record;

   (2)     Execution version of the Settlement Agreement;

   (3)     Execution version of the Modification Agreement;

   (4)     The entered Approval Order ;

   (5)     Entered Order(s) of the Court  approving ALC's assumptions of the Parking Structure Leases;

   (6)     The entered Order of the Court confirming ALC's Plan, which shall have been amended in accordance with the Settlement Agreement;

   (7)     Issued permit(s) by the County of Los Angeles granting without conditions the Parking Permit Application;

   (8)     Unfiled Amended Garikian Indemnity Proof of Claim;

   (9)     Written confirmation and photographs establishing that the Lot 5 Improvements have been completed;

   (9)     Request for Reconveyance of the Deed of Trust in recordable form.

## II.     The Closing

   (A)     "**Closing**" shall occur upon the occurrence of each and all of the following:

   (1)     Entry of the Approval Order as a final order of the Court and deposit of the Approval Order into Escrow;

   (2)     Entry of an order of the Court granting a motion seeking approval for ALC to assume the 16-Space Parking Lease and the Amended 14-Space Parking Lease <u>or</u> of an order confirming ALC's Plan which provides for the assumption of such leases under applicable authority, and deposit into

(3)     Escrow of an order granting approval for the assumption of such leases;
Deposit into Escrow of documentary and photographic evidence that the Lot 5 Improvements have been completed in accordance with one or more issued permits and the Approval Order – with a "Receipt Acknowledged" sign-off by or on behalf of Garikian;

(4)     Issuance by the County of the Parking Permit in accordance with the Parking Permit Application and deposit into Escrow of duplicate certified copies of such permit;

(5)     Deposit into Escrow of the Amended Indemnity Proof of claim showing confirmation of filing:

(6)     Deposit into Escrow of duplicate originals of the Modification Agreement, signed by each of the Parties.

(B)     Upon Closing, the following shall be delivered to the respective Parties:

To Garikian:

(1)     A duplicate original of the Settlement Agreement, bearing an original signature on behalf of ALC;

(2)     A duplicate original of the Modification Agreement, bearing an original signature thereon on behalf of ALC;

(3)     A copy of the items described in Paragraph 1(A)(3) above as evidence of completion of the Lot 5 Improvements;

(4)     A duplicate certified copy of the (issued) Parking Permit

To ALC

(1)     A duplicate original of the Settlement Agreement, bearing an original signature on behalf of Garikian;

(2)     A duplicate original of the Modification Agreement, bearing an original signature thereon on behalf of Garikian;

(2)     The (recordable) Request for Reconveyance;

(3)     ECF confirmation or other Proof of the filing with the Court of the Withdrawal of the Lease Rejection Proof of Claim;

(4)     ECF confirmation or other proof of the filing with the Court of the Amended Indemnity Proof of Claim;

(5)     A duplicate certified copy of the (issued) Parking Permit

## III.    <u>Event of Non-Closing</u>

1.    In the event Closing does not occur on or before May 31, 2018 (the "**Closing Deadline**"), or by any further extension(s) of the Closing Deadline agreed upon by the Parties in writing, the Settlement Agreement shall be deemed terminated, and without further force or effect. In such event, upon written notice of such termination to the Escrow Agent, the Escrow Agent shall return all items deposited into Escrow by Garikian to Garikian, and all items deposited into Escrow by ALC to ALC.

IV. **Notices**

2.  The following are the Parties' respective addresses/contact information for notice/delivery
    purposes under these Escrow Instructions:

**To ALC:**

c/o Gregory M. Salvato, Esq.
Gsalvato@Salvatolawoffices.com

SALVATO LAW OFFICES
355 So. Grand Avenue, Suite 2450
Los Angeles, CA 90071-9500
Telephone: (213) 484-8400
Facsimile: (213) 402-3778

**To Garikian**:

c/o Daniel I. Barness, Esq.
Daniel@BarnessLaw.com

BARNESS & BARNESS LLP
11377 W. Olympic Blvd., 2nd Floor
Los Angeles, CA 90064
Telephone:  (310) 594-3011
Facsimile:  (310) 473-8700


Altadena Lincoln Crossing, LLC, Debtor
in Possession

_____
By: Gregory Galetly, Managing
     Member


Approved as to Form and Content

Salvato Law Offices
Attorneys for Debtor in Possession


By:_____
Gregory M. Salvato, Esq.


The George Garikian Living Trust

_____
By: George Garikian, Trustee



Approved as to Form and Content

Barness & Barness LLP
Attorneys for  The George Garikian
 Living Trust


By:_____
Daniel I. Barness, Esq.

# EXHIBIT "D"

**Fill in this information to identify the case:**

Debtor 1 ALTADENA LINCOLN CROSSING LLC

Debtor 2
(Spouse, if filing)

United States Bankruptcy Court for the: Central District Of California

Case number 2:17-bk-14276 BB

Official Form 410

# Proof of Claim

04 /16

Read the instructions before filling out this form. This form is for making a claim for payment in a bankruptcy case. Do not use this form to make a request for payment of an administrative expense. Make such a request according to 11 U.S.C. § 503.

Filers must leave out or redact information that is entitled to privacy on this form or on any attached documents. Attach redacted copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages, and security agreements. **Do not send original documents;** they may be destroyed after scanning. If the documents are not available, explain in an attachment.

A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.

**Fill in all the information about the claim as of the date the case was filed.** That date is on the notice of bankruptcy (Form 309) **that you received.**

| Part 1: | Identify the Claim |
|---|---|

1. **Who is the current creditor?**

The George Garikian Family Trust
Name of the current creditor (the person or entity to be paid for this claim)

Other names the creditor used with the debtor

2. **Has this claim been acquired from someone else?**

☒ No
☐ Yes. From whom?

3. **Where should notices and payments to the creditor be sent?**

Federal Rule of Bankruptcy Procedure (FRBP) 2002(g)

| Where should notices to the creditor be sent? | Where should payments to the creditor be sent? (if different) |
|---|---|
| The George Garikian Family Trust<br>Name | The George Garikian Family Trust<br>Name |
| c/o Barness & Barness LLP, 11377 W. Olympic Blvd.<br>Number        Street | c/o Barness & Barness LLP, 11377 W. Olympic Blvd.<br>Number        Street |
| Los Angeles        CA        90064<br>City        State        ZIP Code | Los Angeles        CA        90064<br>City        State        ZIP Code |
| Contact phone (310) 594-3011 | Contact phone (310) 594-3011 |
| Contact email | Contact email |

Uniform claim identifier for electronic payments in chapter 13 (if you use one):

_ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _

4. **Does this claim amend one already filed?**

☐ No
X Yes.   Claim number on court claims registry (if known) 10       Filed on 08/08/17
                                                                                                   MM / DD / YYYY

5. **Do you know if anyone else has filed a proof of claim for this claim?**

X No
☐ Yes.   Who made the earlier filing?

**Part 2:**    **Give Information About the Claim as of the Date the Case Was Filed**

| | | |
|---|---|---|
| 6. | **Do you have any number you use to identify the debtor?** | ☐ s      ___  ____    _  ____ |

| | | |
|---|---|---|
| 7. | **How much is the claim?** | Unknown, but not to exceed $60,000 |

**Does this amount include interest or other charges?**

X No

☐ Yes. Attach statement itemizing interest, fees, expenses, or other charges required by Bankruptcy Rule 3001(c)(2)(A).

| | |
|---|---|
| 8. | **What is the basis of the claim?** |

Examples: Goods sold, money loaned, lease, services performed, personal injury or wrongful death, or credit card.

Attach redacted copies of any documents supporting the claim required by Bankruptcy Rule 3001(c).

Limit disclosing information that is entitled to privacy, such as healthcare information.

Indemnity Agreement secured by 2230-2260 Lincoln Ave., Altadena, California

| | |
|---|---|
| 9. | **Is all or part of the claim secured?** |

☐ No

☒ Yes. The claim is secured by a lien on property.

    **Nature of property:**

    ☒ Real estate. If the claim is secured by the debtor's principal residence, file a *Mortgage Proof of Claim Attachment* (Official Form 410-A) with this *Proof of Claim.*

    ☐ Motor vehicle

    ☐ Other. Describe: _____

    **Basis for perfection:** Deed of Trust - Recorded against real property
    _____
    Attach redacted copies of documents, if any, that show evidence of perfection of a security interest (for example, a mortgage, lien, certificate of title, financing statement, or other document that shows the lien has been filed or recorded.)

    **Value of property:**    $ 20,000,000

    **Amount of the claim that is secured:**    $60,000 *

    **Amount of the claim that is unsecured:** $_0_____ (The sum of the secured and unsecured amounts should match the amount in line 7.)

    * Unknown but not to exceed $60,000

    **Amount necessary to cure any default as of the date of the petition:** $_____

    **Annual Interest Rate** (when case was filed)_____%
    ☐ Fixed
    ☐ Variable

| | |
|---|---|
| 10. | **Is this claim based on a lease?** |

X No

☐ Yes. **Amount necessary to cure any default as of the date of the petition.** $_____

| | |
|---|---|
| 11. | **Is this claim subject to a right of setoff?** |

X No

☐ Yes. Identify the property: _____

| | |
|---|---|
| 12. | **Is all or part of the claim entitled to priority under 11 U.S.C. § 507(a)?** |

☐ No

☒ Yes. *Check all that apply:*

                                                                     **Amount entitled to priority**

| A claim may be partly priority and partly nonpriority. For example, in some categories, the law limits the amount entitled to priority. | ☐ Domestic support obligations (including alimony and child support) under 11 U.S.C. § 507(a)(1)(A) or (a)(1)(B). | $_____ |
| | ☐ Up to $2,850* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use. 11 U.S.C. § 507(a)(7). | $_____ |
| | ☐ Wages, salaries, or commissions (up to $12,850*) earned within 180 days before the bankruptcy petition is filed or the debtor's business ends, whichever is earlier. 11 U.S.C. § 507(a)(4). | $_____ |
| | ☐ Taxes or penalties owed to governmental units. 11 U.S.C. § 507(a)(8). | $_____ |
| | ☐ Contributions to an employee benefit plan. 11 U.S.C. § 507(a)(5). | $_____ |
| | ☒ Other. Specify subsection of 11 U.S.C. § 507(a)(__2__) that applies. | $ 60,000  _____ |

* Amounts are subject to adjustment on 4/1/16 and every 3 years after that for cases begun on or after the date of adjustment.

## Part 3:  Sign Below

**The person completing this proof of claim must sign and date it. FRBP 9011(b).**

If you file this claim electronically, FRBP 5005(a)(2) authorizes courts to establish local rules specifying what a signature is.

**A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157 and 3571.**

*Check the appropriate box:*

☐ I am the creditor.

☒ I am the creditor's attorney or authorized agent.

☐ I am the trustee, or the debtor, or their authorized agent. Bankruptcy Rule 3004.

☐ I am a guarantor, surety, endorser, or other codebtor. Bankruptcy Rule 3005.

I understand that an authorized signature on this *Proof of Claim* serves as an acknowledgment that when calculating the amount of the claim, the creditor gave the debtor credit for any payments received toward the debt.

I have examined the information in this *Proof of Claim* and have a reasonable belief that the information is true and correct.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on date  _____
                   MM / DD / YYYY

/s/ Daniel I. Barness
_____
Signature

**Print the name of the person who is completing and signing this claim:**

| Name | Daniel I. Barness |
| | First name        Middle name        Last name |
| Title | Attorneys  for The George Garikian Family Trust |
| Company | Barness & Barness LLP |
| | Identify the corporate servicer as the company if the authorized agent is a servicer. |
| Address | c/o Barness & Barness LLP, 11377 W. Olympic Blvd. |
| | Number        Street |
| | Los Angeles        CA        90064 |
| | City        State        ZIP Code |
| Contact phone | (310) 594-3011        Email |

# EXHIBIT "E"

## AMENDMENT TO PARKING SPACE LEASE
## DATED AS OF JANUARY 8, 2015

.
This Amendment is made as of January 7, 2018 by and between ALTAENA LINCOLN
CROSSING, LLC, a Delaware Limited Liability Company ("**ALC**"/"**Landlord**"), on the one
hand, and George Garikian as Trustee of the George Garikian Living Trust ("**Garikian**")
/"**Tenant**"), on the other hand (collectively, the "**Parties**"), and modifies the PARKING SPACE
LEASE dated as of January 8, 2015,  (the "14-Space Lease") as to which a Memorandum of
Lease, bearing Recording No.20150054311 is of record with the Los Angeles County Recorder's
Office.  This Amendment is made pursuant to the Settlement Agreement of even date between
the Parties and in accordance with paragraph 24(l)of the 14-Space Lease.

Paragraph 3 of the 14-Space Lease is hereby modified as follows:

"3. **Term**.  The term of this lease (the "Term") shall begin on January 8, 2015 (the "Effective
Date"), and shall expire up the earlier of: (1) termination of that certain Shopping Center Lease
by and between ALC and B&V Enterprises, Inc. dated April 1, 2008 and/or (2) Ninety-nine (99)
years from the Effective Date."

Except as modified by the foregoing, the 14-Space Lease shall in all other respects remain
unmodified, and in full force and effect. Further, and for the sake of clarification, this
Amendment shall modify and apply only to the 14-Space Lease, and not the separate lease
agreement between the Parties entitled: "Parking Space and Trash Enclosure Lease " dated as of
January 8, 2015.

So Agreed.

Altadena Lincoln Crossing, LLC, Landlord     Approved as to Form and Content

                                            Salvato Law Offices
                                            Attorneys for Landlord

By: _____            By:_____
Gregory Galletly, Managing Member,          Gregory M. Salvato, Esq.

The George Garikian Living Trust, Lessee

By:_____
    George Garikian, Trustee

Approved as to Form and Content

Barness & Barness LLP
Attorneys for The George Garikian Living
Trust

By:_____
Daniel I. Barness, Esq.

.

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding. My business address is:

**Salvato Law Offices, 355 South Grand Avenue Suite 2450, Los Angeles, CA 90071-9500**

A true and correct copy of the foregoing document entitled (*specify*):

1.  **Notice of Motion for Order to: Approve Compromise between Debtor Altadena Lincoln Crossing, LLC and George Garikian as Trustee of the George Garikian Living Trust; Modify Cash Collateral Order to Approve $50,000 Expenditure Required by Compromise; Memorandum of Points and Authorities; Declaration of Greg Galletly in Support; and**

2.  **Motion for Order to: Approve Compromise between Debtor Altadena Lincoln Crossing, LLC and George Garikian as Trustee of the George Garikian Living Trust; Modify Cash Collateral Order to Approve $50,000 Expenditure Required by Compromise; Memorandum of Points and Authorities; Declaration of Greg Galletly in Support; and**

will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner stated below:

**1. TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**: Pursuant to controlling General Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document. On (*date*) _1/25/2018_, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:

- Daniel I Barness    daniel@barnesslaw.com
- Anastasia E Bessey    anastasia.bessey@kralikjacobs.com, rina.ross@kralikjacobs.com,aeblaw@gmail.com
- Mikel R Bistrow    mikel.bistrow@dinsmore.com, caron.burke@dinsmore.com
- J Scott Bovitz    bovitz@bovitz-spitzer.com
- Peter W Bowie    peter.bowie@dinsmore.com, caron.burke@dinsmore.com
- Christopher Celentino    chris.celentino@dinsmore.com, caron.burke@dinsmore.com
- Lois Jacobs    lois.jacobs@kralikjacobs.com
- Lisa Lenherr    ll@tiemlaw.com, sml@tiemlaw.com
- Ron Maroko    ron.maroko@usdoj.gov
- Gregory M Salvato    gsalvato@salvatolawoffices.com, calendar@salvatolawoffices.com;jboufadel@salvatolawoffices.com;gsalvato@ecf.inforuptcy.com
- James A Tiemstra    jat@tiemlaw.com, sml@tiemlaw.com
- United States Trustee (LA)    ustpregion16.la.ecf@usdoj.gov

☐ Service information continued on attached page

**2. SERVED BY UNITED STATES MAIL**:
On (*date*) _____, I served the following persons and/or entities at the last known addresses in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail, first class, postage prepaid, and addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge <u>will be completed</u> no later than 24 hours after the document is filed.

☐ Service information continued on attached page

//
//
//
//
//
//

This form is mandatory. It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*June 2012*                                                                      **F 9013-3.1.PROOF.SERVICE**

**3. SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL** (state method for each person or entity served): Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on (date) *1/25/2018*, I served the following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows. Listing the judge here constitutes a declaration that personal delivery on, or overnight mail to, the judge will be completed no later than 24 hours after the document is filed.

Overnight
Honorable Sheri Bluebond
United States Bankruptcy Court
255 E. Temple Street, Suite 1534
Los Angeles, CA 90012

☐ Service information continued on attached page

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

| 1/25/2018 | Lynnette Garrett | /s/ Lynnette Garrett |
|-----------|------------------|----------------------|
| Date      | Printed Name     | Signature            |

This form is mandatory. It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*June 2012*

**F 9013-3.1.PROOF.SERVICE**

# EXHIBIT "2"

1  Daniel I. Barness
     SBN 104203, Daniel@BarnessLaw.com
2  **BARNESS & BARNESS LLP**
   13636 Ventura Blvd.
3  Los Angeles, CA 91423
   Telephone:  (310) 594-3011
4  Facsimile:  (818) 906-2638

5  Attorneys for **The George Garikian Living Trust**, Creditor

6                **UNITED  STATES BANKRUPTCY COURT**

7                **CENTRAL  DISTRICT OF CALIFORNIA**

8                     **LOS ANGELES DIVISION**

9                                              Case No. 2:17-bk-14276 BB

10                                     )        Chapter 11
    In re                              )
11                                     )        **OPPOSITION BY THE GEORGE**
    ALTADENA LINCOLN CROSSING,         )        **GARIKIAN LIVING TRUST TO**
12  LLC,                               )        **"MOTION TO APPROVE**
                                       )        **AGREEMENT WITH EAST WEST**
13           Debtor.                   )        **BANK FOR: (1) SETTLEMENT OF**
                                       )        **STATE COURT ACTION; (2)**
14                                     )        **RELIEF FROM STAY; AND**
                                       )        **(3) DISMISSAL OF NINTH CIRCUIT**
15                                     )        **APPEAL"; DECLARATION OF**
                                       )        **DANIEL I. BARNESS**
16                                     )
                                       )        **[REQUEST FOR JUDICIAL NOTICE**
17  _____    )        **FILED CONCURRENTLY]**

18                                              DATE:      January 29, 2020
                                                TIME:      10:00 A.M.
19                                              CRTRM:     1539
                                                           255 E. Temple Street
20                                                         Los Angeles, CA 90012

21

22

23

24

25

26

27

28
                                                                                    1

# <u>TABLE OF CONTENTS</u>

I.          INTRODUCTION

II.         STATEMENT OF FACTS

III.        DISCUSSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8
.
            A. Applicable Authorities . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

            B. Applicable Authorities Do Not Support the Trustee's Motion . . . . . . . . . . . . . . 10

            1.      The Garikian Settlement Agreement is binding upon the Trustee and the
                    Estate . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

            2.      The Motion Invites Harm to Garikian, the Estate and Successors  . . . . . . . . 10

                    a.      Harm to Garikian . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10
                    b.  Harm to Estate and/or Successor Owner  . . . . . . . . . . . . . . . . 11

            3.      The Motion is Ineffectual as a Request to Set Aside the Garikian Settlement
                    Order . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

IV.     CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

            DECLARATION OF DANIEL I. BARNESS  . . . . . . . . . . . . . . . . . . . . . . . . 14

# <u>TABLE OF AUTHORITIES</u>

<u>CASES</u>

*Albert v. Chesapeake Bank & Trust Co. (In re Linton Props., LLC)*, 410 B.R. 1, 12 Bankr. D.D.C.2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*Creative Data Forms, Inc. v. Pennsylvania Minority Business Development Authority*, 72 Bankr. 619, 623 (E.D. Pa. 1985). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*Ford Motor Credit Co. v. Weaver*, 680 F.2d 451, 461 (6th Cir.1982) . . . . . . . . . . . . . . . . . . . . . 8

*In re Johnson,* 518 F.2d 246, 251 (10th Cir.), cert. denied, 423 U.S. 893, 96 S. Ct. 191, 46 L. Ed. 2d 125 (1975) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*Leonard v. Vrooman,* 383 F.2d 556, 561 (9th Cir.1967) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*Mosser v. Darrow*, 341 U.S. 267, 273-74, 71 S. Ct. 680, 683, 95 L. Ed. 927 (1951) . . . . . . . . . . . . 8

*Sherr v. Winkler*, 552 F.2d 1367, 1374 (10th Cir.1977). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*In re Valley Engineering Company*, 41 Bankr. 509 (Bankr. N.D. Ill. 1984) . . . . . . . . . . . . . . . . . . 9

*Wolf v. Weinstein*, 372 U.S. 633, 650, 83 S. Ct. 969, 979, 10 L. Ed. 2d 33 (1963).. . . . . . . . . . . . .8

<u>STATUTES/RULES</u>

Federal Rules of Civil Procedure

Rule 59 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9, 10

Rule 60 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9, 10

Federal Rules of Bankruptcy Procedure

Rule 9023 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

ii

**OPPOSITION BY  THE GEORGE GARIKIAN LIVING TRUST TO "MOTION TO APPROVE AGREEMENT WITH EAST WEST BANK FOR: (1) SETTLEMENT OF STATE COURT ACTION; (2) RELIEF FROM STAY; AND (3) DISMISSAL OF NINTH CIRCUIT APPEAL" DECLARATION OF DANIEL I. BARNESS**

ii

The George Garikian Living Trust (the "Garikian Trust" or "Garikian") submits this Opposition to the Motion by the Chapter 11 Trustee herein (the "Trustee") entitled:  "Motion to Approve Agreement with East West Bank For: (1) Settlement of State Court Action; (2) Relief from Stay; and (3) Dismissal of Ninth Circuit Appeal" (the "Motion") and to the underlying settlement agreement with EWB (the "EWB Settlement").

## I.    **INTRODUCTION**

For substantive and procedural reasons the Motion should be denied:  Harm to the Estate will be among other  adverse consequences of granting the Motion, in that it will result in the setting-aside of the Court's order approving the below-described Garikian Settlement.   In the absence of that settlement, Garikian will assert damages against the Estate arising from rejection of post-petition leases; Garikian's  $5 million secured claim will be reinstated (now as a sold-out junior with an elephantine administrative  claim).  It is also likely that as a consequence,  the Estate will incur the risks and expense of costly litigation to determine Garikian's damages resulting from  the post-petition rejection.

If implemented, the EWB Settlement will cause economic harm to  Garikian as well: By throwing the settled parking issues into disarray and uncertainty, a significant cloud on title, which the Garikian Settlement seeks to avoid, will remain on Garikian's Market Quadrant (defined below). This same disarray and uncertainty over Code-compliant parking  will also cloud the title of  the Estate's below-defined Fitness Quadrant.  That cloud impedes a sale of the Market Quadrant by EWB or its successor, if not preventing a sale altogether.  The Motion not only fails to address the potential harm arising from unwinding the Garikian Settlement, it fails even to mention that Settlement or the Court's order approving it.

The Motion is also procedurally improper, and for that reason alone should be denied:  It is a

disguised attempt to undo a previous Court Order approving a Settlement Agreement between this Chapter 11 Estate and Garikian (the "Garikian Settlement"), and is in dereliction of the Trustee's duties under the Code to act as fiduciary on behalf of all creditors and the Estate.

Accordingly, the Garikian Trust respectfully requests that the Court deny the Motion and decline to approve the EWB Settlement.

## II.    STATEMENT OF FACTS

The following facts are established by the record of these proceedings; the concurrently-filed Request for Judicial Notice ("RJN"); and by the annexed declaration of Daniel I. Barness ("Barness Declaration"):

1.    This case was commenced on April 7, 2017 (the "Petition Date") (Doc 1).  From the Petition Date until October 3, 2019, when a Chapter 11 trustee was appointed (Doc 968), Debtor had been acting as debtor in possession herein.  After close to two years of litigation concerning eight iterations of a plan of reorganization by the former debtor in possession (Doc 943), and after appeals by EWB regarding its default interest assessed against Debtor -- culminating in the Ninth Circuit appeal covered by the Motion -- on October 7, 2019, the Court entered an order appointing a Chapter 11 trustee, followed by the acceptance of such appointment by Jason Rund (the "Chapter 11 Trustee")  [(Doc  965); Barness Declaration, ¶ 1].

2.    Initially (prior to the Petition Date), Debtor's predecessor-entity Altadena Lincoln Crossing, LLC ("ALC")[1] owned an integrated singular shopping center (the "ALC Center") consisting of two quadrants -- the Fitness Quadrant, which had as its anchor tenant a 24-Hour Fitness facility (the "Fitness Quadrant"); and (across the street) the Market Quadrant, which had as

---

[1]    As used herein, "ALC" will mean  the pre-petition Debtor.

**OPPOSITION BY  THE GEORGE GARIKIAN LIVING TRUST TO "MOTION TO APPROVE AGREEMENT WITH EAST WEST BANK FOR: (1) SETTLEMENT OF STATE COURT ACTION; (2) RELIEF FROM STAY; AND (3) DISMISSAL OF NINTH CIRCUIT APPEAL" DECLARATION OF DANIEL I. BARNESS**

3

its anchor tenant Super King Market (the "Market Quadrant").    A covenant in favor of  Los

Angeles County entitled " " (the "County Covenant") that was  recorded on December 7,

2005[2] required that the ALC Center not be legally divided, *i.e.*,  that the Fitness Quadrant and

the Market Quadrant be maintained as a singular ALC Center, versus two legally divided

parcels with two separate centers. [Barness Declaration, ¶ 2]

3.    In order to effect a sale of  the Market Quadrant that would conform to Los Angeles County

requirements and lead to the release of the County's subdivision restriction, the parties (ALC

and Garikian), as part of the documentation of their purchase and sale agreement dated

January 15, 2015[3] (the "Purchase and Sale Agreement") also entered into the Leases and the

Indemnity Agreement, which were incorporated into and made part of the Purchase and Sale

Agreement and documentation. [(Doc 412); RJN, Exhibit "A"] Among other things, these

agreements were intended to achieve formal compliance with County requirements regarding

the Off-Site Parking Arrangements – a condition for the release of the County Covenant

which otherwise would have prevented  the division of the formerly integrated (undivided)

ALC Center [Barness Declaration, ¶ 3].  A Memorandum of Lease covering the 14-Space

Parking Lease [RJN, Exhibit "C"] and a Memorandum of Lease covering the 16-Space

Parking Lease [RJN, Exhibit "D"] were recorded on January15, 2015 in Los Angeles County.

The Indemnity [RJN, Exhibit "E"] The Deed of Trust  [RJN, Exhibit "F"] was executed in

order to secure the Debtor's obligations under the Indemnity Agreement, and was also

recorded on January 15, 2015 in Los Angeles County.    The template for these arrangements

is set forth in correspondence between the County and Garikian, which is part of the record

---

[2]        See RJN, Exhibit "B" and Garikian Declaration [(Doc 412, ¶¶ 1-7); RJN, Exhibit "A".]

[3]        [(Doc 412), ¶¶ 1-7; RJN, Exhibit "A"]

**OPPOSITION BY  THE GEORGE GARIKIAN LIVING TRUST TO "MOTION TO APPROVE
AGREEMENT WITH EAST WEST BANK FOR: (1) SETTLEMENT OF STATE COURT
ACTION; (2) RELIEF FROM STAY; AND (3) DISMISSAL OF NINTH CIRCUIT APPEAL"
DECLARATION OF DANIEL I. BARNESS**                                                                                    4

of these proceedings   [RJN, Exhibit "A"].

4.   As a result of these transactions, ALC (the Estate's predecessor) retained the Fitness

Quadrant and conveyed the Market Quadrant to Garikian.  The sale transaction, without

more, however, would have been impermissible, because it would have left the (Garikian's)

Market Quadrant without sufficient parking according to County requirements and would

have been in abrogation of the parties' agreements with the County upon which withdrawal of

the County Covenant was conditioned. [Barness Declaration, ¶ 4] So, following  guidelines

approved by the County, the parties entered into a number of ancillary agreements, including:

(1) an Indemnity Agreement [ RJN, Exhibit "E" ]: (2) the 14-Space Parking Lease [RJN,

Exhibit "F" ]; and (3) the 16-Space Parking Lease [RJN, Exhibit "D" ][4].

5.   These agreements implemented the County-approved arrangements allocating on ALC's

Fitness Quadrant 30 parking spaces, to be granted to the (Garikian) Market Quadrant to

adjust for the loss of parking resulting from dividing the integrated Center into two

separately-owned parts. The obligations under the Indemnity Agreement were secured by a

deed of trust to the Fitness Quadrant in favor of Garikian [RJN, Exhibit "F"][5].  The Off-Site

---

[4]      Doc 91, pp.34-36 (RJN, Exhibit "E") will hereinafter be called the "Indemnity
Agreement" and the 14-Space Lease and the 16-Space Lease will hereinafter be
called collectively the "Parking Leases".

[5]      The Indemnity Agreement provides indemnification by ALC against the risks of "(i)
any assertion by [SK Market] that section 18.5 of the [SK Market Lease] (or any
other provision of the [SK Market Lease] related to parking, in effect on the date of
this Indemnity Agreement) has been violated due to the failure to provide exclusivity
rights of SK in thirty (30) parking spaces in the [Parking Structure], (ii) any assertion
that the property violates applicable laws, codes or ordinances, in effect as of the
date of this Indemnity Agreement, regarding the provision of parking
spaces based on Tenant Leases in effect on the date of this Indemnitee
(sic) Agreement (so long as Tenant maintains the 162 onsite parking
spaces at the Market Quadrant), (iii) any and all damages and claims that
arise in the event that [Garikian], after pursuing diligently and in good
faith, is unable to procure from Los Angeles County a parking permit for

---

**OPPOSITION BY  THE GEORGE GARIKIAN LIVING TRUST TO "MOTION TO APPROVE
AGREEMENT WITH EAST WEST BANK FOR: (1) SETTLEMENT OF STATE COURT
ACTION; (2) RELIEF FROM STAY; AND (3) DISMISSAL OF NINTH CIRCUIT APPEAL"
DECLARATION OF DANIEL I. BARNESS**                                                              5

Parking Arrangements agreed by the parties (the "Off-Site Parking Arrangements") also included certain specified improvements to ALC's  Lot 5 (a vacant lot) to accommodate 14 parking spaces. These improvements (the "Lot 5 Improvements") included the following: (a) grading of the unimproved Lot 5 (an undeveloped portion of the Debtor's real property) and permit approvals, (b) paving and striping of Lot 5 in accordance with County requirements; and (c) relocation of the sprinkler fixtures, so that no fewer than 14 vehicles can be parked on Lot 5. (RJN, Exhibit "A" at  pp. 7-8).  Without the Lot 5 Improvements, there would be an undue parking burden on the Fitness Quadrant, which otherwise would have an inadequate number of parking spaces to accommodate employees and visitors. *Id.*

6.    Following the Petition Date, a significant dispute arose between Garikian and the Estate when the former debtor-in-possession proposed its First Amended (Doc 160) and Second Amended (Doc 293) Plans.  The First Amended Plan was silent as to assumption/rejection; and the Second Amended Plan would have effected a rejection of the Parking Leases and purportedly of the Indemnity Agreement[6].  In response to this state of affairs, Garikian filed a motion seeking an order compelling assumption or rejection of the parking leases. [Doc 145; Barness Declaration, ¶  6]  That motion to was withdrawn when the parties subsequently

the Property pursuant to file no. RPKP 201300005 (R2013 -- 01662) (the "Parking Permit"), and/or (iv) [Debtor's] breach of or default with regard to any of its covenants under that certain Fifth Amendment to Standard Offer, Agreement and Escrow Instructions for Purchase of Real Estate, dated as of November 18, 2014 [copy attached, but omitted here]. This Agreement shall survive the closing under the PSA [Purchase and Sale Agreement] and the recording of the conveyance deed for the Property to [Garikian]." [RJN, Exhibit "E"]

[6]    Garikian has disputed on the record that the Indemnity Agreement is "executory" in nature. [Barness Declaration, ¶ 8]

**OPPOSITION BY  THE GEORGE GARIKIAN LIVING TRUST TO "MOTION TO APPROVE AGREEMENT WITH EAST WEST BANK FOR: (1) SETTLEMENT OF STATE COURT ACTION; (2) RELIEF FROM STAY; AND (3) DISMISSAL OF NINTH CIRCUIT APPEAL" DECLARATION OF DANIEL I. BARNESS**                                                                        6

reached a settlement [Barness Declaration, ¶ 6].

7.      On or about January 20, 2018, Garikian and the former debtor-in-possession reached a settlement agreement (the "Garikian Settlement"), which was viewed as a better alternative to the extensive and costly litigation which would have arisen from the Estate's targeted rejections.  Among other things, the settlement included Debtor's performance of the Lot 5 Improvements, which had previously been stalled since the 2015 purchase and sale transaction.  [Barness Declaration, ¶ 7]

8.      Among other arrangements embodied by the Garikian Settlement, the Debtor was to assume the two Parking Leases, and Garikian was to withdraw its Indemnity Proof of Claim for $5 million (Doc 361-9, RJN, Exhibit "H") [Barness Declaration, ¶ 8].

9.      On January25, 2019, the Debtor filed a Motion (Doc 125) "Garikian Settlement Approval Motion") seeking Court-approval and authority to enter into the Garikian Settlement, which EWB opposed  [(Doc 406); [Barness Declaration].  On June 24, 2018, the Court issued its order granting the Garikian Settlement Motion. [Doc 561, RJN, Exhibit "I"].  It took from the initial filing of Debtor's Motion for approval of the Garikian Settlement on January 26, 2018 until June 24, 2018 -- a period of over five months-- just for the litigation process concerning the Settlement to run its course.  [Barness Declaration, ¶ 10]

10.     Finally, following the Court's  OSC (Doc 929), the Court ordered the appointment of Chapter 11 trustee. On or about October 23, 2019, Jason Rund (the "Trustee") accepted appointment as Chapter 11 Trustee, and at present is so serving.  [(Doc  965); Barness Declaration, ¶ 10]

11.     The Settlement Agreement resulted from extensive negotiations between Debtor and the Garikian Trust.  The considerable time, effort and expense spent to resolve the parking issues

which stem from Garikian's 2015 acquisition of the Market Quadrant from ALC ultimately

led to the Garikian Settlement Agreement.  The aim of the Settlement Agreement was to

avoid long, drawn-out, expensive litigation; to meet the County requirements (regarding the

Off-site Parking Arrangements); to provide a means by which Debtor might increase the

value of its property, and to mitigate a significant multimillion-dollar risk looming over

Garikian's Market Quadrant, which is also the  risk facing any transferor (*e.g.,*  EWB) or

subsequent owner of the Fitness Quadrant, unless the Lot 5 Improvements are made prior to

any transfer.  At the time of the Trustee's appointment, Garikian and the former

debtor-in-possession were well on  their way to consummating the terms of the Garikian

Settlement, and accomplishing the Lot 5 Improvements.  [Barness Declaration, ¶ 11]

## III.   <u>DISCUSSION</u>

### A.  <u>Applicable Authorities</u>

It is a long-settled principle that a Chapter 11 trustee is a fiduciary of each creditor of the estate.

[<u>See</u>, *e.g., Wolf v. Weinstein*, 372 U.S. 633, 650, 83 S. Ct. 969, 979, 10 L. Ed. 2d 33 (1963).]  As

such, he or she has a duty to treat all creditors fairly and to exercise that measure of care and

diligence that an ordinarily prudent person under similar circumstances would exercise. *Ford Motor*

*Credit Co. v. Weaver*, 680 F.2d 451, 461 (6th Cir.1982); *Sherr v. Winkler*, 552 F.2d 1367, 1374 (10th

Cir.1977).

A  trustee may be personally liable not only for intentional but also negligent violations of duties

imposed upon him by law.  [<u>See</u> , *Mosser v. Darrow*, 341 U.S. 267, 273-74, 71 S. Ct. 680, 683, 95 L.

Ed. 927 (1951); *In re Johnson*, 518 F.2d 246, 251 (10th Cir.), cert. denied, 423 U.S. 893, 96 S. Ct.

191, 46 L. Ed. 2d 125 (1975; cf. *Leonard v. Vrooman,* 383 F.2d 556, 561 (9th Cir.1967) (trustee can

be held personally liable for acts which either are not taken in good faith or are unreasonable).]

**OPPOSITION BY  THE GEORGE GARIKIAN LIVING TRUST TO "MOTION TO APPROVE
AGREEMENT WITH EAST WEST BANK FOR: (1) SETTLEMENT OF STATE COURT
ACTION; (2) RELIEF FROM STAY; AND (3) DISMISSAL OF NINTH CIRCUIT APPEAL"
DECLARATION OF DANIEL I. BARNESS**                                                    8

1   A Trustee is bound by orders of the court, including orders  (as here) arising out of settlements to

2   which the  predecessor debtor-in-possession was a party.  In *Albert v. Chesapeake Bank & Trust Co.*

3   *(In re Linton Props., LLC)*, 410 B.R. 1, 12 (Bankr.D.D.C.2009), for example, a trustee was

4   determined to be bound by a debtor-in-possession's agreement with the particular creditor and the

5   trustee's predecessor, the debtor-in-possession not to challenge a garnishment lien.  Accordingly, the

6   successor Chapter 11 trustee was barred from challenging  the lien.

7
    Motions to set aside previous orders or judgments of the court are governed by  Rules 59 and 60
8
    of the Federal Rules of Civil Procedure.  With certain inapplicable exceptions, Bankruptcy Rules
9
    9023 and 9024 incorporate Fed. R. Civ. Proc. 59 and 60 into all matters governed by the Bankruptcy
10
    Rules.  *Creative Data Forms, Inc. v. Pennsylvania Minority Business Development Authority*, 72
11
    Bankr. 619, 623 (E.D. Pa. 1985).
12

13   Fed. R. Civ. Proc. 60(b)(1) provides that the court may relieve a party from an order entered

14   against such party by reason of mistake, inadvertence, surprise or excusable neglect.   Fed. R. Civ.

15   Proc. 60(b)(6) provides for such relief for "any other reason justifying relief from the operation of

16   the judgment."

17
    Relief from a judgment or order may also be granted under Fed. R. Civ. Proc. 59, as incorporated
18
    by Bankruptcy Rule 9023.  Rule 59 provides in part that the court may "open the judgment . . . ,
19
    amend findings of fact and conclusions of law or make new findings and conclusions, and direct the
20
    entry of a new judgment." Fed. R. Civ. Proc.  59(a).  It has been stated that "one purpose of the Rule
21
    59 motion is to allow the trial court to exercise its "power and duty to order a new trial whenever, in
22
    its judgment, this action is required in order to prevent injustice. [Citation omitted]".  *In re Valley*
23
    *Engineering Company*, 41 Bankr. 509 (Bankr. N.D. Ill. 1984).
24

25

26

27

28

**OPPOSITION BY  THE GEORGE GARIKIAN LIVING TRUST TO "MOTION TO APPROVE
AGREEMENT WITH EAST WEST BANK FOR: (1) SETTLEMENT OF STATE COURT
ACTION; (2) RELIEF FROM STAY; AND (3) DISMISSAL OF NINTH CIRCUIT APPEAL"
DECLARATION OF DANIEL I. BARNESS**                                              9

**B. Applicable Authorities Do Not Support the Trustee's Motion**

**1. The Garikian Settlement Agreement is binding upon the Trustee and the Estate.**

The Garikian Settlement Agreement binds the Estate, and its representatives, including the Trustee.  As such, the Trustee should not be permitted to effect its breach, which he has initiated by filing the Motion.  The Estate's obligation to perform the Lot 5 Improvements is a central component of that settlement agreement.

**2. The Motion Invites Harm to Garikian, the Estate and Successors.**

To the extent implementation of the EWB Settlement results in a cloud on title, because the Lot 5 Improvements will not of been performed, there looms the possibility that the entire transaction leading to the subdivision of the former unitary center, could unravel. At the very least, if the parking arrangements are not implemented, any successor in ownership would face similar clouds on title arising from the uncertainty.  It would therefore be in the interest of all parties involved to have the Lot 5 Improvements completed, so at least this major issue will have been settled and resolved prior to any transfer of title. A cloud on title will be harmful to all parties concerned, if their ability to obtain financing and/or sell their respective parcels is impaired.

**a. Harm to Garikian**

If  implemented, the EWB Settlement would harm Garikian's interests by creating uncertainty about compliance with the off-site parking requirements imposed by the County as a condition to the parcel-split and Garikian's purchase of the Market Quadrant.  The threats of negative financial effects which were facing Garikian until approval of the Settlement  will arise again:  Garikian  has previously shown what those  negative financial effects would be  – impairment of marketability and financing opportunities with respect to the Market Quadrant – that it has faced, and continues to face –because of irresolution of the Off-Site Parking Arrangement issues. [See, *e.g.*, Declaration of George Garikian and attached October 30, 2014 letter to the Los Angeles County Department of Regional Planning / Zoning Permits East, citing problems in obtaining financing because of the

**OPPOSITION BY  THE GEORGE GARIKIAN LIVING TRUST TO "MOTION TO APPROVE AGREEMENT WITH EAST WEST BANK FOR: (1) SETTLEMENT OF STATE COURT ACTION; (2) RELIEF FROM STAY; AND (3) DISMISSAL OF NINTH CIRCUIT APPEAL" DECLARATION OF DANIEL I. BARNESS**

10

unresolved situation with the Off-Site Parking Arrangements. [RJN, Exhibit "A"].

After five months of litigation regarding *just* approval of the Garikian Settlement, the Court finally entered the Garikian Settlement Order on June 24, 2018 [Doc 561]. If the Garikian Settlement is set aside, as would be accomplished by a grant of the Trustee's Motion, there will be consequential harm not only to Garikian and the Estate.

**b. <u>Harm to Estate and/or Successor Owner</u>**

Potential cloud-on-title harm, akin to those faced by Garikian, is also faced by the Estate and any successor-owner. There, however, additional potential harms to the Estate: Abrogation of the Garikian Settlement Agreement by way of the EWB Settlement will also result in Garikian's $5 million secured claims against the Estate springing back, accompanied by a large administrative claim for the breach of the agreements that were to be assumed. It is safe to say that costly claim litigation will follow. Such litigation would be avoidable by full implementation of the Lot 5 Improvements. Without full resolution of the Off-Site Parking Arrangements, including the Lot 5 Improvements, however, title to both parcels (the Fitness and Market Quadrants) will be clouded: The County Covenant could spring back into existence -- or other remedies pursued by the County -- for the failure of the parties to implement the steps which were conditional to that covenant's release. Specifically, the County Covenant [RJN, Exhibit "B"] was released on condition that the Off-Site Parking Arrangements would be implemented in order to make up for the Market Quadrant's parking-shortfall resulting from the split of the Market Quadrant from ALC's-retained Fitness Quadrant [RJN, Exhibit "A"].

It follows then, that the actions which the Trustee is requesting by way of his Motion would also make the title (and therefore lending) issues even more complex. This could adversely affect not only the Trust's Market Quadrant, but also the Estate's Fitness Quadrant, and for that matter, any successor owner, in that this cloud might make it impossible to convey or encumber either of the properties.

**OPPOSITION BY THE GEORGE GARIKIAN LIVING TRUST TO "MOTION TO APPROVE
AGREEMENT WITH EAST WEST BANK FOR: (1) SETTLEMENT OF STATE COURT
ACTION; (2) RELIEF FROM STAY; AND (3) DISMISSAL OF NINTH CIRCUIT APPEAL"
DECLARATION OF DANIEL I. BARNESS**

11

**3.   <u>The Motion is Ineffectual as a Request to Set Aside the Garikian Settlement Order.</u>**

The sole focus of the Motion is approval of the EWB settlement, with no mention of the Garikian

Settlement Order, let alone a request that that Order be set aside.

If the EWB Settlement is approved, however, the Motion would have accomplished more than

just approval of the EWB Settlement: It will have led to the set-aside of the Court's earlier Garikian

Settlement Order, without having satisfied the FRCP Rule 59 or 60 criteria, much less meeting the

requirements for reconsideration under the Local Rules.   The Motion is thus ineffectual to seek  a

set-aside of the Court's Garikian Settlement Order.

As shown by the record, a great deal of time, effort and expense went into the steps leading to the

Garikian Settlement, and the Court's order approving that settlement:  Just the process of obtaining

Court approval of the Garikian Settlement  after it had been reached took more than five months

[Barness Declaration ¶ 9].  That Settlement Agreement grew out of extensive negotiations between

Debtor and the Garikian Trust. Its aim was to avoid drawn-out, expensive litigation; to meet the

County requirements; to provide a means by which Debtor might increase the value of its property;

and to mitigate a significant multi-million dollar risk looming over the Trust's Market Quadrant, with

the same cloud-on-title risks attaching to the Estate's Fitness Quadrant. [Barness Declaration, ¶ 3;

RJN, Exhibit "A"].

As a procedural matter, the expenditure of judicial resources to arrive at the Garikian Settlement

should not be discarded (especially not inadvertently), as the Motion would have it, without

consideration of the Court's previous Garikian Settlement Order.

Thus, without more, as an ineffectual motion for relief under FRCP  59 or 60, the Motion should

be denied.

///

**OPPOSITION BY  THE GEORGE GARIKIAN LIVING TRUST TO "MOTION TO APPROVE
AGREEMENT WITH EAST WEST BANK FOR: (1) SETTLEMENT OF STATE COURT
ACTION; (2) RELIEF FROM STAY; AND (3) DISMISSAL OF NINTH CIRCUIT APPEAL"
DECLARATION OF DANIEL I. BARNESS**                                                          12

IV.    **CONCLUSION**

If granted, the Motion will cause tremendous harm to both the Estate and Garikian, in that, among other things, complex litigation and legal issues that were resolved by way of the Garikian Settlement and the Court's Order thereon will be revived. Further, unless the Lot 5 Improvements are implemented, and the Off-Site Parking Arrangements finally concluded, clouds on title will remain against the Estate's Fitness Quadrant and Garikian's Market Quadrant.

In addition to the significant harm that would result from the granting the Motion, the Motion should also be denied because it is a procedurally defective mechanism to set aside the Garikian Settlement Order.

For the foregoing substantive and procedural reasons, the Garikian Trust respectfully requests that the Court deny the Motion or, alternatively, that it condition relief upon completion of the Lot 5 Improvements.

Dated: January 15, 2020                    Respectfully submitted,


                                           BARNESS & BARNESS LLP

                                           By: */s/ Daniel I. Barness*

                                                Daniel I. Barness
                                                Attorneys for The George Garikian

                                                Living Trust, Creditor

## DECLARATION OF DANIEL I. BARNESS

I am an attorney at law duly licensed to practice before the courts of the State of California and before this Court.   I am a partner in the law firm of Barness & Barness LLP, counsel for the George Garikian Living Trust (the "Garikian Trust" or "Garikian")[7].   I have been a practicing attorney, primarily in the area of bankruptcy, since 1982.  In connection with my representation of Garikian, I have familiarized myself with the matters described in the Docket, and know the facts below either from my own knowledge or from a review of the Docket regarding the described events or circumstances.  The facts stated herein are known to me personally to be true, and if called upon to testify as to the truth of such facts, I could and would so testify.   In forming the conclusions stated in Paragraph 13 below, (*i.e.,* that the EWB Settlement is substantively harmful and that the Motion is procedurally improper), I considered the following matters, all of which are matters of record and/or have been set forth in pleadings and other materials previously filed on behalf of Garikian.  References to "Doc" and "RJN" in this Declaration are to the corresponding docket item or Request for Judicial Notice exhibit, respectively, each of which I reviewed before making this Declaration:

1.    This case was commenced on April 7, 2017 (the "Petition Date") (Doc 1).  From the Petition Date until October 3, 2019, when a Chapter 11 trustee was appointed (Doc 968), Debtor had been acting as debtor in possession herein.  After close to two years of litigation concerning eight iterations of a plan of reorganization by the former debtor in possession (Doc 943), and after appeals by EWB regarding its default interest assessed against Debtor -- culminating in the Ninth Circuit appeal covered by the Motion -- on October 7, 2019, the Court entered an order appointing a Chapter 11 trustee, followed by the acceptance of such appointment by Jason Rund (the "Chapter 11 Trustee")  (Doc  965).

---

[7]      Unless otherwise defined, capitalized terms in this Declaration will have the same meanings as in the Response to which this Declaration is attached.

2.    Initially (prior to the Petition Date), Debtor's predecessor-entity Altadena Lincoln Crossing, LLC ("ALC") owned an integrated singular shopping center (the "ALC Center") consisting of two quadrants -- the Fitness Quadrant, which had as its anchor tenant a 24-Hour Fitness facility (the "Fitness Quadrant"); and (across the street) the Market Quadrant, which had as its anchor tenant Super King Market (the "Market Quadrant").   A covenant in favor of  Los Angeles County (the "County Covenant") that was  recorded on December 7, 2005[8] required that the ALC Center not be legally divided, in other words that the Fitness Quadrant and the Market Quadrant be maintained as a singular ALC Center, versus two legally divided parcels comprising two separate centers.

3.    In order to effect a sale of  the Market Quadrant that would conform to Los Angeles County requirements and lead to the release of the County's subdivision restriction, the parties (ALC and Garikian), as part of the documentation of their purchase and sale agreement dated January 15, 2015[9] (the "Purchase and Sale Agreement") also entered into the Leases and the Indemnity Agreement, which were incorporated into and made part of the Purchase and Sale Agreement and documentation. [(Doc 412); RJN, Exhibit "A"] Among other things, these agreements were intended to achieve formal compliance with County requirements regarding the Off-Site Parking Arrangements – a condition for the release of the County Covenant which otherwise would have prohibited the division of the formerly integrated (undivided) ALC Center.  The template for these arrangements is set forth in correspondence between the County and Garikian, which is part of the record of these proceedings. *Id.*

4.    As a result of these transactions, ALC (the Estate's predecessor) retained the Fitness Quadrant and conveyed the Market Quadrant to Garikian.  The sale transaction, without more, however, would have been impermissible, because it would have left Garikian's

---

[8]        [See Garikian Declaration, (Doc 412, ¶ 1); RJN, Exhibit "A".]

[9]        [(Doc 412), ¶¶ 1-7; RJN, Exhibit "A"]

**OPPOSITION BY  THE GEORGE GARIKIAN LIVING TRUST TO "MOTION TO APPROVE AGREEMENT WITH EAST WEST BANK FOR: (1) SETTLEMENT OF STATE COURT ACTION; (2) RELIEF FROM STAY; AND (3) DISMISSAL OF NINTH CIRCUIT APPEAL" DECLARATION OF DANIEL I. BARNESS**

15

1    Market Quadrant without sufficient parking according to County requirements, and would

2    have been in abrogation of the parties' agreements with the County upon which withdrawal

3    of the County Covenant was conditioned.  So, following  guidelines approved by the County,

4    the parties entered into a number of ancillary agreements, including: (1) an Indemnity

5    Agreement [RJN, Exhibit "E" ]: (2) the 14-Space Parking Space Lease [RJN, Exhibit "C"];

6    and (3) the 16-Space Parking Lease [RJN, Exhibit "D" ]. These agreements implemented the

7    County-approved arrangements allocating on ALC's Fitness Quadrant 30 parking spaces

8    dedicated and granted to the (Garikian) Market Quadrant to adjust for the loss of parking

9    resulting from dividing the integrated Center into two separately-owned parts. The

10    obligations under the Indemnity Agreement were secured by a deed of trust to the Fitness

11    Quadrant in favor of Garikian.  The two Parking Leases were also recorded against the

12    Fitness Quadrant.

13   5.    Integrated as part of the Purchase and Sale Agreement were arrangements for a total of 30

14    off-site parking spaces allocated for the Market Quadrant to be provided on ALC's Fitness

15    Quadrant. The Off-Site Parking Arrangements included certain specified improvements to

16    ALC's  Lot 5 (a vacant lot) to accommodate 14 parking spaces. These improvements (the

17    "Lot 5 Improvements") included the following: (a) grading of the unimproved Lot 5 (an

18    undeveloped portion of the Debtor's real property) and permit approvals, (b) paving and

19    striping of Lot 5 in accordance with County requirements; and (c) relocation of the sprinkler

20    fixtures, so that no fewer than 14 vehicles can be parked on Lot 5. [RJN, Exhibit "H"]

21    Without the Lot 5 Improvements, there would be (and is) an undue parking burden on the

22    Fitness Quadrant, which otherwise would have an inadequate number of parking spaces to

23    accommodate Fitness Quadrant employees and visitors. *Id.*

24

25   6.    Following the Petition Date, a significant dispute arose between Garikian and the Estate

26    when the former debtor-in-possession proposed its First (Doc 160) and Second Amended

27

28

**OPPOSITION BY  THE GEORGE GARIKIAN LIVING TRUST TO "MOTION TO APPROVE
AGREEMENT WITH EAST WEST BANK FOR: (1) SETTLEMENT OF STATE COURT
ACTION; (2) RELIEF FROM STAY; AND (3) DISMISSAL OF NINTH CIRCUIT APPEAL"
DECLARATION OF DANIEL I. BARNESS**    16

(Doc 293) Plans.  The First Amended Plan was silent as to assumption/rejection; and the Second Amended Plan would have effected a rejection of the Parking Leases and purportedly the Indemnity Agreement[10].  In response to this state of affairs, Garikian filed a motion seeking an order compelling assumption or rejection of the parking leases. (Doc 145).  I caused that motion to be withdrawn when the parties subsequently reached their settlement.

7.    On or about January 20, 2018, Garikian and the former debtor-in-possession reached a settlement agreement (the "Garikian Settlement"), which I viewed as a better alternative to the extensive and costly litigation which would have arisen from the Estate's targeted rejections.  Among other things, the settlement included Debtor's performance of the Lot 5 Improvements, which had previously been stalled since the 2015 purchase and sale transaction.

8.    Among other arrangements embodied by the Garikian Settlement, the Debtor was to assume the two Parking Leases, and Garikian was to withdraw its Indemnity Proof of Claim for $5 million (Doc 369-1, RJN, Exhibit "H").

9.    On January25, 2019, the Debtor filed a Motion (Doc 125) seeking Court-approval and authority to enter into the Garikian Settlement, which EWB opposed  [Doc 406].  On June 24, 2018, the Court issued its order granting the Garikian Settlement Motion. [(Doc 561); RJN, Exhibit "I"].  It took from the initial filing of Debtor's Motion for approval of the Garikian Settlement on January 26, 2018 until June 24, 2018 -- a period of over five months-- just for the litigation process concerning the Settlement to run its course.

10.    Finally, following the Court's  OSC (Doc 929), the Court ordered the appointment of a Chapter 11 trustee. On or about October 23, 2019, Jason Rund (the "Trustee") accepted such appointment, and at present is so serving  (Doc  965).

---

[10]    I have disputed on the record that the Indemnity Agreement is "executory" in nature.

**OPPOSITION BY  THE GEORGE GARIKIAN LIVING TRUST TO "MOTION TO APPROVE AGREEMENT WITH EAST WEST BANK FOR: (1) SETTLEMENT OF STATE COURT ACTION; (2) RELIEF FROM STAY; AND (3) DISMISSAL OF NINTH CIRCUIT APPEAL" DECLARATION OF DANIEL I. BARNESS**

17

11.    The Garikian Settlement Agreement resulted from extensive negotiations between Debtor and the Garikian Trust, in all of which I participated.  The considerable time, effort and expense spent to resolve the parking issues which stem from Garikian's 2015 acquisition of the Market Quadrant from ALC ultimately led to the settlement.  The aim of the Garikian Settlement was to avoid long, drawn-out, expensive litigation; to meet the County requirements; to provide a means by which Debtor might increase the value of its property, and to mitigate a significant multimillion-dollar risk looming over Garikian's Market Quadrant, which I view as a risk similarly facing any current or subsequent owner; transferee or transferor of the Fitness Quadrant, unless the Lot 5 Improvements are made prior to any transfer.  At the time of the Trustee's appointment, Garikian and the former debtor-in-possession were well on  their way to consummating the terms of the Garikian Settlement, and accomplishing the Lot 5 Improvements.

I declare under penalty of perjury that the foregoing is true and correct and that this Declaration was executed this  January 15, 2020 at Los Angeles, California.


/s/ *Daniel I. Barness*

_____

Daniel I. Barness

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding.  My business address is:
**BARNESS & BARNESS, LLP,** 13636 Ventura Blvd., Los Angeles, CA 91423

A true and correct copy of the foregoing document, entitled: "**OPPOSITION BY THE GEORGE GARIKIAN
LIVING TRUST TO "MOTION TO APPROVE AGREEMENT WITH EAST WEST BANK FOR: (1) SETTLEMENT OF
STATE COURT ACTION; (2) RELIEF FROM STAY; AND (3) DISMISSAL OF NINTH CIRCUIT APPEAL"
DECLARATION OF DANIEL I. BARNESS"** will be served or was served  (a) on the judge in chambers in the form and
manner required by LBR  LBR 5005-2(d) or was served (a) on the judge in chambers in the form and manner required
by LBR 5005-2(d) and (b) in the manner indicated below.

## I. **TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING ("NEF")** – Pursuant to controlling
General Order(s) and Local Bankruptcy Rule(s) ("LBR"), the foregoing document will be served by the court via NEF and
hyperlink to the document. On 1/15/2020,  I checked the CM/ECF docket for this bankruptcy case or adversary
proceeding and determined that the following person(s) are on the Electronic Mail Notice List to receive NEF
transmission at the email address(es) indicated below:

Daniel I. Barness, Daniel@BarnessLaw.com /Attorney for The George Garikian Family Trust, Creditor
 Lisa Lenherr  l@tiemlaw.com; sml@tiemlaw.com / Former Attorney for Debtor
 Ron  Maroko  ron.maroko@usdoj.gov /Attorney for United States Trustee
James A. Tiemstra  jat@tiemlaw.com; sml@tiemlaw.com / Former Attorney for Debtor
United States Trustee (LA)  ustpregion16.la.ecf@usdoj.gov/ United States Trustee
Hatty K. Yip  hatty.yip@usdoj.gov /Attorney for United States Trustee
Lois Moonitz Jacobs,  lois.jacobs@kralikjacobs.com /Attorneys for East West Bank
Bernard R. Given,  bgiven@loeb.com/ Attorneys for East West Bank
J Scott Bovitz  bovitz@bovitz-spitzer.com /Attorney for Dorn-Platz Management

■Service information continued on attached page

## II.  **SERVED BY U.S. MAIL OR OVERNIGHT MAIL** (indicate method for each person or entity served)**:**
On 1/15/2020I served the following person(s) and/or entity(ies) at the last known address(es) in this bankruptcy case or
adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States Mail, first class,
postage prepaid, and/or with an overnight mail service addressed as follows. Listing the judge here constitutes a
declaration that mailing to the judge will be completed no later than 24 hours after the document is filed.

Hon. Sheri Bluebond
United States Bankruptcy Court - Central District of California
255 E. Temple Street,/Courtroom 1539
Los Angeles, CA 90012

■Service information continued on attached page

## III.  **SERVED BY PERSONAL DELIVERY, FACSIMILE TRANSMISSION OR EMAIL** (indicate method for each
person or entity served): Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on_____, I served the following person(s)
and/or entity(ies) by personal delivery, or (for those who consented in writing to such service method), by facsimile
transmission and/or email as follows.  Listing the judge here constitutes a declaration that personal delivery on the judge
will be completed no later than 24 hours after the document is filed.

☐Service information continued on attached page

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

| 1/15/2020 | Daniel I. Barness | */s Daniel I. Barness* |
|-----------|-------------------|------------------------|
| *Date* | *Type Name* | *Signature* |

**I. TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING ("NEF")** (contd)

Anastasia.bessey@kralikjacobs.com  Attorneys for East West Bank
Christopher Celentino    chris.celentino@dinsmore.com, caron.burke@dinsmore.com
ll@tiemlaw.com, sml@tiemlaw.com
Ron Maroko   Office of the United States Trustee    ron.maroko@usdoj.gov Gregory M Salvato
gsalvato@salvatolawoffices.com, Attorney for Debtor
calendar@salvatolawoffices.com;jboufadel@salvatolawoffices.com, Attorney for Debtor
gsalvato@ecf.info.com, Attorney for Debtor

# EXHIBIT "3"

# United States Bankruptcy Court
## Central District of California
### Los Angeles
### Judge Sheri Bluebond, Presiding
### Courtroom 1539 Calendar

**Wednesday, January 29, 2020**                                    **Hearing Room    1539**

---

10:00 AM
**2:17-14276    Altadena Lincoln Crossing LLC**                                    **Chapter 11**

**#12.00**    Trustee's Motion to Approve Compromise Under Rule 9019 with East West
Bank for:

(1) Settlement of State Court Action

(2) Relief From Stay

(3) Dismissal of Ninth Circuit Appeal

fr. 1-15-20

Docket        1000

**Courtroom Deputy:**

1/22/2020 - John N. Tedford, (310) 277-0077, has been approved for
telephonic appearance on 1/29/20 @ 10

**Tentative Ruling:**

12/27/19 -- Court granted ex parte application by debtor to continue hearing
to January 29, 2020 at 10:00 a.m.  OFF CALENDAR FOR JANUARY 15,
2020.

Tentative Ruling for January 29, 2020:

Court agrees with trustee that the Garikian Agreement has never "closed" or
become effective because a plan was never confirmed.  Garikian retains
whatever rights it would otherwise have had prior to entering into the
settlement agreement.  If the existence of its liens and claims impairs the
value of the property, that will not be the estate's issue after EWB has
foreclosed.  That will be EWB's problem.  Approval of the proposed
compromise would not give rise to a breach of the settlement agreement, and
the compromise is not a disguised attempt to undo the court's prior order
approving the Garikian settlement.

With regard to the Bromley/OPICS objection, court will not resolve in this

# United States Bankruptcy Court
## Central District of California
### Los Angeles
### Judge Sheri Bluebond, Presiding
### Courtroom 1539 Calendar

**Wednesday, January 29, 2020**                                      **Hearing Room    1539**

---

10:00 AM
**CONT...    Altadena Lincoln Crossing LLC**                                      **Chapter 11**

context whether anyone is in a position to assert a lien of any kind on any settlement proceeds obtained by the trustee as a result of this settlement.  If there really are genuine disputes about this, there are other procedural vehicles available for the resolution of such disputes.

Court is not prepared to reconvert the case to chapter 11 to permit the debtor to attempt to confirm yet another plan of reorganization.  Now that the case is in chapter 7, the Court will look to/consider/evaluate the trustee's business judgment utilizing the relevant four factors, not that of the former debtor in possession.  Trustee has outlined his reasons for believing that the proposed settlement is in the best interests of the estate as compared with litigating the lender liability action and the appeal, and the Court is prepared to defer to the trustee's business judgment on these issues.  Trustee has diligently analyzed the issues and formed a reasonable judgment based on available information, and the resulting settlement is, in the court's view, well within the range of reasonableness.  The fact that the debtor would prefer a different approach is not a sufficient reason for the court to deny approval of the proposed settlement.

With regard to the stipulated relief from stay, the Court is concerned about the provision of the stipulation that provides for the relief to be binding in any future bankruptcy case, no matter who the debtor may be, for an indefinite period.  This may well be beyond the authority of the court.  Court would grant relief from stay that would be binding in any case commenced by the debtor or any affiliate or insider of the debtor for an indefinite period, but with regard to any other persons or entities, order should only be binding for a period of two years after recordation of the order granting relief from stay. Subject to this modification, if the parties are still willing to proceed with the compromise, grant motion and approve compromise(s) between EWB and the trustee.

| Party Information |
|:---:|

**Debtor(s):**

Altadena Lincoln Crossing LLC                Represented By
                                                                 Lisa  Lenherr
                                                                 Gregory M Salvato

# United States Bankruptcy Court
## Central District of California
### Los Angeles
### Judge Sheri Bluebond, Presiding
### Courtroom 1539 Calendar

**Wednesday, January 29, 2020**                                    **Hearing Room      1539**

10:00 AM
**CONT...      Altadena Lincoln Crossing LLC**                              **Chapter 11**

    **Movant(s):**

        Jason M Rund (TR)                    Represented By
                                Timothy J Yoo

    **Trustee(s):**

        Jason M Rund (TR)                    Represented By
                                Timothy J Yoo

# EXHIBIT "4"

TIMOTHY J. YOO (State Bar No. 155531)
tjy@lnbyb.com
CARMELA T. PAGAY (State Bar No. 195603)
ctp@lnbyb.com
LEVENE, NEALE, BENDER, YOO & BRILL L.L.P.
10250 Constellation Boulevard, Suite 1700
Los Angeles, CA 90067
Telephone: (310) 229-1234
Facsimile: (310) 229-1244

Attorneys for Jason Rund
Chapter 11 Trustee

FILED & ENTERED

FEB 05 2020

CLERK U.S. BANKRUPTCY COURT
Central District of California
BY wesley     DEPUTY CLERK

# UNITED STATES BANKRUPTCY COURT

## CENTRAL DISTRICT OF CALIFORNIA

### LOS ANGELES DIVISION

|  |  |
|---|---|
| In re<br><br>ALTADENA LINCOLN CROSSING, LLC,<br><br>Debtor. | Case No. 2:17-bk-14276-BB<br><br>Chapter 11<br><br>**ORDER GRANTING MOTION TO APPROVE AGREEMENT WITH EAST WEST BANK FOR: (1) SETTLEMENT OF STATE COURT ACTION; (2) RELIEF FROM STAY; AND (3) DISMISSAL OF NINTH CIRCUIT APPEAL**<br><br>Date:   January 29, 2020<br>Time:   10:00 a.m.<br>Place:  Courtroom 1539<br>          U.S. Bankruptcy Court<br>          255 E. Temple Street<br>          Los Angeles, California 90012 |

The Motion to Approve Agreement with East West Bank for: (1) Settlement of State Court Action; (2) Relief from Stay; and (3) Dismissal of Ninth Circuit Appeal ("Motion"), filed by Jason Rund, the Chapter 11 trustee (the "Trustee") for the bankruptcy estate of Altadena Lincoln Crossing, LLC ("Debtor"), came on for hearing on January 29, 2020, at 10:00 a.m., in the above-entitled Court before the Honorable Sheri Bluebond, United States Bankruptcy Judge. Timothy J. Yoo of Levene, Neale, Bender, Yoo & Brill L.L.P. appeared on behalf of the Trustee. Other appearances are as noted on the Court's record.

1    The Court, having considered the Motion, the supporting declaration and exhibits, the

2    oppositions filed by the Debtor and The George Garikian Living Trust, the response filed by

3    Bromley LLC and OPICS Real Estate Investments & Brokerage LLC to the Motion, and the

4    replies filed by the Trustee and East West Bank ("EWB"), having considered the arguments of

5    counsel, and for the findings and reasons stated on the record, including as set forth in the Court's

6    Tentative Ruling (as amended),

7    **IT IS HEREBY ORDERED** that:

8    1.    The Motion is **GRANTED**;

9    **2.**    The *Settlement Agreement and General Releases* dated December 17, 2019, as

10    amended by that certain Amendment attached to the Trustee's reply as <u>Exhibit 2</u> ("Agreement"),

11    is **APPROVED;**

12    3.    The Trustee and EWB are authorized and directed to take any and all steps

13    necessary to effectuate the Agreement; and

14    4.    Notwithstanding anything to the contrary stated in Paragraph 7 of the Agreement

15    (Trustee's Release of EWB), the release of EWB by the Trustee shall only release the claims that

16    the Trustee has authority to release personally, in his capacity as the Trustee or on behalf of the

17    bankruptcy estate.

18    **IT IS SO ORDERED.**

19                                    # # #

20

21

22

23

24    Date: February 5, 2020

25                                    Sheri Bluebond
                                      United States Bankruptcy Judge

26

27

28

                                          2

# Unpublished Cases

2010 WL 596445
United States Bankruptcy Court,
N.D. California.

In re COMUNITY LENDING, INCORPORATED,
a California Corporation, Debtor.

No. 08–50030 MM.
|
Feb. 16, 2010.

West KeySummary

**1**   **Bankruptcy**   Professional Services;
Attorney Fees

Attorney fees related to judgment creditors'
claim against Chapter 7 debtor did not arise from
a post-petition transaction because the estate's
defense against the claim did not violate any
post-petition duty to avoid frivolous litigation.
There was no finding that the defense of the
proceeding was frivolous or meritless. District
court used rules of contract construction to
reconcile conflicting terms in the benefit plan
at issue, and subsequently expressly noted that
there was a legitimate legal issue to review.

**Attorneys and Law Firms**

Craig C. Chiang, Buchalter Nemer, San Francisco, CA, Doris
A. Kaelin, Jenny L. Fountain, John Walshe Murray, Ivan Jen,
Murray and Murray, Cupertino, CA, for Debtor.

Barry Milgrom, Luce, Forward, Hamilton and Scripps, San
Leandro, CA, Robert A. Franklin, Law Offices of Murray and
Murray, Cupertino, CA.

Nhung Le Luce, Forward, Hamilton and Scripps, San
Francisco, CA, Suzanne Decker, San Leandro, CA, for
Trustee.

John S. Wesolowski, Office of the United States Trustee, San
Jose, CA, for U.S. Trustee.

Jesse L.B. Hill, Law Offices of Jesse L.B. Hill, San Luis
Obispo, CA, for Counter–Defendant.

**MEMORANDUM DECISION AND ORDER ON
MOTIONS TO DETERMINE ADMINISTRATIVE
PRIORITY OF ATTORNEYS' FEES CLAIM**

MARILYN MORGAN, United States Bankruptcy Judge.

*INTRODUCTION*

**\*1**   Former employees of ComUnity Lending Incorporated,
who participated in the company's deferred compensation
plan, assert that CLI unlawfully withheld distributions
that became due upon termination of the plan. During
CLI's bankruptcy, a federal district court entered summary
judgment in favor of the plan participants and subsequently
awarded them $448,934.75 in attorneys' fees as the prevailing
parties. The chapter 7 trustee of debtor's estate has appealed
from the judgment. The plan participants now ask this court
to determine that the fees awarded should be paid as an
administrative expense of CLI's estate. The trustee urges that
the award does not qualify as an administrative expense,
regardless of the outcome on appeal.

*FACTUAL BACKGROUND*

In 2001, CLI, a corporation engaged in the real estate
mortgage and lending business, established a Non–Qualified
Deferred Compensation Plan for a select group of its
employees pursuant to the provisions of the Employee
Retirement Income Security Act of 1974. Under the Plan,
CLI's employee-participants could defer income and taxes by
contributing a portion of their salaries to the Plan. Claimants
Mai Christina Pham, John Pham, Mai Nguyen, Hung Perry
Nguyen, Joyce Freeman and Christopher Hake (collectively
the "Pham claimants") are former CLI employees who
participated in the Plan. Katherine Buckmeyer, Jack
Ferguson, John Nelson, Jeannine Rupert and Phyllis Christich
(collectively the "Buckmeyer claimants") are also former
Plan participants but have retained separate counsel.

A Plan Agreement drafted by CLI sets out the terms of the
Plan. Contributions were held in trust and were administered
by an institutional trustee pursuant to a separate trust
agreement. The terms of the Plan provided that the employee

63 Collier Bankr.Cas.2d 1154, 52 Bankr.Ct.Dec. 231

contributions and any income derived therefrom would remain property of CLI. Although the value of a participant's account was fully vested, it remained expressly subject to the reach of CLI's creditors in the event of insolvency. The Plan also stated that CLI could terminate the Plan at any time. Upon termination, the deferred compensation would be reinstated as taxable salary, the participants would be 100% vested and a lump sum cash payment would become immediately payable to each participant. The Plan further provided that the vested account balance of a participant was to be paid from the trust only to the extent that CLI, at time of payment, was not insolvent.

In August 2007, CLI's Board of Directors voted to terminate the Plan. On September 4, 2007, CLI sent a notice to all participants advising them that the Plan was terminated effective that same day. Following that announcement, the Pham and Buckmeyer claimants submitted distribution requests to the Plan's trustee. The Plan trustee distributed the requested funds to CLI. After receiving the funds, CLI refused to distribute them to the claimants, contending that CLI had become insolvent.

On October 24, 2007, the Pham claimants sued CLI in federal district court alleging, in part, that CLI had unlawfully withheld benefits owed to them in breach of the Plan Agreement. The complaint sought declaratory and injunctive relief, as well as damages. The Pham Claimants sought a writ of attachment against the funds in CLI's possession. In early December 2007, the district court granted the writ and directed CLI to hold the disputed funds in a segregated account.

 *2  On January 4, 2008, CLI filed for relief under chapter 11 of the Bankruptcy Code. Within days, the Pham claimants filed an adversary proceeding raising virtually identical claims to those alleged in the original district court litigation. CLI answered and filed a counterclaim seeking declaratory relief against the Buckmeyer claimants, thereby bringing all plan participants, who were not part of the Pham claimant group, into the litigation. The counterclaim raised no cause of action beyond those raised in the original complaint.

In June 2008, the district court withdrew reference of the adversary proceeding from this court and assumed jurisdiction over it in addition to the original district court action. Over the next five months, the parties briefed and argued cross-motions for summary judgment and the district court took the motions under submission in late October 2008.

Meanwhile, in November 2008, this court granted CLI's request to convert its bankruptcy to a case under chapter 7 of the Bankruptcy Code. A chapter 7 trustee was appointed and assumed responsibility for the defense of the litigation pending in the district court. On December 11, 2008, the district court issued its decision granting summary judgment in favor of the Pham and Buckmeyer claimants. The court found that the benefits due under the Plan were not property of the estate and were not subject to the claims of CLI's general creditors. Subsequently, it entered one judgment that concluded both the original district court action and the adversary proceeding.

On February 13, 2009, the Pham and Buckmeyer claimants filed motions to recover their attorneys' fees, contending that ERISA § 502(g), 29 U.S.C. § 1132(g), authorizes an award of reasonable attorneys fees and costs to prevailing parties. They further requested a determination that any fees awarded were entitled to administrative expense priority in these proceedings. The chapter 7 trustee opposed the motion. The district court granted the request for fees, respectively awarding the Pham and Buckmeyer claimants $358,934.75 and $90,000.00. The court declined, however, to consider whether or not the fees should be paid as an administrative expense of CLI's estate, finding that the issue of priority is a core proceeding to be determined by this court.

In June 2009, the trustee appealed from the district court's grant of summary judgment in favor of the Pham and Buckmeyer claimants and from the subsequent fee order to the extent that the underlying judgment might be overturned. That appeal remains pending. In July, the trustee's professionals filed interim applications for compensation with this court. Without filing written opposition, the Pham and Buckmeyer claimants appeared and voiced objections at the hearing on the fee applications. They did not dispute the reasonableness of fees requested; rather, they objected to any payment of the fees before the priority of their prevailing party fee award could be determined. At the conclusion of the hearing, the court approved the applications only as to the amount of the requested fees and set a briefing schedule on all issues related to payment of the approved fees.

 *3  In their written submissions, the claimants challenged this court's jurisdiction to consider the priority of the fee award pending appeal of the underlying district court judgment. Further, they extensively addressed whether the district court's award of prevailing party attorneys' fees was

WESTLAW   © 2020 Thomson Reuters. No claim to original U.S. Government Works.   2

entitled to administrative priority. On October 9, 2009, this
court concluded that the appeal of the district court judgment
did not divest this court of jurisdiction to determine the
priority of the attorneys' fees awarded by the district court.
Although the parties had already briefed whether the district
court's fee award constituted an administrative expense of
the estate, at the request of the Pham and Buckmeyer claimants,
the court allowed additional briefing on that issue. In light
of the supplemental submissions, the court finds that further
briefing and oral argument is unnecessary and concludes that
the district court's award of fees is not an administrative
expense of the estate.

### LEGAL DISCUSSION

Claims for "actual, necessary costs and expenses of
preserving" an estate are administrative expenses under § 
503(b)(1) of the Bankruptcy Code and are entitled, under
§ 507, to be paid before other general unsecured claims.
Because of bankruptcy's general presumption in favor of
ratable distribution, entitlement to administrative expense
status is construed narrowly to keep administrative costs
to a minimum. *In re Hemingway,* 954 F.2d 1, 5 (1st
Cir.1992). Only post-petition debt qualifies. *Kadejevich
v. Kadejevich (In re Kadejevich),* 220 F.3d 1016, 1019 (9th
Cir.2000)(collecting cases). In light of these standards, a
claimant requesting administrative expense status must prove
that the claim or debt: 1) arose from a post-petition transaction
with the trustee or debtor in possession, and 2) directly
and substantially benefitted the estate. *Einstein/Noah Bagel
Corp. v. Smith (In re BCE West, L.P.),* 319 F.3d 1166,
1172 (9th Cir.2003); *Abercrombie v. Hayden Corp. (In re
Abercrombie),* 139 F.3d 755, 757 (9th Cir.1988). Because the
claimants here cannot satisfy this burden, the fees awarded to
them do not qualify as administrative expenses.

### I. *The Attorneys' Fees Awarded To The Claimants Arise
From a Pre–Petition Transaction.*

In classifying post-petition awards of attorneys' fees, like
the award here, the Ninth Circuit has held that fees,
even those awarded post-petition, will not qualify as an
administrative expense if the source of the obligation to
pay the award arose pre-petition. *Kadejevich,* 220 F.3d
at 1020; *Abercrombie,* 139 F.3d at 758. In *Abercrombie,*

the Ninth Circuit denied administrative priority to attorneys'
fees awarded pursuant to a pre-petition contractual provision.
The fees at issue were incurred post-petition as part of a
successful effort to reverse a lower court judgment that the
debtor in possession had defended. Although the claimant
asserted that the fee award arose from debtor's post-petition
conduct in defending the appeal, the court looked beyond that
conduct and determined that the source of the obligation to
pay the fees was the parties' pre-petition contract. In finding
that the fee award arose from a pre-petition transaction, the
circuit court specifically rejected an earlier appellate panel
decision that had reached a contrary conclusion where a
debtor in possession continued post-petition litigation of a
pre-petition breach of contract claim. *Abercrombie,* 139
F.3d at 758–59, *criticizing,* *In re Madden,* 185 B.R. 815
(9th Cir.BAP1995).

**\*4** In *Kadejevich,* the Ninth Circuit extended its "source of
the obligation" analysis beyond the context of pre-petition
contracts to find that a post-petition fee award pursuant
to a California fee-shifting statute still arose from a pre-
petition transaction. In that case, Nicholas Kadejevich sued
his brother, Robert, for fraud. Then, Robert filed a chapter
11 bankruptcy petition. Post-petition, the brothers agreed to
settle the fraud action, but Robert breached the settlement
agreement. Nicholas proceeded to judgment against his
brother and obtained a ruling that Robert's bad faith conduct in
refusing to honor the settlement agreement entitled Nicholas
to an award of attorneys' fees. Nicholas sought payment of
the post-petition fee award as an administrative expense of
Robert's estate. Relying on *Abercrombie,* the Ninth Circuit
rejected Nicholas' request. Although Nicholas' right to request
fees, *i.e.,* Robert's bad faith conduct, accrued post-petition, the
court reasoned that the source of the obligation to pay the fees
arose pre-petition when the state court fraud action exposed
Robert to liability for fraud and to a claim for fees under the
fee-shifting statute. *Kadejevich,* 220 F.3d at 1020.

The Pham and Buckmeyer claimants urge that the attorneys'
fee award here arose out of a post-petition transaction because
several key events took place after CLI filed its bankruptcy
petition: 1) the filing of the adversary proceeding, 2) the
chapter 7 trustee's defense of the litigation, and 3) the
entry of the district court order awarding them fees. Under
prevailing Ninth Circuit authority, however, none of these
events transforms their attorneys' fee claim into a post-
petition debt. Through the decisions in *Abercrombie* and
*Kadejevich,* the Ninth Circuit has made a clear distinction

between the source of the debtor's obligation to pay a debt and the accrual of the right to pursue recovery of the debt. As long as the first of these two events is pre-petition, the debt will not be entitled to administrative priority. Under the rule in *Kadjevich,* the source of CLI's obligation to pay the attorneys' fee award, at the latest, arose pre-petition when the claim based on CLI's failure to distribute benefits exposed CLI to liability for attorneys' fees under ERISA § 502(g).

That the adversary proceeding and CLI's counterclaim against the Buckmeyer claimants were filed after CLI filed for bankruptcy does not change that conclusion. The Pham claimants' original district court action against CLI and the adversary proceeding are virtually the same, each alleges that CLI unlawfully failed to distribute benefits due under the plan and each seeks identical relief. Indeed, the district court withdrew the reference of the adversary proceeding and, ultimately, entered one judgment closing both cases. Additionally, the timing of CLI's counterclaim does not provide a persuasive basis for treating the Buckmeyer claimants' fee award differently. The counterclaim, which sought declaratory relief, merely served to put the Buckmeyer claimants on notice of the Pham claimants' lawsuit and to ensure that any determination on the merits would be binding between CLI and all of the plan participants. Finally, regardless of when litigation was filed, the event that first exposed CLI to liability occurred pre-petition when CLI did not distribute benefits upon termination of the Plan.

**\*5** The post-petition timing of the district court order awarding fees to the claimants also does not alter the pre-petition nature of CLI's obligation to pay the award. Citing *Barnett v. Jamesway Corp. (In re Jamesway Corp.),* 242 B.R. 130 (Bankr.S.D.N.Y.1999), claimants urge that the post-petition award of fees pursuant to a federal fee-shifting statute makes this case different from *Abercrombie* and *Kadjevich.* In *Jamesway,* an employer violated the WARN Act, a federal statute that requires advance notice of employee terminations. A group of former employees filed suit to recover back pay. After the employer filed for bankruptcy, it continued to defend, and lost, the litigation. The bankruptcy court there ruled that a post-petition fee award pursuant to the WARN Act's fee-shifting provisions arose from a post-petition transaction because, unlike the pre-petition contractual obligation to pay fees in *Abercrombie,* the plaintiffs were not entitled to any fees until they prevailed in the underlying action. Significantly, *Jamesway* was decided between the Ninth Circuit decisions in *Abercrombie* and

*Kadjevich.* The *Jamesway* court relied heavily on *In re Execuair Corp.,* 125 B.R. 600 (Bankr.C.D.Cal.1991), where a California bankruptcy court had concluded that a post-petition award of fees under a Lanham Act fee-shifting provision was entitled to administrative priority. Once the Ninth Circuit had occasion to consider a post-petition award pursuant to a fee-shifting statute, however, it expressly disapproved of *Execuair's* analysis and concluded that there is no principled way to distinguish between a pre-petition contract that provides for fees and a pre-petition tort claim that later results in fees. *Kadjevich,* 220 F.3d at 1020–21 and n. 4. Although *Kadjevich* directly involved a pre-petition tort claim, the court's disapproval of *Execuair* makes it clear that a claim based on a pre-petition statutory violation that later results in fees should be treated consistently.

The claimants further contend that the baseless nature of the trustee's post-petition defense of the district court litigation distinguishes this case from *Abercrombie* or *Kadjevich.* In *Kadjevich,* the Ninth Circuit cited two lower court cases involving frivolous litigation by a trustee or debtor in possession and left open the possibility that a post-petition fee award might be entitled to administrative priority if a trustee were to commence post-petition litigation on behalf of the estate or to seek relief from the automatic stay to continue the prosecution of pre-petition litigation. *Kadjevich.* 220 F.3d at 1021, *citing, In re Met–L–Wood Corp.,* 115 B.R. 133 (N.D.Ill.1990)(bankruptcy trustee wrongfully pursued meritless litigation); *In re E.A. Nord Company, Inc.,* 78 B.R. 289 (Bankr.W.D.Wash.1987)(debtor in possession violated duties owed to creditors by engaging in frivolous post-petition litigation). In *Met–L–Wood* and *E.A. Nord,* the courts recognized that the post-petition litigation was a separate and distinct violation of a duty to avoid frivolous lawsuits. Because the related post-petition attorneys' fees arose out of that separate post-petition breach, they were entitled to administrative priority. Here, however, there has been no finding that the defense of the adversary proceeding was frivolous or meritless. To the contrary, the district court in ruling on the cross-motions for summary judgment used rules of contract construction to reconcile conflicting terms in the Plan. At a subsequent hearing, the court recognized that the Plan contained language that "supported the position of ComUnity Lending and supported [claimants'] position," and expressly noted that there is "a legitimate legal issue there ... is subject to review." In light of those comments, it cannot be said that the estate's defense of the adversary proceeding,

either before the district court or on appeal, has violated any post-petition duty to avoid frivolous litigation. Once again, claimants' related attorneys' fees do not arise from a post-petition transaction.

## II. *The Reading Exception Provides No Basis For Bestowing Administrative Priority on Claimants' Fee Award.*

**\*6** In *Reading Co. v. Brown,* 391 U.S. 471, 88 S.Ct. 1759, 20 L.Ed.2d 751 (1968), the United States Supreme Court recognized a limited exception to the requirement that an administrative claimant show that the expense directly and substantially benefitted the estate. In that case, tort claimants sustained damages in a post-petition fire caused by a receiver's negligence. As a result, the parties agreed that the damages arose from a post-petition transaction and the Court addressed the second element of proof: whether the claimed damages constituted a cost of preserving the estate. Although the damage claim did not "benefit" or "preserve" the estate, the Court looked to equitable principles of "fairness to all persons having claims against the insolvent" and concluded that where a trustee operates a business for the benefit of the creditors, but ends up injuring others, the innocent third parties are entitled to recover their damages ahead of those for whose benefit the business was being operated. *Id.* at 482–83, 88 S.Ct. at 1765. In other words, the Court found that principles of fundamental fairness dictate that the injuries caused by a trustee's post-petition wrongful conduct should be deemed an actual and necessary cost of "preserving" the estate despite the absence of any actual benefit to the estate.

If the fees awarded to the Pham and Buckmeyer claimants had arisen out of a post-petition transaction, the award may well have qualified as an administrative expense under the equitable standards enunciated in *Reading.* It is apparent, however, that the *Reading* exception only provides relief from

the requirement that a claimant requesting administrative expense status show a direct and substantial benefit to the estate. The exception does not transform a pre-petition expense into a post-petition expense. As the Ninth Circuit emphasized in a discussion of *Reading,* "Critically, however, only *post-petition* debts can be treated as administrative expenses; *pre-petition* debts may not." *Kadjevich,* 220 F.3d at 1019 (emphasis in original).

While the court recognizes that ERISA is a remedial statute that should be liberally construed in favor of protecting participants in employee benefit plans and that claimants have expended significant sums of money in their effort to collect their retirement savings, the fact remains that claimants' losses ultimately arise from a pre-petition event. As a result, their request for priority payment of their attorneys' fees must be denied.

### *CONCLUSION*

For the reasons explained, the motions to determine the administrative priority of attorneys' fee claims are denied. The attorneys' fee awards to both the Pham claimants and the Buckmeyer claimants shall be treated as general unsecured claims. In light of this conclusion, there is no reason to further delay payment of the chapter 7 professional fees that were previously approved by this court. Payment of the approved fees is hereby authorized.

**\*7** Good cause appearing, IT IS SO ORDERED.

### All Citations

Not Reported in B.R., 2010 WL 596445, 63 Collier Bankr.Cas.2d 1154, 52 Bankr.Ct.Dec. 231

---

**End of Document**

© 2020 Thomson Reuters. No claim to original U.S. Government Works.

---

 © 2020 Thomson Reuters. No claim to original U.S. Government Works.

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding.  My business address is 10250 Constellation Blvd., Suite 1700, Los Angeles, CA 90067

A true and correct copy of the foregoing document entitled **CHAPTER 7 TRUSTEE'S OBJECTION TO "APPLICATION OF GARIKIAN LIVING TRUST FOR ALLOWANCE AND PAYMENT OF ADMINISTRATIVE EXPENSES" [DOC. NO. 1073]; DECLARATION OF JASON RUND IN SUPPORT THEREOF** will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner stated below:

**1.  TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**:  Pursuant to controlling General Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document. On **July 1, 2020,** I checked the CM/ECF docket for this bankruptcy case and determined that the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:

- **Daniel I Barness    daniel@barnesslaw.com**
- **Anastasia E Bessey    anastasia.bessey@kralikjacobs.com, lois.jacobs@kralikjacobs.com,rina.ross@kralikjacobs.com,aeblaw@gmail.com**
- **Mikel R Bistrow    mikel.bistrow@dinsmore.com, caron.burke@dinsmore.com**
- **J Scott Bovitz    bovitz@bovitz-spitzer.com**
- **Peter W Bowie    peter.bowie@dinsmore.com, caron.burke@dinsmore.com;cindy.renteria@dinsmore.com**
- **Christopher Celentino    chris.celentino@dinsmore.com, caron.burke@dinsmore.com;SDCMLFiles@DINSMORE.COM**
- **Oscar Estrada    oestrada@ttc.lacounty.gov**
- **Bernard R Given    bgiven@loeb.com, mortiz@loeb.com;ladocket@loeb.com;bgiven@ecf.courtdrive.com**
- **Mark S Horoupian    mhoroupian@sulmeyerlaw.com, mhoroupian@ecf.inforuptcy.com;ccaldwell@sulmeyerlaw.com**
- **Lois M Jacobs    lois.jacobs@kralikjacobs.com, anastasia.bessey@kralikjacobs.com,rina.ross@kralikjacobs.com**
- **Justin P Karczag    justin@encorelaw.com, eugene@encorelaw.com;muhammed@encorelaw.com**
- **Kenneth G Lau    kenneth.g.lau@usdoj.gov**
- **Lisa Lenherr    ll@tiemlaw.com, bankruptcy@wendel.com**
- **Carmela Pagay    ctp@lnbyb.com**
- **Brian A Procel    bprocel@millerbarondess.com, rdankwa@millerbarondess.com;docket@millerbarondess.com**
- **Uzzi O Raanan    uraanan@DanningGill.com, DanningGill@gmail.com;uraanan@ecf.inforuptcy.com**
- **Ronald N Richards    ron@ronaldrichards.com, morani@ronaldrichards.com,justin@ronaldrichards.com**
- **Jason M Rund (TR)    trustee@srlawyers.com, jrund@ecf.axosfs.com**
- **Gregory M Salvato    gsalvato@salvatolawoffices.com, calendar@salvatolawoffices.com;jboufadel@salvatolawoffices.com;gsalvato@ecf.inforuptcy.com**
- **John P Schock    schockandschock@yahoo.com**
- **John N Tedford    jtedford@DanningGill.com, danninggill@gmail.com;jtedford@ecf.inforuptcy.com**
- **James A Tiemstra    jat@tiemlaw.com, sml@tiemlaw.com**
- **United States Trustee (LA)    ustpregion16.la.ecf@usdoj.gov**
- **Timothy J Yoo    tjy@lnbyb.com**

---

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*June 2012*                                                          **F 9013-3.1.PROOF.SERVICE**

**2.   SERVED BY UNITED STATES MAIL**:  On **July 1, 2020,** I served the following persons and/or entities at the last known addresses in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail, first class, postage prepaid, and addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge will be completed no later than 24 hours after the document is filed

Debtor
Altadena Lincoln Crossing LLC
210 S Orange Grove Blvd
Pasadena, CA 91105

The Hon. Sheri Bluebond
United States Bankruptcy Court
255 E. Temple Street
Suite 1534, Courtroom 1539
Los Angeles, CA 90012

☐  Service information continued on attached page

**3.   SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL** (state method for each person or entity served):  Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on (*date*) **July 1, 2020,** I served the following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows.  Listing the judge here constitutes a declaration that personal delivery on, or overnight mail to, the judge will be completed no later than 24 hours after the document is filed.

☐  Service information continued on attached page

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

| July 1, 2020 | Lourdes Cruz | /s/ Lourdes Cruz |
| *Date* | *Printed Name* | *Signature* |

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*June 2012*                                                    **F 9013-3.1.PROOF.SERVICE**

# EXHIBIT "7"

1    Daniel I. Barness
     SBN 104203, Daniel@BarnessLaw.com
2    **BARNESS & BARNESS**, LLP
     13636 Ventura Blvd.
3    Los Angeles, CA 91423
     Telephone:  (310) 594-3011
4    Facsimile:   (818) 906-2638

5    Attorneys for **The George Garikian Living Trust**, Applicant

6

7            **UNITED  STATES BANKRUPTCY COURT**

           **CENTRAL  DISTRICT OF CALIFORNIA**
8
           **LOS ANGELES DIVISION**
9

| | |
|---|---|
| | Case No. 2:17-bk-14276 BB |
| | |
| In re | Chapter 7 |
| | |
| ALTADENA LINCOLN CROSSING, LLC, | **REPLY MEMORANDUM IN SUPPORT OF "APPLICATION  BY THE GEORGE GARIKIAN  LIVING TRUST FOR ALLOWANCE AND PAYMENT OF ADMINISTRATIVE EXPENSES"; DECLARATION OF DANIEL I BARNESS** |
|        Debtor. | |
| | |
| _____ | DATE:      July 15, 2020 |
| | TIME:      11:00 A.M. |
| | CRTRM:   1539 |
| |               255 E. Temple Street |
| |               Los Angeles, CA 90012 |

10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

1

The George Garikian Living Trust (hereinafter called "the "Garikian Trust" or "Garikian") submits this reply in response to the Trustee's opposition entitled "*Chapter 7 Trustee's Objection to "Application of Garikian Living Trust for Allowance and Payment of Administrative Expenses*" (the "Opposition").

I.    **INTRODUCTION**

The Opposition asserts that Garikian has no entitlement either to allowance of postpetition attorneys' fees or to a separate claim for administrative expenses arising from the breach of the Settlement Agreement.

As demonstrated below, however, the Trustee asserts these arguments, overlooking three central features: (1) the Court approved the Estate's allowance of attorneys' fees to Garikian which were incurred following the Estate's aggressive action initially to seek rejection of the operative agreements, particularly the Indemnity Agreement[1];  (2) the breach of the Settlement Agreement by the Estate, first occurred (prior to the Estate's settlement with EWB) as an anticipatory breach, upon the appointment of a Trustee in the case, without the Debtor's having completed the Lot 5 Improvements, and having been divested of its ability to perform; and (3) "law of the case" is inapplicable to that earlier anticipatory breach of Debtor's postpetition (court–approved) obligation to expend not less than $50,000 toward the Lot 5 Improvements.

Accordingly, Applicant respectfully submits that the facts and law applicable to this case do not support the Opposition, which should be overruled, and the Application granted.

---

[1]    Unless otherwise defined, capitalized terms herein will have the same meanings as in the Application.

**REPLY MEMORANDUM I N SUPPORT OF "APPLICATION  BY THE GARIKIAN LIVING TRUST FOR ALLOWANCE AND PAYMENT OF ADMINISTRATIVE EXPENSES"**

2

1. **Garikian's Post-Petition Attorneys Fees Were Incurred as a Result of Actions Beneficial to the Estate**

*"The policies underlying the provisions of Sec. 503 . . .  are not hard to discern. **If a reorganization is to succeed, creditors** asked to extend credit after the petition is filed **must be given priority so they will be moved to furnish the necessary credit to enable the bankrupt to function.** [Citation omitted.] Thus, "[w]hen third parties are induced to supply goods or services to the debtor-in-possession  . . .  the purposes of [Sec. 503] plainly require that their claims be afforded priority." . . . Without a provision like Sec. 503, efforts to reorganize would be hampered by the necessity of advance payment for all goods and services supplied to the estate since presumably **no creditor would willingly assume the status of a non-priority creditor to a debtor undergoing reorganization.** "*

*In the Matter of Jartran, Inc.*, 732 F.2d 584 (7th Cir. 1984) (emphasis added).

These policy objectives apply here, generally and to the Garikian court-approved attorneys' fees specifically: Here, although Garikian did not provide postpetition "goods and services" in a literal sense, its decision to deal with the Former DIP through the negotiation, Court–approval process and implementation of arrangements which were aimed at providing a benefit to the Estate –– transferable title to its real property and removal of a major impediment to the Former DIP's reorganization,  Garikian's decision to compromise its attorneys' fees at $60,000 pursuant to, and in the interest of reaching the Settlement, were incentivized by the administrative expense scheme embodied in section 503(b)(1)(A).  Furthermore, the actual amount of attorneys' fees incurred and expended by Garikian, necessitated by the Former DIP's "firing a shot across the bow" by positioning itself  initially to seek rejection of the Indemnity Agreement, among others, was far greater than the $60,000 amount to which the parties agreed. [Barness Declaration, ¶ 1].

The Former DIP described the benefits of the Garikian Settlement as follows:

"Ultimately, the Settlement Agreement will lead to the removal of the Garikian Deed of Trust on the Property once the parking conditions have been satisfied and all amounts due to Garikian have been paid, and will permit the possible development of Lot 5 for other, income producing uses. [Reference deleted.] **All parties and all constituents of the bankruptcy estate will thereby benefit from this Settlement Agreement, which will lead to an enhancement of the value of the Debtor's Property.**"  [See Motion for Approval of the Garikian Settlement, RJN, Exhibit "J" (Doc 1074, Bates ## 132-133) Emphasis added.]

REPLY MEMORANDUM I N SUPPORT OF "APPLICATION  BY THE GARIKIAN
LIVING TRUST FOR ALLOWANCE AND PAYMENT OF ADMINISTRATIVE
EXPENSES"

3

Prior to the Petition Date, the parties had entered into a series of detailed and complex transactions and agreements, including the Fifth Amendment to the Purchase and Sale Agreement ("PSA") [See RJN, Exhibit H, Bates # 075]; and the Indemnity Agreement [RJN, Exhibit "E"], which were aimed at overcoming the objections by the County of Los Angeles to the split of ALC's formerly unitary shopping center into two separate centers.  This was done so that the sale of the Market Quadrant to Garikian could proceed.  Upon commencement of this case, the Former DIP took the first aggressive steps against Garikian by announcing in court papers that it intended to seek rejection of the Indemnity Agreement, among others.  That action necessitated a litigation response by Garikian, which would have been unnecessary had the Former DIP not done so.  By settling with Garikian; stating in pleadings filed with the Court that the Indemnity Agreement etc. would be assumed (not rejected); seeking Court- approval for that settlement; and taking the initial steps (obtaining engineering, etc.) for implementation of the Lot 5 Improvements, the Former DIP effectively transmuted a pre-petition agreement into a post-petition obligation.  The compromises reached by the parties were aimed at enabling the Estate to achieve its objectives regarding its Fitness Quadrant -- *i.e.*, to develop, finance and/or sell the property which otherwise would not have been possible.  Among these "transmuted" obligations was the obligation to cover Garikian's attorneys' fees, as provided in Paragraph 3 of the Fifth PSA [RJN, Exhibit "E",  Bates # 097]; Paragraph  5 of the Indemnity Agreement [RJN, Exhibit "E", Bates # 045]; and Paragraph 9 of the Settlement Agreement Exhibit "H", Bates ##  080, 151].

*In re New York Trap Rock Corp*., 137 B.R. 568, 572 (Bankr.S.D.N.Y.1992), which exactly describes the present situation,  supports the proposition that attorneys' fees may be awarded to creditors in cases in which the "*creditor's right to attorney's fees and costs incurred during the pendency of the case is based upon a pre-petition agreement*" and "*the attorney's fees are incurred as a result of some post-petition action by the debtor*".

---

**REPLY MEMORANDUM I N SUPPORT OF "APPLICATION  BY THE GARIKIAN
LIVING TRUST FOR ALLOWANCE AND PAYMENT OF ADMINISTRATIVE
EXPENSES"**

4

Rather than engaging in separate litigation as to the amount of such attorneys' fees, the parties instead agreed to liquidate that amount at $60,000, which was thereafter implicitly approved by the Court in its order approving that settlement. [RJN, Exhibit "J", Bates # 080, 151]

As a result of Garikian's actions, including the steps leading to the Court's approval of the Garikian Settlement which were aimed at clearing a cloud on title which would have impeded any sale or refinance of the Estate's property, Garikian conferred a benefit upon the Estate. Its attorneys' fees in doing so (provision for which is contained in the Indemnity Agreement), should therefore be compensable as an administrative expense. [See 11 U.S.C. § 503(b)(3)(D); *Matter of D'Lites of America, Inc.*, 108 B.R. 352 (Bankr.N.D.Ga.1989).]

Such a benefit  arose immediately upon the Court's order approving the settlement. That the case was subsequently converted, does not diminish the benefit: It cannot be said that Garikian's participation in the case "as a whole was detrimental to the estate," or "caused an adverse impact on the estate rather than a "substantial contribution".  *Id*.

In this regard, although a creditor might have had an extensive involvement in a case, a court is unlikely to find a substantial contribution when the movant's participation has retarded or interrupted the debtor's reorganization. See *In re DP Partnership*, 106 F.3d 667, 672 (5th Cir.1997); *In re Communications Management & Information, Inc.*, 172 B.R. 136, 141 (Bankr.N.D.Ga.1994) (Murphy, J.); see also In re Big Rivers Elec. Corp., 233 B.R. 739 (W.D.Ky.1998) (denying application for payment of expenses after finding that, although some of the applicant's activities may have benefitted the estate, any benefit was outweighed by the costs associated with the applicant's attempts to interrupt and delay the bankruptcy proceedings).

Exactly the opposite is true here: The fees and expenses (greater than the stipulated $60,000 amount) incurred by Garikian were for the purpose of advancing Debtor's reorganization, with an

**REPLY MEMORANDUM IN SUPPORT OF "APPLICATION  BY THE GARIKIAN LIVING TRUST FOR ALLOWANCE AND PAYMENT OF ADMINISTRATIVE EXPENSES"**

overall benefit to the estate resulting from the removal of a substantial cloud on title and enhancement of the Estate's ability to sell or refinance the Fitness Quadrant. Although the Trustee's subsequent steps – – by way of the EWB Settlement which divested such title -- ultimately made it impossible to reap the benefit conferred by Garikian, a benefit to the Estate had, unquestionably, been conferred.

Although the allowance of these fees were part of the Settlement Agreement, Garikian's entitlement to attorneys' fees can also be seen as distinct and independent of the assumption/rejection issues asserted in the Opposition. As a provision contained in the Settlement Agreement, and highlighted in the Former DIP's Rule 9019 Motion[2], Garikian's legal fees were covered by the Court's order approving that settlement [RJN, Exhibit "I ", Bates ## 120-123], and granting the Former DIP's Rule 9019 Motion.

In arguing against Garikian's administrative-expense treatment of its attorneys' fees, the Opposition relies upon *Kadejevich v. Kadjevich (In re Kadjevich)*, 220 F.3d 1016, 1019 (9th Cir.2000) [Opposition, p.13:10 – 22]. That case, however is factually distinguishable: Unlike *Kadejevich*. here, following a motion by Garikian in response to the Former DIP's stated intention to reject the Leases and the Indemnity Agreement, Garikian filed its Motion to Compel Assumption/Rejection [Doc 157]. As a result, the Former DIP reversed course; entered into a postpetition agreement with Garikian which liquidated the amount of Garikian's attorneys's fees at $60,000 pursuant to the Settlement Agreement -- treating it as an allowed claim for attorneys' fees -- in that agreement, which was thereafter approved by Court order, after vigorous opposition by EWB. [Barness Declaration, ¶ 2]. Also, as a consequence, the Former DIP began implementation of the

---

[2] As Stated in that Motion, "$60,000 [is] .. . an amount intended to cover all [Garikian's] actual legal fees incurred to date" [Settlement Motion, RJN, Exhibit "J", (Bates #135).]

---

**REPLY MEMORANDUM I N SUPPORT OF "APPLICATION  BY THE GARIKIAN LIVING TRUST FOR ALLOWANCE AND PAYMENT OF ADMINISTRATIVE EXPENSES"**

6

1 | Lot 5 Improvements, engaging engineers and taking other preliminary steps toward those

2 | improvements.  *Id.*   Here, unlike the situation in  *Kadejevich* the attorney fee obligation arose

3 | postpetition: The liquidated attorneys' fee amount of $60,000 was not specified, except as part of a

4 | **post**-petition agreement.  Unlike *Kadejevich,* here the fees arose out of a *postpetition* dispute

5 | (Debtor's threatened rejection of the Indemnity Agreement (among others), and the attorney–fee

6 | <u>obligation</u> arose when the Court approved the Settlement Agreement, reclassifying it as a

7 | postpetition obligation.

8

9 | Having taken the calculated risk of dealing with the Former DIP and the Estate, it is unfair

10 | for the Trustee, with "20/20 hindsight", now to assert in the Opposition that Garikian is not entitled

11 | to the relatively meager benefit of $60,000 in attorneys' fees, for which it had bargained  as part of

12 | the Settlement Agreement, because, as a result of the conversion, etc., there was no "benefit to the

13 | estate".

14 | **2.**       **<u>Prior to the EWB Settlement, There was an Anticipatory Breach of the</u>**

15 | **<u>Settlement Agreement, Giving Rise to an Administrative Expense Claim in</u>**

16 | **<u>Favor of Garikian.</u>**

17

18 | While it is true that Garikian opposed the EWB Settlement on the basis that it would effect a

19 | breach of the Garikian Settlement Agreement, and while the Court determined that the EWB

20 | Settlement **did not in and of itself** constitute a breach, an actionable anticipatory breach of that

21 | agreement by the Estate had nevertheless already occurred.

22 | The Garikian Settlement Agreement had two phases: the first phase, which consisted of pre-

23 | –closing obligations such as the Former DIP's obligation to perform the Lot 5 Improvements, and to

24 | obtain confirmation of a plan of reorganization which incorporated the terms of the Settlement --and

25 | a second phase, following the Lot 5 Improvements, entailing  exchange of documents; withdrawal of

26

27

28 | **REPLY MEMORANDUM I N SUPPORT OF "APPLICATION  BY THE GARIKIAN
LIVING TRUST FOR ALLOWANCE AND PAYMENT OF ADMINISTRATIVE
EXPENSES"**                                                                                                    7

1    the Garikian Proofs of Claim; payment of the Garikian attorney fees; and reconveyance of the

2    Garikian Deed of Trust, etc., as the subsequent steps to be taken to achieve Closing [RJN, Exhibit

3    "J"].  The first phase had not been completed, when the Court ordered the appointment of a Chapter

4    11 trustee on October 3, 2019 (Doc 968).  As of that time, the Settlement Agreement was still in

5    effect, because of a series of letter-agreements between the  parties, with the last one extending the

6    Closing to and including February 28, 2020[3] [Barness Declaration, Exhibits "A" through "C"].  The

7    Trustee's appointment, however was an anticipatory breach of the Settlement Agreement, because it

8    divested of the Former DIP of  standing to perform the Lot 5 Improvements or to obtain

9    confirmation of a plan of reorganization. The steps were the equivalent of the Former DIP's

10   announcing on October 3, 2019 that it did not intend to perform its obligations under the Settlement

11   Agreement.

12        In other words, while the Settlement Agreement was still in effect,  and because a trustee had

13   been appointed, there was the equivalent of an announcement that the Former DIP could no longer

14   **perform its contractual obligations**. "A breach occurs when it is reasonably certain that the other

15   party is not going to meet its obligations under the contract in timely fashion." *Central States,*

16   *Southeast and Southwest Areas Pension Fund v. Basic American Industries, Inc*. 252 F.3d 911 (7th

17   Cir. 2001). That event – – the appointment of a trustee – – made it "reasonably certain" that the

18   Estate was not going to meet its obligations under the Settlement Agreement. *Id.*

19

20        Thus, irrespective of the EWB Settlement Agreement, a breach by the Estate had already

21   occurred as a result of the appointment of a Trustee (which was followed by conversion of the case

22   to one under Chapter 7), rendering the Former DIP incapable of performing the Lot 5 Improvements.

---

3        By way of three separate letter–agreements, the Closing was extended from the
original June 30, 2018 Closing Deadline [RJN, Bates # 082] as follows: (1) to
September 30, 2018 (by letter-agreement of 7/13/18, Exhibit "A"); (2) to August 28,
2019 (by letter-agreement of 2/18/19, Exhibit "B"); and finally (3) to February 28,
2020 (by letter-agreement of 8/21/19, Exhibit "C") [Barness Declaration, ¶ 3]

---

28   **REPLY MEMORANDUM I N SUPPORT OF "APPLICATION  BY THE GARIKIAN
LIVING TRUST FOR ALLOWANCE AND PAYMENT OF ADMINISTRATIVE
EXPENSES"**                                                                              8

As such, the Estate was in breach of the Settlement Agreement well before the EWB Settlement.

**3.    "Law of the Case" Is Inapplicable to Debtor's Earlier Anticipatory Breach.**

The Opposition claims that "law of the case" precludes Garikian from asserting breach of a post-petition agreement, and that "the Estate *could not have breached* the terminated Settlement Agreement that never became effective." [Opposition, p.6:13]. This is an overstatement of what the Court actually determined and stated: "**Approval of the proposed compromise** would **not give rise** to a **breach** of the settlement agreement". *Id.*

The separate question of whether there might have been an anticipatory breach of the Settlement Agreement at the time it was still "alive" by means *other than the EWB Settlement Agreement,* such as a breach resulting from the appointment of a trustee[4], much less how such a breach might impact Garikian's administrative expense claim, was simply never covered by the narrow ruling made by the Court. That narrow ruling cannot be seen as dispositive of the question whether other circumstances existing prior to the EWB Settlement might **also** have effected a breach while the Settlement Agreement was still in force.

Further, the Trustee's assertion that the Settlement Agreement never became "effective" is wrong as a matter of fact and law: Factually, as a result of the Settlement Agreement, the Former DIP not only amended its plan to reflect that agreement, setting it forth in all further iterations of its plan, but it also took steps towards implementing the Lot 5 Improvements, engaging engineers, and having an analysis performed of the engineering and work that would be necessary to make the lot suitable for use as a parking lot. As a matter of law, by virtue of the Court's order approving the Garikian Settlement Agreement, the Former DIP earmarked $50,000 out of EWB's cash collateral. This cash – collateral use was approved by the Court over the objection of EWB. [Barness Declaration, ¶ 4].

---

[4]        See discussion *supra*.

**REPLY MEMORANDUM I N SUPPORT OF "APPLICATION  BY THE GARIKIAN
LIVING TRUST FOR ALLOWANCE AND PAYMENT OF ADMINISTRATIVE
EXPENSES"**

9

So, to say that the Settlement Agreement was "never made effective"; that it was "terminated", as the Opposition does, is a mischaracterization of the record and the import of the Court's approval of EWB Settlement and overruling the Garikian objections to that settlement. The Opposition ignores the concrete steps actually taken as a result of, and in reliance upon, that agreement.

The Trustee's assertion that "law of the case" is the final word on the status of the Garikian Settlement Agreement is based on an overstatement of what the Court actually ruled, which had no bearing on any earlier anticipatory breaches, including the breach arising from the appointment of a trustee herein which disabled the Former DIP from performing the Lot 5 Improvements.

## III.    <u>CONCLUSION</u>

For the foregoing reasons, and those stated in the Application, the Garikian Trust respectfully requests that the Court allow Garikian an administrative expense claim in an amount not less than $110,000, consisting of $60,000 as and for attorneys fees liquidated and provided for in the Settlement Agreement; and $50,000, corresponding to the Former DIP's estimate for the Lot 5 Improvements, as and for damages for breach of that Agreement.

Dated: July 8, 2020                          Respectfully submitted,

                                             BARNESS & BARNESS LLP

                                             By: */s/ Daniel I. Barness*

                                             Daniel I. Barness
                                             Attorneys for The George Garikian
                                             Living Trust, Creditor

REPLY MEMORANDUM I N SUPPORT OF "APPLICATION  BY THE GARIKIAN
LIVING TRUST FOR ALLOWANCE AND PAYMENT OF ADMINISTRATIVE
EXPENSES"

10

## DECLARATION OF DANIEL I. BARNESS

I am an attorney at law duly licensed to practice before the courts of the State of California and before this Court.   I am a partner in the law firm of Barness & Barness LLP, counsel for the George Garikian Living Trust (the "Garikian Trust" or "Garikian").   I have been a practicing attorney, primarily in the area of bankruptcy, since 1982.  In connection with my representation of the Garikian Trust, I have familiarized myself with the matters described in the Docket, and know the facts below either from my own knowledge or from a  review of the Docket regarding the described events or circumstances.  The facts stated herein are known to me personally to be true, and if called upon to testify as to the truth of such facts, I could and would so testify.

1.  Following review of my firm's accounting records regarding the Altadena Lincoln Crossing matter, I determined that the actual amount of attorneys' fees paid and incurred to my firm for litigation in this case as a result of the Former DIP's positioning itself to seek rejection of the Indemnity Agreement, among others, was far greater than the $60,000 amount to which the parties agreed. The actual amount of such fees and costs paid and incurred exceeds $100,000.

2.  Following a motion by Garikian in response to the Former DIP's stated intention (in one of the early versions of its Plan) to reject the Leases and the Indemnity Agreement, I caused to be filed a Motion to Compel Assumption/Rejection [Doc 157].  As a result, the Former DIP reversed course; entered into a postpetition agreement with Garikian which, among other things, liquidated the amount of Garikian's attorneys's fees at $60,000 -- treating it as an allowed claim for attorneys' fees -- which was thereafter approved by Court order, after vigorous opposition by EWB.  It is my understanding, from my review of the Former DIP's Monthly Operating Reports (MORs), and in-court statements made by Gregory Salvato, the

**REPLY MEMORANDUM I N SUPPORT OF "APPLICATION  BY THE GARIKIAN LIVING TRUST FOR ALLOWANCE AND PAYMENT OF ADMINISTRATIVE EXPENSES"**

11

Former DIP's counsel, that the Former DIP had begun implementation of the Lot 5

Improvements by engaging engineers, having engineering studies performed and taking other

steps aimed at completing those improvements.

3.    By way of three separate letter–agreements signed by Mr. Salvato and me, the Closing was

extended from the original June 30, 2018 Closing Deadline [RJN, Bates # 082] as follows:

(1) to September 30, 2018 (by letter-agreement of 7/13/18, a true and correct copy of which

is attached as Exhibit "A"); (2) to August 28, 2019 (by letter-agreement of 2/18/19, a true

and correct copy of which is attached as Exhibit "B"); and finally (3) to February 28, 2020

(by letter-agreement of 8/21/19, a true and correct copy of which is attached as Exhibit "C").

4.    It is my understanding from Debtor's various plans; and from its MORS, that the Former DIP

earmarked $50,000 out of EWB's cash collateral for the Lot 5 improvements. This

cash–collateral use was approved by the Court over EWB's objections,  as part of the same

order approving the Garikian Settlement Agreement.

I declare under penalty of perjury that the foregoing is true and correct and that this

Declaration was executed this  July 8, 2020  at Los Angeles, California.


/s/ *Daniel I. Barness*

_____

Daniel I. Barness

**REPLY MEMORANDUM I N SUPPORT OF "APPLICATION  BY THE GARIKIAN
LIVING TRUST FOR ALLOWANCE AND PAYMENT OF ADMINISTRATIVE
EXPENSES"**

12

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26                                        EXHIBIT "A"

27

28

# *B*ARNESS *& B*ARNESS *LLP*

11377 W. Olympic Blvd., 2ⁿᵈ Floor
Los Angeles, CA 90064
Telephone (310) 594-3011
Facsimile (310) 473-8700

767 Third Ave., 36ᵗʰ Floor
New York, NY 10017
Telephone (212) 752-3575
Facsimile   (212) 751-6387

Reply to Los Angeles Office

July 13, 2018

Gregory M. Salvato, Esq.
Salvato Law Offices
355 So. Grand Avenue, Suite 2450
Los Angels, CA 90071-9500

> Re:      *In re Altadena Lincoln Crossing, LLC*
>          Case No. 2:17-bk-14276-BB

Dear Greg:

As we discussed today, this memorializes our agreement to extend the closing of Escrow to and
including September 30, 2018, with the understanding that further extensions may be necessary,
especially depending upon the pace of progress toward a confirmation order.

Please sign below to signify your agreement to the extension of closing to September 30, 2018.

> Very truly,
> Barness & Barness LLP
>
> DANIEL I. BARNESS

So Agreed:      Salvato Law Offices

By: _____
    Gregory M. Salvato

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

EXHIBIT "B"

26

27

28

**REPLY MEMORANDUM I N SUPPORT OF "APPLICATION BY THE GARIKIAN
LIVING TRUST FOR ALLOWANCE AND PAYMENT OF ADMINISTRATIVE
EXPENSES"**

14

*BARNESS & BARNESS* LLP

11377 W. Olympic Blvd., 2nd Floor
Los Angeles, CA 90064
Telephone (310) 594-3011
Facsimile (310) 473-8700

Reply to Los Angeles Office

767 Third Ave., 36th Floor
New York, NY 10017
Telephone (212) 752-3575
Facsimile (212) 751-6387

DANIEL I. BARNESS

Writer's Email: Daniel@BarnessLaw.com

February 18, 2019

** Via Email **
Gsalvato@Salvatolawoffices.com

Gregory M. Salvato, Esq.
Salvato Law Offices
355 So. Grand Avenue, Suite 2450
Los Angels, CA 90071-9500

> Re:   *In re Altadena Lincoln Crossing, LLC*
>        Case No. 2:17-bk-14276-BB
>        Settlement Agreement dated January 20, 2018
>        Further Extension of Closing (02/28/2019 - 08/28/2019)

Dear Greg:

We have informally discussed further extending the Closing, and my understanding is that you would be amenable to a further extension.

If that is still the case, please sign below and return your signature via reply-email, to indicate your agreement to an extension to August 28, 219.

Otherwise, please give me a call at your convenience.

Thank you.

Very truly,
Barness & Barness LLP

DANIEL I. BARNESS

So Agreed:        Salvato Law Offices

By:
Gregory M. Salvato

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

EXHIBIT "C'

25

26

27

28

**REPLY MEMORANDUM I N SUPPORT OF "APPLICATION  BY THE GARIKIAN
LIVING TRUST FOR ALLOWANCE AND PAYMENT OF ADMINISTRATIVE
EXPENSES"**

15

*BARNESS & BARNESS*

13636 Ventura Blvd., Los Angeles, CA 91423
Telephone:  (310) 594-3011
Facsimile  (818) 906-2638
Daniel@BarnessLaw.com

Jordan Barness  (1957-2018)

August 21, 2019

** Via Email **
Gsalvato@Salvatolawoffices.com

Gregory M. Salvato, Esq.
Salvato Law Offices
355 So. Grand Avenue, Suite 2450
Los Angels, CA 90071-9500

Re:   *In re Altadena Lincoln Crossing, LLC*
Case No. 2:17-bk-14276-BB
Settlement Agreement dated January 20, 2018
Further Extension of Closing (8/28/2019 - 2/28/2020)

Dear Greg:

Please sign below to indicate your agreement to further extend the closing of Escrow provided in the referenced Settlement Agreement from the (extended) August 28, 2019  deadline to and including February 28, 2020, with the understanding that further extensions may be necessary.

Please sign below to signify your agreement to the extension of closing as stated above.

Thank you.

Sincerely,

Barness & Barness

DANIEL I. BARNESS

So Agreed:        Salvato Law Offices

By:
Gregory M. Salvato

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding.  My business address is:
**BARNESS & BARNESS, LLP,**  11377 Olympic Blvd., 2nd Floor, Los Angeles, CA 90064

A true and correct copy of the foregoing document, entitled: **REPLY MEMORANDUM IN SUPPORT OF "APPLICATION  BY THE GEORGE GARIKIAN  LIVING TRUST FOR ALLOWANCE AND PAYMENT OF ADMINISTRATIVE EXPENSES"; DECLARATION OF DANIEL I BARNESS** will be served or was served  (a) on the judge in chambers in the form and manner required by LBR  LBR 5005-2(d) or was served (a) on the judge in chambers in the form and manner required by LBR 5005-2(d) and (b) in the manner indicated below.

**I. TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING ("NEF")** – Pursuant to controlling General Order(s) and Local Bankruptcy Rule(s) ("LBR"), the foregoing document will be served by the court via NEF and hyperlink to the document. On 7/8/2020,  I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following person(s) are on the Electronic Mail Notice List to receive NEF transmission at the email address(es) indicated below:

Daniel I. Barness, Daniel@BarnessLaw.com /Attorney for The George Garikian Family Trust, Creditor
 Lisa Lenherr  l@tiemlaw.com; sml@tiemlaw.com / Former Attorney for Debtor
 Ron  Maroko  ron.maroko@usdoj.gov /Attorney for United States Trustee
 James A. Tiemstra  jat@tiemlaw.com; sml@tiemlaw.com / Former Attorney for Debtor
 United States Trustee (LA)  ustpregion16.la.ecf@usdoj.gov/ United States Trustee
 Hatty K. Yip  hatty.yip@usdoj.gov /Attorney for United States Trustee
 Lois Moonitz Jacobs,  lois.jacobs@kralikjacobs.com /Attorneys for East West Bank
 Bernard R. Given,  bgiven@loeb.com/ Attorneys for East West Bank
 J Scott Bovitz  bovitz@bovitz-spitzer.com /Attorney for Dorn-Platz Management

■Service information continued on attached page

**II.  SERVED BY U.S. MAIL OR OVERNIGHT MAIL** (indicate method for each person or entity served)**:**
On 7/8/2020 I served the following person(s) and/or entity(ies) at the last known address(es) in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States Mail, first class, postage prepaid, and/or with an overnight mail service addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge will be completed no later than 24 hours after the document is filed.

Hon. Sheri Bluebond
United States Bankruptcy Court - Central District of California
255 E. Temple Street,/Courtroom 1539
Los Angeles, CA 90012

■Service information continued on attached page

**III.  SERVED BY PERSONAL DELIVERY, FACSIMILE TRANSMISSION OR EMAIL** (indicate method for each person or entity served): Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on_____, I served the following person(s) and/or entity(ies) by personal delivery, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows. Listing the judge here constitutes a declaration that personal delivery on the judge will be completed no later than 24 hours after the document is filed.

□Service information continued on attached page

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

| | | |
|---|---|---|
| 7/8/2020 | Karen King | /s Karen King |
| Date | Type Name | Signature |

**I. TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING ("NEF")** (contd)

Anastasia.bessey@kralikjacobs.com  Attorneys for East West Bank
Christopher Celentino    chris.celentino@dinsmore.com, caron.burke@dinsmore.com
ll@tiemlaw.com, sml@tiemlaw.com
Ron Maroko   Office of the United States Trustee    ron.maroko@usdoj.gov Gregory M Salvato
gsalvato@salvatolawoffices.com, Attorney for Debtor
calendar@salvatolawoffices.com;jboufadel@salvatolawoffices.com, Attorney for Debtor
gsalvato@ecf.info, Attorney for Debtor

Chapter 7 Trustee, Jason M. Rund: trustee@srlawyers.com
United States Trustee (LA): ustpregion16.la.ecf@usdoj.gov
Counsel for Debtor: Gregory Salvato, gsalvato@salvatolawoffices.com
Counsel for Trustee: Timothy J. Yoo, tjy@lnbyb.com
Daniel I Barness daniel@barnesslaw.com
Anastasia E Bessey anastasia.bessey@kralikjacobs.com,
lois.jacobs@kralikjacobs.com,rina.ross@kralikjacobs.com,aeblaw@gmail.com
Mikel R Bistrow mikel.bistrow@dinsmore.com, caron.burke@dinsmore.com
J Scott Bovitz bovitz@bovitz-spitzer.com
Peter W Bowie peter.bowie@dinsmore.com, caron.burke@dinsmore.com;cindy.renteria@dinsmore.com Christopher
Celentino chris.celentino@dinsmore.com,
caron.burke@dinsmore.com;SDCMLFiles@DINSMORE.COM
Oscar Estrada oestrada@ttc.lacounty.gov
Bernard R Given bgiven@loeb.com, mortiz@loeb.com;ladocket@loeb.com;bgiven@ecf.courtdrive.com
Mark S Horoupian mhoroupian@sulmeyerlaw.com,
dwalker@sulmeyerlaw.com;mhoroupian@ecf.inforuptcy.com
Lois M Jacobs lois.jacobs@kralikjacobs.com
Kenneth G Lau kenneth.g.lau@usdoj.gov
Lisa Lenherr ll@tiemlaw.com, bankruptcy@wendel.com
Brian A Procel bprocel@millerbarondess.com, rdankwa@millerbarondess.com;docket@millerbarondess.com
Uzzi O Raanan uor@dgdk.com, DanningGill@gmail.com;uraanan@ecf.inforuptcy.com
Ronald R Richards ron@ronaldrichards.com, morani@ronaldrichards.com,justin@ronaldrichards.com
John N Tedford jtedford@dgdk.com, danninggill@gmail.com;jtedford@ecf.inforuptcy.com
James A Tiemstra jat@tiemlaw.com, sml@tiemlaw.com

# EXHIBIT "8"

# United States Bankruptcy Court
## Central District of California
### Los Angeles
### Judge Sheri Bluebond, Presiding
### Courtroom 1539 Calendar

---

**Wednesday, July 15, 2020**                                             **Hearing Room    1539**

---

<u>11:00 AM</u>
**2:17-14276    Altadena Lincoln Crossing LLC**                                        **Chapter 7**

**#100.00**    Application by George Garikian Living Trust for Allowance and Payment of
Administrative Expenses

Docket        1073

**Courtroom Deputy:**

7/13/20 - Jeffrey kwong, (310)229-1234,  has been approved for ZoomGov
appearance on 7/15/20 @ 11am

**Tentative Ruling:**

**All hearings on this calendar will be conducted remotely, using
ZoomGov video and audio.**

Parties in interest and members of the public may connect to the video
and audio feeds, free of charge, using the connection information
provided below.

Individuals may participate by ZoomGov video and audio using a
personal computer (equipped with camera, microphone and speaker), or a
handheld mobile device (such as an iPhone or Android phone).
Individuals may opt to participate by audio only using a telephone
(standard telephone charges may apply).

Neither a Zoom nor a ZoomGov account is necessary to participate and
no pre-registration is required.  The audio portion of each hearing will be
recorded electronically by the Court and constitutes its official record.

**Video/audio web address:**  https://cacb.zoomgov.com/j/1604882692
**ZoomGov meeting number:**    160 488 2692

---

# United States Bankruptcy Court
## Central District of California
### Los Angeles
### Judge Sheri Bluebond, Presiding
### Courtroom 1539 Calendar

**Wednesday, July 15, 2020**                                    **Hearing Room    1539**

11:00 AM
**CONT...    Altadena Lincoln Crossing LLC**                              **Chapter 7**
    **Password:**  181985

    **Telephone conference lines:**          1 (669) 254 5252 or 1 (646) 828
    7666
    (when prompted, enter meeting number and password shown above)

    For more information on appearing before Judge Bluebond by ZoomGov,
    please see the information entitled "Notice of Video Appearance
    Procedures" on the Court's website at:
    https://www.cacb.uscourts.gov/judges/honorable-sheri-bluebond
    under the tab, "Instructions/Procedures."
    ------------------------------------------------------
    Tentative Ruling for July 15, 2020:

    Deny motion.  Court has already determined (and it is clear from the
    terms of the agreement) that the settlement agreement with Garikian
    never became effective because a plan was never confirmed in this case.
    Therefore, it cannot be said that the debtor or the trustee breached the
    agreement, and Garikian cannot assert any claims based on a breach of
    the agreement or rights under that agreement.


    Garikian is not entitled to adequate protection under section 363(e).
    There never was a sale and, as the court explained in connection with
    approval of the trustee's compromise with EWB, Garikian's rights were
    not affected by that compromise.  Garikian retained whatever liens and
    claims it had prior to its settlement agreement with the debtor.  (That is,
    its claim is not reduced.  Garikian is free to assert the larger
    presettlement claim amount and any rights it would otherwise have

**United States Bankruptcy Court**
**Central District of California**
**Los Angeles**
**Judge Sheri Bluebond, Presiding**
**Courtroom 1539 Calendar**

---

**Wednesday, July 15, 2020**                                           **Hearing Room    1539**

---

11:00 AM
**CONT...        Altadena Lincoln Crossing LLC**                              **Chapter 7**

waived under its settlement agreement with the debtor.)

Garikian has not articulated a coherent basis upon which it should be allowed an administrative claim.

| Party Information |
|---|

**Debtor(s):**

Altadena Lincoln Crossing LLC              Represented By
                                           Lisa  Lenherr
                                           Gregory M Salvato
                                           Justin P Karczag

**Trustee(s):**

Jason M Rund (TR)                          Represented By
                                           Timothy J Yoo

---

# EXHIBIT "9"

1   TIMOTHY J. YOO (State Bar No. 155531)
    tjy@lnbyb.com
2   EVE H. KARASIK (State Bar No. 155356)
    ehk@lnbyb.com
3   JEFFREY S. KWONG (State Bar No. 288239)
    jsk@lnbyb.com
4   LEVENE, NEALE, BENDER, YOO & BRILL L.L.P.
    10250 Constellation Boulevard, Suite 1700
5   Los Angeles, CA 90067
    Telephone: (310) 229-1234
6   Facsimile: (310) 229-1244

7   Attorneys for Jason Rund
    Chapter 7 Trustee

FILED & ENTERED

JUL 17 2020

CLERK U.S. BANKRUPTCY COURT
Central District of California
BY wesley    DEPUTY CLERK

## UNITED STATES BANKRUPTCY COURT

## CENTRAL DISTRICT OF CALIFORNIA

## LOS ANGELES DIVISION

| | |
|---|---|
| In re<br><br>ALTADENA LINCOLN CROSSING, LLC,<br><br>       Debtor. | Case No. 2:17-bk-14276-BB<br><br>Chapter 7<br><br>**ORDER DENYING "APPLICATION OF GARIKIAN LIVING TRUST FOR ALLOWANCE AND PAYMENT OF ADMINISTRATIVE EXPENSE"**<br><br>Date:  July 15, 2020<br>Time:  11:00 a.m.<br>Place:  Courtroom 1539<br>       U.S. Bankruptcy Court<br>       255 E. Temple Street<br>       Los Angeles, California 90012 |

      The "*Application Of Garikian Living Trust For Allowance And Payment Of Administrative Expense*" [Doc. No. 1073] (the "<u>Application</u>") filed by The George Garikian Living Trust (the "<u>Applicant</u>") came for hearing on July 15, 2020, at 11:00 a.m. before the Honorable Sheri Bluebond, United States Bankruptcy Judge.  Daniel I. Barness of Barness & Barness, LLP appeared on behalf of Applicant and Jeffrey S. Kwong of Levene, Neale, Bender, Yoo & Brill L.L.P. appeared on behalf of Jason Rund, the Chapter 7 trustee (the "<u>Trustee</u>") for the bankruptcy estate of Altadena Lincoln Crossing, LLC.

1          The Court, having considered the Application and supporting declarations, exhibits, and

2   request for judicial notice [Doc. No. 1074] filed by Applicant; the opposition and annexed

3   declaration [Doc. No. 1094] filed by the Trustee; and the reply [Doc. No. 1103] filed by

4   Applicant, having considered the arguments of counsel, and for the findings and reasons stated on

5   the record at the time of hearing on the Application, and other good cause appearing therefor,

6          **IT IS HEREBY ORDERED** that the Application is **DENIED**.

7

8                                                    # # #

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24   Date: July 17, 2020

25                                          Sheri Bluebond
                                           United States Bankruptcy Judge
26

27

28

                                                    2

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding.  My business address is 10250 Constellation Boulevard, Suite 1700, Los Angeles, CA 90017.

A true and correct copy of the foregoing document entitled

**CHAPTER 7 TRUSTEE'S OPPOSITION TO MOTION FOR RECONSIDERATION OF "ORDER DENYING APPLICATION BY THE GEORGE GARIKIAN LIVING TRUST FOR ALLOWANCE AND PAYMENT OF ADMINISTRATIVE EXPENSES . . . ." [DOC. NO. 1116]; DECLARATION OF JASON RUND IN SUPPORT THEREOF**

will be served or was served (a) on the judge in chambers in the form and manner required by LBR 5005-2(d); and (b) in the manner stated below:

**1.  TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**:  Pursuant to controlling General Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document. On **August 12, 2020**, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:

- **Daniel I Barness    daniel@barnesslaw.com**
- **Anastasia E Bessey    anastasia.bessey@kralikjacobs.com,**
  **lois.jacobs@kralikjacobs.com,rina.ross@kralikjacobs.com,aeblaw@gmail.com**
- **Mikel R Bistrow    mikel.bistrow@dinsmore.com, caron.burke@dinsmore.com**
- **J Scott Bovitz    bovitz@bovitz-spitzer.com**
- **Peter W Bowie    peter.bowie@dinsmore.com,**
  **caron.burke@dinsmore.com;cindy.renteria@dinsmore.com**
- **Christopher Celentino    chris.celentino@dinsmore.com,**
  **caron.burke@dinsmore.com;SDCMLFiles@DINSMORE.COM**
- **Oscar Estrada    oestrada@ttc.lacounty.gov**
- **Bernard R Given    bgiven@loeb.com, mortiz@loeb.com;ladocket@loeb.com;bgiven@ecf.courtdrive.com**
- **Mark S Horoupian    mhoroupian@sulmeyerlaw.com,**
  **mhoroupian@ecf.inforuptcy.com;ccaldwell@sulmeyerlaw.com**
- **Lois M Jacobs    lois.jacobs@kralikjacobs.com,**
  **anastasia.bessey@kralikjacobs.com,rina.ross@kralikjacobs.com**
- **Eve H Karasik    ehk@lnbyb.com**
- **Justin P Karczag    justin@encorelaw.com, eugene@encorelaw.com;muhammed@encorelaw.com**
- **Jeffrey S Kwong    jsk@lnbyb.com, jsk@ecf.inforuptcy.com**
- **Kenneth G Lau    kenneth.g.lau@usdoj.gov**
- **Lisa Lenherr    ll@tiemlaw.com, bankruptcy@wendel.com**
- **Carmela Pagay    ctp@lnbyb.com**
- **Brian A Procel    bprocel@millerbarondess.com,**
  **rdankwa@millerbarondess.com;docket@millerbarondess.com**
- **Uzzi O Raanan    uraanan@DanningGill.com, DanningGill@gmail.com;uraanan@ecf.inforuptcy.com**
- **Ronald N Richards    ron@ronaldrichards.com, morani@ronaldrichards.com,justin@ronaldrichards.com**
- **Jason M Rund (TR)    trustee@srlawyers.com, jrund@ecf.axosfs.com**
- **Gregory M Salvato    gsalvato@salvatolawoffices.com,**
  **calendar@salvatolawoffices.com;jboufadel@salvatolawoffices.com;gsalvato@ecf.inforuptcy.com**
- **John P Schock    schockandschock@yahoo.com**
- **John N Tedford    jtedford@DanningGill.com, danninggill@gmail.com;jtedford@ecf.inforuptcy.com**
- **James A Tiemstra    jat@tiemlaw.com, sml@tiemlaw.com**
- **United States Trustee (LA)    ustpregion16.la.ecf@usdoj.gov**
- **Timothy J Yoo    tjy@lnbyb.com**

**2.  SERVED BY UNITED STATES MAIL**: On **August 12, 2020**,, I served the following persons and/or entities at the last known addresses in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail, first class, postage prepaid, and addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge will be completed no later than 24 hours after the document is filed.

---

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

Honorable Sheri Bluebond
United States Bankruptcy Court
255 E. Temple Street, Suite 1534 / Courtroom 1539
Los Angeles, CA 90012

Debtor
Altadena Lincoln Crossing LLC
210 S Orange Grove Blvd
Pasadena, CA 91105

☐ Service information continued on attached page

**3.  SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL** (state method for each person or entity served):  Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on **August 12, 2020**, I served the following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows.  Listing the judge here constitutes a declaration that personal delivery on, or overnight mail to, the judge will be completed no later than 24 hours after the document is filed.

☐ Service information continued on attached page

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

| **August 12, 2020** | Lourdes Cruz | /s/ Lourdes Cruz |
|---|---|---|
| *Date* | *Printed Name* | *Signature* |

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*June 2012*

**F 9013-3.1.PROOF.SERVICE**